**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AMERICAN ACADEMY OF PEDIATRICS, <br><br> *Plaintiff,* <br><br> v. <br><br> JAMES UTHMEIER, ATTORNEY GENERAL OF THE STATE OF FLORIDA, in his official capacity, <br><br> *Defendant.* | Case No. _____ <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** <br><br> **(Rule 57 Speedy Hearing Request)** |

## INTRODUCTION

1.     The American Academy of Pediatrics ("AAP") is a non-partisan 501(c)(3) non-profit organization founded in 1930 to advance the health of all infants, children, adolescents, and young adults.  AAP is committed to improving the health of children, including through furnishing pediatricians and families with accurate, scientifically supported information.  Since its inception, AAP has been a leading national voice on pediatric medicine and public discourse concerning the health and well-being of young people.  Consistent with its mission, AAP issues medical guidance and policy statements on a wide range of pediatric conditions—from sleep apnea to pain management—to assist medical practitioners in providing evidence-backed care to their patients.[1]

2.     AAP has repeatedly highlighted, including through evidence-based policy statements, the importance of support for transgender and gender-diverse ("TGD") youth; this

---

[1] *Latest AAP Policy*, Am. Acad. of Pediatrics, https://publications.aap.org/collection/524/AAP-Policy (last visited Mar. 1, 2026).

includes, where appropriate, the provision of gender affirming care ("GAC"). The gender-affirmative care model is a multidisciplinary practice model that follows a well-established, evidence-based clinical framework that emphasizes individualized, medically necessary care, care coordination, and additional support to meet a young person's biopsychosocial needs. GAC encompasses a wide range of supportive measures—not any single medical intervention—tailored to the individual's age, developmental status, and individualized medical needs, and is provided pursuant to individualized care plans developed in consultation with medical clinicians, families, and patients.

3.      In 2018, in furtherance of its goal of advancing pediatric health, AAP promulgated a policy statement ("2018 Policy Statement") titled "Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents," which it reaffirmed in 2023.[2] AAP continually advocates for access to appropriate care for TGD youth through policy engagement, participating in rulemaking, publishing medical and scientific articles, and amicus briefing.

4.      AAP's advocacy for TGD youth to be able to access appropriate medical care, as determined in consultation with their clinicians and family, has drawn significant political opposition. In recent months, this opposition has included an unfounded suit filed on December 9, 2025, by James Uthmeier, the Attorney General of Florida ("AG"), against AAP in the Circuit Court of the Nineteenth Judicial Circuit, St. Lucie County, Florida ("Retaliatory Action" or "Action").[3]

---

[2] *See* Exhibit 1, AAP, Policy Statement, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for ("2018 Policy Statement") (last visited Mar. 1, 2026).

[3] A copy of the Complaint filed in the Retaliatory Action is attached hereto as Exhibit 2.

5.      Despite AAP's status as a non-profit scientific and medical organization engaged in protected speech, the AG asserts that AAP's scientific work—along with that of two co-defendants in the Action, the World Professional Association for Transgender Health ("WPATH") and the Endocrine Society ("ES")—constitutes unfair and deceptive trade practices and racketeering under Florida state law.

6.      The Retaliatory Action does not plausibly allege that AAP sold goods or services in the marketplace, let alone misled consumers into purchasing anything.  Instead, the Retaliatory Action is a transparent and pretextual attempt to wield state power against ideological opponents in violation of the First Amendment and contrary to established medical science.

7.      The Action arises amid a broader campaign by the State of Florida to suppress speech regarding GAC.  In recent years, Florida has enacted laws restricting or prohibiting GAC, limited discussion of gender identity in educational settings, and curtailed the expressive rights of LGBTQ+ individuals.

8.      Florida officials—including Governor Ron DeSantis, Surgeon General Joseph Ladapo, the AG and senior officials within his office—have repeatedly singled out AAP and GAC for condemnation and characterized transgender rights as "gender ideology."[4]  To Florida, this

---

[4] *See, e.g.*, Fla. H.B. 641 (2026) (defining "gender ideology" as "the false belief that replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and become women and vice versa, and requiring all institutions of society to regard this false claim as true.  The term includes the idea that there is a vast spectrum of genders that are disconnected from a person's sex.  Gender ideology is internally inconsistent in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body."); Steve Contorno, *Florida bans teaching of gender identity and sexual orientation through 12th grade*, CNN (Apr. 19, 2023), https://edition.cnn.com/2023/04/19/politics/florida-bans-teaching-gender-identity-sexual-orientation (last visited Mar. 1, 2026) ("'Gender ideology has no place in our K through 12 school system,' DeSantis said from South Carolina on Wednesday."); Jesse Mendoza, *Anastasios Kamoutsas ousts Florida professor from statewide sociology panel, citing 'gender ideology' in course*, Florida Politics (Oct. 30, 2025), https://floridapolitics.com/archives/763194-(continued…)

3

dispute is political rather than scientific.

9.     The AG is an active participant in this campaign.  He has publicly boasted about suing AAP for "mutilating kids,"[5] referred to drag performances as demonic,[6] and pursued investigations and litigation aimed at excluding LGBTQ+ individuals from public life.[7]  The AG has further described providers of GAC as "evil" and said "it's time for [them] to pay."[8]

10.     While this lawsuit is, on one level, simply another effort by the AG to suppress disfavored expression through improper use of state enforcement power against First Amendment-protected speech, the timing and procedural context of the lawsuit further suggest it was filed to affect the outcomes of Florida state elections and to distract from a scandal surrounding the AG.

11.     Five days before the Retaliatory Action was filed, on December 4, 2025, the *Orlando Sentinel* reported that Florida had repaid $10 million to Medicaid after a state investigation concluded the AG "committed fraud by diverting for political purposes funds that

---

anastasios-kamoutsas-ousts-florida-professor-from-statewide-sociology-panel-citing-gender-ideology-in-course (last visited Mar. 1, 2026).

[5] Attorney General James Uthmeier (@AGJamesUthmeier), X (Dec. 9. 2025 at 11:44 AM), https://x.com/AGJamesUthmeier/status/1998433573993398563 (last visited Mar. 1, 2026).

[6] Samantha Riedel, *City Counsel to Florida AG Over Drag Show: We Did Not Ask For Your Legal Opinion*, Them (Nov. 12, 2025), https://www.them.us/story/florida-attorney-general-pensacola-drag-queen-christmas-suzie-toot (last visited Mar. 1, 2026).

[7] Drew Dixon, *James Uthmeier files lawsuit against swimming organization, seeks to block transgender competitors*, Florida Politics (Jan. 13, 2026), https://floridapolitics.com/archives/773647-james-uthmeier-files-lawsuit-against-swimming-organization-seeks-to-block-transgender-competitors (last visited Mar. 1, 2026); Michael Vecerina, *Transgender activist steps back from social media amid state investigation*, Florida's Voice (July 3, 2026), https://flvoicenews.com/transgender-activist-steps-back-from-social-media-amid-state-investigation (last visited Mar. 1, 2026).

[8] James Uthmeier (@JamesUthmeierFL), X (Jan. 31, 2026, at 12:04 PM), https://x.com/JamesUthmeierFL/status/2017645230070141282 (last visited Mar. 1, 2026).

should have gone back to the state Medicaid program."[9]  The Republican State Representative who led the investigation, Alex Andrade, explained that the payment "means [the AG] stole . . . from taxpayers."[10]

12.     Two days before the Retaliatory Action was filed, on December 7, *Florida Politics* declared Representative Andrade "almost (but not quite) the biggest winner" of the week in Florida politics, reporting that the "repayment from the state to the federal government shows Andrade had it right from the beginning" in arguing that the DeSantis administration had "improperly siphoned $10 million in Medicaid settlement funds" and "routed [them] into political efforts aligned with" the Governor and the AG.[11]

13.     The same day the Retaliatory Action was filed, on December 9, Florida held special elections across the state, including races for a State Senate seat and the mayoralty of Miami, the state's largest metropolitan area.[12]  The Miami mayoral race was "widely viewed as an early bellwether for how races next year will take shape."[13]

14.     The AG's social media activity that day was a mix of posts about the Retaliatory Action and his support for political candidates.  He contrasted AAP and its co-defendants as

---

[9] Jeffrey Schweers, *State's federal Medicaid payment undermines DeSantis claim about Hope Florida donation*, Orlando Sentinel (Dec. 4, 2025), https://www.orlandosentinel.com/ 2025/12/04/states-federal-medicaid-payment-undermines-desantis-claim-about-hope-florida-donation (last visited Mar. 1, 2026).

[10] Gabriel Russon, *Alex Andrade questions state agency's repayment in Hope Florida scandal*, Florida Politics (Dec. 4, 2025), https://floridapolitics.com/archives/768289-alex-andrade-questions-state-agencys-repayment-in-hope-florida-scandal (last visited Mar. 1, 2026).

[11] Ryan Nicol, *Winner and Loser of the Week in Florida politics — Week of 11.30.25*, Florida Politics (Dec. 7, 2025), https://floridapolitics.com/archives/768192-winner-and-loser-of-the-week-in-florida-politics-week-of-11-30-25 (last visited Mar. 1, 2026).

[12] Peter Scholsch, *Sunburn – The morning read of what's hot in Florida politics – 12.9.25*, Florida Politics (Dec. 9, 2025), https://floridapolitics.com/archives/768709-sunburn-the-morning-read-of-whats-hot-in-florida-politics-12-9-25 (last visited Mar. 1, 2026).

[13] *Id.*

"mutilating kids and misleading families," with his favored political candidates, who would "fight . . . to protect our children, families, and God-given rights."[14]

15.     Despite the AG's advocacy, a Democrat won the Miami mayoral race for the first time in twenty-seven years, and Democrats swung the State Senate district by nearly twenty-two points. *Florida Politics* observed that "South Florida is feeling blue."[15]

16.     The day after the election, on December 10, the AG sued Starbucks over its "DEI policies."[16]

17.     This sequence of events demonstrates that the AG's actions were driven not by concern for Floridians, but by political expediency. In filing the Retaliatory Action, the AG crossed from permissible political activity into unconstitutional, coercive use of state power against AAP.

