## IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
## IN AND FOR ST. LUCIE COUNTY, FLORIDA

**OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS,**

      *Plaintiff,*

  v.

**WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, ENDOCRINE SOCIETY,** and **AMERICAN ACADEMY OF PEDIATRICS,**

      *Defendants.*

Case No. _____

## <u>COMPLAINT</u>

1.     Gender dysphoria is "a condition that involves distress regarding one's sexed body and/or associated social expectations."[1]

2.     Pediatric gender dysphoria was a rarity a decade ago. In fact, researchers did not begin tracking the phenomenon until 2017.[2] However, the number of children and adolescents in the United States diagnosed with gender dysphoria has skyrocketed in recent years. Annual diagnoses increased exponentially

---

[1] *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Dep't of Health & Human Services 12 (Nov. 19, 2025), https://opa.hhs.gov/sites/default/files/2025-05/gender-dysphoria-report.pdf ("HHS Review").

[2] Robin Respaut & Chad Terhune, *Putting numbers on the rise in children seeking gender care*, Reuters (Oct. 6, 2022), https://www.reuters.com/investigates/special-report/usa-transyouth-data/.

from 2017 to 2021,[3] and by 2022, 300,000 American children identified as "transgender."[4] That number surged to 724,000 in 2023 and continues to grow.[5]

3. This rapid rise—which coincides with a general "deterioration in youth mental health" associated with social media, smartphones, a lack of in-person interaction, and other societal ills—suggests that pediatric gender dysphoria is a symptom of deeper psychological needs.[6] And while it is natural for children and adolescents to feel anxious about their changing bodies, these feelings usually "disappear" after they reach puberty.[7]

4. National health agencies in the United States and Europe therefore endorse a holistic psychosocial approach designed to alleviate pediatric gender dysphoria and other mental distress through family therapy and individual counseling.[8]

5. However, this model of care does not comport with Defendants' ideology and financial incentives. So, rather than attempting to resolve the underlying causes

---

[3] *Id.*

[4] Azeen Ghorayshi, *Report Reveals Sharp Rise in Transgender Young People in the U.S.*, New York Times (June 10, 2022), https://www.nytimes.com/2022/06/10/science/transgender-teenagers-national-survey.html.

[5] Sam Levin, *More than 2.8m people in US identify as trans, including 724,000 youth, data shows*, The Guardian (Aug. 20, 2025), https://www.theguardian.com/world/2025/aug/20/trans-people-us-data.

[6] Hilary Cass, *Independent review of gender identity services for children and young people: Final report* 109–10 (Apr. 2020), https://cass.independent-review.uk/home/publications/final-report/ ("Cass Review").

[7] *Treatment: Gender dysphoria*, National Health Service, https://www.nhs.uk/conditions/gender-dysphoria/treatment/.

[8] *Id.*; *see also* HHS Review at 268–69; *Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors*, Council for Choices in Health Care in Finland (PALKO / COHERE Finland) at 8, https://segm.org/sites/default/files/Finnish_Guidelines_2020_Minors_Unofficial%20Translation.pdf ("Finnish Review").

of psychological distress, Defendants developed a treatment protocol that irreversibly alters children's bodies to conform to their anxieties. This sequence of interventions, which Defendants call "gender-affirming care," begins with puberty suppression, progresses to cross-sex hormones, and culminates in surgical procedures on minors' breasts and genitals (collectively, "sex interventions").

6.    These drugs and surgeries are extremely profitable for Defendants and their members. Insurance data shows that, as of 2022, sex intervention was a $4.1 billion industry.[9] Studies forecast that revenues will reach $8 billion by 2030.[10]

7.    But Defendants have a problem: there is no credible evidence that sex interventions alleviate pediatric gender dysphoria.[11] To convince patients, insurance companies, regulators, and judges otherwise, Defendants initiated a coordinated campaign to develop "clinical guidelines" recommending sex intervention for pediatric gender dysphoria.

8.    The campaign began when the World Professional Association for Transgender Health (WPATH) published the Standards of Care ("SOC") Version 5 in 1998. In hindsight, the guidelines' recommendations were comparatively modest: puberty blockers for adolescents, and cross-sex hormones in select cases beginning no earlier than 16. However, over the ensuing years, Defendants published more and

---

[9] Wesley J. Smith, *The 'Gender-Industrial Complex' Makes Billions Annually*, National Review (Aug. 28, 2024), https://www.nationalreview.com/corner/the-gender-industrial-complex-makes-billions-annually/ (citing *The Gender Industrial Complex*, American Principles Project, https://americanprinciplesproject.org/wp-content/uploads/2024/06/Gender-Industrial-Complex-Full-Report.pdf).
[10] *Id.*
[11] Cass Review at 13 ("The reality is that we have no good evidence on the long-term outcomes of interventions to manage gender-related distress.").

3

more guidelines containing more and more permissive recommendations. Now, Defendants' guidelines recommended pre-pubertal "social transition," puberty suppression beginning at age 9, cross-sex hormones with no age minimum, breast surgeries with no age minimum, and genital surgeries with no age minimum.

9. There has never been any credible evidence for any of these recommendations. However, by continuing to reference one another over an extended period of time, Defendants' guidelines built a façade of legitimacy. WPATH's SOC-6 cited WPATH's SOC-5; Endocrine Society's 2007 Guideline was co-sponsored by WPATH and cited WPATH's SOC-6; WPATH's SOC-7 cited the Endocrine Society's 2009 Guideline; the Endocrine Society's 2019 Guideline was co-sponsored by WPATH and cited WPATH's SOC-7; the American Academy of Pediatrics' 2018 Policy Statement cited Endocrine Society's 2019 Guideline and WPATH's SOC-7; WPATH's SOC-8 cited Endocrine Society's 2019 Guideline and American Academy of Pediatrics' 2018 Policy Statement (collectively, "Defendants' Guidelines").

10. This scheme was, for a time, quite successful. Defendants' Guidelines "dominated the development of other guidelines,"[12] and courts relied on them to enjoin state laws banning pediatric sex interventions.[13]

11. The house of cards collapsed in 2024, however, when internal leaks, litigation discovery, and systematic reviews commissioned by national health

---

[12] Jo Taylor, et al., *Clinical guidelines for children and adolescents experiencing gender dysphoria or incongruence: a systematic review of guideline quality (part 1)*, 109 Archives of Disease in Childhood s65, s71 (Apr. 9, 2024), https://adc.bmj.com/content/109/Suppl_2/s65 ("York Guideline Quality").

[13] *See, e.g., Dekker v. Weida*, 679 F. Supp. 3d 1271, 1278 (N.D. Fla. 2023).

agencies exposed Defendants' "circular" guidelines as an elaborate sham.[14]

12.     Nevertheless, Defendants continue to peddle their discredited clinical guidelines as "evidence-based standards of care" to sell memberships. Because Defendants continue to generate demand for pediatric sex interventions by deceiving the public with their phony guidelines, sex intervention providers and ideologues continue to purchase memberships.

13.     Defendants' reprehensible and immoral actions capitalize on the mental distress of children—as well as the natural affections and fears their parents—to help their members sell lucrative surgeries and drugs that irreversibly mutilate and chemically alter children's bodies without providing any credible medical benefit. In their wake is a growing number of "detransitioners" who feel "butchered by institutions [they] thought [they] could trust."[15]

14.     Defendants' campaign to mislead patients, parents, insurers, regulators, and courts about the reversibility and efficacy of pediatric sex interventions violates the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) and constitutes a pattern of racketeering activity under the Florida Racketeer Influenced and Corrupt Organization Act (the Florida RICO Act).

15.     To protect its residents and consumers, the State of Florida petitions this Court to declare Defendants' actions unlawful, impose statutory penalties, and order injunctive relief.

---

[14] Cass Review at 130.
[15] *The evidence to support medicalised gender transitions in adolescents is worryingly weak* The Economist (Apr. 5, 2023), https://www.economist.com/briefing/2023/04/05/the-evidence-to-support-medicalised-gender-transitions-in-adolescents-is-worryingly-weak.

## PARTIES

16.     Plaintiff Attorney General James Uthmeier is authorized to bring this action to seek declaratory relief, injunctive relief, civil penalties, attorney's fees and costs, and other statutory and equitable relief for FDUTPA violations occurring in or affecting more than one judicial circuit. §§ 501.203(2), 501.207, Fla. Stat. The Attorney General has investigated the matters alleged in this Complaint and determined that this enforcement action serves the public interest. § 501.207(2), Fla. Stat.

17.     Attorney General Uthmeier is authorized to bring actions seeking injunctive relief, civil penalties, attorney's fees, and investigative costs for violations of the Florida RICO Act. § 895.05(9), Fla. Stat.

18.     Defendant World Professional Association for Transgender Health is a 501(c)(3) corporation headquartered at 1061 East Main Street, Suite 300, East Dundee, IL 60118.

19.     Defendant Endocrine Society is a 501(c)(3) corporation headquartered at 2055 L Street NW, No. 600, Washington, DC 20036.

20.     Defendant American Academy of Pediatrics is a 501(c)(3) corporation headquartered at 345 Park Boulevard, Itasca, IL 60143.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction under section 26.012, Florida Statutes, because the amount in controversy exceeds $50,000. §§ 26.012(2)(a), 34.01(1)(c)3., Fla. Stat.

22.     Venue lies in this Court because Defendants are foreign corporations doing business in this State and the cause of action accrued in St. Lucie County. § 47.051, Fla. Stat.

## FACTUAL ALLEGATIONS

I.     **DEFENDANTS PUBLISH "CLINICAL GUIDELINES" FOR THE TREATMENT OF CHILDREN AND ADOLESCENTS EXPERIENCING GENDER DYSPHORIA.**

   A.     **WPATH Is Created for the Purpose of Legitimizing Fringe Sex Interventions.**

23.     While WPATH holds itself out as an "interdisciplinary professional and educational organization" with the "mission" of "promot[ing] evidence based care . . . in transgender health,"[16] it has never been a disinterested scientific enterprise.

24.     The first "sex reassignment surgery" was overseen by German sexologist Magnus Hirschfeld in 1906.[17] Hirschfeld, a eugenicist who advocated for the sterilization of the "feebleminded,"[18] wrote about his experiments in 1910's *Die Transvestiten*, which coined the term "transvestite."[19] In 1919, Hirschfeld opened the Institute for Sexual Science in Berlin, which specialized in "sexual transitions."[20]

25.     Physicians mentored by Hirschfeld at the Institute for Sexual Science

---

[16]     *About WPATH*, World Professional Association for Transgender Health, https://wpath.org/about/mission-and-vision/.

[17]     *See* Finn Ballard, *The House That Hirschfeld Built*, Gay & Lesbian Review (Mar.–Apr. 2025), https://glreview.org/article/the-house-that-hirschfeld-built-2/.

[18]     Laurie Marhoefer, RACISM AND THE MAKING OF GAY RIGHTS 129–46 (2022); Michael Cook, *A dark corner of transgender history*, BioEdge (May 29, 2023), https://bioedge.org/gender/transgender/a-dark-corner-of-transgender-history/.

[19]     *Transvestism*, Britannica (online ed.), https://www.britannica.com/topic/transvestism.

[20]     Megan Lim, et al., *A pioneering gender-affirming health institute opened in 1919 in Berlin*, NPR (Mar. 1, 2023), https://www.npr.org/2023/03/01/1160457191/a-pioneering-gender-affirming-health-institute-opened-in-1919-in-berlin.

became pioneers in the field of sex intervention. For example, Erwin Gohrbandt performed the first known penectomy-vaginoplasty in 1931 under Hirschfeld's supervision.[21]

26.     Another of Hirschfeld's proteges, Harry Benjamin, moved to New York City after studying at the Institute for Sexual Science.[22] Benjamin's career languished in America for many years. After peddling a serum extracted from turtles as a cure for tuberculosis, Benjamin began promoting "tying off the ducts carrying sperm from the testes" and x-raying ovaries to stimulate "sexual rejuvenation."[23] Medical journals disproved Benjamin's techniques as "medical follies," and physicians in the American Medical Association counted Benjamin among the "quacks, near-quacks, and faddists."[24]

27.     Benjamin's fortunes improved in 1948, when he began seeing patients for "transsexualism." His new practice's first patient was a male child who insisted

---

[21] Andrew J. Zilavy et al., *The History of Gender-Affirming Vaginoplasty Technique*, 165 Urology 366, 368 (2022), https://www.goldjournal.net/action/showPdf?pii=S0090-4295%2822%2900297-7. Gohrbandt would later participate in the hypothermia experiments at the Dachau concentration camp, which involved submerging prisoners in icy water to the point of unconsciousness and attempting to revive them through various means, including immersion in boiling water. Christian Pross, *Nazi Doctors, German Medicine, and Historical Truth*, in George J. Annas & Michael A. Grodi, THE NAZI DOCTORS AND THE NUREMBURG CODE 36 (1995); Robert L. Berger, *Nazi Science — The Dachau Hypothermia Experiments*, 322 New England J. Med. 1436 (May 17, 1990), https://www.nejm.org/doi/pdf/10.1056/NEJM199005173222006. The experiments killed between 80 and 90 prisoners. Berger at 1437.
[22] Vernon Rosario, *The Birth of Transgender Science*, Gay & Lesbian Review (Sept. 2024), https://glreview.org/article/the-birth-of-transgender-science/ (reviewing Alison Li, WONDROUS TRANSFORMATIONS: MAVERICK PHYSICIAN, THE SCIENCE OF HORMONES, AND THE BIRTH OF THE TRANSGENDER REVOLUTION (2023)).
[23] *Id.*
[24] *Id.*

he was a girl.[25] The child was referred to Benjamin by Alfred Kinsey,[26] a sexologist who used "fraudulent, criminally gathered research"[27] to normalize deviant sexual behavior, including rape and pedophilia.[28] Benjamin administered estrogen and arranged for the child and his mother to travel to Germany for surgery.[29] Soon, European doctors began referring "transexual" patients to Benjamin as well.[30]

