**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AMERICAN ACADEMY OF PEDIATRICS, | |
| *Plaintiff*, | |
| v. | Case No. 1:26-cv-02401 |
| JAMES UTHMEIER, in his official capacity as Attorney General of the State of Florida, | |
| *Defendant*. | |

**DEFENDANT'S MOTION TO DISMISS AND RESPONSE**
**TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

JAMES UTHMEIER
  *Attorney General*

RYAN D. NEWMAN
  *Chief Deputy Attorney General*

DAVID M.S. DEWHIRST
  *Solicitor General*

JASON J. MUEHLHOFF
  *Chief Deputy Solicitor General*
VINCENT LI
  *Deputy Solicitor General*
SAMUEL F. ELLIOTT (FBN 1039898)
  *Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
samuel.elliott@myfloridalegal.com

*Counsel for Attorney General*
*James Uthmeier*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................................ii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF THE FACTS ....................................................................................... 2

ARGUMENT .................................................................................................................. 5

    I.    The *Younger* Abstention Doctrine Applies. ....................................................... 6

        A.    This case satisfies the elements for *Younger* abstention. ............................. 6

        B.    No exception to the *Younger* abstention doctrine applies. ............................ 8

    II.    This Court Lacks Personal Jurisdiction over the Attorney General. ............. 18

    III. Venue Is Improper. ...................................................................................... 21

    IV.  The Complaint Fails to State a Claim upon which Relief Can Be Granted. ... 23

        A. The Complaint does not state a claim for First Amendment retaliation. ..... 23

        B. The Complaint does not state a claim for viewpoint discrimination. ........... 28

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION ............................. 28

CONCLUSION ............................................................................................................. 30

CERTIFICATE OF SERVICE ...................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
486 U.S. 492 (1988) ....................................................................................................24

*Allstate Life Ins. Co. v. Stanley W. Burns, Inc.,*
80 F. Supp. 3d 870 (N.D. Ill. 2015) .................................................................... 6, 22

*Arensman v. Brown,*
430 F.2d 190 (7th Cir. 1970) .......................................................................................11

*Arkebauer v. Kiley,*
985 F.2d 1351 (7th Cir. 1993) .....................................................................................12

*B.D. by & through Myer v. Samsung SDI Co.,*
91 F.4th 856 (7th Cir. 2024)........................................................................................19

*Bates v. State Bar of Arizona,*
433 U.S. 350 (1977) .....................................................................................................25

*Bell v. Keating,*
697 F.3d 445 (7th Cir. 2012) .......................................................................................27

*Berrada Props. Mgmt. Inc. v. Romanski,*
608 F. Supp. 3d 746 (E.D. Wis. 2022)........................................................................12

*Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.,*
582 U.S. 255 (2017) .....................................................................................................18

*Carbone v. Zollar,*
845 F. Supp. 534 (N.D. Ill. 1993) ........................................................................ 12, 27

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
447 U.S. 557 (1980) ............................................................................................... 25, 28

*CF Ent., Inc. v. Nielsen Co. (US), LLC,*
No. 20-CV-2393, 2023 WL 5289296 (N.D. Ill. Aug. 17, 2023) ................................. 2

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .....................................................................................................27

*Collins v. Kendall Cnty.,*
807 F.2d 95 (7th Cir. 1986) .........................................................................................12

*Crenshaw v. Supreme Ct. of Indiana,*
170 F.3d 725 (7th Cir. 1999) .........................................................................................8

*Daimler AG v. Bauman,*
571 U.S. 117 (2014) .....................................................................................................19

*Dombrowski v. Pfister,*
380 U.S. 479 (1965) .......................................................................................................8

*Dutch Valley Growers, Inc. v. Rietveld,*
314 F.R.D. 293 (N.D. Ill. 2016) ...................................................................... 21

*Floralife, Inc. v. Floraline Int'l, Inc.,*
633 F. Supp. 108 (N.D. Ill. 1985) ................................................................. 30

*Forty One News, Inc. v. Cnty. of Lake,*
491 F.3d 662 (7th Cir. 2007) ........................................................................... 5

*FreeEats.com, Inc. v. Indiana,*
502 F.3d 590 (7th Cir. 2007) ................................................................... 8, 17

*Frost v. Nessel,*
712 F. Supp. 3d 1008 (W.D. Mich. 2024) ................................................... 13

*Goldlawr, Inc. v. Heiman,*
369 U.S. 463 (1962) ....................................................................................... 22

*Goodman v. Ill. Dep't of Fin. & Pro. Regul.,*
430 F.3d 432 (7th Cir. 2005) ........................................................................ 28

*Grando Corp. v. Rochford,*
536 F.2d 197 (7th Cir. 1976) .................................................................. 10, 11

*Grantham v. Challenge-Cook Bros.,*
420 F.2d 1182 (7th Cir. 1969) ..................................................................... 21

*Inspector Gen. v. Banner Plumbing Supply, Co.,*
34 F. Supp. 2d 682 (N.D. Ill. 1998) .............................................................. 8

*Int. Shoe Co. v. Washington,*
326 U.S. 310 (1945) ....................................................................................... 18

*Int'l Coll. of Surgeons v. City of Chicago,*
153 F.3d 356 (7th Cir. 1998) .......................................................................... 6

*John Crane, Inc. v. Shein Law Center, Ltd.,*
891 F.3d 692 (7th Cir. 2018) ......................................................... 19, 20, 21

*Kendall-Jackson Winery, Ltd. v. Branson,*
82 F. Supp. 2d 844 (N.D. Ill. 2000) .............................................................. 6

*Ken-N.K., Inc. v. Vernon Twp.,*
18 F. App'x 319 (6th Cir. 2001) ................................................................... 10

*Leroy v. Great Western United Corp.,*
443 U.S. 173 (1979) ................................................................................. 21, 22

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ....................................................................................... 28

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,*
457 U.S. 423 (1982) ......................................................................................... 7

*Minocqua Brewing Co. LLC v. Hess,*
160 F.4th 849 (7th Cir. 2025) ...................................................................... 23

*Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440 (7th Cir. 2010) .......................................... 18

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) .................................................................................. 27

*Murthy v. Missouri*, 603 U.S. 43 (2024) .................................................................................... 14

*Nat'l Comm'n on Egg Nutrition v. F.T.C.*, 570 F.2d 157 (7th Cir. 1977) .......................................................... 26, 30

*Nicole K. by next friend Linda R. v. Stigdon*, 990 F.3d 534 (7th Cir. 2021) ................................................................ 6

*Otto Milk Co. v. United Dairy Farmers Co-op. Ass'n*, 388 F.2d 789 (3d Cir. 1967) .............................................................. 24

*Pappas v. Twp. of Galloway*, 565 F. Supp. 2d 581 (D.N.J. 2008) .................................................. 10

*Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987) ..................................................................... 9, 29

*Perez v. Ledesma*, 401 U.S. 82 (1971) ......................................................................... 10

*Pincham v. Ill. Jud. Inquiry Bd.*, 872 F.2d 1341 (7th Cir. 1989) ....................................................... 12, 17

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ....................................................................... 28

*Rogers v. City of Hobart*, 996 F.3d 812 (7th Cir. 2021) .............................................................. 20

*Safe Haven Sober Houses, LLC v. City of Bos.*, 517 F. Supp. 2d 557 (D. Mass. 2007) ............................................. 10