18.     The Retaliatory Action alleges violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Florida Statute § 501.204(1),[17] and the Florida Racketeer Influenced and Corrupt Organizations Act ("RICO"), Florida Statute § 895.03(3)–(4),[18] predicated on purported misleading advertising under Florida Statute § 817.41(1). These claims stretch both statutes far beyond their text and purpose. AAP is a non-partisan, non-profit organization focused on pediatric health; the medical guidance and legal advocacy that Florida targets are protected

---

[14] *Supra* note 5; James Uthmeier (@JamesUthmeierFL), X (Dec. 9, 2025, at 12:04 PM), https://x.com/JamesUthmeierFL/status/1998438608252871087 (last visited Mar. 1, 2026).

[15] Janelle Irwin Taylor, *South Florida is feeling blue, and that's a delight for Democrats*, Florida Politics (Dec. 10, 2025), https://floridapolitics.com/archives/769299-south-florida-is-feeling-blue-and-thats-a-delight-for-democrats (last visited Mar. 1, 2026).

[16] *Attorney General James Uthmeier Sues Starbucks for Illegal Race-Based Quota Policies* (Dec. 10, 2025), www.myfloridalegal.com/newsrelease/attorney-general-james-uthmeier-sues-starbucks-illegal-race-based-quota-policies (last visited Mar. 1, 2026); Attorney General James Uthmeier (@AGJamesUthmeier), X (Dec. 10, 2025, at 11:47 AM), https://x.com/AGJamesUthmeier/status/1998796682289365005 (last visited Mar. 1, 2026).

[17] *See* Ex. 2 ¶¶ 198–211.

[18] *See id.* ¶¶ 212–26.

speech that do not promote particular products, clinicians, or services. AAP publishes medical and scientific guidance to inform clinical judgment. Its guidance is not advertising, does not induce patients to undergo treatment, and does not solicit membership. Nor does the Retaliatory Action allege any plausible criminal enterprise. There is simply no legal basis for this action.

19.     Notably, in the two months since filing the Retaliatory Action, the AG has neither served AAP nor even communicated with it. This radio silence, the Retaliatory Action's lack of legal and factual merit, and the AG's demonstrated animus towards AAP and transgender people confirms that the Action is performative, politically motivated, and aimed at punishing AAP for its speech, dissemination of scientific research, and medical advocacy.

20.     Unable to prevail in the marketplace of ideas, the AG is abusing the powers of his office to impose state-sanctioned medical orthodoxy. Filing a meritless lawsuit to punish and deter protected speech constitutes unlawful retaliation and impermissible viewpoint discrimination under the First Amendment. The AG is entitled to disagree with AAP's speech and to express such disagreement publicly. He is not entitled to use the power of his government office as a cudgel, with which to silence speech he disfavors.

21.     Absent judicial intervention, the AG's actions will continue to impose real and ongoing harm on AAP by burdening its rights to free speech and petition. Without relief, AAP is forced to choose between continuing to speak at the risk of escalating state retaliation or capitulating to coercive pressure and abandoning its mission. The Constitution does not permit the AG to impose such a choice.

## JURISDICTION AND VENUE

22.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because AAP's claims arise under 42 U.S.C. §§ 1983 and 1988 and the First Amendment to the U.S. Constitution.

23.     This Court has authority to issue declaratory relief, grant preliminary and

permanent injunctive relief, and grant other appropriate relief, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, the All Writs Act, 28 U.S.C. § 1651, *Ex parte Young*, 209 U.S. 123 (1908), Federal Rules of Civil Procedure 57 and 65, and the Court's inherent equitable powers.

24.     Subject-matter jurisdiction exists under Article III because AAP has suffered and will continue to suffer concrete injuries-in-fact that are traceable to the AG's initiation of the Retaliatory Action and would be redressed by a favorable decision of this Court.

25.     This dispute is ripe for adjudication because the AG has violated and continues to violate AAP's First Amendment rights.  The Retaliatory Action has caused and continues to cause associational, financial, and other harms.

26.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b)(2) because AAP has suffered and will continue to suffer the injuries giving rise to this action in this District.

**THE PARTIES**

27.     Plaintiff American Academy of Pediatrics is a non-profit organization dedicated to improving the health of all infants, children, adolescents, and young adults.  AAP's approximately 67,000 members include pediatricians in every state who provide direct care to infants, children, adolescents, and young adults in both hospital and outpatient settings.[19]  AAP itself is incorporated under the laws of Illinois; headquartered in Itasca, Illinois; and operated exclusively for charitable and educational purposes under Section 501(c)(3) of the Internal Revenue Code.  Grounding its work in science, AAP advances pediatric clinical expertise, provides high-quality education and

---

[19] *About the AAP*, Am. Acad. of Pediatrics, www.aap.org/en/about-the-aap (last visited Mar. 1, 2026).

policy guidance, fosters the development of scientific pediatric research, and advocates on behalf of all young people.

28.     Defendant James Uthmeier is the Attorney General of Florida.  At all times relevant to this action, he has acted under color of state law.  Defendant is responsible for initiating the Retaliatory Action, sued in his official capacity, and subject to, *inter alia*, prospective injunctive relief.  *Cf. Ex parte Young*, 209 U.S. 123, 157–60 (1908).

## FACTUAL ALLEGATIONS

I.     **AAP Has a Long History of Advancing the Welfare of All Infants, Children, Adolescents, and Young Adults.**

   A.     **AAP Was Founded to Advance the Health of All Young People.**

29.     AAP is a non-profit organization founded in 1930 to optimize the health of all infants, children, adolescents, and young adults.[20]

30.     As reflected in its founding documents, AAP's fundamental purpose is to support research, education, ethics, and dignity in pediatric practice for the ultimate welfare of young people—"none of [AAP's purposes] is for pecuniary profit."[21]  Two core aspects of AAP's mission are to "foster and stimulate interest in pediatrics and correlate all aspects of work[] for the welfare of children which properly comes within the scope of pediatrics [and] . . . to promote publications and encourage contributions to medical and scientific literature pertaining to pediatrics."[22]

31.     For nearly a century, AAP has served as a leading national authority on pediatric

---

[20] *Articles of Incorporation*, in The American Academy of Pediatrics: 90 Years of Caring for Children 1930–2020 26 (Am. Acad. of Pediatrics, 2020), https://publications.aap.org/aapbooks/book/556/chapter/5813841/Articles-of-Incorporation (last visited Mar. 1, 2026).

[21] *Id.* at 28.

[22] *Id.*

medicine, clinical guidance, and health policy.[23]

**B.** **AAP Engages in Advocacy, Education, and Scientific Research to Advance the Health of Young People.**

32.     AAP achieves its mission by advocating for evidence-based policies that promote pediatric health, fostering research that advances pediatric medicine, and educating clinicians who provide direct patient care.

33.     AAP does not sell any medical products or services to patients or their families.

34.     AAP regularly participates in public policy debates, submits comments in agency rulemakings, and files amicus briefs in support of its mission to advance and improve the quality of and access to pediatric healthcare.

35.     AAP also promotes scientific and medical discourse by conducting original health services research on topics such as food allergies, mental health, obesity, and vaccinations.[24] AAP's research articles have been published in numerous peer-reviewed journals.[25]

36.     Since 1948, AAP has published *Pediatrics*, an editorially independent, peer-reviewed scientific journal featuring original research, clinical observations, and articles about a variety of topics that intersect with pediatrics, such as nutrition, psychology, education, and dentistry.  The journal's mission is to "[e]ncompass the needs of the whole child in his or her physiologic, mental, emotional, and social structure."[26]

37.     AAP provides educational resources to medical professionals.  AAP offers courses

---

[23] *About the AAP, supra* note 19.

[24] *Research,* Am. Acad. of Pediatrics, www.aap.org/en/research (last visited Mar. 1, 2026).

[25] *Research Journal Articles*, Am. Acad. of Pediatrics, www.aap.org/en/research/research-journal-articles (last visited Mar. 1, 2026).

[26] *Pediatrics Overview*, Am. Acad. of Pediatrics, https://publications.aap.org/pediatrics/pages/overview (last visited Mar. 1, 2026).

and trainings on a variety of subject matters—such as rendering first aid and managing asthma—to ensure that pediatricians have the knowledge they need to provide their patients with the latest evidence-based and science-backed care.[27] AAP hosts events, such as conferences, to enable professionals in the pediatrics field to collaborate and openly exchange ideas about how to advance the well-being of young people through their practice.[28]

38.     As noted, AAP also issues clinical guidance and policy statements on a wide range of pediatric conditions to assist medical practitioners in providing evidence-backed care to their patients.[29]

39.     AAP policy statements are authored by panels of subject-matter experts and undergo rigorous, evidence-based, and non-partisan review.[30]

40.     The authors of AAP policy statements are not compensated.

41.     AAP does not promote its policy statements through advertisements.

42.     AAP policy statements are made publicly available at no cost, regardless of membership status.

---

[27] *PediaLink & EQIPP Courses*, Am. Acad. of Pediatrics, www.aap.org/en/shopaap/shop-by-product/online-courses/?srsltid=AfmBOopAhz__abGuZe3zP7d0aOiHmzie5IgeKXmmHDL a35dyU2E9p58a (last visited Mar. 1, 2026); *Live & Virtual Education*, Am. Acad. of Pediatrics, www.aap.org/en/shopaap/shop-by-product/live-activities (last visited Mar. 1, 2026).

[28] AAP Experience National Conference & Exhibition Home Page, https://aapexperience.org/# (last visited Mar. 1, 2026).

[29] *Clinical Practice Guidelines,* Am. Acad. of Pediatrics, https://publications.aap.org/collection/ 523/Clinical-Practice-Guidelines (last visited Mar. 1, 2026); *see also Latest AAP Policy*, Am. Acad. of Pediatrics, https://publications.aap.org/collection/524/AAP-Policy (last visited Mar. 1, 2026).

[30] *Policy Statement Development Process,* Am. Acad. of Pediatrics, https://www.aap.org/en/policy/ policy-statement-development-process (last visited Mar. 1, 2026).

### C. AAP's Statements Regarding GAC, Including the 2018 Policy Statement, Are Part of Its Mission to Improve the Well-Being of Transgender and Gender Diverse Youth.

43. GAC is one of many scientific and medical subjects on which AAP provides clinical guidance. GAC refers to an evidence-based continuum of care for individuals diagnosed with gender dysphoria.

44. Gender dysphoria is a condition characterized by clinically significant distress or impairment in social, occupational, or other important areas of functioning due to a marked incongruence between the patient's gender identity (*i.e.*, the innate sense of oneself as being a particular gender) and sex assigned at birth.