28.    In 1954, Benjamin oversaw the vaginoplasty of George William "Christine" Jorgensen.[31] Jorgensen had served in the Army during World War II, and his transformation became national news. Benjamin capitalized on the press, publishing *The Transsexual Phenomenon*.[32] The book laid out Benjamin's view that, "[s]ince . . . the mind of the transsexual cannot be adjusted to the body, it is logical and justifiable to attempt the opposite, to adjust the body to the mind."[33] Interventions recommended by the book included hormone therapy and surgery, including castration, penectomy, and vaginoplasty.[34]

29.    In 1963, Benjamin began performing sex interventions on Rita "Reed"

---

[25] Walt Heyer *"Sex Change" Surgery: What Bruce Jenner, Diane Sawyer, and You Should Know*, Public Discourse (Apr. 27, 2015), https://www.thepublicdiscourse.com/2015/04/14905/.
[26] *Id.*
[27] Tom Strode, *Kinsey's flawed, deviant research transformed laws, Reisman says*, Baptist Press (Feb. 4, 1998), https://www.baptistpress.com/resource-library/news/kinseys-flawed-deviant-research-transformed-laws-reisman-says/; *see also* Judith A. Reisman et al., KINSEY, SEX AND FRAUD: THE INDOCTRINATION OF A PEOPLE Hardcover (1990).
[28] *See* Robert H. Knight, *How Alfred C. Kinsey's Sex Studies Have Harmed Women and Children*, Concerned Women for America, https://concernedwomen.org/images/content/kinsey-women_11_03.pdf.
[29] Heyer, *supra*.
[30] Joanne Meyerowitz, HOW SEX CHANGED: A HISTORY OF TRANSSEXUALITY IN THE UNITED STATES 143 (2002).
[31] Rosario, *supra*.
[32] *Id.*
[33] Harry Benjamin, THE TRANSSEXUAL PHENOMENON 53 (1966).
[34] *See id.*

Erickson, a female heiress who wanted to live as a man.[35] In 1969, Erickson's foundation bankrolled Benjamin's "International Symposium on Gender Identity."[36] Ten years later, the foundation created the Harry Benjamin International Gender Dysphoria Association (HBIGDA) to fund Benjamin's efforts to promote sex interventions.[37]

30.     HBIGDA's first order of business was the development of "clinical guidelines" that could be used to legitimize the sex interventions being performed by Benjamin and his collaborators. HBIGDA published its first "Standards of Care for the Health of Transexual People" ("Standards of Care" or "SOC") in 1979, the same year it was incorporated. Revisions were published in 1980, 1981, and 1990.[38]

## B.     WPATH Begins the Enterprise by Publishing the SOC-5 (1998)

31.     The fifth version of the Standards of Care, published in 1998, was the first to address the treatment of adolescents. It recommended that, "[i]n selected cases," adolescents as may be administered "hormonal therapy" in two phases.[39] Hormones administered in the first phase, known colloquially as puberty blockers, "delay the somatic changes of puberty."[40] The second phase is the administration of

---

[35] Matt Walsh, *The Secret History of WPATH, the Perverse Cult That Pushed Gender Madness into the Mainstream*, Daily Wire (Mar. 6, 2024), https://www.dailywire.com/news/the-secret-history-of-wpath-the-perverse-cult-that-pushed-gender-madness-into-the-mainstream.
[36] *International Symposia*, World Professional Association for Transgender Health, https://wpath.org/about/history/international-symposia/.
[37] *Id.*
[38] *History and Purpose*, World Professional Association for Transgender Health, https://wpath.org/publications/soc8/soc8-history/.
[39] Stephen B. Levine, et al., *Harry Benjamin International Gender Dysphoria Association's The Standards of Care for Gender Identity Disorders, Fifth Version*, 2 Int. J. Transgenderism 2 (Apr. - June 1998) ("WPATH SOC-5").
[40] *Id.*

"cross-sex hormones."[41]

32.    The SOC-5 claimed that, while cross-sex hormones "produce irreversible changes," puberty-blockers merely "gain time to further explore the gender and other developmental issues in psychotherapy."[42]

33.    The SOC-5 stated that "[s]econd phase hormones, those which induce opposite sex characteristics [sic] should not be given prior to age 16 years."[43] No age minimum was specified for puberty blockers.[44]

34.    WPATH had no credible evidence for these recommendations. Rather, the recommendations represent the far end of the Overton window as it existed in 1998.

## C.    WPATH Publishes the SOC-6 (2001)

35.    The SOC-5 were just the beginning of HBIGDA's campaign to slowly shift the range of medically- and politically-acceptable pediatric sex interventions by publishing gradually more permissive guidelines. The next iteration of HBIGDA's Standards of Care were released in 2001.[45] The SOC-6 raised the possibility of gender dysphoric adolescents "attend[ing] school using a name and clothing opposite to his or her sex of assignment."[46]

36.    Whereas the SOC-5 provided no guidance about the age at which

---

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] Walter Meyer III, et al., *Harry Benjamin International Gender Dysphoria Association's The Standards of Care for Gender Identity Disorders, Sixth Version*, 5 Int. J. Transgenderism 1 (Jan. – Mar. 2001) ("WPATH SOC-6").

[46] *Id.* at 12–13.

puberty blockers should be commence, the SOC-6 advised that "[a]dolescents may be eligible for puberty suppressing hormones as soon as pubertal changes have begun," which may be as early as "9 years of age."[47] The SOC-6 justified this recommendation by asserting that puberty suppressing hormones effectively "avert negative social and emotional consequences of gender dysphoria."[48] On the other hand, "[r]efusing timely medical interventions for adolescents might prolong gender dysphoria and contribute to an appearance that could provoke abuse and stigmatization."[49]

37.     As for cross-sex hormones, the SOC-6 abandoned the age limit specified by the SOC-5 (16 years old), instead recommending that "treatment decisions should be made among the adolescent, the family, and the treatment team."[50]

38.     HBIGDA cited no credible evidence for these recommendations and there was none.

**D.  Endocrine Society Joins the Enterprise by Publishing the 2007 ES Guideline**

39.     The Endocrine Society is a membership organization that bills itself as "a global community of physicians and scientists dedicated to accelerating scientific breakthroughs and improving patient health and well being."[51] To this end, Endocrine Society "[p]ublish[es] and promot[es] cutting-edge endocrine science through [its] peer-reviewed journals and other publications," "[s]erv[es] as a trusted advocate for [its] members with policymakers and regulators to ensure scientific

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Who We Are*, Endocrine Society, https://www.endocrine.org/about-us.

discovery is appropriately supported and policies benefit healthcare providers and patients," and "[c]reat[es] resources and educational materials to help clinicians and researchers accelerate the pace of scientific discovery and translate the latest science into quality clinical care."[52]

40.    In 2009, WPATH recruited Endocrine Society to the enterprise by co-sponsoring Endocrine Society's "Gender Dysphoria/Gender Incongruence Guideline" ("the 2009 ES Guideline"). The 2009 ES Guideline adopted nearly all the SOC-6's recommendations and cited the SOC-6 as the evidence for its recommendations.[53] Like HBIGDA's Standard of Care, the 2009 ES Guideline claimed that puberty blockers are "fully reversible"[54] and justified them on the assertion that "[m]anagement of gender dysphoria usually improves" after "[p]ubertal suppression."[55]

**E.    WPATH Publishes the SOC-7 (2011)**

41.    The newly-renamed WPATH[56] added a new link to the guidelines daisy chain in 2011 with the Standards of Care Version 7.

42.    Unlike previous guidelines, the SOC-7 presented "social transitioning" as an option for *pre-pubertal* children allegedly experiencing gender dysphoria.[57]

---

[52] *Id.*
[53] Wylie C Hembree et al., *Endocrine treatment of transsexual persons: an Endocrine Society clinical practice guideline*, 94 J. Clinical Endocrinology & Metabolism 3132, 3135 (Sept. 2009), https://academic.oup.com/jcem/article/94/9/3132/2596324 ("2009 ES Guideline").
[54] *Id.*
[55] *Id.* at 3140.
[56] *International Symposia, supra.*
[57] Eli Coleman et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7*, 13 Int. J. Transgenderism 165, 176 (Aug. 27, 2012), https://onlineacademiccommunity.uvic.ca/ahdevor/wp-content/uploads/sites/2247/2020/04/Standards-of-Care-for-the-Health-of-Transsexual-

43.     And while the SOC-7 stuck to the guidance in the SOC-6 and 2009 ES Guideline that "[g]enital surgery should not be carried out until . . . patients reach the legal age of majority,"[58] they stated that "[c]hest surgery in FtM [female to male] patients [i.e., mastectomy] could be carried out earlier, preferably after ample time of living in the desired gender role and after one year of testosterone treatment."[59]

44.     As evidence for their recommendations, the SOC-7 cited the 2009 ES Guideline—the same guidelines that had been sponsored by WPATH and relied upon earlier versions of the WPATH Standards of Care. The SOC-7 warned that "[r]efusing timely medical interventions for adolescents might prolong gender dysphoria."[60]

**F.  Endocrine Society Publishes the 2017 ES Guideline**

45.     Endocrine Society leapfrogged the SOC-7 in November 2017 with a new Gender Dysphoria/Gender Incongruence Guideline ("the 2017 ES Guideline").[61] According to Endocrine Society, the ES Guideline "provides the standard of care,"[62] "sets the standard of care,"[63] and "[e]stablishes a framework for the appropriate

---

Transgender-and-Gender-Nonconforming-People-Version-7.pdf ("WPATH SOC-7").

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] Wylie C Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869 (Nov. 2017), https://academic.oup.com/jcem/article/102/11/3869/4157558 ("2017 ES Guideline").

[62] *Transgender Health: An Endocrine Society Position Statement*, Endocrine Society (Dec. 16, 2020), https://www.endocrine.org/advocacy/position-statements/transgender-health; Letter from Endocrine Society to Rachel Levine (Apr. 5, 2021), https://www.endocrine.org/-/media/endocrine/files/advocacy/society-letters/2021/april-2021/levine-letter.pdf.

[63] *Endocrine Society urges policymakers to follow science on transgender health*, Endocrine Society (Oct. 28, 2019), https://www.endocrine.org/news-and-advocacy/news-room/2019/transgender-custody-statement; @EndoMedia, X (Oct 29, 2019 12:49 PM), https://x.com/EndoMedia/status/1189222801531555840.

treatment of . . . individuals" experiencing gender dysphoria.[64]

46.     WPATH co-sponsored the revision.[65] And just as the 2009 ES Guideline marched in lockstep with WPATH's SOC-6, the 2017 ES Guideline marched in lockstep with WPATH's SOC-7, including eliminating the age minimum for breast surgeries.[66]

## G.     AAP Joins the Enterprise by Issuing the AAP Policy Statement (2018)

47.     The American Academy of Pediatrics (AAP) is a membership organization with the mission of "attain[ing] optimal physical, mental, and social health and well-being for all infants, children, adolescents and young adults."[67]

48.     To "help guide practitioners in the care of children," AAP publishes "policy statements" on topics that impact the health and wellbeing of infants, children, adolescents and young adults.[68] AAP claims that these policy statements "are written by medical experts," "reflect the latest evidence in the field," and "are evidence driven, nonpartisan and rigorously reviewed."[69] AAP emphasizes that its policy statements "are an integral part of the Academy's identity."[70]

49.     In October 2018, the American Academy of Pediatrics published a policy statement entitled "Ensuring Comprehensive Care and Support for Transgender and

---

[64] *Gender Dysphoria / Gender Incongruence Guideline Resources*, Endocrine Society (Oct. 25, 2024), https://www.endocrine.org/clinical-practice-guidelines/gender-dysphoria-gender-incongruence.

[65] 2017 ES Guideline at 3869.

[66] *Id.* at 3872.

[67] *Mission and Strategic Plan*, American Academy of Pediatrics, https://www.aap.org/en/about-the-aap/strategic-plan/.

[68] *Policy Statement Development Process*, American Academy of Pediatrics, https://www.aap.org/en/policy/policy-statement-development-process/.