*Sekerez v. Supreme Ct. of Indiana*, 685 F.2d 202 (7th Cir. 1982) .............................................................. 11

*Speech First, Inc. v. Killeen*, 968 F.3d 628 (7th Cir. 2020) .............................................................. 26

*Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013) ........................................................................... 7

*Starr v. Fed. Aviation Admin.*, 589 F.2d 307 (7th Cir. 1978) ........................................................... 8, 17

*Stroman Realty, Inc. v. Grillo*, 438 F. Supp. 2d 929 (N.D. Ill. 2006) ............................................. 12

*Stroman Realty, Inc. v. Martinez*, 505 F.3d 658 (7th Cir. 2007) ............................................................... 7

*Tamburo v. Dworkin,*
   601 F.3d 693 (7th Cir.2010) ...................................................................... 20

*Tarkowski v. Lake Cnty.,*
   775 F.2d 173 (7th Cir. 1985) ..................................................................... 18

*Telemedicine Sols. LLC v. WoundRight Techs., LLC,*
   27 F. Supp. 3d 883 (N.D. Ill. 2014) .......................................................... 20

*Tr. & Inv. Advisers, Inc. v. Hogsett,*
   43 F.3d 290 (7th Cir. 1994) .................................................................... 6, 7

*United States v. Alvarez,*
   567 U.S. 709 (2012) ................................................................................. 25

*United States v. Benson,*
   561 F.3d 718 (7th Cir. 2009) ..................................................................... 25

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
   425 U.S. 748 (1976) ............................................................................ 26, 30

*Wallace v. Herron,*
   778 F.2d 391 (7th Cir. 1985) ......................................................... 5, 19, 20

*Wilk v. Am. Med. Ass'n,*
   895 F.2d 352 (7th Cir. 1990) ..................................................................... 24

*Yelp Inc. v. Paxton,*
   137 F.4th 944 (9th Cir. 2025).......................................................... 14, 15, 16

*Younger v. Harris,*
   401 U.S. 37 (1971) ......................................................................... 6, 7, 9, 29

**Statutes**

28 U.S.C. § 1391(b)(2) ................................................................................. 21, 22
28 U.S.C. §1406.................................................................................................. 22
735 Ill. Comp. Stat. 5/2–209(c) ...................................................................... 18
Fla. Stat. § 501.202(2).................................................................................. 8, 30
Fla. Stat. § 501.207(2)...................................................................................... 30
Fla. Stat. § 542.16......................................................................................... 8, 30

**Rules**

Fed. R. Civ. P. 11 ............................................................................................. 18
Fla. R. Civ. P. 1.070(j)...................................................................................... 17
Fla. R. Civ. P. 1.190(a)...................................................................................... 17

**Treatises**

Erwin Chemerinsky, *Federal Jurisdiction* § 13.4 (4th ed. 2004)............................. 10

**Law Review Articles**

C. Keith Wingate, *The Bad Faith–Harassment Exception to the Younger Doctrine: Exploring the Empty Universe,* 5 Rev. of Litig. 123 (1986).................................... 10
Owen M. Fiss, *Dombrowski,* 86 Yale L.J. 1103 (1977)............................................. 10

**INTRODUCTION**

To lend credibility to the dangerous, experimental treatments offered by its members, Plaintiff American Academy of Pediatrics (AAP) created a "policy statement" recommending puberty blockers, cross-sex hormones, and breast and genital surgeries (collectively, "sex interventions") as the "standard of care" for children and adolescents experiencing gender dysphoria. The policy development process was rigged in favor of this predetermined outcome. Systematic reviews published by national health agencies around the world have repeatedly debunked AAP's policy, concluding there is "no credible evidence" that pediatric sex interventions are fully reversible or effective at reducing dysphoria. AAP nonetheless persists in its unscientific claims, because they generate business for its members.

This conduct violates multiple provisions of Florida law and puts Florida's consumers at risk. To enforce the law and protect vulnerable children and parents, Florida's Attorney General, James Uthmeier, initiated an enforcement proceeding against AAP in Florida's Nineteenth Judicial Circuit Court.

AAP would rather litigate that case in this Court. Erroneously invoking 42 U.S.C. § 1983, AAP asks this Court to deem the Enforcement Action meritless and enjoin proceedings in that state tribunal. The most elementary doctrines of abstention, jurisdiction, and venue prevent this Court from doing so. These procedural ailments demonstrate that AAP respects legal standards exactly as much as medical standards—i.e. not much at all. As for AAP's claims, phony medical standards designed to deceive consumers and exert market power in restraint of trade find no safe harbor in the First Amendment. This case must be dismissed.

1

## STATEMENT OF THE FACTS

On December 9, 2025, the Attorney General filed an enforcement action against AAP and two other medical associations in Florida circuit court ("the Enforcement Action"). The facts giving rise to the action are detailed in the amended complaint attached as Exhibit 1 ("the Amended Complaint").[1]

To summarize, the Amended Complaint describes how AAP worked in tandem with its co-defendants to concoct clinical guidelines establishing puberty-blockers, cross-sex hormones, and breast and genital surgeries as the only "evidence-based" treatments for minors experiencing gender dysphoria. Am. Compl. ¶¶ 1, 15. These guidelines were never intended to follow the evidence wherever it led; rather, through "panel stacking" and willful blindness to obvious conflicts of interest, *id.* ¶¶ 12, 166–78, 209–27, 237, AAP and its co-conspirators ensured that the guidelines would embrace the sex interventions offered by their members and disparage the counseling-based treatment offered by their members' competitors. *Id.* ¶¶ 61–62, 107.

The methodology employed by AAP was especially egregious. While AAP policy statements are usually the result of a highly structured development process distributing editorial control between several experienced clinicians, *id.* ¶ 219, AAP's policy statement on pediatric gender dysphoria was contrived, written, and reviewed by one person—a medical resident whose nascent practice consisted largely of

---

[1] Matters outside the pleadings are presented solely for the Court's consideration of the Attorney General's response to the PI Motion. *See CF Ent., Inc. v. Nielsen Co. (US), LLC*, No. 20-CV-2393, 2023 WL 5289296, at *1 (N.D. Ill. Aug. 17, 2023) (the motion to dismiss standard requiring courts to "accept as true the complaint's well-pleaded allegations . . . doesn't apply when ruling on a motion for a preliminary injunction").

prescribing puberty blockers and cross-sex hormones to gender-dysphoric children and adolescents. *Id.* ¶¶ 220–22. Unsurprisingly, the policy statement recommends pre-pubertal "social transition," "reversible" puberty blockers and cross-sex hormones beginning as early as age 9, breast surgeries with no age minimum, and genital surgeries with no age minimum. *Id.* ¶¶ 10, 59–60.

AAP would later block attempts by its co-conspirators to implement guardrails on the provision of so-called "gender-affirming care" (GAC). In 2022, one of AAP's co-conspirators sent AAP a draft of its revised guidelines, which recommended age minimums for breast and genital surgeries. *Id.* ¶¶ 185–86. AAP threatened to publicly oppose the guidelines unless the age minimums were removed. *Id.* ¶¶ 190, 194. To "reach a deal with the AAP," the co-conspirator capitulated. *Id.* ¶¶ 195–96.