45. GAC is not a single treatment or intervention, but rather a continuum of individualized measures that may be used to affirm a patient's gender. These may include social support and legal affirmation, as well as medical interventions such as hormone treatments and puberty blockers, depending on the individual needs of the patient and their family. In very rare cases, GAC may also include gender-affirming surgeries, when determined to be developmentally and medically appropriate following careful consultation with the patient, their family, and qualified medical and mental health clinicians.[31] This continuum of care is widely recognized by the medical and scientific community as appropriate treatment for individuals diagnosed with gender dysphoria, including minors. The appropriateness of any specific intervention is determined on an individualized basis through collaborative decision-making among the patient, their family, and their healthcare clinicians.

46. Consistent with its approach to other pediatric conditions, AAP published the Policy Statement in *Pediatrics* in October 2018.

---

[31] Ex. 1 at 6.

47.    The 2018 Policy Statement has always been freely accessible online and remains available at no cost.[32]

48.    In announcing the 2018 Policy Statement, AAP explained that "gender identity" is increasingly recognized as "a complex concept . . . beyond traditional definitions of masculinity and femininity," and that society "struggles to adapt to and appreciate" the experiences of TGD individuals.  As a result, "intolerance, discrimination and stigma" persist, leading TGD youths and their families to seek "advocacy, care and referrals" from pediatric clinicians.[33]

49.    The announcement stated that AAP "stands against stigmatization and marginalization of TGD youths" and emphasizes their acceptance within families, communities, and the workforce, while outlining "the role of pediatricians in addressing the needs, challenges and resilience of TGD youths and their families."  Consistent with this approach, the 2018 Policy Statement explains that as TGD youth reflect on their gender identity, "various interventions may be considered" to align gender expression with identity, a process of reflection, acceptance, and sometimes intervention known as "gender affirmation."[34]

50.    The 2018 Policy Statement, like all of AAP's work, is grounded in scientific evidence and does not recommend any specific treatment, promote any clinician, or endorse any product or service.

51.    The 2018 Policy Statement addresses the reported prevalence of gender dysphoria among youth, the research into mental health implications of gender dysphoria for youth, and the

---

[32] *See supra* note 1.

[33] Jason Rafferty, *Pediatricians are key in supporting transgender, gender-diverse youths,* Am. Acad. of Pediatrics (Sept. 17, 2018), https://publications.aap.org/aapnews/news/12710/ Pediatricians-are-key-in-supporting-transgender (last visited Mar. 1, 2026).

[34] Ex. 1 at 5.

"gender-affirmative care model" by which pediatric clinicians "offer developmentally appropriate care that is oriented toward understanding and appreciating the youth's gender experience."[35]

52.　　The 2018 Policy Statement also addresses the role of the pediatrician and the clinical setting in ensuring patients are comfortable and affirmed in their identity, and research on the role of familial acceptance as well as safe schools and communities for TGD youth.[36]  The 2018 Policy Statement makes clear that "one of the most important ways to promote high-quality health care for youth who identify as TGD and their families is increasing the knowledge base and clinical experience of pediatric clinicians in providing culturally competent care to such populations."[37]

53.　　Throughout the 2018 Policy Statement, AAP emphasizes that decisions about GAC are individualized and must consider the "risks, benefits, and other factors unique to each patient and family" prior to initiating any treatment.[38]

54.　　AAP plays no role in prescribing, providing, or pricing GAC.  AAP is not involved in any patient's decision to undergo GAC, nor is it involved in any healthcare clinician's decision to recommend, approve, or provide any specific intervention within the GAC continuum of care to a particular patient or family.

55.　　In August 2023, following its standard five-year review cycle,[39] AAP reviewed and reaffirmed the 2018 Policy Statement and authorized the development of updated guidance based

---

[35] *Id.* at 4.

[36] *Id.*

[37] *Id.* at 10.

[38] *Id.* at 5.

[39] *Policy Statement Development Process*, *supra* note 30.30

on a systematic review of the evolving scientific evidence.[40]  Any updates "reflect[ed] data and research on gender-affirming care since the original policy was released and offer[ed] updated guidance."[41]

56.     AAP reiterated its commitment to ensuring that TGD youth "are seen, heard and valued as they are" and its opposition to "laws or regulations that discriminate against transgender and gender-diverse individuals, or that interfere in the doctor-patient relationship."[42]

57.     Beyond the 2018 Policy Statement, AAP continues to educate clinicians about research related to GAC through conferences, training, and other professional forums.  For example, GAC was a topic at AAP's National Conference & Exhibition, held in Denver, Colorado between September 26 and 30, 2025.[43]

58.     Across all platforms, AAP's mission has been consistent: to describe the state of scientific and medical research so pediatricians can exercise informed clinical judgment and provide appropriate, supportive care to youth experiencing gender dysphoria.

59.     AAP also advocates for the health of TGD youth through amicus briefs, policy advocacy, comments on agency rulemakings,[44] and collaboration with other organizations

---

[40] Alyson Sulaski Wyckoff, *AAP reaffirms gender-affirming care policy, authorizes systematic review of evidence to guide update*, Am. Acad. of Pediatrics (Aug. 4, 2023), https://publications. aap.org/aapnews/news/25340/AAP-reaffirms-gender-affirming-care-policy (last visited Mar. 1, 2026).

[41] *Id.*

[42] *Id.*

[43] Am. Acad. of Pediatrics, *AAP Experience Denver 2025 Home Page*, https://aapexperience25. eventscribe.net (last visited Mar. 1, 2026).

[44] *See, e.g.*, Susan J. Kressly, *AAP Opposes New HHS Rules Restricting Access to Care for Families,* Am. Acad. of Pediatrics (Dec. 18. 2025), www.aap.org/en/news-room/news-releases/ aap/2025/aap-opposes-new-hhs-rules-restricting-access-to-care-for-families/ (last visited Mar. 1, 2026); Brief for Am. Acad. of Pediatrics et al. as Amici Curiae Supporting Appellees, *Washington v. Trump*, No. 25-1922 (9th Cir. Sept. 19, 2025); Meredith McNamara et al., *Combating Scientific Disinformation on Gender-Affirming Care*, 152 Pediatrics 1, 1 (Sept. 2023), https://publications. (continued…)

committed to improving the well-being of young people.

## II. The AG's Action Impermissibly Retaliates Against and Targets AAP's Protected First Amendment Activities.

60. The AG's Action retaliates against AAP for its speech on GAC and attempts to silence AAP for offering clinical guidance advocating for appropriate, individualized GAC, as well as for advocating on behalf of TGD youth.

61. The Action's retaliatory purpose is evident on its face because it targets AAP's protected First Amendment activities.

62. The Retaliatory Action's claims against AAP under FDUTPA and Florida RICO are meritless; as such, they demonstrate that the Action was filed to punish and suppress AAP's GAC-related speech and activities, not for any legitimate law enforcement purpose.

63. Florida's failure to perfect service more than two months after filing the Retaliatory Action, despite the AG's repeated reliance on the Action as a political talking point, is additional evidence of the Action's retaliatory basis.

### A. The Action Is Facially Retaliatory.

64. The Retaliatory Action's allegations against AAP are directed entirely at conduct protected by the First Amendment: speech and petition, including policy advocacy, on matters of scientific and medical concern.

65. The AG makes no legitimate effort to connect any of that protected conduct to actual violations of Florida's laws.

66. Instead, the Action condemns AAP's publications, recommendations, and advocacy as "reprehensible and immoral" and describes GAC as "irreversibl[e] mutilat[ion]" and

---

aap.org/pediatrics/article/152/3/e2022060943/193719/Combating-Scientific-Disinformation-on-Gender (last visited Mar. 1, 2026).

"butcher[y]," underscoring the political and ideological nature of the Action.[45]

67.     When the Action identifies AAP's specific conduct, it does so in terms that highlight that conduct's First Amendment character.

            1.     **The Action Impermissibly—and Inaccurately—Targets Protected Speech.**

68.     For example, the Action alleges that AAP joined a criminal enterprise by "publish[ing]" its 2018 Policy Statement.[46]

69.     Publishing is speech protected by the First Amendment.

70.     The Action further alleges that AAP "adopted . . . recommendations" from Version 7 of WPATH's Standards of Care guidelines and the Endocrine Society's 2019 Guideline and "cited" them in support of AAP's own recommendations, as evidence of the putative criminal enterprise.[47]

71.     Similarly, the Action emphasizes that AAP and its co-defendants "continu[ed] to reference one another over an extended period of time" as purported evidence of a coordinated, deceptive "scheme."[48]

72.     Making recommendations, including by curating or referencing the recommendations of third parties, is protected speech.

73.     The Retaliatory Action repeats this and similar First Amendment-oriented framing

---

[45] Ex. 2 ¶ 13.

[46] *Id.* ¶ 49.

[47] *Id.* ¶ 50.

[48] *Id.* ¶¶ 9–10.

throughout, focusing on how AAP and its co-defendants "publish,"[49] "create,"[50] and "campaign."[51]

74.     As clinical guidance addressing a developing and contested area of medical science, AAP's 2018 Policy Statement is quintessential scientific speech protected by the First Amendment.

75.     The Action further alleges that the 2018 Policy Statement "shifted the medical profession's Overton window," thereby increasing rates of GAC.[52]

76.     The "Overton Window" is a political concept describing how ideas become acceptable in public discourse and how organizations can "convince voters that policies outside the window should be in it"—*i.e.*, persuade the public to accept their ideas.[53]

77.     Sharing information in the marketplace of ideas is, of course, core First Amendment activity, and is no less protected because it is effective. Disagreement with the speech, or concern that such speech is persuasive, does not render it unfair or deceptive.

78.     The Action also targets AAP's protected right to petition, including participation in litigation, regulatory processes, and related advocacy.

79.     Specifically, the Retaliatory Action cites as purported wrongdoing criticism (by AAP's Florida Chapter[54]) of Florida Department of Health ("FDOH") guidance on GAC[55]; AAP's

---

[49] *Id.* ¶¶ 152, 176, 186, 193.

[50] *Id.* ¶¶ 176, 193.

[51] *Id.* ¶¶ 7, 8, 14, 35.

[52] *Id.* ¶ 51.

[53] Maggie Astor, *How the Politically Unthinkable Can Become Mainstream*, N.Y. Times (Feb. 26, 2019), www.nytimes.com/2019/02/26/us/politics/overton-window-democrats.html (last visited Mar. 1, 2026).