[69] *Id.*

[70] *Id.*

Gender-Diverse Children and Adolescents" ("the AAP Policy Statement").[71]

50. The AAP Policy Statement adopted the recommendations of the SOC-7 and the 2019 ES Guideline and cited those guidelines as evidence for its recommendations.[72] However, unlike the SOC-7 and the 2019 ES Guideline, the AAP Policy Statement recommended surgeries on "genitalia," including "removal of internal organs, such as ovaries or the uterus."[73] AAP further urged insurers to "offer coverage for health care that is specific to the needs of youth who identify as TGD, including coverage for . . . surgical gender-affirming interventions."[74]

**H. States Respond by Banning Sex Interventions on Minors**

51. The AAP Policy Statement effectively shifted the medical profession's Overton window. The rate of pediatric sex intervention—including genital surgeries—exploded from 2019 to 2021.[75]

52. This, however, was outside the Overton window for the voting public.

53. In 2021, Arkansas became the first State to ban sex interventions on minors.[76] Alabama and Arizona followed in the spring of 2022.[77]

54. In April 2022, Florida's Department of Health issued guidance on

---

[71] Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics 1 (Oct. 2018), https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for?autologincheck=redirected ("AAP Policy Statement").
[72] *Id.* at 12–13.
[73] *Id.* at 7.
[74] *Id.* at 10.
[75] *See* Ghorayshi, *supra*; Levin, *supra*.
[76] *See* Lindsey Dawson & Jennifer Kates, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions*, KFF (last accessed Dec. 9, 2025), https://www.kff.org/lgbtq/gender-affirming-care-policy-tracker/.
[77] *Id.*

treating gender dysphoria for children and adolescents ("FDOH Guidance").[78] The FDOH Guidance noted that "[s]ystematic reviews on hormonal treatment for young people show a trend of low-quality evidence, small sample sizes, and medium to high risk of bias."[79] It concluded that, "[b]ased on the currently available evidence, encouraging mastectomy, ovariectomy, uterine extirpation, penile disablement, tracheal shave, the prescription of hormones which are out of line with the genetic make-up of the child, or puberty blockers, are all clinical practices which run an unacceptably high risk of doing harm."[80]

55.     Regarding puberty blockers and cross-sex hormones, the Department of Health found that hormonal treatments carry "the potential for long-term, irreversible effects" and that "evidence regarding their psychosocial and cognitive impact is generally lacking."[81] The Department therefore warned that "[a]nyone under 18 should not be prescribed puberty blockers or hormone therapy."[82]

56.     The FDOH Guidance further cautioned that "[g]ender reassignment surgery should not be a treatment option for children or adolescents."[83]

57.     Based on the FDOH Guidance, Florida's Agency for Health Care Administration (AHCA) directed the Florida Medicaid program to evaluate whether the gender-affirming care model is consistent with generally accepted professional

---

[78] *Treatment of Gender Dysphoria for Children and Adolescents*, Florida Department of Health (Apr, 20, 2022), https://www.floridahealth.gov/newsroom/2022/04/20220420-gender-dysphoria-guidance.pr.html.
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*

medical standards.[84]

58.     In June 2022, "[f]ollowing a robust review of available medical evidence and the assessment of five medical experts, including health care researchers who studied the quality of the evidence relied upon for 'gender affirming' care," AHCA issued a final report determining that "sex reassignment surgery, cross-sex hormones, and puberty blockers are not consistent with generally accepted professional medical standards and are experimental and investigational with the potential for harmful long term affects."[85]

59.     AHCA's report included the following findings:[86]

- "Scientific studies supporting hormone replacement therapy, puberty blockers, and sex reassignment surgery for treating gender dysphoria are weak to very weak."

- "The evidence showing benefits from hormone replacement therapies for gender dysphoria is very weak."

- "Scientific studies do not show that the use of puberty blockers improves mental health."

- "There is a lack of long term, follow-up studies after sex reassignment surgery."

- "There are no randomized control trials on the effectiveness of 'gender affirming' care."

60.     Thus, AHCA promulgated rules excluding puberty blockers, cross-sex hormones, and surgeries from the Medicaid program's coverage treatments for

---

[84] *Agency for Health Care Administration Releases Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria*, Florida Agency for Health      Care      Administration      (June      2,      2022), https://ahca.myflorida.com/content/download/7115/file/6-2-22_AHCA_GAPMS_Press_Release_FINAL.pdf?version=1.
[85] *Let Kids Be Kids*, Florida Agency for Health Care Administration https://ahca.myflorida.com/let-kids-be-kids.
[86] *Id.*

pediatric gender dysphoria.[87]

61.     Defendants doubled down.  According to WPATH: "The Florida Boards, rather than following the science and consensus-based guidelines established and recently updated by WPATH, have chosen politics over science to deny families and their children vital medical care. Lack of access to gender affirming care adds to a patient's psychosocial stress and is associated with increased suicidality. The proposed ban will result in pain and potential harm for the very constituents it claims to protect. We denounce the proposed draft rule as cruel, counter to medical evidence and discriminatory."[88] WPATH further stated that the Florida Department of Health's "so-called guidance" was "aimed at stopping medically necessary health care for transgender youth" and "misrepresent[ed] the science on how to care for them."[89]

62.     The Endocrine Society released a statement that "object[ed] to the Florida Department of Health's bulletin on gender-affirming care for transgender and gender-diverse youth" and "call[ed] on the Florida Department of Health to rescind its bulletin and allow physicians to provide evidence-based care."[90] Endocrine Society alleged that the FDOH Guidance was contrary to "evidence-based care that is

---

[87] Fla. Admin. Code R. 59G-1.050(7).

[88] *Statement of Opposition to Florida Draft Rule Banning Gender Affirming Care for Adolescents*, WPATH (Nov. 11, 2022), https://wpath.org/wp-content/uploads/2024/11/WPATHUSPATH-Statement-re-Florida-Ban-Nov-11-2022.pdf.

[89] *WPATH/USPATH Denounce Florida Department of Health for Harmful Guidelines Targeting Trans Youth*, WPATH (Apr. 21, 2022), https://wpath.org/wp-content/uploads/2024/11/WPATHUSPATH-Statement-re-Florida-Apr-21-2022.pdf.

[90] *Endocrine Society opposes Florida Department of Health policy on gender dysphoria treatment for children and adolescents*, Endocrine Society (Apr. 20, 2022), https://endocrinenews.endocrine.org/endocrine-society-opposes-florida-department-of-health-policy-on-gender-dysphoria-treatment-for-children-and-adolescents/.

supported by major international medical groups—including the Endocrine Society, American Medical Association, the American Psychological Association, and the American Academy of Pediatrics—and Clinical Practice Guidelines."[91]

63.     Endocrine Society further argued that the FDOH Guidance "reflects widespread misinformation about gender-affirming care. . . . When an individual's gender identity is not respected and the individual cannot access medical care, it can result in higher psychological problem scores and can raise the person's risk of committing suicide or other acts of self-harm."[92]

64.     Endocrine Society also reasserted the reversibility of puberty blockers: "The Florida Department of Health's message to eliminate access to puberty-delaying medication for transgender and gender-diverse teenagers contradicts accepted medical practice. Only reversible treatments to delay puberty are recommended for younger adolescents, according to our Clinical Practice Guideline and joint policy perspective issued with the Pediatric Endocrine Society. Puberty-delaying medication is a safe, reversible and conservative approach that gives teenagers and their families more time to explore their options."[93]

65.     The Endocrine Society statement went on to represent that "[t]here is broad consensus within the medical community about the importance of gender-affirming care. Other major international medical and scientific organizations such as WPATH . . . and the American Academy of Pediatrics are in alignment with the

---

[91] *Id.*
[92] *Id.*
[93] *Id.*

20

Society on the importance of gender-affirming care."[94]

66.     The president of AAP's Florida chapter called it "disheartening that Florida's health agency continues to issue child-health guidance that conflicts with broad scientific consensus and without the consultation of pediatric physicians."[95] "Appropriate gender-affirming care," she said, "is safe and effective for treating patients experiencing gender dysphoria."[96] Moreover, "[r]esearch shows that access to evidence-based gender affirming care among adolescents significantly improves their mental health."[97]

67.     AAP posted an online "rapid-response rebuttal report" "to challenge [the Florida Department of Health's] disinformation about [gender affirming care]" and submitted public comments opposing the AHCA rule.[98]

68.     Defendants and their clinical guidelines were also instrumental in litigation brought by gender dysphoric minors and their parents that challenged the AHCA rule in federal court. Their complaint included the following statements:

- "The World Professional Association for Transgender Health ('WPATH') and the Endocrine Society have published widely accepted guidelines for treating gender dysphoria."[99]

---

[94] *Id.*

[95] *FCAAP Rejects New Florida Department of Health Guidelines on Gender-affirming Care for Youth*, Florida Chapter of the American Academy of Pediatrics (Apr. 21, 2022), https://www.fcaap.org/posts/news/press-releases/florida-chapter-of-the-american-academy-of-pediatrics-rejects-new-florida-department-of-health-guidelines-on-gender-affirming-care-for-youth/.

[96] *Id.*

[97] *Id.*

[98] Meredithe McNamara et al., *Combating Scientific Disinformation on Gender-Affirming Care*, 152 Pediatrics 1, 1 (Sept. 2023), https://publications.aap.org/pediatrics/article/152/3/e2022060943/193719/Combating-Scientific-Disinformation-on-Gender.

[99] First Amended Complaint, *Dekker v. Weida*, No. 4:22-cv-00325-RH-MAF, 2023 WL

- "WPATH is an international and multidisciplinary association whose mission is to promote evidence-based health care protocols for transgender people. WPATH publishes the Standards of Care based on the best available science and expert professional consensus."[100]

- "The WPATH Standards of Care and Endocrine Society Guidelines are widely accepted as best practices guidelines for the treatment of adolescents and adults diagnosed with gender dysphoria and have been recognized as authoritative by the leading medical organizations. The WPATH Standards of Care and Endocrine Society Guidelines recognize that puberty delaying medication, hormone therapy, and surgery to align a person's primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring) with their gender identity are medically necessary services for many people with gender dysphoria."[101]

- "Under the WPATH Standards of Care, medical interventions may become medically necessary and appropriate after transgender youth reach puberty."[102]

- "Puberty delaying treatment is reversible."[103]

- "Gender-affirming medical care . . . has been shown to positively impact the short and long-term health outcomes for transgender people of all ages."[104]

- "When transgender people are provided with access to appropriate and individualized gender-affirming care in connection with treatment of gender dysphoria, its symptoms can be alleviated and even prevented. As such, the . . . . Endocrine Society, . . . , American Academy of Pediatrics, and other major medical organizations have recognized that gender-affirming care is medically necessary, safe, and effective treatment for gender dysphoria, and that access to such treatment improves the health and well-being of transgender people."[105]

- "The medical procedures for the treatment of gender dysphoria are not 'cosmetic' or 'elective' or for the mere convenience of the patient, but instead are medically necessary for the treatment of the diagnosed medical condition. They are not experimental or investigational, because decades of both clinical experience and medical research show that they are essential to achieving

---

3723972 ¶ 37 (N.D. Fla. May 18. 2023).

[100] *Id.* at ¶ 38.

[101] *Id.* at ¶ 39.

[102] *Id.* at ¶ 47.

[103] *Id.* at ¶ 49.

[104] *Id.* at ¶ 52.

[105] *Id.* at ¶ 56.

well-being for transgender patients with gender dysphoria."[106]

69.     Defendants submitted amicus briefs in support of the plaintiffs, arguing that the AHCA rule "did not rest on scientific knowledge and should be enjoined pending litigation."[107]

70.     Realizing that the plaintiffs would rely on their positions on treatments for gender dysphoria, AHCA sought documents and corporate depositions from WPATH, the Endocrine Society, and the American Academy of Pediatrics.[108] "In particular, the State wanted to know why the organizations support puberty blockers and cross-sex hormones as treatments for gender dysphoria, and how the organizations reached this position."[109] Defendants resisted and successfully quashed the subpoenas in United States Court of Appeals for the District of Columbia. "The State was thus prevented from . . . test[ing] the credibility and reliability of these organizations' public positions on the treatment of gender dysphoria."[110]

71.     The district court enjoined AHCA's rule, concluding that, "based on current medical knowledge," AHCA unreasonably determined that puberty blockers and cross-sex hormones to treat gender dysphoria are experimental.[111] The district court relied on the WPATH and Endocrine Society guidelines, calling them "the widely accepted standard of care."[112]

---

[106] *Id.* at ¶ 57.
[107] McNamara, *supra*, at 4.
[108] Defendants-Appellants' Initial Brief, *Dekker v. Weida*, No. 23-12155, 2023 WL 6849939, at *17 (11th Cir. Oct. 6, 2023).
[109] *Id.* at *17.
[110] *Id.*
[111] *Dekker*, 679 F. Supp. 3d at 1283.
[112] *Id.* at 1299.

72.     In 2023, the Florida Legislature codified the Department of Health's recommendations by enacting SB 254.[113] That legislation generally prohibits "sex-reassignment prescriptions and procedures . . . for patients younger than 18 years of age."[114]

73.     By the end of 2023, 19 States prohibited or restricted physicians from performing sex interventions on minors.[115]

## I.     WPATH Publishes the SOC-8 (2022)

74.     The eighth version of the Standards of Care ("SOC-8") was published in WPATH's journal, the "International Journal of Transgender Health," on September 15, 2022.[116] The SOC-8 identify "increasing scientific evidence" as WPATH's sole motivation for commissioning a new Standards of Care.[117]

75.     The SOC-8 assert that WPATH "is an international, multidisciplinary, professional association whose mission is to promote evidence-based care [and] research . . . in transgender health."[118] As such, publication of the Standards of Care is "[o]ne of the main functions of WPATH."[119]

76.     The SOC-8 go to great lengths to assure readers that they are an objective assessment of existing scientific evidence. They claim to be "informed by a

---

[113] Ch. 2023-90 Fla. Laws (codified at § 456.52(1), Fla. Stat.).

[114] *Id.*

[115] Dawson & Kates, *supra.*

[116] Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int. J. Transgender Health 1 (Sept. 15, 2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ("WPATH SOC-8").

[117] *Id.*

[118] *Id.* at S3.