Fueled by the imprimatur of AAP and other trusted medical associations, pediatric sex interventions skyrocketed. Annual diagnoses of childhood gender dysphoria increased exponentially from 2017 to 2021, and by 2022, 300,000 American children identified as "transgender." *Id.* ¶ 3. That number surged to 724,000 in 2023 and continues to grow. *Id.* Profits from these treatments have been immense. Insurance data shows that, as of 2022, sex intervention was a $4.1 billion industry. *Id.* ¶ 7. Studies forecast that revenues will reach $8 billion by 2030. *Id.*

We now know, however, that AAP's positions are not—and never were—backed by science. National health agencies eventually began to conduct systematic reviews of pediatric gender dysphoria, and these systematic reviews—the "gold standard" in evidence-based medicine—have uniformly concluded that there is "no credible

3

evidence" that puberty blockers are reversible or that any sex interventions effectively alleviate gender dysphoria in children and adolescents. *Id*. ¶¶ 109–151. Worse still, the systematic reviews determined that the co-conspirators' guidelines lack "methodological rigor" and relied on nothing but "circular" references to each other. *Id*. ¶¶ 136–43, 298. National health agencies therefore recommend a counseling-based model of care instead of AAP's heavy-handed approach. *Id*. ¶¶ 119, 123, 135, 150. Undeterred, AAP and its co-conspirators continue to falsely and misleadingly advertise that their guidelines are "evidence driven" and that sex interventions are the only "evidence-based" treatment for pediatric gender dysphoria. *Id*. ¶¶ 238–68.

The Attorney General filed the Enforcement Action in Florida's Nineteenth Judicial Circuit Court in and for St. Lucie County on December 9, 2025. The complaint included claims under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) and the Florida Racketeer Influenced and Corrupt Organizations Act (the Florida RICO Act). Instead of going through the normal course of litigation in Florida state court, AAP filed this action on March 4, 2026. Its complaint alleges that the Enforcement Action constitutes retaliation for activity protected by the First Amendment and viewpoint discrimination. ECF No. 1 ¶¶ 4, 20 ("the Complaint"). It filed a motion for preliminary injunction the same day. ECF No. 4 ("the PI Motion"). AAP's memorandum in support of the PI Motion asks this Court to "enjoin the Florida Attorney General from taking retaliatory action against AAP in response to AAP's exercise of its First Amendment rights." ECF No. 4-1 at 15 ("the PI Memo").

4

On March 16, 2026, the Attorney General filed the Amended Complaint. Ex. 1. The Amended Complaint retains the FDUTPA and Florida RICO claims and adds a claim under the Florida Antitrust Act. Am. Compl. ¶¶ 276–313. The Attorney General served AAP with the Amended Complaint on March 17, 2026. The return of service is attached as Exhibit 2.

**ARGUMENT**

This case should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(3), and 12(b)(6). By filing this case in this Court, AAP flouts elementary doctrines regarding abstention, personal jurisdiction, and venue. First, the Enforcement Action meets each of the criteria for *Younger* abstention: it is judicial in nature, implicates important state interests, and offers AAP an adequate opportunity to raise its constitutional claims. No exception applies, and AAP's arguments to the contrary are frivolous. Supreme Court precedent therefore "requires [this] court[] to abstain from enjoining [the] ongoing state proceedings." *Forty One News, Inc. v. Cnty. of Lake*, 491 F.3d 662, 665–66 (7th Cir. 2007).

Second, this Court lacks personal jurisdiction over the Attorney General. The Attorney General has not purposefully availed himself of the benefits and protections of conducting activities in Illinois. Indeed, the Complaint does not describe a single action taken by the Attorney General in Illinois. Rather, the Attorney General filed a complaint against AAP and two other defendants "in a [Florida] court pursuant to a [Florida] lawsuit, and it would be unreasonable to require [him] to appear in [Illinois] to defend this suit on the basis of such attenuated contacts." *Wallace v. Herron*, 778 F.2d 391, 394 (7th Cir. 1985).

5

Third, venue is improper. AAP claims that it "has suffered and will continue to suffer the injuries giving rise to this action in this District," ECF. 1 ¶ 26, but "harm felt [by a plaintiff] in the original forum is not sufficient for a finding of proper venue under Section 1391(b)(2)." *Allstate Life Ins. Co. v. Stanley W. Burns, Inc.*, 80 F. Supp. 3d 870, 879 (N.D. Ill. 2015) (collecting cases).

Due to these glaring procedural flaws, this Court need not (and must not) reach the merits. But even if it were proper for this Court to assess the merits, AAP's complaint would still be ripe for dismissal because it fails to state a claim for First Amendment retaliation or viewpoint discrimination.

## I. The *Younger* Abstention Doctrine Applies.

This case satisfies the elements for *Younger* abstention, and no exception applies. It therefore must be dismissed.[2] *See Nicole K. by next friend Linda R. v. Stigdon*, 990 F.3d 534, 537 (7th Cir. 2021) (*Younger* abstention is "compulsory").

### A. This case satisfies the elements for *Younger* abstention.

The United States Supreme Court has "long recognized a few well defined classes of cases . . . where abstention is not only permissible but expected." *Tr. & Inv. Advisers, Inc. v. Hogsett*, 43 F.3d 290, 294 (7th Cir. 1994). "*Younger v. Harris* and its progeny comprise one such class." *Id.* (citing *Younger v. Harris,* 401 U.S. 37 (1971)).

*Younger* originally required federal courts to "abstain from enjoining ongoing

---

[2] While abstention doctrines are prudential rather than jurisdictional, *see Int'l Coll. of Surgeons v. City of Chicago*, 153 F.3d 356, 361 n.4 (7th Cir. 1998), "[a] Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is the appropriate mechanism for raising abstention issues." *Kendall-Jackson Winery, Ltd. v. Branson*, 82 F. Supp. 2d 844, 853 (N.D. Ill. 2000).

state criminal proceedings." *Id.* The doctrine is founded in "notions of comity and federalism at the heart of our nation's delicate balancing act." *Id.* Given state sovereignty's "highly important place in our Nation's history and its future," the Supreme Court has stressed "time and time again that the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Younger*, 401 U.S. at 45.

Subsequent Supreme Court decisions "extended *Younger* abstention" to "state civil proceedings that are akin to criminal prosecutions," including "civil enforcement proceedings." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72–73 (2013); *Hogsett*, 43 F.3d at 294 ("Although *Younger* involved a suit to enjoin a state criminal proceeding, the doctrine has since been expanded beyond state criminal prosecutions to various civil proceedings in state court implicating important state interests."). The rationale for this expansion is that "federal court interference" in a state civil enforcement action is "an offense to the State's interest . . . likely to be every bit as great as it would be were th[e] [case] a criminal proceeding." *Kendall-Jackson Winery*, 82 F. Supp. 2d at 853 (quoting *Juidice v. Vail*, 430 U.S. 327, 334 (1977)).

*Younger* abstention applies when the underlying state proceedings (1) are judicial in nature, (2) implicate important state interests, and (3) provide an adequate opportunity to raise constitutional defenses. *Stroman Realty, Inc. v. Martinez*, 505 F.3d 658, 662 (7th Cir. 2007) (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432 (1982)). The Enforcement Action satisfies each of these criteria: it is before a state circuit court judge; it implicates Florida's important state

7

interests in fostering effective competition and protecting consumers, *see* Fla. Stat. §§ 542.16, 501.202(2); and AAP will have ample opportunity to raise its First Amendment defense in Florida's Nineteenth Judicial Circuit*, see Crenshaw v. Supreme Ct. of Indiana,* 170 F.3d 725, 729 (7th Cir. 1999) (abstaining where there was no evidence that the "state courts [we]re biased or harbor[ed] bad faith toward" the Section 1983 plaintiff).