[54] The Florida Chapter – American Academy of Pediatrics ("FCAAP") is "Florida's premier organization representing the interests of pediatricians and pediatric providers in Florida." Fl. Ch. of the Am. Acad. of Pediatrics, About FCAAP, https://www.fcaap.org/about-fcaap (last visited Mar. 2, 2026). FCAAP is an independent legal entity with its own constitution and bylaws. *Id.*

[55] Ex. 2 ¶ 66.

publication in *Pediatrics* of an article summarizing actions taken by certain physicians in response to that FDOH guidance[56]; AAP's submission of public comments opposing a rule promulgated by Florida's Agency for Health Care Administration ("AHCA")[57]; AAP's filing of an amicus brief in support of plaintiffs challenging that rule[58]; plaintiffs' reliance on AAP's guidance in that litigation[59]; and AAP' successful efforts to quash a Florida subpoena seeking materials related to that litigation.[60]

80.     Responding to government policy, submitting comments in notice-and-comment rulemaking, and participating in litigation against the government, directly or as an amicus, are protected by the First Amendment right to petition.

81.     The retaliatory nature of the Action's allegations is made more apparent by how few allegations in the Action concern AAP at all—notably, AAP is substantively mentioned, directly and indirectly, in no more than 25 paragraphs out of more than 220.

82.     When the Action does reference AAP, it reveals its retaliatory purpose by mischaracterizing the 2018 Policy Statement and repeating, often nearly verbatim, mischaracterizations drawn from other sources.

83.     For instance, the Action asserts that "the AAP Policy Statement *recommended* surgeries on 'genitalia,' including 'removal of internal organs, such as ovaries or the uterus.'"[61] That characterization is false and misleading.

---

[56] *Id.* ¶ 67.

[57] *Id.*

[58] *Id.* ¶ 69.

[59] *Id.* ¶ 68.

[60] *Id.* ¶ 70.

[61] Ex. 2 ¶ 50 (emphasis added).

84.     To the contrary, the 2018 Policy Statement provides a survey of contemporaneous practices in the GAC field.[62]  It does not recommend *any* particular medical intervention.

85.     In describing GAC practices, the 2018 Policy Statement explains that surgeries are sometimes used "to feminize or masculinize features," and that surgeries can include the "removal of internal organs."[63]  This passage is not making any medical recommendations.

86.     Contrary to the Action's allegations that AAP misled anyone about reversibility,[64] the 2018 Policy Statement also expressly acknowledges that gender-affirming surgery is "irreversible" and explains that "current protocols typically reserve surgical interventions for adults," though they are "occasionally pursued during adolescence on a *case-by-case basis*, considering the necessity and benefit to the adolescent's overall health and often including multidisciplinary input from medical, mental health, and surgical clinicians as well as from the adolescent and family."[65]

87.     While the Action likewise alleges that AAP "urged insurers to 'offer coverage for health care that is specific to the needs of youth who identify as TGD, including coverage for . . . surgical gender-affirming interventions,'"[66] it omits relevant context and qualifying information. The 2018 Policy Statement recommends access to "comprehensive, gender-affirming, and developmentally appropriate health care that is provided in a safe and inclusive clinical space" and "that insurance plans offer coverage for health care that is specific to the needs of youth who identify as TGD, including coverage for medical, psychological, and, *when indicated*, surgical

---

[62] Ex. 1 at 6–7 (providing a list of elements, one or more of which was included in "[m]ost protocols for gender-affirming interventions").

[63] *Id.* at 7 (emphasis added).

[64] Ex. 2 ¶¶ 14, 193.

[65] Ex. 1 at 7 (emphasis added).

[66] Ex. 2 ¶ 50.

gender-affirming interventions."[67]

88.     The Action also mischaracterizes the 2018 Policy Statement through a chart seemingly created for the Action purporting to describe "age limits" recommended by WPATH, the Endocrine Society, and AAP.[68]

| | Social Transition | Puberty Blockers | Cross-Sex Hormones | Breast Surgery | Genital Surgery |
|---|---|---|---|---|---|
| WPATH SOC-5 (1998) | - | No rec. | 16 yrs | 18 yrs | 18 yrs |
| WPATH SOC-6 (2001) | No rec. | Tanner 2 (9 yrs) | 16 yrs | 18 yrs | 18 yrs |
| ES GUIDELINE (2009) | - | Tanner 2 (9 yrs) | 16 yrs | 18 yrs | 18 yrs |
| WPATH SOC-7 (2011) | No min. | Tanner 2 (9 yrs) | No min. | No min. | 18 yrs |
| ES GUIDELINE (2017) | No min. | Tanner 2 (9 yrs) | No min. | No min. | 18 yrs |
| AAP POLICY (2018) | No min. | Tanner 2 (9 yrs) | No min. | No min. | No min. |
| WPATH SOC-8 (2022) | No min. | Tanner 2 (9 yrs) | No min. | No min. | No min.* |

*The SOC-8 do not recommend phalloplasty until age 18.

89.     The AG's chart, as shown above, asserts that the 2018 Policy Statement recommends no minimum age for social transition, cross-sex hormones, breast surgery, or genital surgery, and that it recommends puberty blockers beginning at Tanner Stage 2,[69] *i.e.*, the onset of puberty, or age nine.[70]

90.     These assertions are—again—false and misleading.  The 2018 Policy Statement refers to "General Age Ranges" in describing various forms of GAC contemporaneously practiced in the field, expressly "[n]ot[ing] that the provided age range and reversibility is based on the little

---

[67] Ex. 1 at 10.

[68] Ex. 2 ¶¶ 92–93.

[69] Tanner staging, also known as Sexual Maturity Rating, is "an objective classification system that providers use to document and track the development and sequence of secondary sex characteristics of children during puberty."  Micky Emmanuel & Brooke Bokor, *Tanner Stages*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK470280 (last visited Mar. 1, 2026).

[70] Ex. 2 ¶¶ 92–93.

data that are currently available."[71]   The Policy Statement provides a table summation of, *inter alia*, the "General Age Ranges" in which, under "[m]ost protocols for gender-affirming interventions," various forms of GAC were being provided:

- Social affirmation: Any

- Puberty blockers: During puberty (Tanner stages 2–5)

- Cross-sex hormone therapy: Early adolescence onward

- Gender-affirming surgeries: Typically adults (adolescents on case-by-case basis).[72]

91.    With respect to surgery, the 2018 Policy Statement further explains that "[e]ligibility criteria for gender-affirmative surgical interventions among adolescents are not clearly defined between established protocols and practice," and that "eligibility is usually determined on *a case-by-case basis with the adolescent and the family along with input from medical, mental health, and surgical providers.*"[73]

92.    The only category to which no age range is affixed is "social affirmation," defined as "a reversible intervention" involving changes such as "hairstyle, clothing, pronouns, [or] name."[74]

93.    The Action additionally asserts that the AAP Florida Chapter President said that GAC "is safe and effective for treating patients experiencing gender dysphoria,"[75] omitting the nuanced message of the full statement, which said in relevant part that "*appropriate* gender-

---

[71] Ex. 1 at 6.

[72] *Id.*

[73] *Id.* (emphasis added).

[74] *Id.*

[75] Ex. 2 ¶ 66.

affirming care, *conducted in close coordination with pediatricians and parents*, is safe and effective for treating patients experiencing gender dysphoria."[76]

94.     Beyond these mischaracterizations of AAP's descriptions of GAC—which are, of course, all protected activity under the First Amendment—the only other allegations meaningfully touching on AAP's conduct concern an alleged conspiracy surrounding the development of Version 8 of WPATH's Standards of Care ("SOC-8") guidelines.

95.     The Action's narrative regarding SOC-8 appears largely borrowed from an amicus brief filed by the state of Alabama in *United States v. Skrmetti*, 605 U.S. 495 (2025), ("*Skrmetti Amicus Brief*"), a different case involving different parties, different claims, and in a different forum.[77]

96.     These extensive similarities suggest that the Action is not the product of a reasonably diligent investigation by a credible state actor but was instead hurriedly filed after grafting Alabama's *Skrmetti* Amicus Brief into a civil enforcement action.

97.     Even within the borrowed SOC-8 discussion, AAP scarcely appears: it is mentioned

---

[76] *See FCAAP Rejects New Florida Department of Health Guidelines on Gender-affirming Care for Youth*, Florida Chapter of the American Academy of Pediatrics (Apr. 21, 2022), www.fcaap. org/posts/news/press-releases/florida-chapter-of-the-american-academy-of-pediatrics-rejects-new -florida-department-of-health-guidelines-on-gender-affirming-care-for-youth (last visited Mar. 1, 2026) (emphasis added).

[77] *Compare* Ex. 2 ¶¶ 133–69 *with* Brief of Ala. as Amicus Curiae Supporting State Resp'ts, *United States v. Skrmetti*, No. 23-477, 2024 WL 4525181, at *11–18, *25–26 (Oct. 15, 2024) (summarizing documents discovered in *Boe v. Marshall*).  In particular, at least fifteen of the numbered paragraphs in the Retaliatory Action share significant semantic similarities with the amicus brief.  Paragraphs 133–36 and 158–59 of the Retaliatory Action closely track the *Skrmetti* Amicus Brief's structure and quotations.  And in Paragraphs 149–57, the overlap is so substantial as to appear near-verbatim, with only minor changes to wording or punctuation.  For example, the Action alleges: "Privately, WPATH knew the SOC 8 were riddled with conflicts." Ex. 2 ¶ 149. The Alabama *Skrmetti* Amicus Brief similarly states: "Privately, WPATH leaders knew [SOC-8] was not up to par."  *Skrmetti* Amicus Brief, 2024 WL 4525181, at *27.  This type of corollary language in the Retaliatory Action mirrors the *Skrmetti* Amicus Brief's material through Paragraph 157.

in only two paragraphs out of more than forty devoted to SOC-8, both of which read as copied from the *Skrmetti* Amicus Brief (which is, in turn, cited as the sole supporting material for each paragraph).

98.     The Action alleges that AAP "threatened to oppose SOC-8 if WPATH did not remove the age minimums."[78]

99.     It also asserts that some WPATH personnel criticized AAP's methodology and were "surprised" that AAP's comments on SOC-8 were "thin on scientific evidence,"[79] and that because AAP is a major organization, it was able to pressure WPATH to remove ages from SOC-8.[80]

100.     On their own terms, these allegations do not plead actionable misconduct. They describe ordinary professional disagreement, which is an important and necessary feature of the scientific process. At root, they allege only that AAP advocated a position and WPATH responded to it.