[119] *Id.* at S5.

systematic review of evidence and an assessment of the benefits and harms of alternative care options."[120] The SOC-8 elsewhere claim to be "based on the best available science and expert professional consensus in transgender health,"[121] with recommendation statements "developed based on data derived from independent systematic literature."[122] The SOC-8's topline conclusion is that its authors succeeded in establishing "standards for promoting optimal health care and guidance for the treatment of people experiencing gender incongruence"[123] that provide "safe and effective pathways" for such patients.[124]

### i. WPATH's Claims about the Methodology of the SOC-8

77.     Regarding methodology, the SOC-8 boast that they are "based upon a more rigorous and methodological evidence-based approach than previous versions. This evidence is not only based on the published literature (direct as well as background evidence) but also on consensus-based expert opinion."[125]

78.     The development of the SOC-8 allegedly consisted of 19 steps:[126]

    i. Establishing Guideline Steering Committee including Chair, and Co-Chairs (July 19, 2017)

    ii. Determining chapters (scope of guidelines)

    iii. Selecting Chapter Members based upon expertise (March 2018)

    iv. Selecting the Evidence Review Team: John Hopkins University (May 2018)

    v. Refining topics included in the SOC-8 and review questions for systematic reviews

---

[120] *Id.* at S247.
[121] *Id.* at S3.
[122] *Id.*
[123] *Id.*
[124] *Id.*
[125] *Id.* at S8, S247.
[126] *Id.* at S247.

vi.     Conducting systematic reviews (March 2019)

vii.    Drafting the recommendation statements

viii.   Voting on the recommendation statements using a Delphi process (September 2019–February 2022)

ix.     Grading of the recommendations statements

x.      Writing the text supporting the statements

xi.    Independently validating the references used in the supportive text

xii.   Finalizing a draft SOC-8 (December 1, 2021)

xiii.  Feedback on the statements by International Advisory Committee

xiv.  Feedback on the entire draft of the SOC-8 during a public comment period (November 2021–January 2022)

xv.   Revision of Final Draft based on comments (January 2022–May 2022)

xvi.  Approval of final Draft by Chair and Co-Chairs (June 10, 2022)

xvii. Approval by the WPATH Board of Directors

xviii. Publication of the SOC-8

xix.  Dissemination and translation of the SOC-8

79.    In forming the Guideline Steering and Chapter Committees pursuant to steps 1 and 3, the SOC-8 claim to have used "recommendations on clinical practice guideline development from the National Academies of Medicine and The World Health Organization that addressed transparency, the conflict-of-interest policy, committee composition and group process."[127] Revision committees allegedly "consisted of subject matter experts, health care professionals, researchers and stakeholders with diverse perspectives and geographic representation."[128]

80.    The SOC-8 further represent that "[c]onflict [sic] of interests were reviewed as part of the selection process for committee members and at the end of the

---

[127] *Id.*

[128] *Id.*

process before publication. No conflicts of interest were deemed significant or consequential."[129]

81. Steps 4 and 6 were handled by an "independent team" of researchers at Johns Hopkins University led by Dr. Karen A. Robinson.[130] The systematic reviews undertaken by Johns Hopkins allegedly "informed" WPATH's recommendations.[131]

82. As for step 8, WPATH represents that "[c]onsensus of the final recommendations was attained using a Delphi process that included all members of the Standards of Care Revision committee and required that recommendation statements were approved by 75% of members."[132] WPATH discloses that step 15, revision of the final draft based on public comments, required the reconvening of Delphi in January 2022 to modify two statements and compose three additional statements.[133]

83. For step 9, the SOC-8 say that "chapter members graded each statement using a process adapted from the Grading of Recommendations, Assessment, Development and Evaluations (GRADE) framework. This a transparent framework for developing and presenting summaries of evidence and provides a systematic approach for making clinical practice recommendations."[134] Statements were allegedly classified as "strong recommendations" ("we recommend") where "the evidence is of high quality" and "there are few downsides of

---

[129] *Id.* at S177.
[130] *Id.* at S247.
[131] *Id.*
[132] *Id.*
[133] *Id.* at S251.
[134] *Id.* at S250.

therapy/intervention/strategies."[135] On the other hand, the SOC-8 offer "weak recommendations" ("we suggest") where "there are weaknesses in the evidence base" or "there is a need to balance the potential upsides and downsides of interventions/therapy/strategies."[136]

### ii. WPATH's Claims about the Findings of the SOC-8

84.     The SOC-8 claim that the methodology described above yielded the following recommendations and conclusions:

85.     "There is strong evidence demonstrating the benefits in quality of life and well-being of gender-affirming treatments, including endocrine and surgical procedures," which "effectively affirm an individual's gender identity and reduce gender incongruence and dysphoria."[137]

86.     "Social transition can be extremely beneficial to many TGD people," as "[s]ocial transition and gender identity disclosure can improve the mental health of a TGD person seeking gender-affirming interventions."[138] With respect to children, the benefits of social transition "include facilitating gender congruence while reducing gender dysphoria and enhancing psychosocial adjustment and well-being."[139] The SOC-8 note that "[t]hese findings differ markedly from the mental health challenges consistently noted in prior research with gender diverse children and adolescents and suggest the impact of social transition may be positive."[140]

---

[135] *Id.*
[136] *Id.*
[137] *Id.* at S18.
[138] *Id.* at S39.
[139] *Id.* at S77.
[140] *Id.*

87.    Puberty blockers are recommended when "[t]he adolescent has reached Tanner stage 2," i.e., "[t]he onset of puberty."[141]

88.    "[T]he data consistently demonstrate improved or stable psychological functioning, body image, and treatment satisfaction" for transgender adolescents who are administered puberty blockers.[142] "[T]his emerging evidence base indicates a general improvement in the lives of transgender adolescents" who receive puberty blockers.[143] "Taken as a whole, the data show early medical intervention—as part of broader combined assessment and treatment approaches focused on gender dysphoria and general well-being—can be effective and helpful for many transgender adolescents seeking these treatments."[144] Administration of the pubertal hormone suppressor GnRHa (colloquially known as "puberty blockers") to adolescents is "fully reversible" and provides "an extended time for adolescents to explore their gender identity by means of an early social transition."[145]

89.    The administration of cross-sex hormones "has been shown to improve quality of life and to decrease depression and anxiety.[146]

90.    Regarding sex intervention surgeries:

- "Top surgery" in biological females (mastectomy) leads to "a consistent and direct increase in health-related quality of life, a significant decrease in gender dysphoria, [and] a consistent increase in satisfaction with body and appearance."[147]

---

[141] *Id.* at S64.
[142] *Id.* at S46.
[143] *Id.* at S47.
[144] *Id.* at S47.
[145] *Id.* at S112.
[146] *Id.* at S174.
[147] *Id.* at S128.

- "Breast augmentation" surgery in biological males leads to "a consistent and direct improvement in patient satisfaction, including general satisfaction, body image satisfaction, and body image" and a "positive trend toward improvement in both depression and anxiety scores."[148]

- Vaginoplasty in biological males leads to a high level of patient satisfaction and a "low incidence of regret."[149]

- Metoidioplasty and phalloplasty in biological females lead to "high overall levels of postoperative satisfaction."[150]

- Studies "have reported improved psychosocial functioning and decreased gender dysphoria in adolescents who have undergone vaginoplasty," suggesting "there may be a benefit for some adolescents to having [surgical] procedures performed before the age of 18."[151]

91. "Access to gender-affirming medical treatment is associated with a substantial reduction in the risk of suicide attempt."[152]

92. Because they are "effective at reducing gender incongruence and gender dysphoria," "gender-affirming interventions" are "medically necessary."[153]

> These include but are not limited to hysterectomy +/- bilateral salpingo-oophorectomy; bilateral mastectomy, chest reconstruction or feminizing mammoplasty, nipple resizing or placement of breast prostheses; genital reconstruction, for example, phalloplasty and metoidioplasty, scrotoplasty, and penile and testicular prostheses, penectomy, orchiectomy, vaginoplasty, and vulvoplasty; hair removal from the face, body, and genital areas for gender affirmation or as part of a preoperative preparation process; gender-affirming facial surgery and body contouring; voice therapy and/or surgery; as well as puberty blocking medication and gender-affirming hormones[.][154]

93. Thus, Defendants' Guidelines completed their preordained evolution

---

[148] *Id.*
[149] *Id.* at S129.
[150] *Id.*
[151] *Id.* at S66.
[152] *Id.* at S174.
[153] *Id.* at S18.
[154] *Id.*

from puberty blockers and cross-sex hormones starting no earlier than 16 (SOC-5) all the way to genital surgery without age limit (SOC-8):

| | Social Transition | Puberty Blockers | Cross-Sex Hormones | Breast Surgery | Genital Surgery |
|---|---|---|---|---|---|
| WPATH SOC-5 (1998) | - | No rec. | 16 yrs | 18 yrs | 18 yrs |
| WPATH SOC-6 (2001) | No rec. | Tanner 2 (9 yrs) | 16 yrs | 18 yrs | 18 yrs |
| ES GUIDELINE (2009) | - | Tanner 2 (9 yrs) | 16 yrs | 18 yrs | 18 yrs |
| WPATH SOC-7 (2011) | No min. | Tanner 2 (9 yrs) | No min. | No min. | 18 yrs |
| ES GUIDELINE (2017) | No min. | Tanner 2 (9 yrs) | No min. | No min. | 18 yrs |
| AAP POLICY (2018) | No min. | Tanner 2 (9 yrs) | No min. | No min. | No min. |
| WPATH SOC-8 (2022) | No min. | Tanner 2 (9 yrs) | No min. | No min. | No min.* |

*The SOC-8 do not recommend phalloplasty until age 18.

## II. DEFENDANTS' CLAIMS ARE FALSE AND MISLEADING.

### A. Systematic Reviews Prove that There is No Credible Evidence that Puberty Blockers Are Fully Reversible or that Pediatric Sex Interventions Improve Mental Health.

In determining whether medical evidence is reliable, clinicians are guided by the principles of evidence-based medicine. *See* Gordon Guyatt et al., *Users' Guides to the Medical Literature: Essentials of Evidence-Based Clinical Practice* 10, JAMAEVIDENCE (3d ed. 2015), https://perma.cc/H46Z-NKEC. Evidence-based medicine employs a hierarchy of evidence, with "systematic reviews" at the top and "expert opinion" at the bottom.

A systematic review involves the "identification, selection, appraisal, and summary of primary studies that address a focused clinical question using methods to reduce the likelihood of bias." *Id.* at 484. After formulating the relevant question to be researched, reviewers identify selection criteria for relevant studies. *See id.* at 274–75. Reviewers then "conduct a comprehensive search of the literature in all relevant medical databases, which typically yields a large number of potentially

relevant titles and abstracts." *Id.* "They then apply the selection criteria to the titles and abstracts, arriving at a smaller number of articles that they retrieve." *Id.* at 275. "Having completed the culling process, the reviewers assess the risk of bias of the individual studies and abstract data from each study," *id.*, bias being a "deviation from the underlying truth because of a feature of the design or conduct of a research study." *Id.* at 422. If the data comes from studies with a high risk of bias, then the data is less reliable. And "[e]ven if the results of different studies are consistent, determining their risk of bias is still important" because "[c]onsistent results are less compelling if they come from studies with a high risk of bias." *Id.* at 283.

While Defendants have been publishing guidelines for decades, there were no published systematic reviews on pediatric gender dysphoria until relatively recently. Once national health agencies began conducting systematic reviews in the early 2020s, however, Defendants' Guidelines were quickly exposed as methodologically bankrupt. Specifically, disinterested systematic reviews—the gold standard in evidence-based medicine—have determined that there is no credible evidence that puberty blockers are "fully reversible" or that sex interventions lead to positive mental health outcomes for children or adolescents. Thus, guidelines containing these representations cannot be properly characterized as "evidence-based."

i. **The Finnish Review**

94. In Finland, public health services are "monitored, defined, and assessed as a whole by the Council for Choices in Health Care (COHERE)."[155] Due to a drastic

---

[155] *What is COHERE Finland?*, Council for Choices in Health Care in Finland (PALKO / COHERE Finland), https://palveluvalikoima.fi/en/cohere-finland.

increase in the number of patients, including minors, referred to the Helsinki University Hospital and the Tampere University Hospital for assessment and treatment of gender dysphoria, COHERE "decided to prepare recommendations for medical treatments of gender dysphoria."[156] Based on "the available research evidence, . . . a literature review of medical treatments, an extensive ethical analysis, and feedback following meetings with patients and the advocacy groups who represent them," COHERE published a report entitled "Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors" in 2020 ("the Finnish Review").[157]

95. The Finnish Review found no correlation between puberty blockers and diminishment in gender dysphoria or improvement in body image.[158] On the other hand, "[p]otential risks of GnRH therapy include disruption in bone mineralization and the as yet unknown effects on the central nervous system," and "[t]he effect of pubertal suppression . . . on fertility is not yet known."[159]

96. The Finnish Review also evaluated "the effect of initiating cross-sex hormone therapy on functioning, progression of developmental tasks of adolescence, and psychiatric symptoms."[160] It found that "during cross-sex hormone therapy, problems in these areas did not decrease."[161]

97. Surgical treatments, the Finnish Review stated, "are not part of the

---

[156] Finnish Review at 4.
[157] *Id.*
[158] *Id.* at 6, 8.
[159] *Id.* at 6.
[160] *Id.*
[161] *Id.*

treatment methods for dysphoria caused by gender-related conflicts in minors."[162]

98.    Ultimately, the Finnish Review concluded that, "[i]n light of available evidence, gender reassignment of minors is an experimental practice."[163]

99.    Instead, the Finnish Review advised that "[t]he first-line intervention for gender variance during childhood and adolescent years is psychosocial support."[164] It noted that, "[i]n adolescents, psychiatric disorders and developmental difficulties may predispose a young person to the onset of gender dysphoria. These young people should receive treatment for their mental and behavioral health issues, and their mental health must be stable prior to the determination of their gender identity."[165]

## ii.    The Swedish Review

100.    In April 2023, researchers published a two-year systematic review commissioned by the Swedish National Board of Health and Welfare ("the Swedish Review").[166]

101.    The Swedish Review concluded that "the efficacy and safety, benefits and risks of [gender-affirming] treatments are not proven," and that "the risks of puberty blockers and gender-affirming treatment are likely to outweigh the expected benefits of these treatments."[167] It noted multiple "factors have shifted the balance

---

[162] *Id.* at 10.
[163] *Id.* at 8.
[164] *Id.*
[165] *Id.*
[166] *Care of children and adolescents with gender dysphoria*, Socialstyrelsen (Dec. 2022), https://www.socialstyrelsen.se/contentassets/444af6c0a5fb429c9b56fd51b931a816/2023-1-8330.pdf.
[167] *Id.* at 3.

between benefit and risk in a negative direction."[168] First, alluding to the concept of social contagion, the Swedish Review described a "lack of clarity about the causes, . . . particularly in the 13 to 17 age group and especially among people whose registered sex at birth is female."[169] The second factor was "[t]he documented prevalence among young adults of medical detransition, which is the process by which a person discontinues gender-affirming medical treatment for any reason or seeks to reverse the medical effects of completed gender-affirming treatment."[170] And third, "[t]he experience-based knowledge of participating experts is less uniform than it was in 2015."[171]

102.    Like the Finnish Review, the systematic review underlying the Swedish Review found no evidence for the assertion that puberty blockers are "fully reversible." Instead, it concluded that "long-term effects of hormone therapy on psychosocial and somatic health are unknown, except that GnRHa treatment seems to delay bone maturation and gain in bone mineral density."[172]

103.    Sweden's National Board of Health and Welfare therefore recommends that treatment of pediatric gender dysphoria should focus on "psychosocial support" and that healthcare professionals "[s]ystematically search for signs of autism spectrum disorder (ASD) and ADHD/ADD."[173]

---

[168] *Id.*

[169] *Id.*

[170] *Id.* at 4.