### B. No exception to the *Younger* abstention doctrine applies.

AAP seems to concede the applicability of *Younger*, which is why it retreats to *Younger*'s "bad faith exception." PI Memo. at 11–13. But that path is daunting: AAP bears the burden to prove bad faith, *FreeEats.com, Inc. v. Indiana*, 502 F.3d 590, 596 (7th Cir. 2007), and government officials enjoy a "presumption of good faith . . . that must be refuted by well-nigh irrefragable proof." *Starr v. Fed. Aviation Admin.*, 589 F.2d 307, 315 (7th Cir. 1978); *see also Inspector Gen. v. Banner Plumbing Supply, Co.*, 34 F. Supp. 2d 682, 687 (N.D. Ill. 1998). As evidence of bad faith, AAP points only to (1) public criticism of AAP by the Attorney General and other state officials, (2) an alleged lack of merit for the FDUTPA and Florida RICO claims, and (3) the fact that the Attorney General had not yet served his complaint on AAP and its co-defendants.

### i. *The bad faith exception applies only when state enforcement authorities persist in the face of multiple unsuccessful state enforcement actions.*

AAP's "evidence" betrays a gross misunderstanding of *Younger*'s bad faith exception. The exception was first recognized by *Younger* itself, which acknowledged that the Court had previously enjoined a state prosecution in *Dombrowski v. Pfister*, 380 U.S. 479 (1965). In *Dombrowski,* the director, treasurer, and attorney of a civil

rights organization in Louisiana were arrested and charged with violations of the "Louisiana Subversive Activities and Communist Control Law" and the "Communist Propaganda Control Law." *Dombrowski*, 401 U.S. at 482. The police also raided the organization's office and seized its files. *Id.* at 487. Later that month, a state judge "quashed the arrest warrants as not based on probable cause" and "granted a motion to suppress the seized evidence on the ground that the raid was illegal." *Id.* at 487–88. Despite the state court's orders, the prosecutor "continu[ed] to threaten to initiate new prosecutions of appellants under the same statutes . . . and was threatening to use . . . copies of the illegally seized documents to obtain grand jury indictments against the appellants on charges of violating the same statutes." *Younger*, 401 U.S. at 48. Because these "unusual circumstances" presented "a situation in which defense of the State's criminal prosecution [would] not assure adequate vindication of constitutional rights," the Court did not abstain. *Id.* at 48–49, 54.

While *Younger* did not overrule *Dombrowski*, the Court made clear that *Dombrowski* "should not be regarded as having upset the settled doctrines that have always confined very narrowly the availability of injunctive relief against state . . . prosecutions." *Id.* at 53; *see also Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987) ("[W]hen a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary."). *Perez v. Ledesma*, a decision published the same day as *Younger*, characterized the *Dombrowski* exception as applying to "cases of proven harassment or prosecutions

9

undertaken by state officials in bad faith without hope of obtaining a valid conviction." 401 U.S. 82, 85 (1971).

Given the narrow and extreme circumstances needed to trigger the bad faith exception, it is no surprise that "since *Younger,* there is not a single instance in which the Supreme Court has applied this exception and found a state action to constitute a bad faith prosecution." Erwin Chemerinsky, *Federal Jurisdiction* § 13.4 (4th ed. 2004). Courts and legal commentators have therefore widely concluded that the bad faith exception applies "to only one specific set of facts: where state officials initiate repeated prosecutions to harass an individual or deter his conduct, and where the officials have no intention of following through on these prosecutions." *Ken-N.K., Inc. v. Vernon Twp.*, 18 F. App'x 319, 325 n.2 (6th Cir. 2001); *see also Safe Haven Sober Houses, LLC v. City of Bos.*, 517 F. Supp. 2d 557, 563 (D. Mass. 2007) ("[C]ommentators have observed that 'the universe of bad-faith-harassment claims that can be established is virtually empty.'" (quoting Chemerinsky, Federal Jurisdiction § 13.4 (quoting Owen M. Fiss, *Dombrowski,* 86 Yale L.J. 1103, 1115 (1977) & citing C. Keith Wingate, *The Bad Faith–Harassment Exception to the Younger Doctrine: Exploring the Empty Universe,* 5 Rev. of Litig. 123 (1986)))); *Pappas v. Twp. of Galloway*, 565 F. Supp. 2d 581, 590 n.3 (D.N.J. 2008).

The Seventh Circuit is no exception. Its decisions have steadfastly confined the bad faith exception to cases involving state actors who persist in the face of multiple unsuccessful state enforcement actions. Start with *Grando Corp. v. Rochford*, 536 F.2d 197 (7th Cir. 1976). At issue there was a Chicago ordinance conditioning movie

10

theater licenses on "a satisfactory showing" to the mayor that the applicant was a "fit and proper person." *Id.* at 201. Two movie theaters' applications for licenses were denied, yet they continued to operate in violation of the ordinance. In response, Chicago police officers arrested the theaters' managers, and the city initiated "some 100 cases" against them. *Id.*

The movie theaters sued under Section 1983, challenging the constitutionality of the ordinance and seeking injunctive relief against the enforcement actions. *Id. Younger* abstention did not apply, they argued, because the volume of prosecutions evidenced harassment and bad faith. *Id.* at 202. The district court agreed, but the Seventh Circuit reversed. The Seventh Circuit explained that "[i]n *Dombrowski* state attempts to prosecute the federal plaintiffs had been uniformly unsuccessful." *Id.* at 203. "[H]arassment and bad faith were inferred from evidence of multiple unsuccessful prosecutions." *Id.* at 204. But Chicago's enforcement actions against the movie theaters managers "ha[d] generally resulted in convictions." *Id.* at 204. Thus, the bad faith exception did not apply. *Id.*

The Seventh Circuit continues to limit the bad faith exception to cases involving repeated state enforcement actions "even in the face of judicial decisions declaring the officials' actions illegal." *Sekerez v. Supreme Ct. of Indiana*, 685 F.2d 202, 208 (7th Cir. 1982) (abstaining because "[t]he allegations contained in the complaint . . . f[e]ll far short of those allegations contained in the complaint in *Dombrowski*"), *abrogation on other grounds recognized by Hogsett*, 43 F.3d at 293; *see also Arensman v. Brown*, 430 F.2d 190, 192 (7th Cir. 1970) ("The court's decision in

11

*Dombrowski* is based upon a highly complicated state of facts, far different from those here, and is of no aid to plaintiff."); *Collins v. Kendall Cnty.*, 807 F.2d 95, 101 (7th Cir. 1986) (holding that the bad faith exception applies when "multiple prosecutions . . . [are] consistently unsuccessful" and abstaining because the state attorney had "successfully prosecuted the plaintiffs on three obscenity charges"); *Pincham v. Ill. Jud. Inquiry Bd.*, 872 F.2d 1341, 1350 (7th Cir. 1989) (bad faith exception did not apply where Section 1983 plaintiff did not allege facts showing that state officials were "using or threatening to use prosecutions, *regardless of their outcome,* as instrumentalities to suppress speech" (quoting *Collins*, 807 F.2d at 101)); *Berrada Props. Mgmt. Inc. v. Romanski*, 608 F. Supp. 3d 746, 754 (E.D. Wis. 2022) (bad faith exception applies to "[p]rosecutorial persistence in the face of repeated losses").