101.     The record in the underlying case referenced in Alabama's *Skrmetti* Amicus Brief of AAP's involvement in the development of SOC-8 rests on a single letter from AAP to WPATH, dated September 8, 2022.[81]

102.     That letter consisted of three bullet point recommendations, only one of which is relevant here. That bullet stated: "SOC 8 recommendations for gender-affirming surgery do not align with AAP policy. The AAP does not recommend surgery for minors except on an individualized, case-by-case basis with parental involvement and consent. Additionally, AAP

---

[78] Ex. 2 ¶ 156.

[79] *Skrmetti* Amicus Brief, 2024 WL 4525181, at *20.

[80] Ex. 2 ¶ 157.

[81] *Skrmetti* Amicus Brief, 2024 WL 4525181, at *20; *Boe v. Marshall*, No. 2:22-cv-00184, ECF No. 700-16, Defendants' Mot. for Summary Judgment, Ex. 187, at 13–14, 100, 107, 109, 191 (M.D. Ala. Oct. 9, 2024).

experts agree SOC 8 lacks the evidence to justify the recommended ages."[82]

103.    As that letter reflects, characterizing AAP as seeking removal of age minimums to facilitate surgery for minors is false and misleading.  AAP's expressed position was the opposite: surgery for minors should *not* be recommended except on an individualized, case-by-case basis with parental involvement and consent, and AAP believed that there was insufficient evidentiary support to justify specifying particular ages at which surgery would be uniformly appropriate.[83]

104.    On September 22, 2022, in an email, a WPATH member expressed that, based on AAP's letter, the member understood AAP "believe[d] that surgery of any type should not happen until the patient is age of majority."[84]  This context illustrates that, contrary to the Action's narrative, AAP did not seek to promote pediatric surgery.

105.    Critically, the discussion between AAP and WPATH reflects diverging viewpoints engaging on recommendations for a medical guidance document.  This is not collusion; it is the marketplace of ideas at work.  The AG incoherently treats an evidence-based dispute over guidance as proof of concerted wrongdoing.[85]

106.    The AG's allegations about SOC-8, like the Action's other allegations regarding AAP, impermissibly target First Amendment-protected speech.

### 2.    The Action Impermissibly—and Inaccurately—Targets Protected Activity.

107.    The Retaliatory Action further targets AAP's First Amendment-protected activity, including participation in litigation and rulemakings.

---

[82] *Boe v. Marshall*, MSJ Ex. 187 at 13.

[83] *Id.* at 13–14.

[84] *Id.* at 191.

[85] Ex. 2 ¶¶ 8–10.

108. The AG assails AAP's opposition to Medicaid rules proposed by Florida in 2022 that excluded coverage for GAC, both for AAP's organization and submission of public comments to the rule and for other litigants' reliance on AAP medical guidelines in challenging the AHCA rule in federal court.[86]

109. The Retaliatory Action further attacks AAP's activities in court, including AAP's filing of an amicus curiae brief in support of plaintiffs challenging Florida policies[87] and its decision to file suit—successfully—to quash an earlier retaliatory attempt by Florida and others to compel disclosure of its internal documents, in response to its amicus activity.[88]

110. While the Action describes AAP's First Amendment-protected activity at length, showcasing the AG's umbrage at AAP's opposition to Florida's regulations—which were overturned in federal court[89]—the Action never even seeks to tie such activity to its claims.

111. Moreover, it is canon that submitting comments during a notice-and-comment rulemaking process and participating in litigation against the government, whether as a party or as an amicus, are activities of petition protected by the First Amendment.

112. In short, the Retaliatory Action mischaracterizes AAP's statements and activity, all of which are protected by the First Amendment. The Action's reliance on such conduct confirms that it is impermissible retaliation for protected expression and advocacy.

---

[86] *Id.* ¶¶ 67–68.

[87] *Id.* ¶ 69.

[88] *Id.* ¶ 70. The AHCA and its Secretary issued subpoenas to AAP and other amici in *Dekker v. Weida* seeking, *inter alia*, depositions and documents concerning their GAC policies, internal approval policies, and reasons for filing an amicus brief. *Id.*

[89] Indeed, the Northern District of Florida held in *Dekker* that Florida's rule and statute constituted "purposeful discrimination against transgenders," *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1293 (N.D. Fla. 2023), noting that Florida's consultants and experts had previously made comments characterizing GAC as a "'lie,' a 'moral violation,' a 'huge evil,' and 'diabolical,'" as well as a "woke idea" or profiteering scheme by the pharmaceutical industry or doctors, *id.* at 1279.

## B. The Action's Meritless and Defective FDUTPA Claim Shows Retaliatory Intent.

113. FDUTPA bars unfair or deceptive acts or practices that occur "in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). FDUTPA does not apply to AAP's conduct as alleged in the Action.

114. AAP engaged in no deceptive or unfair acts. The GAC-related speech and activities the Action targets were noncommercial advocacy, unrelated to any consumer transaction.

115. The 2018 Policy Statement provides an overview of gender dysphoria and the treatments available for it. The Statement is clear about the state of the science, including where more research is needed.

116. The 2018 Policy Statement does not advocate any particular treatment for any patient or age groups of patients. As noted, the Statement emphasizes that individual care decisions should be made in consultation with healthcare clinicians and families. Nothing about the Statement is unfair or deceptive.

117. AAP does not play any role in pricing, prescribing, or providing GAC treatment to patients. GAC medical treatments, if available to and appropriate for an individual, are medical care that can only be administered, prescribed, and/or performed by individual physicians, based on their professional judgment, not by AAP.

118. The non-commercial medical guidance and legal advocacy that Florida targets are protected speech that do not promote particular products, clinicians, or services. AAP publishes medical and scientific guidance to inform clinical judgment. Its guidance is not advertising, does not induce patients to undergo treatment, and does not solicit membership. AAP's GAC-related advocacy, likewise, is non-commercial. AAP provides its policy statements and clinical guidance to the public *free of charge*. None of the targeted conduct is "the conduct of any trade or

27

commerce."

119.     AAP's other activities discussed in the Retaliatory Action are neither deceptive nor commercial.  AAP's participation in notice-and-comment rulemaking, its filing of amicus briefs, and its short letter to WPATH were all non-deceptive and grounded in AAP's evidence-based understanding of the science.  None of these activities involved trade or commerce.

120.     The Retaliatory Action does allege the existence of a single commercial transaction, based on the fact that doctors can choose to pay to be members of AAP.  The AG seems to be asserting that AAP freely published its non-deceptive 2018 Policy Statement, submitted comments during rulemaking, filed amicus briefs, and collaborated with medical organizations to induce a higher number of doctors to pay for AAP memberships.  That allegation is frivolous and unsupported by any reasonable factual basis.

121.     Moreover, FDUPTA has a four-year statute of limitations. Fla. Stat. § 95.11(3)(F). The gravamen of the FDUTPA claim in the Retaliatory Action is the 2018 Policy Statement, published seven years before the Action was filed.  The Retaliatory Action's FDUTPA claim is thus time-barred.

122.     The Retaliatory Action is not a serious attempt to enforce Florida's consumer protection laws.  The lack of a legitimate law-enforcement rationale is further evidence that the true motive behind the Action was to punish and silence AAP for its speech and activities supporting GAC.

**C.     The Action's Meritless Florida RICO Claim Shows Retaliatory Intent.**

123.     RICO prohibits a criminal "enterprise" from engaging in a "pattern of racketeering activity." A "pattern of racketeering activity" is defined as a series of at least two predicate criminal acts, drawn from a list enumerated in the Florida RICO statute.  The Retaliatory Action identifies "misleading advertising" as AAP's predicate offense.

124.     AAP is a professional medical association.  It was not and is not part of any kind of criminal enterprise, nor does the Action point to any advertisements at all, misleading or otherwise.

125.     The Retaliatory Action states that AAP joined a criminal enterprise with WPATH and ES when it published its 2018 Policy Statement, which references WPATH's SOC-7 and ES's 2019 Guidelines.[90]  Publishing medical guidance and citing other medical guidance on the same topic is not engaging in a criminal enterprise.

126.     Neither is the 2018 Policy Statement misleading advertising.  As noted above, the Statement is not deceptive, false, or misleading.  It is measured, honest, and true.  It is not advertising because it has nothing to do with any commercial transaction.

127.     Neither do any of AAP's other GAC-related activities discussed in the Retaliatory Action amount to either a criminal enterprise or misleading advertising.  Participating in notice-and-comment rulemaking, filing amicus briefs, and expressing views to another organization are the normal, lawful activities of a professional association.  None of these activities can be reasonably characterized as advertising, which under Florida law must be a statement made "'with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services.'"[91]

128.     The Retaliatory Action's RICO claim is preposterous.  Its lack of merit is evidence of its true purpose: to punish and silence AAP's advocacy for GAC.

**D.     The Circumstances Accompanying the Action Underscore Its Retaliatory Nature.**

129.     The Retaliatory Action was filed on December 9, 2025—nearly three months ago.

---

[90] Ex. 2 ¶¶ 49–50.

[91] *See id.* ¶ 217 (quoting Fla. Stat. § 817.40(5)).

To date, Florida has not served the complaint on AAP, nor otherwise taken steps to continue the Action.

130.    That inaction has not stopped Florida officials from repeatedly invoking the Action in press appearances and on social media to promote their retaliatory campaign against AAP.

131.    The contrast between Florida's failure to advance the case in court and its eagerness to publicize the case in public statements further confirms that the Action is driven by political motives, not by any genuine concern that AAP violated the law.

132.    On the day the Retaliatory Action was filed, the AG's announcement video on X stated that he was taking legal action against AAP, WPATH, and ES because "we believe these organizations failed to disclose the risks, limits, and evidence when promoting so-called gender affirming care for children."[92]   In the accompanying written post, the AG added: "In 2023, @GovRonDeSantis signed legislation to ban so-called 'gender-affirming care' for kids.  Now it's time for accountability!"[93]

133.    Other Florida officials amplified this messaging and "continu[ed] to reference one another" by chain-retweeting posts.[94]   Jeremy Redfern, (the "AG's Deputy Chief of Staff"), reposted the AG's video,[95] and then Christina Pushaw, (the "Governor's Communications Advisor"), reposted Redfern's repost.[96]

134.    Two days after filing the Retaliatory Action, the AG appeared on *Good Morning*

---

[92] Attorney General James Uthmeier (@AGJamesUthmeier), X (Dec. 9, 2025, at 11:44 AM), https://x.com/AGJamesUthmeier/status/1998433573993398563 (last visited Mar. 1, 2025).