[171] *Id.*

[172] Jonas F. Ludvigsson et al., *A systematic review of hormone treatment for children withgender dysphoria and recommendations for research*, 112 Acta Paediatrica 2280 (Nov. 2023), https://onlinelibrary.wiley.com/doi/epdf/10.1111/apa.16791.

[173] Socialstyrelsen, *supra*, at 5.

### iii.  The Cass Review

104.  In 2020, Great Britian's National Health Service (NHS), noticing a striking increase in pediatric gender dysphoria diagnoses, called for an independent systematic review of gender identity services for children and young people.[174]

105.  "Given the increasingly evident polarisation among clinical professionals," NHS asked Dr. Hillary Cass—and well-respected pediatrician and senior clinician "with no prior involvement or fixed views in this area"—to oversee the review.[175]

106.  To guide the review, NHS commissioned a "research programme" from the University of York using an open procurement process.[176] The University of York ultimately produced qualitative and quantitative studies of epidemiology and outcomes for children and young people facing gender dysphoria, an international survey of available gender services, and eight systematic reviews.[177] The systematic reviews evaluated patient characteristics, social transition, psychosocial interventions, "puberty suppression," "masculinising and feminising hormone interventions," and care pathways.[178] A final systematic review evaluated the quality of existing guidelines on pediatric gender dysphoria.[179]

107.  In April 2024, NHS published a final report synthesizing the findings of Dr. Cass and the University of York ("the Cass Review"). The report is widely

---

[174] Cass Review at 25.
[175] *Id.* at 75.
[176] *Id.* at 20.
[177] *Id.* at 53.
[178] *Id.*
[179] *Id.*

36

regarded as one of "the most comprehensive, evidence-based reviews of a medical service from the long history of such independent investigations" in the United Kingdom.[180]

108. In the forward, Dr. Cass delivers her topline conclusion: "This is an area of remarkably weak evidence, and yet results of studies are exaggerated or misrepresented by people on all sides of the debate to support their viewpoint. The reality is that we have no good evidence on the long-term outcomes of interventions to manage gender-related distress."[181]

109. Beginning with "social transitioning," Dr. Cass reported that systematic reviews "showed no clear evidence that social transition in childhood has any positive or negative mental health outcomes, and relatively weak evidence for any effect in adolescence" other than that "those who had socially transitioned at an earlier age and/or prior to being seen in clinic were more likely to proceed to a medical pathway."[182]

110. Similarly, the Cass Review "found no evidence that puberty blockers improve body image or dysphoria."[183]

111. It also rejected the notion that there is any credible evidence for the claim that puberty blockers are "fully reversible." To the contrary, there is "no evidence that puberty blockers buy time to think," and "[b]locking the release of these

---

[180] C. Ronny Cheung et al., *Gender medicine and the Cass Review*, 110 Arch. Dis. Child. 1, 2 (2024).
[181] *Id.* at 13.
[182] *Id.* at 31.
[183] *Id.* at 179.

sex hormones could have a range of unintended and as yet unidentified consequences."[184]

112. For instance, because puberty blockers "inhibit" normal pubertal "experimentation," there is "no way of knowing whether the normal trajectory of the sexual and gender identity may be permanently altered."[185] The Cass Review also recognized that "[m]ultiple studies" have shown that puberty blockers compromise bone density.[186] Worse yet, "brain maturation may be temporarily or permanently disrupted by the use of puberty blockers, which could have a significant impact on the young person's ability to make complex risk-laden decisions, as well as having possible longer-term neuropsychological consequences."[187]

113. Similarly, Dr. Cass stated that "[n]o conclusions can be drawn about the effect [of cross-sex hormone interventions] on gender dysphoria, body satisfaction, psychosocial health, cognitive development, or fertility."[188] The Cass Review also noted an "increasing" percentage of people treated with hormones who subsequently detransition.[189]

114. Dr. Cass further concluded that "[i]t has been suggested that hormone treatment reduces the elevated risk of death by suicide in this population, but the evidence found did not support this conclusion. . . . [T]he evidence does not adequately

---

[184] *Id.* at 32, 178.
[185] *Id.* at 178.
[186] *Id.* at 132.
[187] *Id.* at 178.
[188] *Id.* at 33.
[189] *Id.*

support the claim that gender-affirming treatment reduces suicide risk."[190]

115. Based on the Cass Review, NHS recommends that pediatric gender dysphoria be treated with psychosocial interventions rather than sex interventions.

116. To explain the divergence between her recommendations and those of Defendants' clinical guidelines, Dr. Cass presented the results of the University of York's appraisal of existing guidelines. The University of York "identified 23 guidelines published between 1998 and 2022 that contained recommendations about children and young people with gender dysphoria," but only five—including the 2017 ES Guideline and WPATH's SOC-8—"described using a systematic approach to searching for and/or selecting evidence."[191]

117. However, using the Appraisal of Guidelines for REsearch & Evaluation (AGREE) II instrument—"the most commonly applied and comprehensively validated appraisal tool"[192]—the University of York found that the ES Guideline and WPATH Standards of Care are both methodologically defective. The University of York found that the 2017 ES Guideline rated just 42 out of 100 in terms of "developmental rigour" and "lack[ed] a robust and transparent approach to [its] development."[193] The Cass Review therefore warned healthcare providers not to use the 2017 ES Guideline.[194]

118. For WPATH, Dr. Cass relayed that the organization "has been highly

---

[190] *Id.* at 187.
[191] *Id.* at 130.
[192] *Id.* at 128.
[193] York Guideline Quality at s71.
[194] Cass Review at 130.

influential in directing international practice, although its guidelines were found by the University of York appraisal process to lack developmental rigour,"[195] scoring just 35 out of 100.[196] Dr. Cass warned that the SOC-8 "overstate[] the strength of the evidence in making the[ir] recommendations"[197] and should not be relied on by physicians.[198]

119. Specifically, the University of York concluded that Defendants' guidelines did "not follow[] the international standards for guideline development"[199] and "describe insufficient evidence about the risks and benefits of medical treatment in adolescents, particularly in relation to long-term outcomes. Despite this, [they] then went on to cite this same evidence to recommend medical treatments."[200]

120. The University of York also reported that early Endocrine Society and WPATH guidelines were "linked through cosponsorship"[201] and relied on little more than self-references. Other organizations' guidelines then used the "recommend[ed] medical treatments [from the 2009 ES Guideline and WPATH SOCs 5-7] as their basis for making the same recommendations."[202] The 2017 ES Guideline and WPATH SOC-8 completed the loop by citing those third-party guidelines as evidence for their recommendations.[203]

---

[195] *Id.* at 28.
[196] York Guideline Quality at s69.
[197] Cass Review at 132.
[198] *Id.* at 130.
[199] *Id.* at 27, 130.
[200] York Guideline Quality at s68–69.
[201] *Id.* at s65.
[202] Cass Review at 130.
[203] York Guideline Quality at s70.

121. As Dr. Cass explained: "Early versions of two international guidelines, the Endocrine Society 2009 and World Professional Association for Transgender Healthcare (WPATH) 7 guidelines influenced nearly all the other guidelines. These two guidelines are also closely interlinked, with WPATH adopting Endocrine Society recommendations, and acting as a co-sponsor and providing input to drafts of the Endocrine Society guideline. WPATH 8 cited many of the other national and regional guidelines to support some of its recommendations, despite these guidelines having been considerably influenced by WPATH 7. The links between the various guidelines are demonstrated in the graphics in the guideline appraisal paper. The circularity of this approach may explain why there has been an apparent consensus on key areas of practice despite the evidence being poor."[204]

122. The following graph,[205] referenced in the previous paragraph, shows how early versions of the WPATH SOC and ES Guideline "dominated the development of other guidelines,"[206] which were then cited as the evidentiary basis for the 2017 ES Guideline, 2018 AAP Policy Statement, and SOC-8:

---

[204] Cass Review at 130.
[205] York Guideline Quality at s70.
[206] *Id.* at s71.



123. Ultimately, the University of York determined that the Finnish Review and Swedish Review were "the only guidelines that have been informed by an ethical review conducted as part of the guideline development" and thus the only guidelines that "could be recommended for use in practice."[207]

**iv.   American Reviews**

124. While the Finnish, Swedish, and Cass Reviews did not evaluate the psychological effects of pediatric surgical intervention (because they are illegal in their respective countries), systemic reviews recently published in the United States have also disproven the SOC-8's claim that surgical interventions provide any benefits to mental health.

---

[207] Cass Review at 130.

125. For example, a study published by the University of Texas in February 2025 evaluated 107,583 gender-dysphoric patients and found that those who underwent transgender surgery "demonstrated a significantly higher risk for depression, anxiety, suicidal ideation, and substance use disorders than those without surgery."[208]

126. A systematic review published by the United States Department of Health and Human Services in May 2025 likewise concluded that "the best available evidence indicates that . . . surgery [in adolescents] ha[s] not been shown to improve mental health outcomes" and that the "ubiquitous claim that . . . regret rates [of children who have undergone transition procedures] are vanishingly low is unsupported by the evidence."[209]

## B. Internal Leaks and Litigation Discovery Reveal WPATH's Misrepresentations about the Methodology Behind the SOC-8.

127. In March 2024, Environmental Progress, a nonprofit think tank, received hundreds of documents and communications from an anonymous source.[210] The files included "screenshots of posts from WPATH's internal messaging forum dating from 2021 to 2024 and a video of an internal panel discussion."[211]

128. At the same time, the State of Alabama was obtaining information about the development of the SOC-8 through discovery. The case, which challenged the

---

[208] Joshua E. Lewis et al., *Examining gender-specific mental health risks after gender-affirming surgery: a national database study*, 22 J. Sex Med. 645 (Apr. 2025), https://pubmed.ncbi.nlm.nih.gov/39996623/.
[209] HHS Review at 132.
[210] Mia Hughes, *The WPATH Files*, Environmental Progress (Mar. 4, 2024), https://environmentalprogress.org/big-news/wpath-files.
[211] *Id.*

State's ban on sex interventions for minors, was brought in federal court by parents of "transgender children" and a pair of physicians.[212] The medical necessity of intervention was central to plaintiffs' arguments, and their experts, many of whom were WPATH members, relied on the SOC-8 to demonstrate medical necessity. "Unsurprisingly, the Defendants sought discovery from WPATH regarding, among other things, the evidence it used to develop its guidelines and standards of care. But surprisingly, the organization allegedly responsible for creating the benchmark for gender dysphoria treatment was not so keen on turning over the evidence it used to develop that standard."[213] WPATH "resisted the Defendants' subpoena at every turn."[214] Initially, it moved to quash the subpoena arguing that the information was not relevant to the case—an argument the court found "preposterous."[215] WPATH then sought an interlocutory appeal and mandamus from the Court of Appeals for the Eleventh Circuit, which were denied.[216]

129.   In the end, much of the material obtained by Alabama, including depositions of WPATH leadership, became public information. These documents reveal that WPATH's representations about the development and rigor of the SOC-8 range from highly misleading to brazenly false.

### i.   The SOC-8 were not motivated by "increasing scientific evidence."

130.   Revisions of previous versions of the Standards of Care have been so

---

[212] Memorandum Opinion and Order, *Boe v. Marshall*, No. 2:22-CV-0184-LCB, 2025 WL 1638374, at *1 (M.D. Ala. June 9, 2025).
[213] *Id.*
[214] *Id.*
[215] *Id.* at 2
[216] *Id.*

nakedly activist that even former WPATH members have warned that the organization's recommendations are "dominated by politics and ideology, rather than by scientific process."[217]

131.    The SOC-8 were no exception. By 2020, States were beginning to recognize sex interventions on minors as a problem. The first ban was enacted in 2021, and many States would follow in short order.[218]

132.    Advocacy groups quickly challenged the legislation, but they were hamstrung by the fact that many of the banned sex interventions were not recommended for minors, even by the WPATH and Endocrine Society guidelines.