In short, "it has been clear, from the very beginning, that [the bad faith exception] provide[s] a very narrow gate for federal intervention in pending state . . . proceedings." *Arkebauer v. Kiley,* 985 F.2d 1351, 1358 (7th Cir. 1993); *see also Carbone v. Zollar*, 845 F. Supp. 534, 538 (N.D. Ill. 1993) ("The exception for prosecutorial bad faith . . . is quite narrow."); *Stroman Realty, Inc. v. Grillo*, 438 F. Supp. 2d 929, 935 (N.D. Ill. 2006) (bad faith exception is "extremely narrow").

### ii. *The bad faith exception does not authorize federal courts to conduct a first-instance merits analysis of the underlying state enforcement action.*

Ignoring this precedent, AAP seeks to make new law. Its suggested novel application of the bad faith exception would transform the "very narrow gate for federal intervention" into an open floodgate. *Arkebauer*, 985 F.2d at 1358. Whereas Seventh Circuit precedent simply directs federal district courts to consider how *state*

12

*courts* have resolved the merits of *prior* state enforcement actions, AAP asks this Court to enjoin the *very first* state enforcement action based on *the Court's own* assessment of the enforcement action's legal merit. PI Memo. at 9–11, 13.

This bizarre version of the bad faith exception—which would be good news to state criminal defendants everywhere—"would swallow the rule and effectively extend [the exception] [to] every instance in which a defendant has a good faith argument that his alleged actions do not satisfy the elements in the charging statute." *Frost v. Nessel*, 712 F. Supp. 3d 1008, 1015 (W.D. Mich. 2024), *aff'd*, No. 24-1132, 2025 WL 1136288 (6th Cir. Apr. 17, 2025). Such "federaliz[ation]" of state law would achieve "the exact result *Younger* abstention is designed to prevent." *Id.* Try as it may, AAP cannot use *Younger*'s "extremely narrow" bad faith exception to remove the Enforcement Action from Florida's Nineteenth Judicial Circuit to the United States District Court for the Northern District of Illinois.

### iii.    The public comments by the Attorney General and others are not evidence of **Younger** *bad faith.*

Next, AAP points to public comments critical of AAP as evidence that the Enforcement Action was brought in bad faith. Yet the evidence it cites is irrelevant and falls far short of establishing bad faith. These comments generally fall into three categories. The first category consists of comments made by persons other than the Attorney General. *See e.g.*, Compl. ¶¶ 133, 137, 144, 145, 147, 148, 153, 156-161. The second category contains comments by the Attorney General related to transgenderism, but not AAP. For example, the Attorney General's statement that allowing men to compete in women's sports demonstrates a "radical ideology." *Id.* at

13

¶ 166. The third category contains a few comments made by the Attorney General that actually discuss AAP. For example, the Attorney General's statement that AAP and its co-defendants in the Enforcement Action "have been recommending and pushing [GAC] on parents, pressuring parents, telling them that these are safe," and that their actions have "mutilate[d] kids and misle[d] families." *Id*. at ¶¶ 169–170.

The first category—AAP's airing of grievances against Governor Ron DeSantis, the Governor's communications director, Florida's Surgeon General, former State Representative Randy Fine, former Speaker of the House Paul Renner, and State Representative Webster Barnaby—has no bearing on this case.[3]

The relevance of the second and third categories was recently addressed by the Ninth Circuit in a strikingly similar case, *Yelp Inc. v. Paxton*, 137 F.4th 944 (9th Cir. 2025). In 2022, Yelp began notifying its users that "crisis pregnancy centers" "typically provide limited medical services and may not have licensed medical professionals onsite." *Id.* at 948. Facing backlash, Yelp removed the notice. Texas Attorney General Ken Paxton nevertheless filed "a civil enforcement action against Yelp in Texas state court" alleging that the notice "was false and misleading and violated the Texas Deceptive Trade Practices Consumer Protection Act." *Id.* at 949. Yelp brought a First Amendment retaliation claim under Section 1983 and sought a

---

[3] This facially absurd "evidence" has sweeping implications. AAP would have federal courts impute bad faith to an independently elected constitutional officer based on the comments and actions of other state officers and employees. This rule would erase not only the lines drawn by the federal constitution to separate power between the States and the federal government, but also the lines drawn by state constitutions to separate power between and within the branches of state government. Just as standing is not dispensed in gross, *see Murthy v. Missouri*, 603 U.S. 43, 61 (2024), neither is bad faith.

14

preliminary injunction in federal district court in California. *Id.* The district court abstained under *Younger*. Yelp appealed, arguing that the bad faith exception applied. As evidence of bad faith, Yelp noted that Attorney General Paxton's "opposition to abortion is a centerpiece of his political platform" and that "he 'celebrat[ed]' [*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 224 (2022)] and created a holiday to commemorate the decision." Brief for Yelp Inc. at 16, *Yelp Inc. v. Paxton*, No. 23-CV-04977-TLT, 2024 WL 413464 (N.D. Cal. Feb. 1, 2024). Yelp also pointed out that "in announcing his enforcement action, the Attorney General highlighted a 'lengthy public statement' from Yelp's CEO vowing to 'fight[] the legal battle against abortion bans,' after *Dobbs*" and "suggest[ed] Yelp's 'politics' were 'the primary motivation' for the CPC-related communications." *Id.*

The Ninth Circuit rejected this "evidence": "Although Yelp takes issue with Attorney General Paxton's efforts to regulate abortion and abortion-related matters, state Attorneys General . . . are entitled to have enforcement priorities and policy positions. If an enforcement action consistent with that policy direction were enough to establish a retaliatory motive, state courts would regularly be stripped of their authority at the hands of federal injunctions—directly contrary to *Younger*'s overarching message of respect for state courts." *Yelp*, 137 F.4th at 955–56. Under Yelp's argument, state enforcement actions would become "retaliatory whenever they touch on hot-button issues." *Id.* at 956. While Texas's action "implicate[d] a sensitive matter on which people disagree," that did not make it "retaliatory within the meaning of *Younger*'s bad faith exception." *Id.*

15

Neither did Attorney General Paxton's press release indicate bad faith, "even if it used strong rhetoric." *Id.* While the Attorney General remarked on Yelp's views on abortion, the statement was "part of the set-up for explaining Yelp's decision to issue what the OAG regarded as a misleading consumer notice. And more broadly, treating the commonplace stridency of prosecutorial press releases as synonymous with bad faith would lead to federal courts enjoining state court proceedings with great regularity, contrary to the Supreme Court's direction that *Younger*'s exceptions are narrow." *Id.* The Ninth Circuit concluded that, because Yelp had not alleged "a serial pattern of litigation," the circumstances were "not of the same character as those few cases that have applied *Younger*'s bad faith exception." *Id.* at 955.

Like Yelp, AAP asks this Court to equate the parties' disagreement about a "hot button issue" with *Younger* bad faith. For the same reasons given by the Ninth Circuit, this Court must decline to do so. The Attorney General's alleged comments about the Enforcement Action on social media and during a podcast are likewise no evidence of bad faith. As is obvious from AAP's own pleading, those comments simply explained the basis for the Enforcement Action and, notably, expressed an expectation of success. Compl. ¶¶ 169–171.