[93] *Id.*

[94] *See* Ex. 2 ¶ 9.

[95] Jeremy Redfern (@JeremyRedfernFL), X (Dec. 9, 2025, at 12:14 PM), https://x.com/JeremyRedfernFL/status/1998441017381404961 (last visited Mar. 1, 2026).

[96] Christina Pushaw (@ChristinaPushaw), X (Dec. 9, 2025), https://x.com/ChristinaPushaw/status/1998442814305096145 (last visited Mar. 1, 2026).

*Orlando*, where he made clear that his focus was on pursuing "medical health organizations that have lied to parents" and "made billions of dollars."[97]

135.    Despite never plausibly alleging financial profit in the Retaliatory Action, and despite the fact that AAP does not provide any medical treatments or services and publishes its clinical guidance for free, the AG claimed, in discussing the Retaliatory Action, that GAC constitutes a "billion-dollar industry selling these hormone treatments and surgeries," and stated: "I want them to pay for it."[98]

136.    The same day, the AG tweeted: "I want to see the medical establishment that pushed the sick idea that 'a child can be born in the wrong body' held accountable for the lies they told and damage they've done.  It's why my office filed a lawsuit against them yesterday."[99]

137.    On February 1, 2026, Governor DeSantis's Chief of Staff Jason Weida retweeted a post about AAP, and added: "Once universally respected, the American Academy of Pediatrics (@AmerAcadPeds) now is little more than an advocacy organization for leftist politicians and special interest groups.  Like them, the AAP thinks your children are theirs to raise according to their amoral collectivist code."[100]

138.    If Florida officials genuinely believed these allegations, one would expect the AG to be actively pursuing the Retaliatory Action, or at least to have served the complaint.  Instead, months have passed without action, despite the AG's promise to "follow the evidence, protect

---

[97] Good Morning Orlando, *Florida Attorney General James Uthmeier joins GMO*, 10:20–13:15 (Dec. 11, 2025), https://podcasts.apple.com/us/podcast/florida-attorney-general-james-uthmeier-joins-gmo/id1656796418?i=1000740844639 (last visited Mar. 1, 2026).

[98] *Id.*

[99] James Uthmeier (@JamesUthmeierFL), X (Dec. 11, 2025, at 12:38 PM), https://x.com/AGJamesUthmeier/status/1999172058555502842 (last visited Mar. 1, 2026).

[100] Jason Weida (@JasonWeidaFL), X (Feb. 1, 2026, at 5:20 PM), https://x.com/jasonweidafl/status/2018087143160381854 (last visited Mar. 1, 2026).

children, and defend parents' rights to make informed decisions," belying any claim that Floridians face imminent harm.[101]

139.     The AG's conduct demonstrates that his professed aims were not the real reasons for filing suit.

140.     Rather, the Retaliatory Action was filed to advance political objectives and to punish disfavored speech.

### III.    Such Political Retaliation Is Consistent with Florida's Practice of Retaliation Against Perceived Ideological Opponents, Including Supporters of GAC.

141.     The Retaliatory Action is consistent with other recent actions by Florida state officials, including the AG, to restrict speech with which they disagree and target its speakers, particularly on GAC and other issues of gender and sexuality.

### A.     Florida Explicitly Opposes GAC and Its Supporters.

142.     GAC has become the subject of intense national political disagreement, with federal administrations and states adopting sharply opposing positions through legislation, policy, and guidance.[102]

143.     Florida has taken an active role in efforts to restrict GAC, and its political leadership has repeatedly expressed hostility toward such care, transgender people, and organizations that support them, labeling GAC as "woke gender ideology."[103]

---

[101] Attorney General James Uthmeier (@AGJamesUthmeier), X (Dec. 9, 2025, at 11:44 AM), https://x.com/AGJamesUthmeier/status/1998433573993398563 (last visited Mar. 1, 2026).

[102] *See* Annette Choi, *27 states have passed laws restricting gender-affirming care for trans youth*, CNN (Apr. 30, 2025), www.cnn.com/politics/state-ban-gender-affirming-care-transgender-dg (last visited Mar. 1, 2026).

[103] *Gov. Ron DeSantis addresses 'woke gender ideology' ahead of 'Don't say gay' law taking effect*, CBS News (June 15, 2022), www.cbsnews.com/miami/news/gov-ron-desantis-addresses-woke-gender-ideology-dont-say-gay-law (last visited Mar. 1, 2026).

144. Governor DeSantis has described GAC as "castration" and "sterilization,"[104] asserted that it "disfigur[es] young kids," and accused clinicians of "literally chopping off the private parts of young kids."[105]

145. Florida's Surgeon General claimed that AAP "lost credibility" by purportedly "endorsing sex-change surgeries for children."[106]

146. The AG's Deputy Chief of Staff, has falsely claimed that the Florida Chapter of AAP "support[s] double mastectomies on 14 year-old girls,"[107] and has labeled GAC "chemical castration."[108]

147. The Governor's Communications Advisor has called GAC an "Orwellian euphemism."[109]

148. Members of the Florida Legislature have echoed this rhetoric. Former

[104] Ian Schwartz, *DeSantis: "Gender Affirming Care" Is Euphemism for Castration and Sterilization*, RealClear Politics (July 23, 2022), www.realclearpolitics.com/video/2022/07/23/desantis_gender_affirming_care_is_a_euphemism_for_castration_and_sterilization.html (last visited Mar. 1, 2026).

[105] Dawn Ennis, *DeSantis Wages War of Words to Oppose Abortion and Transgender Healthcare*, Forbes (Aug. 9, 2022), www.forbes.com/sites/dawnstaceyennis/2022/08/05/war-of-words-this-is-the-way-florida-fights-reproductive-and-transgender-healthcare (last visited Mar. 1, 2026).

[106] Joseph A. Ladapo (@FLSurgeonGen), X (July 30, 2025, at 5:47 PM), https://x.com/FLSurgeonGen/status/1950674564272541719 (last visited Mar. 1, 2026).

[107] Jeremy Redfern (@JeremyRedfernFL), X (Aug. 2, 2022, at 5:29 PM), https://x.com/JeremyRedfernFL/status/1554580168672481280 (last visited Mar. 1, 2026).

[108] Eric Daugherty, *'It is Chemical Castration': Florida Dept. of Health Press Sec. Fires Back at PolitiFact for Downplaying Gender Transition for Children*, Florida's Voice (Aug. 12, 2022), https://flvoicenews.com/it-is-chemical-castration-florida-dept-of-health-press-sec-fires-back-at-politifact-for-downplaying-gender-transition-for-children (last visited Mar. 1, 2026).

[109] Christina Pushaw (@ChristinaPushaw), X (Aug. 6, 2022, at 9:42 AM), https://x.com/ChristinaPushaw/status/1555912266834477056 (last visited Mar. 1, 2026).

Representative Randy Fine[110] and former House Speaker Paul Renner[111] have characterized GAC as "mutilation" and the "butchering of children,"[112] while Representative Webster Barnaby has referred to transgender people as "mutants" and "demons."[113]

149. These positions are reflected in Florida's agency actions and legislative efforts, including April 2022 guidance issued by the Florida Department of Health regarding contemporaneous U.S. Department of Health and Human Services ("HHS") positions and discouraging social transition, puberty blockers, hormone therapy, and "gender reassignment surgery" for minors.[114]

150. Reflecting this rhetoric, Florida subsequently became one of the first states to enact laws to restrict LGBTQ-related expression and healthcare.[115]

151. In March 2022, Governor DeSantis signed H.B. 1557, limiting classroom instruction on sexual orientation and gender identity in Florida elementary schools,[116] and

---

[110] Randy Fine (@VoteRandyFine), X (Apr. 4, 2022, at 11:42 AM), https://x.com/VoteRandyFine/status/1511006353711673350 (last visited Mar. 1, 2026); Randy Fine (@VoteRandyFine), X (May 2, 2023, at 11:43 AM), https://x.com/VoteRandyFine/status/1653424906304991236 (last visited Mar. 1, 2026).

[111] Paul Renner (@Paul_Renner), X (Apr. 6, 2023, at 8:08 AM), https://x.com/i/status/1643948717240733698 (last visited Mar. 1, 2026).

[112] Randy Fine (@VoteRandyFine), X (Mar. 3, 2023, at 10:21 AM), https://x.com/VoteRandyFine/status/1631676140304646144 (last visited Mar. 1, 2026).

[113] Andrew Atterbury, *Florida Republican apologizes after calling transgender people 'mutants'*, Politico (Apr. 10, 2023, at 8:24 PM), www.politico.com/news/2023/04/10/florida-republican-apology-transgender-comments-00091315 (last visited Mar. 1, 2026).

[114] Florida Department of Health (@HealthyFla), X (Apr. 20, 2022, at 9:24 AM) Florida Department of Health, https://x.com/HealthyFla/status/1516769882683195395 (last visited Mar. 1. 2026).

[115] Lindsey Dawson & Jennifer Kates, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions*, KFF (Nov. 24, 2025), www.kff.org/lgbtq/gender-affirming-care-policy-tracker (last visited Mar. 1, 2026).