133.    Thus, like previous versions of the Standards of Care, the SOC-8 were commissioned as a means to WPATH's ideological and financial ends. Communications unearthed by internal leaks and litigation discovery reveal that WPATH members retained as experts by the advocacy groups challenging the legislation "advocate[d] for language changes [in the SOC] to strengthen [their] position in court."[219] Others agreed. For example, one member expressed the need for a new Standards of Care that would "have serious effect in the law and policy settings that have affected us so much recently; even if the wording isn't quite correct for people who have the background you and I have."[220] Another member agreed that

---

[217] Azeen Ghorayshi & Austin Mitchell, *The Protocol: Episode 4*, New York Times (June 2, 2025), https://www.nytimes.com/2025/06/02/podcasts/trans-gender-care-protocol.html.
[218] Dawson & Kates, *supra*.
[219] Brief of Alabama as Amicus Curiae Supporting State Respondents, *U.S. v. Skrmetti*, No. 23-477, 2024 WL 4525181, at *11 (Oct. 15, 2024) (summarizing documents discovered in *Boe v. Marshall*) ("Brief of Alabama").
[220] *Id.*

"we need[] a tool for our attorneys to use in defending access to care."[221] Yet another said that a new Standards of Care was needed to "help in the fight against the conservative anti trans agenda."[222]

134.    WPATH therefore commissioned a "legal review" of the SOC-8 by attorneys orchestrating the legal challenges. WPATH considered the American Civil Liberties Union, the Transgender Legal Defense & Education Fund, and Lambda Legal before landing on GLAD Law.[223]

135.    WPATH's leaders acknowledged that attorney involvement in the development of clinical guidelines is highly unusual. In a message to another WPATH author, WPATH president Dr. Walter Bouman observed that he did not "recall the Endocrine Guidelines going through legal reviews before publication, or indeed the current SOC[-7]."[224]

136.    At the top of the wish list for the activist lawyers conducting the SOC-8 legal review—and the WPATH members whom they retained as experts—was authority for the proposition that sex interventions are medically necessary. As one member explained: "Medical necessity is at the center of dozens of lawsuits in the US right now," "one or more of which could go to the Supreme Court[] on whether trans care is medically necessary vs. experimental or cosmetic. I cannot overstate the importance of SOC 8 getting this right at this important time."[225]

---

[221] *Id.* at *13.
[222] *Id.* at *18.
[223] *Id.* at *12.
[224] *Id.*
[225] *Id.* at *13.

137.    Establishing the medical necessity of sex intervention was critical for another reason: insurance. Because experimental medicine is usually not covered by health insurance, one of the primary objectives of WPATH's SOC8 was to secure insurance coverage.[226] As a SOC-8 revision committee member expressed in one internal communication: "I really think the main argument [for establishing the medical necessity of adolescent interventions] is access/insurance."[227]

### ii. SOC-8 revision committee members were not screened for conflicts pursuant to industry standards.

138.    With the objective of establishing the medical necessity of experimental sex interventions firmly in mind, WPATH created an authorship structure that would guarantee its predetermined conclusions.

139.    Under step 1—the creation of the Guideline Steering Committee—WPATH selected Dr. Eli Coleman, a sexologist at the University of Minnesota, to chair the Guideline Steering Committee.[228] Asa Radix and Jon Arcelus were selected as Co-Chairs.[229] Two WPATH presidents, Dr. Bouman and Dr. Marci Bowers, a male surgeon who has undergone sex interventions and performed thousands of vaginoplasties, also oversaw development of the guideline.[230]

140.    These selections did not comply with the recommendations on clinical practice guideline development that WPATH claimed to follow. The World Health Organization (WHO) recommends selecting a guideline chair who is free of significant

---

[226] *See* WPATH SOC-8 at S16.
[227] Brief of Alabama at *18.
[228] *Id.* at *10.
[229] WPATH SOC-8 at S248.
[230] Brief of Alabama at *10–11.

conflicts and neutral between differing perspectives.[231] The National Academies of Medicine (NAM) likewise recommend that "unconflicted methodologists" lead recommendation development.[232]

141. Yet SOC-8 Guideline Steering Committee Chair Eli Coleman "had unmanaged financial and/or non-financial [conflicts of interest] that were plausibly 'significant or consequential.'"[233] First, Coleman had coauthored academic publications in support of expanded access to medical transition, including the SOC-7.[234] "Using WHO criteria, his professional activities and academic profile, which were closely aligned with advancing medical transition, likely constitute both intellectual and financial COIs."[235] The fact that Coleman's academic work was funded by the Tawani Foundation, chaired by transgender advocate Jennifer Pritzker, further evinces a conflict between Coleman's personal interests and professional obligations as Guideline Steering Committee Chair.[236]

142. Chapter members were equally conflicted. NAM and WHO recognize that arm's-length experts are best equipped to create clinical guidelines. Thus, both instruct that "[m]embers with [conflicts of interest] should represent *not more than a minority* of the [guideline development group]."[237]

143. However, WPATH membership and demonstrated support for the

---

[231] *Id.* at *25–26.
[232] HHS Review at 167.
[233] *Id.*
[234] *Id.* at 167–68.
[235] *Id.* at 168.
[236] *Id.*
[237] Brief of Alabama at *26.

48

expansion of gender transition were prerequisites for *all* members of the SOC-8 revision committee—a "composition bias" that the Department of Health and Human Services would later identify as "panel stacking."[238] As Dr. Bowers explained, it was "important" for each author "to be an advocate for [transitioning] treatments before the guidelines were created."[239] He likewise called it "absolutely" important for someone to be an "advocate" of sex intervention to be considered for the committee.[240] Thus, "expertise due to accomplishments in trans health advocacy and a history of work in the community" was an express "criteri[on] for stakeholder membership in the SOC8 Revision Committee."[241]

144. Chapter members demonstrated their advocacy bona fides in a variety of ways. For instance, it was "not unusual at all" for WPATH members who had published articles advocating for broader acceptance of sex interventions to weigh the credibility of those same articles as part of their duties as a SOC-8 revision committee member.[242]

145. Other SOC-8 revision members were accepted because they had "a member of a family that includes a transgender child, sibling, partner, parent, etc."[243]

146. Others testified as paid expert witnesses in legal cases directly related

---

[238] HHS Review at 170.
[239] Brief of Alabama at *26.
[240] HHS Review at 216 n.30.
[241] *Establishing the SOC8 Revision Committee and the Chairs and Lead Evidence Team*, WPATH, https://wpath.org/publications/soc8/revision-committee/.
[242] Brief of Alabama at *26.
[243] *Establishing the SOC8 Revision Committee and the Chairs and Lead Evidence Team*, WPATH, https://wpath.org/publications/soc8/revision-committee/.

to gender transition before and during the SOC-8 development process.[244] While NAM explicitly identifies this as a conflict of interest, Coleman concluded, apparently on his own authority, that it is "ethically justifiable" for members involved in active litigation to advocate for guideline changes that would strengthen their legal positions.[245]

147.    Other chapter members derived much of their income from performing the sex interventions that the SOC-8 purported to evaluate disinterestedly. For example, Dr. Loren Schechter co-authored the chapter on surgery, despite being a plastic surgeon who profits from performing gender transitions surgeries.[246] Dr. Bowers, who served both as a Guidelines Steering Committee member and as co-author of the surgery chapter, has made millions of dollars performing sex interventions.[247]

148.    All these activities constitute conflicts of interest under NAM's definition: "[a] divergence between an individual's private interests and his or her professional obligations such that an independent observer might reasonably question whether the individual's professional actions or decisions are motivated by personal gain, such as financial, academic advancement, clinical revenue streams, or community standing."[248] Yet not one author was excluded from SOC-8 due to a conflict, and no conflicts were disclosed to readers.[249]

---

[244] Brief of Alabama at *11; HHS Review at 169.
[245] Brief of Alabama at *11; HHS Review at 169..
[246] HHS Review at 169.
[247] Brief of Alabama at *27.
[248] Id. at *26–27.
[249] Id. at *27.

149.    Privately, WPATH knew the SOC-8 were riddled with conflicts. Dr. Coleman admitted at his deposition that "most participants in the SOC-8 process had financial and/or nonfinancial conflicts of interest."[250] Another author agreed that "[e]veryone involved in the SOC process" had at least a non-financial interest in creating a more permissive Standards of Care.[251] Dr. Robinson likewise "expect[ed] many, if not most, SOC-8 members to have competing interests."[252] She even informed WPATH that "[d]isclosure, and any necessary management of potential conflicts, should take place *prior* to the selection of guideline members."[253] "Unfortunately," she said, "this was not done here."[254] Indeed, the SOC-8 committee did not submit conflict of interest disclosure statements until at least six months *after* members had already been selected.[255]

### iii.    The SOC-8 include recommendations decided outside the Delphi consensus-building process.

150.    The SOC-8 were shaped not only by activist attorneys, but also activists within the Biden administration.

151.    Admiral Richard "Rachel" Levine, the former Assistant Secretary for Health at HHS, met regularly with WPATH leaders, "eager to learn when SOC 8 might be published."[256] According to one WPATH member who met with Levine, "[t]he failure of WPATH to be ready with SOC 8 [was] proving to be a barrier to

---

[250] *Id.*
[251] *Id.*
[252] *Id.*
[253] *Id.* at *28.
[254] *Id.*
[255] HHS Review at 168.
[256] Brief of Alabama at *15.

optimal policy progress" for the Biden Administration.[257] Another member reported: "I am meeting with Rachel Levine and her team," "as the US Department of Health is very keen to bring the trans health agenda forward."[258]

152.    Levine's role was not merely advisory. A few months before SOC-8 was to be published in September 2022 (and long after the public comment period had closed that January), WPATH sent Levine an "Embargoed Copy - For Your Eyes Only" draft of SOC-8 that had been "completed" and sent to the publisher for proofreading and typesetting.[259] The draft included a departure from Standards of Care 7, which, except for so-called "top surgeries," restricted transitioning surgeries to patients who had reached the "[a]ge of majority in a given country."[260] The draft SOC-8 relaxed the age minimums: 14 for cross-sex hormones, for "chest masculinization" (i.e., mastectomy), for "breast augmentation, facial surgery (including rhinoplasty, tracheal shave, and genioplasty)," for "metoidioplasty, orchiectomy, vaginoplasty, hysterectomy and fronto-orbital remodeling," and for "phalloplasty."[261]

153.    After reviewing the draft, Levine's office contacted WPATH at the beginning of July with a political concern: that the listing of "specific minimum ages for treatment," "under 18, will result in devastating legislation for trans care."[262] Admiral Levine's chief of staff suggested that WPATH hide the recommendations by

---

[257] *Id.*
[258] *Id.* at *16.
[259] *Id.*
[260] *Id.*
[261] *Id.* at *16–17.
[262] *Id.* at *17.

removing the age limits from SOC-8.[263] WPATH leaders met with Levine and HHS officials to discuss the age recommendations. According to a WPATH participant, Levine "was very concerned" that "having ages (mainly for surgery) will affect access to health care for trans youth."[264] The WPATH members reported back to their colleagues: "[Levine] and the Biden administration worried that having ages in the document will make matters worse. She asked us to remove them."[265]

154. The authors of the adolescent chapter wrestled with how to respond to the request:

- "[T]he fear is that ages will spark political attacks on access. I don't know how I feel about allowing US politics to dictate international professional clinical guidelines that went through Delphi."[266]

- "I'm also curious how the group feels about us making changes based on current US politics . . . . I agree about listening to Levine."[267]

- "I think it's safe to say that we all agree and feel frustrated (at minimum) that these political issues are even a thing and are impacting our own discussions and strategies."[268]

155. WPATH initially told Levine that it "could not remove [the age minimums] from the document" because the recommendations had already been approved by the Delphi consensus process.[269] Indeed, Dr. Coleman said that consensus was "[t]he only evidence we had" for the recommendations.[270] But, WPATH continued, "we heard your comments regarding the minimal age criteria" and,

---

[263] *Id.*
[264] *Id.* at *18.
[265] *Id.* at *18 n.67.
[266] *Id.* at *18.
[267] *Id.* at *18.
[268] *Id.* at *18–19.
[269] *Id.* at *19.
[270] *Id.*

"[c]onsequently, we have made changes to the SOC8" by downgrading the age "recommendation" to a "suggestion."[271] But this did not pacify Levine, who immediately requested more meetings with WPATH.[272]

156.    Just days before the SOC-8 were to be published, AAP joined Levine in threatening to oppose SOC-8 if WPATH did not remove the age minimums.[273]

157.    Internally, WPATH responded by criticizing the "AAP guidelines" as having "a very weak methodology, written by few friends who think the same"[274] Dr. Bouman "struggle[d] to find any sound evidence-based argument(s)" in AAP's comments and was "surprised that a 'reputable' association as the AAP is so thin on scientific evidence."[275] In the end, because AAP was "a MAJOR organization" and "it would be a major challenge for WPATH" if AAP opposed SOC-8, WPATH caved and "agreed to remove the ages."[276]

158.    Thus, despite the Delphi "consensus," the SOC-8 do not contain age minimums for any transitioning hormonal or surgical intervention outside of phalloplasty.[277] The SOC-8 deem all other surgeries "medically necessary gender-affirming medical treatment[s] in adolescents."[278]

159.    In his deposition, Dr. Coleman made clear that WPATH removed the age minimums "without being presented any new science of which the committee was