### iv. *Compliance with the deadline for service under the Florida Rules of Civil Procedure is not evidence of bad faith.*

Lastly, the PI Memo suggests that the Attorney General's "failure to prosecute [his] case" is evidence of bad faith. *Id.* at ¶ 138. But this argument is unbefitting of a licensed attorney. No such failure has occurred. Under the Florida Rules of Civil Procedure, plaintiffs have 120 days to serve their initial pleading. Fla. R. Civ. P.

16

1.070(j). The Attorney General filed the Enforcement Action on December 9, 2025, making service due April 8, 2026. The rules further allow a plaintiff to amend a pleading once as a matter of course at any time before a responsive pleading is served. Fla. R. Civ. P. 1.190(a).[4] The Attorney General filed the Amended Complaint on March 16, 2026, and served AAP the following day. Ex. 1; Ex. 2. Florida is actively prosecuting the Enforcement Action with full expectation of prevailing on the merits. Compliance with state court procedure is not evidence of bad faith.

In sum, *Younger*'s bad faith exception is "extremely narrow," applying only to cases where a state actor continues to prosecute claims that have been uniformly rejected in state court. To say that AAP's "evidence" of bad faith is "sketchy at best and clearly insufficient to make the requisite showing of bad faith or harassment" would be an understatement. *Pincham*, 872 F.2d at 1350. AAP comes nowhere close to satisfying its burden of presenting the "well-nigh irrefragable proof" necessary to overcome the presumption that the Enforcement Action is being prosecuted in good faith. *Starr*, 589 F.2d at 315; *FreeEats.com*, 502 F.3d at 596.

This case satisfies the criteria for *Younger* abstention, and no exception applies. The only question remaining is "how to abstain from these claims; by dismissing or merely staying them." *FreeEats.com*, 502 F.3d at 600. Because AAP has no claim for damages, this Court must dismiss the case. *Id.* (explaining that "[a] stay is appropriate when a plaintiff is foreclosed from bringing his damages claims in the

---

[4] For AAP's ease of reference, a freely accessible link to the Florida Rules of Civil Procedure can be found here: https://www-media.floridabar.org/uploads/2025/12/Civil-Procedure-Rules-01-01-26.pdf.

state proceeding"). AAP's suit here, not the Attorney General's, is the one made in bad faith.[5] The Court should dismiss.

## II. This Court Lacks Personal Jurisdiction over the Attorney General.

Apart from *Younger*, this Court should dismiss for lack of personal jurisdiction. Under the Due Process Clause of the Fourteenth Amendment, "a defendant is subject to personal jurisdiction in a particular state only if the defendant had 'certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010) (quoting *Int. Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

In cases arising under federal law, "a federal court has personal jurisdiction over the defendant if either federal law or the law of the state in which the court sits authorizes service of process to that defendant." *Id.* at 443. Illinois's long-arm statute is co-terminus with the limits of the Due Process Clause with the Fourteenth Amendment. *Id.* at 443 (citing 735 Ill. Comp. Stat. 5/2–209(c)).

Personal jurisdiction can be general or specific. *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017). This Court clearly lacks general jurisdiction over the Office of the Florida Attorney General because it is not "essentially at home" in Illinois. *Daimler AG v. Bauman*, 571 U.S.

---

[5] Given the frivolous nature of the suit, the Attorney General maintains the right to move for attorney's fees, *see Tarkowski v. Lake Cnty.*, 775 F.2d 173, 176 (7th Cir. 1985) ("defendant who prevails in a federal civil rights suit is entitled to an award of attorney's fees . . . if the suit was frivolous."), as well as the right to move for sanctions against AAP's counsel, *see* Federal Rule of Civil Procedure 11, if this case is not dismissed or transferred.

117, 122 (2014). Specific personal jurisdiction requires: "(1) purposeful availment—the defendant must have purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in the forum; (2) relatedness—the alleged injury must arise out of or relate to the defendant's forum-related activities; and (3) fairness—the exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice." *B.D. by & through Myer v. Samsung SDI Co.*, 91 F.4th 856, 861 (7th Cir. 2024).

These criteria are not satisfied when the only connection between the defendant and the forum State is litigation against a forum-State resident in a different State. For instance, in *Wallace v. Herron*, an Indiana businessman sued three California lawyers in Indiana court for malicious prosecution. 778 F.2d at 392. The allegedly malicious suit was filed by the lawyers in California. The businessman argued that the California litigation created sufficient contacts between the lawyers and Indiana. *Id.* at 393–94. The Seventh Circuit rejected this argument: "the defendants filed . . . motions on behalf of their clients in a California court pursuant to a California lawsuit, and it would be unreasonable to require the defendants to appear in Indiana to defend this suit on the basis of such attenuated contacts." *Id.* at 394.

Similarly, in *John Crane, Inc. v. Shein Law Center Limited*, the only nexus between the defendant (a Pennsylvania-based law firm) and the forum State (Illinois) was asbestos litigation filed by the defendant against an Illinois-based manufacturer in Pennsylvania, California, and Texas. 891 F.3d 692, 695–96 (7th Cir. 2018). The

19

Seventh Circuit dismissed for lack of personal jurisdiction, reiterating that the "plaintiff cannot be the only link between the defendant and the forum." *Id.* at 695. "All contacts the defendants had with . . . Illinois were incidental to the litigation proceeding elsewhere. It would be unfair to require the defendants to appear in Illinois because of these limited contacts." *Id.* at 696.

AAP will likely argue (as it does with respect to venue, *see infra*) that this Court possesses specific personal jurisdiction over the Attorney General because the Enforcement Action has affected AAP in Illinois. But the Seventh Circuit has long held that a plaintiff may not "hale any defendant into court in the plaintiff's home state, where the defendant has no contacts, merely by asserting that the defendant has committed an intentional tort against the plaintiff." *Wallace*, 778 F.2d at 394. Because "the relationship among the defendant, the forum, and the litigation must arise out of contacts that the *defendant* has created with the forum state," "[t]he question is not whether the plaintiff experienced a particular injury or effect in the forum state but whether the defendant's conduct connects him with the forum in a meaningful way." *Rogers v. City of Hobart*, 996 F.3d 812, 819 (7th Cir. 2021); *see also Telemedicine Sols. LLC v. WoundRight Techs., LLC*, 27 F. Supp. 3d 883, 895 (N.D. Ill. 2014) (explaining that plaintiffs must allege "injury plus") (citing *Tamburo v. Dworkin,* 601 F.3d 693 (7th Cir.2010)).

The Complaint does not identify any conduct connecting the Attorney General with Illinois. In fact, Illinois is mentioned only three times: as AAP's state of incorporation, as the location of AAP's headquarters, and as the locus of AAP's alleged

20

injuries. Compl. ¶¶ 26–27. These allegations fall woefully short of satisfying AAP's burden to prove personal jurisdiction. *John Crane*, 891 F.3d at 695 ("When challenged, the plaintiff has the burden of proving personal jurisdiction."). Because this Court lacks personal jurisdiction over the Attorney General, it must dismiss.

### III. Venue Is Improper.

Venue is improper for similar reasons. "When faced with a motion to dismiss for improper venue under Fed. R. Civ. P. 12(b)(3), the plaintiff bears the burden of proving venue is proper." *Dutch Valley Growers, Inc. v. Rietveld*, 314 F.R.D. 293, 295 (N.D. Ill. 2016) (collecting cases); *see also Grantham v. Challenge-Cook Bros.*, 420 F.2d 1182, 1184 (7th Cir. 1969).