[116] H.B. 1557, 2022 Fla. Laws 22; Executive Office of Governor Ros Desantis, *Governor Ron DeSantis Debunks Book Ban Hoax*, (March 8. 2023), www.flgov.com/eog/news/press/2023/governor-ron-desantis-debunks-book-ban-hoax (last visited Mar. 1, 2026).

expanded the law through eighth grade in May 2023 with H.B. 1069.[117]

152.    Also in May 2023, he signed S.B. 254,[118] criminalizing the provision of GAC to minors, authorizing the state to take custody of minors receiving such care, and imposing criminal penalties on clinicians.[119]

153.    Governor DeSantis has continued to publicly oppose GAC.  On October 14, 2025— 56 days before the Retaliatory Action was filed—Florida Governor DeSantis retweeted a post in which another user predicted that "by 2030 trans identification in kids and teens will be back well under 1 percent.  This was a cultural bubble aided by the massive profits available to surgeons and hospitals that pushed these mutilations, and it has decisively popped."  Governor DeSantis added: "And hopefully the people who butchered the kids will be held accountable, including the medical organizations that gave them cover[.]"[120]

154.    Thereafter, in December 2025—shortly after the Retaliatory Action was filed— Florida legislators expanded upon restrictions to GAC by introducing H.B. 743 and S.B. 1010, which would increase penalties, and authorize private causes of action against and investigations into healthcare clinicians by the Attorney General for assisting with GAC.[121]

B.    **Florida Retaliates Against Ideological Opponents.**

155.    In addition to prior retaliation *against AAP* for legal advocacy on GAC, *see supra*

---

[117] H.B. 1069, 2023 Fla. Laws 105; Aaron Navarro, *DeSantis signs flurry of anti-trans bills, including ban on gender-affirming care for minors*, CBS News (May 17, 2023, at 9:41 PM EDT), www.cbsnews.com/news/florida-ron-desantis-anti-trans-bills-ban-gender-affirming-care-minors-drag-shows (last visited Mar. 1, 2026).

[118] S.B. 254, 2023 Fla. Laws 90.

[119] Navarro, *supra* note 117.

[120] Ron DeSantis (@RonDeSantis), X (Oct. 14, 2025, at 9:25 PM), https://x.com/RonDeSantis/status/1978270929613468082 (last visited Mar. 1, 2026).

[121] Fla. H.B. 743 (2026); Fla. CS for S.B. 1010.

Sec. II.B–D.  Florida officials have repeatedly retaliated against those who publicly disagree with or oppose their stance on GAC and LGBTQ+ rights.

156.    For example, in August 2022, Governor DeSantis suspended State Attorney Andrew Warren after Warren engaged in protected speech opposing legislation targeting the transgender community, "especially transgender youth's access to gender-affirming care."[122]

157.    Although no Florida law at the time criminalized GAC, the Governor cited Warren's statements supporting access to GAC as grounds for suspension.[123]

158.    Florida employed similar retaliatory tactics after the Walt Disney Company ("Disney") publicly opposed Florida's Parental Rights in Education Act, H.B. 1557.[124]  Governor DeSantis accused Disney of "cross[ing] the line" and vowed to "fight[] back."[125]

159.    Shortly thereafter, Florida legislators moved to revoke Disney's self-governing authority under the Reedy Creek Improvement Act.[126]  Florida House Representative Spencer Roach publicly linked the effort to Disney's "woke ideology."[127]

160.    In April 2022, DeSantis signed S.B. 4-C, dissolving Disney's special district, which

---

[122] *Warren v. DeSantis*, 90 F.4th 1115, 1120–21 (11th Cir. 2024), *opinion vacated and superseded*, 125 F.4th 1361 (11th Cir. 2025).

[123] Fla. Executive Order 22-176 (2022), www.flgov.com/eog/sites/default/files/executive-orders/2024/EO-22-176-compressed.pdf (last visited Mar. 1, 2026).

[124] Alison Durkee, *Disney Says Striking Down 'Don't Say Gay' Law Is Company's 'Goal' After DeSantis Signs Bill*, Forbes (Apr. 14, 2022), www.forbes.com/sites/alisondurkee/2022/03/28/disney-says-striking-down-dont-say-gay-law-is-companys-goal-after-desantis-signs-bill (last visited Mar. 1, 2026).

[125] David Kihara, *DeSantis says Disney 'crossed the line' in calling for 'Don't Say Gay' repeal*, Politico (Mar. 29, 2022) www.politico.com/news/2022/03/29/desantis-disney-dont-say-gay-repeal-00021389 (last visited Mar. 1, 2026).

[126] Fatma Khaled, *Disney at Risk of Losing Its Own Government in Florida*, Newsweek (Apr. 1, 2022), www.newsweek.com/disney-risk-losing-its-own-government-florida-1693955 (last visited Mar. 1, 2026).

[127] *Id.*

effectively rescinded Disney's self-governing rights.[128]  And in February 2023 he signed H.B. 9-B, which restructured the governing board of the successor district to be appointed by the Governor.[129]

161.    Governor DeSantis justified these actions as necessary "to force Disney to stop 'trying to inject woke ideology' on children."[130]

162.    Disney subsequently filed suit against DeSantis, alleging "retaliation for expressing a political viewpoint unpopular with certain State officials."[131]  The litigation concluded after Disney and DeSantis reached a settlement agreement, halting a pending appeal to the Eleventh Circuit.[132]

## C.    Attorney General Uthmeier Uses His Office to Punish and Suppress GAC-Related Speech.

163.    Florida Attorney General Uthmeier, who shares both ideological alignment and a strong personal connection with Governor DeSantis, serving previously as his Chief of Staff and Presidential Campaign Manager,[133] has taken a strong stance against transgender people and GAC, grounded in his personal moral judgments.  He is, of course, entitled to his views and free to

---

[128] S.B. 4-C, 2022 Fla. 266.

[129] H.B. 9-B, 2023 Fla. 5.

[130] Jonathan Chait, *DeSantis Promises Florida Will Control Disney's Content: Right-wing board to clamp down on "woke ideology" in cartoons*, Intelligencer (Mar. 1, 2023), https://nymag.com/intelligencer/2023/03/desantis-promises-florida-will-control-disney-content.html (last visited Mar. 1, 2026).

[131] Second Am. Compl., *Walt Disney Parks and Resorts U.S., Inc. v. DeSantis et al.*, No. 4:23-cv-00163-AW-MJF, 2023 WL 9105430 (N.D. Fla. Sept. 7, 2023).

[132] Elisabeth Buchwald and Samantha Delouya, *Disney and DeSantis have settled their yearslong dispute*, CNN (Mar. 27, 2024), www.cnn.com/2024/03/27/business/desantis-disney-fight-reaches-settlement (last visited Mar. 2, 2026).

[133] CBS Miami Team, *Who is James Uthmeier? Gov. DeSantis appoints new Florida attorney general*, CBS NEWS (Feb. 17, 2025), www.cbsnews.com/miami/news/james-uthmeier-florida-attorney-general (last visited Mar. 2, 2026).

express them. He is also entitled to use the powers of his office to enforce the laws of Florida within constitutional bounds. What he cannot do—and what he nevertheless has done, in the Retaliatory Action and in other cases—is use the powers of his office to punish and suppress speech that supports transgender people and GAC.

164. Just last year, the AG sued Target over LGBTQ-themed products marketed to youth,[134] despite acknowledging that such conduct was expressive activity.[135] He described the products as "[g]ross" and "absolutely disgusting,"[136] objected to what he called "Target's radical ideological efforts to try to sexualize children with, you know, trans clothing lines and things,"[137] and stated he would not allow his children to "look[] at trans clothing when they walk into a department store."[138]

165. The AG has also sought to suppress drag performances,[139] labeling participants "demonic" and "anti-Christian."[140] He has said that "[t]rans activists don't have the First

---

[134] Jacob Ogles, *Florida's new Attorney General sues Target for selling products for LGBTQ+ youth*, Advocate (Feb. 21, 2025), www.advocate.com/politics/florida-attorney-general-sues-target-dei (last visited Mar. 1, 2026).

[135] The Sean Hannity Show: *Protecting the Constitution - February 21st, Hour 3*, 6:43–9:30 (Feb. 21, 2025) https://podcasts.apple.com/us/podcast/protecting-the-constitution-february-21st-hour-3/id1112194905?i=1000694928237 (last visited Mar. 1, 2026).

[136] A.G. Gancarski, *James Uthmeier recounts successes to Moms for Liberty*, Florida Politics (Oct. 17, 2025), https://floridapolitics.com/archives/761143-james-uthmeier-recounts-successes-to-moms-for-liberty (last visited Mar. 1, 2026).

[137] The Sean Hannity Show: *Protecting the Constitution - February 21st, Hour 3*, 6:43–9:30 (Feb. 21, 2025), https://podcasts.apple.com/us/podcast/protecting-the-constitution-february-21st-hour-3/id1112194905?i=1000694928237 (last visited Mar. 1, 2026).

[138] *Id.*

[139] C.J. Ciaramella, *Inside Ron DeSantis' Crackdown on Drag Shows*, Reason (Nov. 9, 2023), https://reason.com/2023/11/09/inside-ron-desantis-crackdown-on-drag-shows (last visited Mar. 1, 2026).

[140] Samantha Riedel, *City Council to Florida AG Over Drag Show: We Did Not Ask For Your Legal Opinion*, Them (Nov. 12, 2025), www.them.us/story/florida-attorney-general-pensacola-drag-queen-christmas-suzie-toot (last visited Mar. 1, 2026).

Amendment right to expose kids to their weird sexual fetishes."[141]

166.    He has pursued investigations and enforcement actions against transgender athletes[142] and social-media influencers.[143]  He has described acceptance of transgender athletes as a "radical ideology" that "threatens women, kids, and our Florida way of life."[144]

167.    The through-line in these lawsuits and investigations is the use of coercive governmental authority to punish and silence protected speech and expressive activity that supports transgender people and GAC.

168.    So, too, with the Retaliatory Action.  The AG's own statements about the Action leave no doubt about either his animus toward GAC and its supporters or the retaliatory purpose of the Action.

169.    On the day the AG filed the Retaliatory Action, he announced on X that his office had sued AAP "for mutilating kids and misleading families."[145]  He took aim directly at AAP's "recommendations" and "political activism."[146]

170.    On a podcast two days later, the AG explained that the Action targets "all of these

---

[141] Rachel Tucker, *'Radical and wrong': Florida vows to fight rulings against 'anti-drag' law*, WFLA (May 15, 2025) www.wfla.com/news/politics/radical-and-wrong-florida-vows-to-fight-rulings-against-anti-drag-law (last visited Mar. 1, 2026).

[142] Drew Dixon, *James Uthmeier files lawsuit against swimming organization, seeks to block transgender competitors*, Florida Politics (Jan. 13, 2026), https://floridapolitics.com/archives/773647-james-uthmeier-files-lawsuit-against-swimming-organization-seeks-to-block-transgender-competitors (last visited Mar. 1, 2026).

[143] Michelle Vecerina, *Transgender activist steps back from social media amid state investigation*, Florida's Voice (Jul. 3, 2025), https://flvoicenews.com/transgender-activist-steps-back-from-social-media-amid-state-investigation (last visited Mar. 1, 2026).