---

[271] *Id.*
[272] *Id.*
[273] *Id.*
[274] *Id.*
[275] *Id.* at *20.
[276] *Id.*
[277] *Id.*
[278] *Id.*

previously unaware."[279] In fact, despite assuring that "formal consensus for *all* statements was obtained using the Delphi process," WPATH treated its decision as "highly, highly confidential."[280] When asked by the press about the removal of the age minimums, WPATH forewent saying what was "true" in favor of saying "what [it] need[ed] to say."[281]

### iv. WPATH was not "informed" by the Johns Hopkins University systematic reviews; it suppressed them.

160.    WPATH's legal review team advised against conducting systematic evidence reviews, lest they "reveal[] little or no evidence and put[] us in an untenable position in terms of affecting policy or winning lawsuits."[282] Nevertheless, WPATH commissioned six systemic reviews from Dr. Robinson's evidence review team at Johns Hopkins University.[283]

161.    The choice of John's Hopkins was strategic, as the institution has a long history of cooperation with gender transition activists. In fact, John Hopkins Hospital opened North America's first gender clinic with seed funding from Rita Erickson's foundation.[284]

162.    Nevertheless, the attorneys' fear proved prescient. In August 2020, Dr. Robinson wrote to the Agency for Healthcare Research and Quality at HHS about

---

[279] *Id.* at *21.
[280] *Id.*
[281] *Id.* at *22.
[282] *Id.* at *2.
[283] *Research into trans medicine has been manipulated*, The Economist (June 27, 2024), https://www.economist.com/united-states/2024/06/27/research-into-trans-medicine-has-been-manipulated.
[284] Walsh, *supra.*

their research into "multiple types of interventions (surgical, hormone, voice therapy . . .)." Her conclusion: "[W]e found little to no evidence about children and adolescents."[285]

163.    Dr. Robinson further informed HHS that she was "having issues with this sponsor" "trying to restrict our ability to publish."[286] WPATH had rejected Robinson's request to publish two manuscripts because her team failed to seek "final approval" of the articles from a SOC-8 Steering Committee member.[287] WPATH also mandated that authors "use the Data for the benefit of advancing transgender health in a positive manner" as defined by WPATH and "involved at least one member of the transgender community in the design, drafting of the article, and the final approval of the article."[288]

164.    In fact, in December 2017, an executive director at WPATH Dr. Robinson that her team "cannot publish their findings independently."[289] In case there was any confusion, the executive director later reiterated that "the [WPATH] board wants it to be clear that the data cannot be used without WPATH approval."[290]

165.    Dr. Robinson pushed back: "Hopkins as an academic institution, and I as a faculty member therein, will not sign something that limits academic freedom in this manner," nor "language that goes against current standards in systematic

---

[285] Brief of Alabama at *32.
[286] *Id.*at *33.
[287] *Id.*
[288] *Id.*
[289] *Research into trans medicine has been manipulated*, The Economist (June 27, 2024), https://www.economist.com/united-states/2024/06/27/research-into-trans-medicine-has-been-manipulated.
[290] *Id.*

reviews and in guideline development."[291]

166.    WPATH eventually allowed the Johns Hopkins team to publish two of its manuscripts.[292] It is still unclear what happened to the other four.[293]

**v.    WPATH deviated from GRADE methodology when the results did not support its predetermined conclusions.**

167.    WPATH claims to have used a process "adapted from the Grading of Recommendations, Assessment, Development and Evaluations (GRADE) framework" for "developing and presenting summaries of evidence"—a "systematic approach for making clinical practice recommendations."[294] According to the SOC-8's purported methodology, the Johns Hopkins team conducted systematic evidence reviews, "assign[ing] evidence grades using the GRADE methodology," and "present[ing] evidence tables and other results of the systematic review" to the SOC-8 authors.[295]

168.    Chapter authors were then to grade the recommendation statements based on the evidence. The SOC-8 represent that "strong recommendations"—"we recommend"—were only for situations where "the evidence is high quality," "a high degree of certainty [that] effects will be achieved," "few downsides," and "a high degree of acceptance among providers."[296] On the other hand, "[w]eak

---

[291] *Research into trans medicine has been manipulated*, The Economist (June 27, 2024), https://www.economist.com/united-states/2024/06/27/research-into-trans-medicine-has-been-manipulated.
[292] Brief of Alabama at *34.
[293] The suppression of the Johns Hopkins studies is reminiscent of an episode years earlier where WPATH censured a member who publicly discussed concerns about "sloppy" care resulting from gender dysphoric youth being "[r]ushed through the medicalization" of transitioning treatments. *Id.* at *40.
[294] Brief of Alabama at *28.
[295] *Id.*
[296] *Id.* at *29.

recommendations"—"we suggest"—were for when "there are weaknesses in the evidence base," "a degree of doubt about the size of the effect that can be expected," and "varying degrees of acceptance among providers."[297]

169. Yet Dr. Coleman has since revealed that "we were not able to be as systematic as we could have been (e.g., we did not use GRADE explicitly)."[298] Dr. Karasic likewise admitted that, rather than relying on systematic reviews, some drafters simply "used authors . . . we were familiar with."[299] WPATH also decided not to differentiate "between statements based on [literature reviews] and the rest," and ordered the removal of all notations disclosing the quality of evidence for each recommendation.[300]

## C. The HHS Review Repudiates Defendants' Guidelines.

170. In November 2025, HHS published "a peer-reviewed study of the medical dangers posed to children from attempts to change their biological sex."[301]

171. Like the Cass Review, the HHS Review found "extensive problems in the SOC-8 development process" and concluded that the SOC-8 is neither "credible" nor "evidence-based."[302] Rather, WPATH "steer[ed] findings to align with predetermined agendas rather than allowing an independent, evidence-driven

---

[297] *Id.*
[298] *Id.*
[299] *Id.* at *30.
[300] *Id.*
[301] *HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures*, U.S. Dep't of Health & Human Services (Nov. 19, 2025), https://www.hhs.gov/press-room/hhs-releases-peer-reviewed-report-discrediting-pediatric-sex-rejecting-procedures.html
[302] HHS Review at 147, 166.

process."[303] The SOC-8's "substantial methodological shortcomings and conflicts of interest . . . result[ed] in recommendations not reliably supported by rigorous evidence."[304]

## III. Defendants Continue to Make False Representations about the Reversibility and Efficacy of Sex Interventions and the Legitimacy of Their Guidelines to Sell Memberships.

### A. WPATH

172.    WPATH continues to market the SOC-8 as a "rigorous review of all evidence and ideas"[305] that was "developed using an evidence-based approach"[306] and "explain[s] in detail the science—and evidence—based benefits of gender affirming care for TGD people."[307] The SOC-8 are prominently displayed on WPATH's website and freely downloadable therefrom.[308]

173.    WPATH continues to make these debunked claims because they are crucial to its ability to sell memberships, generate business for their members, recruit trainees, and solicit donations.

174.    The Standards of Care are essential to the sale of WPATH memberships. Because WPATH continues to generate demand for pediatric sex interventions by deceiving the public with its phony guidelines, sex intervention providers and ideologues continue to purchase WPATH memberships.

---

[303] *Id.* at 172.
[304] *Id.* at 156.
[305] *History and Purpose*, WPATH, https://wpath.org/publications/soc8/soc8-history/.
[306] *Id.*
[307] *Statement of Opposition to Legislation Banning Access to Gender-Affirming Health Care in the US* (Mar. 8, 2023), https://wpath.org/wp-content/uploads/2024/11/USPATH_WPATH-Statement-re_-GAHC-march-8-2023.pdf.
[308] *Standards of Care Version 8*, WPATH, https://wpath.org/publications/soc8/.

175. The SOC-8 help WPATH generate income in other ways as well. For example, another benefit listed on the "Membership" page of WPATH's website is "Opportunities to join WPATH task forces and committees," the most important being the Standards of Care revision committee.[309]

176. Another benefit is "[i]nclusion in the online WPATH 'Find a Provider' search tool," which connects individuals seeking sex interventions to WPATH members who perform them.[310] The Standards of Care and the search tool are crucial to WPATH's business model. WPATH publishes the Standards of Care to generate demand for sex interventions by duping minors and their parents (as well as insurers, regulators, and courts) into believing that pediatric sex interventions are safe, reversible, and effective at alleviating gender dysphoria. Indeed, the SOC-8 state that, "[w]hile this is primarily a document for health care professionals, individuals, their families, and social institutions may also use the SOC-8 to understand how it can assist with promoting optimal health for members of this diverse population." WPATH then maintains a search tool directing prospective sex intervention customers to sex intervention providers. Sex intervention providers' desire to fund efforts to create guidelines that generate demand for sex interventions, and to appear in directories of sex intervention providers, causes them to purchase WPATH memberships, thereby fueling WPATH's enterprise.

177. WPATH's "Find a Provider" tool prompts users to input their city.[311] The

---

[309] *Membership Information*, WPATH, https://wpath.org/membership/membership-information/.
[310] *Id.*
[311] *Provider Directory Search*, WPATH, https://app.wpath.org/provider/search.

tool then returns a list of providers based in that city. In this respect, the WPATH website is not a passive webpage; it engages with users throughout Florida, and in St. Lucie County, to solicit information and, based on that information, direct prospective patients to a provider.

178.    The "Find a Provider" tool lists 61 providers in the State of Florida.[312] The practice of at least one WPATH member is based in St. Lucie County.[313]

179.    The "About WPATH" page of WPATH's website contains a link to the "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8" (SOC-8). In a paragraph repeating the claim that WPATH offers evidence-based standards of care, WPATH states: "We are funded primarily through the support of our membership, and through donations and grants sponsored by non-commercial sources."[314] The website's navigation bar, which appears at the top of each page, includes a "Donate" tab.

180.    The "Donate" page repeats that "[t]he World Professional Association for Transgender Health (WPATH) is dedicated to promoting evidence based care . . . in transgender health" and tells potential donors that contributions support WPATH's

---

[312]    *Provider        Directory        Search*,        WPATH, https://app.wpath.org/member/search/results?cb_member_search_form_global%5Baddress%5D%5Bcountry%5D=US&cb_member_search_form_global%5Baddress%5D%5Bstate%5D=FL&cb_member_search_form_global%5BfirstName%5D=&cb_member_search_form_global%5BlastName%5D=&cb_member_search_form_global%5Bphone%5D=&cb_member_search_form_global%5Bspecialty%5D=.

[313]    *Provider        Directory        Search*,        WPATH, https://app.wpath.org/provider/search?provider_directory_search_form%5Baddress%5D%5Bcountry%5D=US&provider_directory_search_form%5Baddress%5D%5Bstate%5D=FL&provider_directory_search_form%5Baddress%5D%5Bcity%5D=port+saint+lucie&provider_directory_search_form%5BfirstName%5D=&provider_directory_search_form%5BlastName%5D=&provider_directory_search_form%5Bspecialty%5D=.

[314]    *About WPATH*, WPATH, https://wpath.org/about/mission-and-vision/.

"research" and "standards."[315]

181.    The false and misleading claims about the developmental rigor of the Standards of Care also create a false belief that WPATH is a legitimate source of evidence-based research, facilitating WPATH's efforts to sell trainings and conference tickets.

182.    WPATH has transmitted, and continues to transmit, the Standards of Care to consumers, providers, and insurers across the State of Florida and specifically in St. Lucie County.

## B.    Endocrine Society

183.    Endocrine Society continues to market the 2017 ES Guideline as evidence-based clinical guidelines.

184.    Endocrine Society continues to make this debunked claim because it is crucial to its ability to sell memberships and generate business for its members. Because Endocrine Society continues to generate demand for pediatric sex interventions by deceiving the public with its phony guidelines, sex intervention providers and ideologues continue to purchase Endocrine Society memberships.

185.    The 2017 ES Guideline is prominently displayed on Endocrine Society's webpage and freely downloadable therefrom.

186.    Like WPATH, Endocrine Society advertises its "'Find an Endocrinologist' Physician Referral Directory" as a leading benefit of membership.[316] Endocrine Society publishes the ES Guideline to generate demand for sex

---

[315] *Donate*, WPATH, https://wpath.org/donate-home/.
[316] *Membership*, Endocrine Society, https://www.endocrine.org/membership.

interventions by duping minors and their parents (as well as insurers, regulators, and courts) into believing that pediatric sex interventions are safe, reversible, and effective at alleviating gender dysphoria. Endocrine Society then maintains a search tool directing prospective sex intervention customers to sex intervention providers. Sex intervention providers' desire to fund efforts to create guidelines that generate demand for sex interventions, and to appear in directories of sex intervention providers, causes them to purchase Endocrine Society memberships, thereby fueling Endocrine Society's enterprise.

187.    Endocrine Society's "Find an Endocrinologist" tool prompts users to input their ZIP code and a radius.[317] The tool then returns a list of providers within the specified range of that city. In this respect, the Endocrine Society website is not a passive webpage; it engages with users throughout Florida, and in St. Lucie County, to solicit information and, based on that information, direct prospective patients to a provider.

188.    The "Find an Endocrinologist" tool lists 169 providers in the State of Florida.[318] The practice of at least one Endocrine Society member is based in St. Lucie County.[319]

189.    Endocrine Society also advertises the opportunity to serve on its committees (including the task force that drafts the ES Guideline) as a benefit of

---

[317] *Find an Endocrinologist*, Endocrine Society, https://www.endocrine.org/patient-engagement/find-an-endocrinologist-directory.
[318]    *Find an Endocrinologist*, Endocrine Society, https://www.endocrine.org/patient-engagement/find-an-endocrinologist-directory/find-an-endocrinologist-results?page=1&state=FL.
[319] *Id.*

membership.[320]

190.    Endocrine Society has transmitted, and continues to transmit, the ES Guideline to consumers, providers, and insurers across the State of Florida and specifically in St. Lucie County.