AAP asserts that venue lies under 28 U.S.C. § 1391(b)(2), which allows a civil action to be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." AAP claims that a substantial part of the events giving rise to its claims occurred in this District "because AAP has suffered and will continue to suffer the injuries giving rise to this action in this District." Compl. ¶ 26.

This argument runs headlong into the controlling Supreme Court decision, *Leroy v. Great Western United Corp.*, 443 U.S. 173 (1979). The plaintiff there was a Texas corporation that challenged Idaho's "Corporate Takeover Act" in the Northern District of Texas. The Fifth Circuit found venue proper under 28 U.S.C. § 1391(b)(2), reasoning "that the 'claim arose' in Dallas because . . . that is where Idaho's statute had its impact on [the corporation]." *Id.* at 186.

The Supreme Court rejected this reasoning. *Id.* It stressed that the purpose of

21

"statutorily specified venue is to protect the *defendant* against the risk that a plaintiff will select an unfair or inconvenient place of trial," not "to provide for venue at the residence of the plaintiff." *Id*. at 183–84, 185. "[I]t [wa]s action . . . taken in Idaho by Idaho residents—the enactment of the statute . . . as well as the future action that may be taken in the State by its officials to punish or to remedy any violation of its law, that provide[d] the basis for [the corporation's] federal claim." *Id*. at 185–86. Thus, the claim had "only one obvious locus—the District of Idaho." *Id*. at 185.

Adhering to *Leroy*, courts in this District hold that "[a] plaintiff's economic harm felt in the original forum is not sufficient for a finding of proper venue under Section 1391(b)(2)." *Allstate Life Ins.*, 80 F. Supp. 3d at 879 (collecting cases); *Bartlett v. Bartlett*, No. 16 CV 6595, 2017 WL 106043, at *3 (N.D. Ill. Jan. 11, 2017) ("[C]ourts in this district generally hold that the locus of a plaintiff's economic harm is an insufficient basis for venue under § 1391(b)(2).") (citing *Leroy*, 443 U.S. at 183–84).

The Enforcement Action is the event giving rise to AAP's claims. That action was taken in Florida, by a Florida resident. That the Enforcement Action has allegedly caused AAP injury in Illinois is irrelevant for purposes of 28 U.S.C. § 1391(b)(2). Thus, improper venue is an independent basis for dismissal.[6]

---

[6] When venue is improper, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406. Here, the interests of justice do not require transfer, so the case should be dismissed. *Cf. Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466 (1962) (explaining that "a typical example of the problem sought to be avoided" by 28 U.S.C. § 1406 is the "los[s] [of] a substantial part of [a] cause of action under the statute of limitations"). If not dismissed, this case should be transferred to the District where the Enforcement Action was filed: the Southern District of Florida, Fort Pierce Division.

22

## IV. The Complaint Fails to State a Claim upon which Relief Can Be Granted.

Putting aside each of the fatal procedural flaws in AAP's action, the Complaint still fails to state a claim for First Amendment retaliation or viewpoint discrimination.

### A. The Complaint does not state a claim for First Amendment retaliation.

To satisfy the elements of First Amendment retaliation, AAP "must demonstrate (1) that [it] engaged in protected First Amendment activity, (2) that [it] suffered a deprivation because of that activity, and (3) causation—that is, that the First Amendment activity was at least a motivating factor in the [Attorney General's] decision to [file the Enforcement Action]." *Minocqua Brewing Co. LLC v. Hess*, 160 F.4th 849, 855 (7th Cir. 2025). The Complaint fails all three prongs.

### i. *The Enforcement Action addresses anticompetitive and deceptive activity unprotected by the First Amendment.*

The Attorney General's Amended Complaint (attached as Exhibit 1) contains three counts, none of which challenge First Amendment-protected activity.

Count I alleges that AAP and its co-defendants contracted, combined, or conspired in restraint of trade or commerce in violation of the Florida Antitrust Act. Am. Compl. ¶¶ 276–84. Longstanding precedent from the United States Supreme Court holds that "private standards-setting associations" act in restraint of trade when they fail to employ "procedures that prevent the standard-setting process from being biased by members with economic interests in stifling product competition" or "bias the process by . . . stacking the private standard-setting body with decisionmakers sharing their economic interest." *Allied Tube & Conduit Corp. v.*

23

*Indian Head, Inc.*, 486 U.S. 492, 499–501, 511 (1988).

The Seventh Circuit applied this precedent in *Wilk v. American Medical Association*, holding that the American Medical Association's ("AMA") "medical standards" for the treatment of medical problems constituted a restraint of trade. 895 F.2d 352, 363–65 (7th Cir. 1990). Motivated by the economic incentives of its members, the AMA organized a committee to create guidelines deeming chiropractors "unscientific practitioners." *Id.* at 355. It was "very clear" from the record "that the Committee's members did not have open minds to pro-chiropractic arguments or evidence." *Id.* at 363. Rather, the committee systematically ignored evidence "that chiropractic was effective, indeed more effective than the medical profession, in treating certain kinds of problems, such as back injuries," and the AMA continued to issue warnings about the chiropractic profession even after there "was no longer an objectively reasonable concern." *Id.*

The Amended Complaint alleges facts showing that AAP failed to employ procedures to prevent their standards-setting process from becoming biased by members with economic interests in promoting sex interventions and stifling the competing counseling-based model of care. To the contrary, AAP delegated wholesale standards-setting authority to a medical resident with a pecuniary interest in establishing drugs and surgeries as the only treatment for pediatric gender dysphoria. *Id.* ¶¶ 219–22. In short, Count I challenges conduct unprotected by the First Amendment, not speech. *Cf. Otto Milk Co. v. United Dairy Farmers Co-op. Ass'n*, 388 F.2d 789, 799 (3d Cir. 1967) (holding the First Amendment "protection does not

24

reach Sherman Act offenders").

Counts II (FDUTPA) and III (Florida RICO Act) assert that Defendants have made—and continue to make—willfully false and misleading representations about the rigor of their guidelines and the safety, reversibility, and efficacy of pediatric sex interventions. Am. Compl. ¶¶ 285–313. For example, Defendants continue to represent that drugs and surgeries are the only evidence-based treatment for pediatric gender dysphoria despite systematic review after systematic review—the "gold standard" of medical evidence—concluding that there is "no credible evidence" that such interventions effectively alleviate pediatric gender dysphoria and recommending the counseling-based approach instead. *Id.* ¶¶ 109–51. The Amended Complaint explains that AAP and its co-conspirators have taken this position not because it comports with the science, but rather because it generates business for their members and helps them sell memberships. *Id.* ¶¶ 238–68.

False, deceptive, and misleading commercial speech such as this "of course is subject to restraint." *Bates v. State Bar of Arizona*, 433 U.S. 350, 383 (1977). "The First Amendment provides broad protection to speech, but not all speech. Commercial speech receives lesser protection and false or misleading commercial speech receives no protection at all." *United States v. Benson*, 561 F.3d 718, 725 (7th Cir. 2009) (citing *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562–63 (1980) (States "may ban forms of communication more likely to deceive the public than to inform it")); *see also United States v. Alvarez*, 567 U.S. 709, 717–18 (2012).