[144] Attorney General James Uthmeier (@AGJamesUthmeier), X (Feb. 28, 2025, at 10:33 AM), https://x.com/agjamesuthmeier/status/1895497440406774106 (last visited Mar. 2, 2026).

[145] Attorney General James Uthmeier (@AGJamesUthmeier), X (Dec. 9, 2025, at 11:44 AM), https://x.com/AGJamesUthmeier/status/1998433573993398563 (last visited Mar. 2, 2026).

[146] *Id.*

medical organizations that have been recommending and pushing these treatments on parents, pressuring parents, telling them that these are safe."[147]

171.     The AG described the Action's objectives in explicitly punitive financial terms: "So we want to hurt them in their wallet. We want them to cough up millions."[148] The AG explained that he brought the Action under FDUTPA and Florida RICO because those statutes allow "statutory damages of $10,000 for every time you say something that's misleading," and enhanced penalties based on alleged coordination.[149] The AG insisted that Florida would "end it"—meaning gender-affirming care—"for once and for all."[150]

172.     AG Uthmeier has not been mysterious about his goals with the Retaliatory Action. He seeks to punish and silence supporters of GAC. This is First Amendment retaliation and viewpoint discrimination, plain and simple.

**IV.     The AG's Actions Have Harmed, and Will Continue to Harm, AAP.**

173.     The Retaliatory Action inflicts concrete injuries to AAP's constitutionally protected speech and associational activities. Absent judicial relief, the continuation of this action will further burden and chill AAP's protected conduct.

174.     AAP's core mission is to attain and champion optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults. To further that core mission, AAP develops and disseminates evidence-based clinical guidance and participates in

---

[147] The Benny Show, *The Real Conspiracy Around Charlie Kirk's Assassination | America Deserves the Truth*, 1:17:35–1:21:40 (Dec. 11, 2025), https://podcasts.apple.com/us/podcast/the-real-conspiracy-around-charlie-kirks/id1584730781?i=1000740889370 (last visited Mar. 1, 2026).

[148] *Id.*

[149] *Id.*

[150] *Id.*

public discourse on pediatric health policy. Such activities are at the core of the First Amendment.

175.     The Retaliatory Action has materially disrupted the conditions under which AAP engages in protected expression. By subjecting AAP's scientific and policy advocacy to a meritless enforcement action seeking drastic remedies, the AG has imposed substantial risks and burdens that now weigh upon AAP's decisions about when and how to speak about GAC. These burdens undermine AAP's ability to fulfill its mission, including its interest in fostering the open exchange of scientific and medical ideas that the First Amendment exists to protect.

176.     AAP's work is inherently collaborative and depends on the voluntary participation of medical experts in research, policy development, and public discussion of pediatric health issues to advance healthcare for all infants, children, adolescents, and young adults. The AG's enforcement action deters members and collaborators who would otherwise participate in panels, contribute to guidance, or serve in public-facing roles. Florida's retaliatory campaign prevents free engagement with AAP, as these individuals now fear that their speech or affiliation may subject them to government scrutiny or public targeting, thereby impairing AAP's associational rights and the collective production of protected speech.

177.     Absent judicial intervention, the AG's actions will continue to chill expression, disrupt association, and unreasonably burden AAP's protected activities in violation of the First Amendment.

178.     This case does not require the Court to resolve scientific debates, assess medical standards, or opine on the merits of GAC. Nor does this case require the Court to in any way silence speech that is critical of GAC. It requires only the application of settled First Amendment principles: the government may not weaponize civil enforcement to punish speech and petition with which it disagrees.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of the First Amendment – Retaliation for Protected Activity**
**U.S. Const. amend. I., as incorporated by U.S. Const. amend. XIV**
**42 U.S.C. § 1983; *Ex parte Young***

179.    All preceding paragraphs are incorporated and reasserted as if fully set forth here.

180.    The First Amendment guarantees a right to "freedom of speech" and "to petition the Government for a redress of grievances." U.S. Const. amend. I. The right to petition includes the right "to appeal to courts and other forums established by the government." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).

181.    Furthermore, "the First Amendment protects scientific expression and debate just as it protects political and artistic expression." *Bd. of Trustees of Leland Stanford Jr. Univ. v. Sullivan*, 773 F. Supp. 472, 474 (D.D.C. 1991); *see also Nat'l Inst. of Family and Life Advocs. v. Becerra*, 585 U.S. 755, 756 (2018) (recognizing the "danger of content-based regulations 'in the fields of medicine and public health'"); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us . . . . That freedom is therefore a special concern of the First Amendment[.]").

182.    The government violates the First Amendment when it retaliates against someone for exercising their First Amendment rights. *See, e.g.*, *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018) ("[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech."); *Smith v. Ark. State Highway Emp., Loc. 1315*, 441 U.S. 463, 465 (1979) (a person can "speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so."). "Reprisal for protected speech offends the

Constitution because it threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citation modified). "[T]he law is settled" on this issue. *Gonzalez v. Trevino*, 602 U.S. 653, 662 (2004) (Alito, J., concurring) (quoting *Hartman*, 547 U.S. at 256).

183.    The AG's Retaliatory Action against AAP violates the First Amendment's prohibition on retaliation for engaging in protected First Amendment activity.

184.    AAP has engaged in protected, non-commercial speech, in the form of clinical guidance reflecting scientific research and evidence-based strategies regarding GAC that AAP publishes to help medical professionals support their patients and their families in making informed, individualized health decisions.

185.    As set forth in Sections II and III of this Complaint, the AG initiated its investigation for the improper, illegitimate purpose of retaliating against AAP for engaging in speech that the AG disfavors.  The AG has shown—through, *inter alia*, his words and actions before and after the lawsuit and the facial deficiency of the Retaliatory Action—that he is not acting for a legitimate purpose.  Instead, he is acting in furtherance of the stated goal to halt support of evidence-based treatments for gender dysphoria with which the State of Florida and the AG disagree.  The AG is doing so by targeting medical and scientific organizations, like AAP, that speak out in favor of permitting physicians, families, and patients access to such evidence-based care.

186.    The AG additionally initiated his investigation for the improper, illegitimate purpose of retaliating against AAP for engaging in protected petition of the Government, including by filing amicus briefs, submitting comments in rulemakings, and participating in public policy debates in support of AAP's mission to support and improve the quality and access to pediatric health care, including GAC.  "Petitions to the courts and similar bodies can . . . address matters of

great public import" and "facilitate the informed public participation that is a cornerstone of democratic society." *Guarnieri*, 564 U.S. at 397. "[T]he right to petition extends to all departments of the Government," including "administrative agencies" and "courts." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

187.    The retaliatory impetus for the Action is evident in its lack of a legal or factual basis. The Retaliatory Action fails to identify any unlawful conduct or credibly explain how the state laws it relies on could possibly extend to AAP's protected speech and activities. The Retaliatory Action is designed to deter a person of ordinary firmness from engaging further in protected medical and policy speech and petition.

188.    The AG's First Amendment violations have caused and will cause AAP ongoing irreparable harm. AAP's freedom of speech and to petition the government, in court and otherwise, are being significantly impaired by the AG's retaliatory action.

### COUNT II

**Violation of the First Amendment – Viewpoint Discrimination**
**U.S. Const. amend. I, as incorporated by U.S. Const. amend. XIV**
**42 U.S.C. § 1983; *Ex parte Young***

189.    The paragraphs above are incorporated and reasserted as if fully set forth here.

190.    "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024).

191.    "The government" therefore "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S.

661, 706 (2010) (Alito, J., dissenting) ("The proudest boast of our free speech jurisprudence is that we protect the freedom to express [even] the thought that we hate.") (internal quotations omitted); *see also Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 137 (1961) (Black, J., dissenting) ("[T]he freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish.").

192.    The AG's Retaliatory Action discriminates on the basis of viewpoint by targeting AAP based on disagreements with AAP's position on the scientific and medical support for and efficacy of GAC, as evidenced by the AG's own public framing of GAC.

193.    There is no legitimate, much less compelling, state interest in punishing an organization for, or chilling it from, advancing views with which the government disagrees.

194.    Even if a compelling interest were at stake, the AG's Retaliatory Action is not narrowly tailored to advancing that interest because Florida already prohibits GAC for youth and could enforce those laws to stop any such conduct it identifies—rather than broadly seeking to suppress any and all speech about the subject.

195.    The AG's actions have caused and continue to cause AAP ongoing and irreparable harm, including by pressuring AAP to censor or alter its First Amendment-protected speech and association.

## PRAYER FOR RELIEF

WHEREFORE, AAP respectfully requests that the Court enter an order or judgment in favor of Plaintiff AAP and against the AG as follows:

1.    Declare that the AG's Retaliatory Action constitutes retaliation in violation of Plaintiff's rights under the First Amendment of the U.S. Constitution.

2. Declare that the AG's Retaliatory Action constitutes viewpoint discrimination in violation of Plaintiff's rights under the First Amendment of the U.S. Constitution.

3. Preliminarily and permanently enjoin the AG, his officers, agents, servants, and employees from initiating any action to interfere with or curtail Plaintiff's exercise of its constitutional rights, including by suing Plaintiff in connection with its promulgation of its 2018 Policy Statement or its 2023 re-affirmation of the 2018 Policy Statement.

4. Grant reasonable attorneys' fees, costs, and expenses of this action pursuant to 42 U.S.C. § 1988.

5. Grant such other and further relief as this Court deems just and proper.

DATED: March 4, 2026

Respectfully submitted,

*/s/ Amber M. Charles*

Valerie Hletko (ARDC No. 6323429)*
Amber M. Charles (D.C. Bar No. 1035226)**
Paul Killebrew (N.Y. Bar No. 4605846)**
Alexandra J. Widas (D.C. Bar No. 1645372)**
Francisco I. Collantes (D.C. Bar No. 90032159)**
Sarah Haddon (D.C. Bar No. 90005098)**
Kristin Oakley (D.C. Bar No. 90020204)**
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Tel. (202) 662-6000
vhletko@cov.com
acharles@cov.com
pkillebrew@cov.com
awidas@cov.com
fcollantes@cov.com
shaddon@cov.com
koakley@cov.com

*Member of the N.D. Ill. Trial Bar*
**Member of the N.D. Ill. General Bar*

*Counsel for American Academy of Pediatrics*

46