**C.    AAP**

191.    AAP continues to market its 2019 Policy Statement as an evidence-based evaluation demonstrating the reversibility and efficacy of pediatric sex interventions.

192.    AAP continues to make these debunked claims because they are crucial to its ability to sell memberships and generate business for its members. Because AAP continues to generate demand for pediatric sex interventions by deceiving the public with its phony guidelines, sex intervention providers and ideologues continue to purchase AAP memberships.

193.    Like WPATH and Endocrine Society, AAP advertises its membership directory as a leading benefit of membership.[321] AAP publishes the Policy Statement to generate demand for sex interventions by duping minors and their parents (as well as insurers, regulators, and courts) into believing that pediatric sex interventions are safe, reversible, and effective at alleviating gender dysphoria. AAP then maintains a search tool directing prospective sex intervention customers to sex intervention providers. Sex intervention providers' desire to fund efforts to create guidelines that generate demand for sex interventions, and to appear in directories of sex

---

[320] *Membership*, Endocrine Society, https://www.endocrine.org/membership.
[321] *Fellow Members*, AAP, https://www.aap.org/en/membership-application/Fellows/.

intervention providers, causes them to purchase AAP memberships, thereby fueling AAP's enterprise.

194.    AAP's "Find a Pediatrician" tool prompts users to input their city or ZIP code.[322] The tool then returns a list of providers based in that city or ZIP code. In this respect, the AAP website is not a passive webpage; it engages with users throughout Florida, and in St. Lucie County, to solicit information and, based on that information, direct prospective patients to a provider.

195.    AAP's "Find a Pediatrician" tool lists 480 providers in the State of Florida.[323] The practice of at least one AAP member is based in St. Lucie County.[324]

196.    AAP also advertises the opportunity to serve on its committees as a benefit of membership.

197.    AAP has transmitted, and continues to transmit, the AAP Policy Statements to consumers, providers, and insurers across the State of Florida and specifically in St. Lucie County.

## COUNT I
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

198.    The Attorney General realleges and incorporates, as though fully set forth, paragraphs 1 to 197 of this complaint.

199.    Section 501.204(1), Florida Statutes, prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or

---

[322] *Find a Pediatrician*, AAP, https://www.healthychildren.org/English/tips-tools/find-pediatrician/Pages/Pediatrician-Referral-Service.aspx
[323] *Id.*
[324] *Id.*

practices in the conduct of any trade or commerce."

200. "Trade or commerce" is "broadly defined in the statute" as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated" and includes "the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity." *Id.* at 716 n.7 (quoting § 501.203(8), Fla. Stat.).

201. FDUTPA is to be "construed liberally to promote the policy of "protect[ing] the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.; *see also Diamond Aircraft Indus., Inc. v. Horowitch*, 107 So. 3d 362, 367 (Fla. 2013) (observing that "[t]he Legislature has specifically articulated that the provisions of FDUTPA are to be construed liberally").

202. Accordingly, "courts have adopted broad definitions of the term "unfair trade practice." *BJ's Wholesale Club, Inc. v. Bugliaro*, 319 So. 3d 711, 716–17 (Fla. 3d DCA 2021). "An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

203. A "representation or omission" that is "likely to deceive a consumer acting reasonably in the same circumstances" constates an unfair trade practice. *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000).

204. Because FDUTPA "is designed to protect not only the rights of litigants, but also the rights of the consuming public at large," *Beacon*, 842 So. 2d, 777, "a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *State, Off. of Atty. Gen., Dep't of Legal Affs. v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. 1st DCA 2004); *see also Davis*, 776 So. 2d at 974 ("[T]he question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances.").

205. "[A]n advertisement is considered deceptive if it has the capacity to convey misleading impressions to consumers even though nonmisleading interpretations may be possible." *Dep't of Legal Affs. v. Father & Son Moving & Storage, Inc.*, 643 So. 2d 22, 26 (Fla. 4th DCA 1994) (citing *Chrysler Corp. v. F.T.C.*, 561 F.2d 357 (D.C. Cir. 1977)).

206. "[A]ny person, firm, corporation, association, or entity, or any agent or employee of the foregoing, who is willfully using, or has willfully used, a method, act, or practice declared unlawful under s. 501.204 . . . is liable for a civil penalty of not more than $10,000 for each such violation." § 501.2075, Fla. Stat. Additional penalties apply if the practice is directed at a senior citizen, a person who has a disability, a servicemember, or a servicemember's spouse or dependent child. *Id.*; § 501.2077(2–3), Fla. Stat. A violation is "willful" if the defendant "knew or should have known that [its] conduct was unfair or deceptive." § 501.2075, Fla. Stat.

207. Defendants have made false and misleading representations and

omissions about the safety, reversibility, and efficacy of sex interventions in Florida and St. Lucie County in particular through many mediums, including their websites, publications, and public statements, and through their members. Specifically, Defendants continue to falsely advertise that: (1) there is credible evidence demonstrating that sex interventions mitigate gender dysphoria and suicidality, (2) puberty blockers are fully reversible, and (3) their guidelines are "evidence-based." WPATH has made many more false statements regarding the methodology of the SOC-8.

208. These representations are immoral, unethical, oppressive, and unscrupulous. They are also likely to mislead a consumer acting reasonably in the circumstances to believe that sex interventions drugs are safer, more reversible, or more effective than they truly are, to their detriment. Thus, Defendants' claims constitute a deceptive and unfair trade practice.

209. Defendants made these false and misleading representations to facilitate the conduct of their "trade or commerce." The representations were intended to and did aid the Defendants in advertising, soliciting, providing, offering, and distributing memberships and the services that accompany membership, such as patient referrals, publishing opportunities and discounts, designations, voting and officeholding privileges, regulatory and legislative advocacy, and access to member-only content. The representations also were intended to and did aid the Defendants in advertising, soliciting, providing, offering, and distributing goods (such as published journals) and services (such as training seminars).

210. Each transmission of the false and misleading representations, including each transmission of a physical or digital copy of the Defendants' guidelines, constitutes a distinct violation of FDUTPA. *See 3B TV, Inc. v. State, Off. of Att'y. Gen.*, 794 So. 2d 744, 751 (Fla. 1st DCA 2001) (citing *State v. Ell–Gee, Inc.,* 255 So.2d 542, 545–46 (Fla. 3d DCA 1971) ("The fact that the same words were used and the same . . . conduct was indulged in does not convert the separate activities into a continuous transaction or continuing activity.")).

211. Defendants these representations and omissions willfully. Defendants have significant expertise in the development of clinical guidelines and knew from the beginning that their guidelines regarding pediatric gender dysphoria were unsupported by credible evidence and did not meet industry standards. In any event, critical analyses such as those issued by Florida's Department of Health and Agency for Health Care Administration in 2022 and reviews published by national health agencies thereafter put Defendants on notice that their claims regarding the methodological rigor of their guidelines and the safety, reversibility, and efficacy of sex interventions were baseless. Thus, Defendants knew or should have known that their conduct was unfair and deceptive.

## COUNT II
## FLORIDA RICO ACT

212. The Attorney General realleges and incorporates, as though fully set forth, paragraphs 1 to 197 of this complaint.

213. Section 895.03(3–4), Florida Statutes, makes it unlawful "for any person employed by, or associated with, any enterprise to conduct or participate, directly or

indirectly, in such enterprise through a pattern of racketeering activity," or to "conspire or endeavor" to do so.[325]

214. An "enterprise" is "any individual, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity . . . ; and it includes illicit as well as licit enterprises . . . ."

215. "Pattern of racketeering activity" is defined as "engaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided . . . that the last of such incidents occurred within 5 years after a prior incident of racketeering conduct."

216. As relevant here, "racketeering activity" means "to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit . . . [a]ny crime that is chargeable by petition, indictment, or information under . . . [c]hapter 817, relating to fraudulent practices, false pretenses, fraud generally, credit card crimes, and patient brokering." § 895.02(8)(a)36., Fla. Stat.

217. Under chapter 817, it is "unlawful for any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any

---

[325] It is also unlawful "for any person who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise," "for any person, through a pattern of racketeering activity . . . , to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property," or for any person to "conspire or endeavor" to do the foregoing. § 895.03(1–2, 4), Fla. Stat.

portion thereof, any misleading advertisement." § 817.41(1), Fla. Stat. "Misleading advertising" is defined as "any statements made, or disseminated, in oral, written, electronic, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services." § 817.40(5), Fla. Stat.

218. Violations of section 817.41 are punishable as first-degree misdemeanors, § 817.45(1), Fla. Stat., and therefore constitute "racketeering activity." § 895.02(8)(a)36., Fla. Stat.

219. Natural persons who violate section 895.03 are subject to a civil penalty of up to $100,000; artificial persons are subject to a civil penalty of up to $1 million. § 895.05(9)(a), Fla. Stat.

220. The circuit court is further authorized to enjoin violations of section 895.03 by (a) ordering divestment; (b) imposing reasonable restrictions upon future activities or investments; (c) ordering dissolution or reorganization; (d) ordering suspension or revocation of state licenses and permits; and (e) ordering forfeiture of charters and certificates to conduct business. § 895.05(1), Fla. Stat.

221. "Any person prevailing in a civil action for violation of [section 817.41] shall be awarded costs, including reasonable attorney's fees, and may be awarded

punitive damages in addition to actual damages proven. This provision is in addition to any other remedies prescribed by law." § 817.41(6), Fla. Stat.

222. Defendants' claims regarding the methodical rigor of their clinical guidelines and the safety, reversibility, and efficacy of sex interventions are false and misleading. Specifically, Defendants continue to falsely advertise that: (1) there is credible evidence demonstrating that sex interventions mitigate gender dysphoria and suicidality, (2) puberty blockers are fully reversible, and (3) their guidelines are "evidence-based." WPATH has made many more false statements regarding the methodology of the SOC-8.

223. Defendants have caused, made, and disseminated these claims before the general public of Florida and portions thereof with the intent of legitimizing and promoting the sex interventions offered by their members. These statements were made in Florida and St. Lucie County in particular through, *inter alia*, Defendants' websites, publications, and public statements, and through their members. Defendants knew, or through the exercise of reasonable care or investigation would have ascertained, that these statements were untrue or misleading. These statements therefore constitute "misleading advertisements" under section 817.40(5).

224. Because these advertisements are punishable as first-degree misdemeanors, § 817.45(1), Fla. Stat., they also constitute "racketeering activity" under section 895.02(8)(a)36.

225. Defendants have disseminated multiple misleading advertisements with the same or similar intent (to promote sex interventions as treatment for

pediatric gender dysphoria), results (the purchase of pediatric sex interventions), accomplices (co-Defendants), victims (minors experiencing gender dysphoria and those paying for their care, such as parents, employers, and insurers), and methods of commission (through representations on their websites and publications). The advertisements are interrelated and not isolated incidents. The misleading advertisements are frequent and ongoing; Defendants transmit physical and digital copies of their clinical guidelines each day. Thus, the most recent misleading advertisement occurred well within five years of a prior misleading advertisement.

226.   Defendants have therefore conducted and participated, and conspired to conduct and participate, in an enterprise through a pattern of racketeering activity in violation of section 895.03(3–4), Florida Statutes.

## PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

Plaintiff respectfully requests this Court:

A.   Declare that Defendants' representations, which mislead reasonable consumers about the reversibility and efficacy of pediatric sex interventions, constitute an unfair trade practice under FDUTPA.

B.   Pursuant to section 501.2075, impose the statutory penalty of $10,000 for each instance in which Defendants transmitted false or misleading claims about the safety, reversibility, or efficacy of sex interventions.

C.   Declare that Defendants' repeated misleading advertisements regarding the reversibility and efficacy of pediatric sex interventions constitute a pattern of racketeering activity.

D.   Pursuant to section 895.05(9)(a), impose a civil penalty of $1 million on each Defendant.

E.   Pursuant to section 895.05(1), enjoin Defendants from continuing to make misleading advertisements regarding the safety, reversibility, or efficacy of pediatric sex interventions.

F.   Award attorney's fees and investigative costs.

G.   Issue any additional relief it finds necessary, including:

- Ordering Defendants to divest their interests in the enterprise;

- Imposing reasonable restrictions upon Defendants' future activities;

- Ordering the dissolution or reorganization of Defendants' enterprise;

- Ordering the suspension or revocation of all licenses, permits, or prior approvals granted to Defendants by any agency of the State; and

- Ordering the forfeiture of Defendants' charters and the revocation of certificates authorizing Defendants to conduct business within Florida.

Date: December 9, 2025                     Respectfully Submitted,


JAMES UTHMEIER
*Attorney General*                              */s/ Samuel Elliott*

DAVID DEWHIRST                          Nicholas J. Weilhammer (FLB 479322)
*Chief Deputy Attorney General*          *Associate Deputy Attorney General*
                                        Nicholas.Weilhammer@myfloridalegal.com
                                         Tracy Moye (FLB 782361)
                                         *Chief Assistant Attorney General*
                                         Tracy.Moye@myfloridalegal.com
                                         Victoria Butler (FLB 861250)
                                         *Director of Consumer Protection Litigation*
                                         Victoria.Butler@myfloridalegal.com
                                         Samuel F. Elliott (FLB 1039898)
                                         *Deputy Solicitor General*
                                         OFFICE OF THE FLORIDA
                                         ATTORNEY GENERAL
                                         PL-01 The Capitol
                                         Tallahassee, FL 32399-1050
                                         Telephone: (850) 414-3300
                                         Facsimile: (850) 410-2672
                                         samuel.elliott@myfloridalegal.com

                                         *Counsel for Plaintiff State of Florida*