States have a strong interest in ensuring that "the stream of commercial

25

information flow cleanly." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 772 (1976). This is especially true where, as here, the false and deceptive commercial speech relates to public health. As the Seventh Circuit explained in *National Commission on Egg Nutrition v. F.T.C.*, "[t]he First Amendment interest is twofold: it embraces the interests of both the speaker and the prospective audience, which, in the case of commercial speech, consists of consumers." 570 F.2d 157, 162 (7th Cir. 1977). "The consumers' interest, which is in obtaining information on which to base the decision of whether to buy is served by insuring that the information is not false or deceptive, and, in fact, coincides with the public interest served by the regulation." *Id.* (citation omitted), "The fact that health is involved enhances the interests of both consumers and the public" and tips the scale "in favor of regulation." *Id.*

### ii.    The Complaint does not allege facts showing that AAP has suffered any deprivation due to the Enforcement Action.

To satisfy the second element of First Amendment retaliation, the plaintiff must "show a chilling effect on his speech that is objectively reasonable, *and that he self-censors as a result.*" *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (emphasis added).

The Complaint does not contain any facts indicating that the Enforcement Action has caused AAP or its members to self-censor. An affidavit by AAP President Mark Del Monte filed with the PI Motion provides one possible example of self-censorship, ECF No. 4-2 ¶ 18 ("the Del Monte Affidavit") (describing "individuals"— whether or not AAP members, the affidavit does not say—who "declined or withdrew

26

from media interviews or participation in AAP workshops, panels, or educational sessions"), but AAP admits that this occurred *prior to* the Enforcement Action—perhaps some time after AAP's unscientific claims were discredited by a slew of systematic reviews. Indeed, whatever GAC-related "chill" AAP may have experienced is attributed by its own admissions to executive orders and lawsuits filed by the Trump administration prior to the Enforcement Action. *See id.* ¶ 9. And while the Del Monte Affidavit speculates about how AAP or its members could possibly self-censor in the future, "[a]llegations of possible future injury are not sufficient" to "substantiate [the] concrete and particularized chilling effect on [AAP's] protected speech or expressive conduct" needed to pursue prospective relief. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012).

### iii.     *The Complaint does not plausibly allege that the Enforcement Action was caused by its First Amendment speech.*

The Complaint also fails to adequately allege causation. As already discussed, AAP's false and misleading representations about the safety, reversibility, and efficacy of pediatric sex interventions and the methodological rigor of its policy statement are not First Amendment-protected activity. The Complaint provides no reason to believe that this illegal, constitutionally unprotected activity was insufficient to prompt the Enforcement Action. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–86 (1977). "To the contrary, based on the allegations set forth in [AAP's] complaint, the more likely explanation for defendant's decision to prosecute is the undeniable fact that [AAP and its co-defendants] have flaunted the law of [Florida]." *Carbone*, 845 F. Supp. at 539.

27

**B. The Complaint does not state a claim for viewpoint discrimination.**

AAP and its co-defendants cannot make out a viewpoint discrimination claim either. AAP and its co-defendants are unable to allege that the Attorney General's enforcement against them constitutes impermissible content-based regulation because their conduct falls within a well-defined exception to content-based regulations. While the First Amendment generally prevents content-based regulation, "our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992), which include "fraud" and false commercial speech. *Alvarez*, 567 U.S. at 717–18; *Central Hudson,* 447 U.S. at 562–63. AAP's viewpoint claim therefore fails because the speech it identifies is not entitled to First Amendment protection at all.

In conclusion, the Complaint is procedurally defective and fails to state a claim upon which relief can be granted. It must be dismissed.

## RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Goodman v. Ill. Dep't of Fin. & Pro. Regul.*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)). The movant must show that "(1) they have a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest." *Id.*

**1.** AAP stumbles on the first step. As explained above, there is no likelihood that the Court will ever reach the merits of AAP's claims—much less that AAP would be successful in those claims. The *Younger* abstention doctrine applies, this Court lacks personal jurisdiction over the Attorney General, and venue is improper. In any event, AAP would lose on the merits because the Enforcement Action is a result of its anticompetitive conduct (Count I) and false commercial speech (Counts II and III)—activity wholly unprotected by the First Amendment. And even if these activities were found to enjoy First Amendment protection, AAP has not pled facts showing a chilling of speech traceable to the Enforcement Action.

**2.** Next, if AAP's actions are protected by the First Amendment as it says, then AAP has an adequate remedy at law: raising the First Amendment as a defense in Florida's Nineteenth Judicial Circuit. *See Pennzoil Co*, 481 U.S. at 15 ("[W]hen a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary.").

**3.** The Enforcement Action is not causing irreparable harm. AAP continues to advocate in favor of GAC. Am. Compl. ¶ 261; Del Monte Aff. ¶ 34. Its only example of self-censorship predates the Enforcement Action. And "the cost, anxiety, and inconvenience of having to defend against a single [civil enforcement action]," is not itself an irreparable injury. *Younger*, 401 U.S. at 46. That AAP waited nearly three months to seek an injunction also suggests that it is not being irreparably harmed by the Enforcement Action. *See Floralife, Inc. v. Floraline Int'l, Inc.*, 633 F. Supp. 108,

29

112 (N.D. Ill. 1985) ("delay in filing for a preliminary injunction is a relevant consideration" because it "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury").

**4.** Finally, the public interest disfavors a preliminary injunction. The State of Florida has compelling interests in fostering effective competition, Fla. Stat. § 542.16, and protecting its consumers from deception. Fla. Stat. § 501.202(2). Its interest in the "clean flow" of commercial information is particularly acute in this case, where the affected consumers are vulnerable parents considering life-altering drugs and surgeries for their mentally distressed children. *Va. State Bd. of Pharmacy*, 425 U.S. at 771–72; *Nat'l Comm. on Egg Nutrition*, 570 F.2d at 162. Indeed, Florida law required the Attorney General to execute a determination of public interest to bring the FDUTPA claim. Fla. Stat. § 501.207(2).

AAP fails to make a clear showing for any of the elements required for a preliminary injunction, let alone all four.

## CONCLUSION

This Court should dismiss the Complaint under *Younger* abstention. If this Court determines that *Younger* does not apply, it should dismiss the Complaint for lack of personal jurisdiction. If this Court determines it has personal jurisdiction over the Attorney General, it should dismiss the Complaint for improper venue or transfer the case to the Southern District of Florida, Fort Pierce Division. If this Court determines that venue is proper, it should dismiss the Complaint for failure to state a claim upon which relief can be granted. This Court should also deny the PI Motion.

March 18, 2026

JAMES UTHMEIER
  *Attorney General*

RYAN D. NEWMAN
  *Chief Deputy Attorney General*

Respectfully submitted,

*/s/ Samuel F. Elliott*

DAVID M.S. DEWHIRST
  *Solicitor General*

JASON J. MUEHLHOFF
  *Chief Deputy Solicitor General*
VINCENT LI
  *Deputy Solicitor General*
SAMUEL F. ELLIOTT (FBN 1039898)
  *Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
samuel.elliott@myfloridalegal.com

*Counsel for Attorney General*
*James Uthmeier*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished by electronic service through the CM/ECF Portal on March 18, 2026, to all counsel of record.

*/s/ Samuel F. Elliott*
Deputy Solicitor General

31