**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR ST. LUCIE COUNTY, FLORIDA**

|  |  |
|---|---|
| **OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS,**<br><br>    *Plaintiff,*<br><br>    **v.**<br><br>**WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH**, **INC.,** **THE ENDOCRINE SOCIETY, and AMERICAN ACADEMY OF PEDIATRICS**,<br><br>    *Defendants.* | Case No. 2025-CA-002660 |

## AMENDED COMPLAINT

Plaintiff, the Office of the Attorney General, State of Florida, Department of Legal Affairs, brings this action against Defendants World Professional Association for Transgender Health, Inc., The Endocrine Society, and American Academy of Pediatrics (collectively, "Defendants"), and alleges:

## INTRODUCTION

1. For decades, the World Professional Association for Transgender Health, Inc. ("WPATH"), The Endocrine Society ("Endocrine Society" or "ES"), and the American Academy of Pediatrics ("AAP") have conspired, colluded, and collectively agreed to deceive vulnerable children and parents about "gender-affirming" drugs and surgeries.

2.      Gender dysphoria is "a condition that involves distress regarding one's sexed body and/or associated social expectations."[1]

3.      A decade ago, pediatric gender dysphoria was a rarity. In fact, researchers did not begin tracking the phenomenon until 2017.[2] But the number of children and adolescents in the United States diagnosed with gender dysphoria since then has skyrocketed. Annual diagnoses increased exponentially from 2017 to 2021,[3] and by 2022, 300,000 American children identified as "transgender."[4] That number surged to 724,000 in 2023 and continues to grow.[5]

4.      This rapid rise—which coincides with a general "deterioration in youth mental health" associated with social media, smartphones, a lack of in-person interaction, and other societal ills—suggests that pediatric gender dysphoria is a symptom of deeper psychological needs.[6] And while it is natural for children to feel anxious about their changing bodies, these feelings usually "disappear" after they reach puberty.[7]

---

[1] *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Dep't of Health & Human Services 12 (Nov. 19, 2025), https://opa.hhs.gov/sites/default/files/2025-05/gender-dysphoria-report.pdf ("HHS Review").

[2] Robin Respaut & Chad Terhune, *Putting numbers on the rise in children seeking gender care*, Reuters (Oct. 6, 2022), https://www.reuters.com/investigates/special-report/usa-transyouth-data/.

[3] *Id.*

[4] Azeen Ghorayshi, *Report Reveals Sharp Rise in Transgender Young People in the U.S.*, New York Times (June 10, 2022), https://www.nytimes.com/2022/06/10/science/transgender-teenagers-national-survey.html.

[5] Sam Levin, *More than 2.8m people in US identify as trans, including 724,000 youth, data shows*, The Guardian (Aug. 20, 2025), https://www.theguardian.com/world/2025/aug/20/trans-people-us-data.

[6] Hilary Cass, *Independent review of gender identity services for children and young people: Final report* 109–10 (Apr. 2020), https://cass.independent-review.uk/home/publications/final-report/ ("Cass Review").

[7] *Treatment: Gender dysphoria*, National Health Service,

5. National health agencies in the United States and Europe therefore endorse a holistic psychosocial approach designed to alleviate pediatric gender dysphoria and other mental distress through family therapy and individual counseling (the "Counseling-Based Model of Care").[8]

6. The medical industrial complex finds this model of care unprofitable and, therefore, unacceptable. So it developed a competing protocol that "treats" pediatric dysphoria with lifelong prescription drug use and a parade of costly surgeries. This sequence of interventions, commonly referred to as "gender-affirming care," begins with "social transition," advances to the administration of puberty-suppressing drugs and cross-sex hormones, and culminates in surgical procedures on the minor's breasts and genitals (collectively, "sex interventions").

7. This "model of care" is extremely profitable. Insurance data shows that, as of 2022, sex intervention was a $4.1 billion industry.[9] Studies forecast that revenues will reach $8 billion by 2030.[10]

8. But the physicians, psychologists, and pharmaceutical companies who stood to gain from "gender-affirming care" had a problem: there is no credible

---

https://www.nhs.uk/conditions/gender-dysphoria/treatment/.

[8] *Id.*; *see also* HHS Review at 268–69; *Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors*, Council for Choices in Health Care in Finland (PALKO / COHERE Finland) at 8, https://segm.org/sites/default/files/Finnish_Guidelines_2020_Minors_Unofficial%20Translation.pdf ("Finnish Review").

[9] Wesley J. Smith, *The 'Gender-Industrial Complex' Makes Billions Annually*, National Review (Aug. 28, 2024), https://www.nationalreview.com/corner/the-gender-industrial-complex-makes-billions-annually/ (citing *The Gender Industrial Complex*, American Principles Project, https://americanprinciplesproject.org/wp-content/uploads/2024/06/Gender-Industrial-Complex-Full-Report.pdf).

[10] *Id.*

evidence that sex interventions alleviate pediatric gender dysphoria.[11] To convince patients, parents, insurance companies, and judges otherwise, the sex intervention industry needed the imprimatur of trusted medical associations.

9. Enter Defendants. Sensing a growing demand from their members and prospective members, Defendants collectively agreed to develop "clinical guidelines" that would embrace the pediatric sex interventions offered by their members—and disparage the Counseling-Based Model of Care offered by their members' competitors—all to exclude those competitors from the Relevant Market.

10. The campaign began when WPATH published the Standards of Care ("SOC") Version 5 in 1998. In hindsight, the guidelines' recommendations were comparatively modest: puberty blockers for adolescents, and cross-sex hormones in select cases beginning no earlier than 16. But Endocrine Society and AAP joined WPATH's enterprise in the ensuing years, and Defendants worked together to publish more and more guidelines containing gradually more permissive recommendations. Now, Defendants recommend pre-pubertal "social transition," puberty blockers and cross-sex hormones beginning as early as age 9, breast surgeries with no age minimum, and genital surgeries with no age minimum.

11. There is not, and has never been, any credible evidence that these interventions are safe, reversible, or effective at alleviating pediatric gender dysphoria. But by working together to draft and reference one another's guidelines over an extended period of time, Defendants built a façade of legitimacy for gender-

---

[11] Cass Review at 13 ("The reality is that we have no good evidence on the long-term outcomes of interventions to manage gender-related distress.").

4

affirming care. WPATH's SOC-6 (2001) cited the SOC-5; Endocrine Society's 2009 Guideline was co-sponsored by WPATH and cited the SOC-6; WPATH's SOC-7 (2011) cited Endocrine Society's 2009 Guideline; Endocrine Society's 2017 Guideline was co-sponsored by WPATH and cited the SOC-7; AAP's 2018 Policy Statement cited Endocrine Society's 2017 Guideline and the SOC-7; WPATH's SOC-8 (2022) cited Endocrine Society's 2017 Guideline and AAP's 2018 Policy Statement (collectively, "Defendants' Guidelines").

12.     The methodologies used by Defendants to develop these guidelines lacked meaningful safeguards to prevent the standard-setting process from being biased. To the contrary, through "panel stacking," suppression of disfavored evidence, and repeated failures to identify and manage conflicts of interest, Defendants guaranteed that their clinical guidelines would reach the predetermined outcome demanded by their members.

13.     This scheme was, for a time, successful. Defendants' Guidelines "dominated the development of other guidelines,"[12] legislatures and regulators incorporated the Guidelines into their statutes and administrative rules, and courts relied on the Guidelines to enjoin laws banning pediatric sex interventions.[13]

---

[12] Jo Taylor, et al., *Clinical guidelines for children and adolescents experiencing gender dysphoria or incongruence: a systematic review of guideline quality (part 1)*, 109 Archives of Disease in Childhood s65, s71 (Apr. 9, 2024), https://adc.bmj.com/content/109/Suppl_2/s65 ("York Guideline Quality").

[13] *See, e.g., Dekker v. Weida*, 679 F. Supp. 3d 1271, 1278 (N.D. Fla. 2023).

14. The house of cards collapsed in 2024, when internal leaks, litigation discovery, and systematic reviews commissioned by national health agencies exposed Defendants' "circular" guidelines as an elaborate, collusive sham.[14]

15. But Defendants continue to peddle their discredited clinical guidelines as "evidence-based standards of care" to sell memberships and generate business for their members.

16. Defendants' reprehensible and immoral actions capitalize on the mental distress of children—as well as the natural affections and fears of their parents—to help their members sell lucrative surgeries and drugs that irreversibly mutilate and chemically alter children's bodies without providing any credible medical benefit. In their wake is a surge in "detransitioners" who feel "butchered by institutions [they] thought [they] could trust."[15]

17. Defendants' campaign to mislead patients, parents, insurers, and courts about the reversibility and efficacy of pediatric sex intervention violates the Florida Antitrust Act of 1980 (the Florida Antitrust Act), the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), and the Florida Racketeer Influenced and Corrupt Organization Act (the Florida RICO Act).

18. To protect its residents and consumers, the State of Florida petitions this Court to enjoin Defendants from continuing their unlawful conduct, impose statutory penalties, and order other appropriate statutory and equitable relief.

---

[14] Cass Review at 130.

[15] *The evidence to support medicalised gender transitions in adolescents is worryingly weak* The Economist (Apr. 5, 2023), https://www.economist.com/briefing/2023/04/05/the-evidence-to-support-medicalised-gender-transitions-in-adolescents-is-worryingly-weak.

## PARTIES

19. Plaintiff Attorney General James Uthmeier is authorized to bring this action under the Florida Antitrust Act on behalf of the State of Florida and natural persons therein. § 542.27(2), Fla. Stat.

20. Attorney General Uthmeier is also authorized to bring this action to seek injunctive relief, civil penalties, attorney's fees and costs, and other statutory and equitable relief for FDUTPA violations occurring in or affecting more than one judicial circuit. §§ 501.203(2), 501.207, Fla. Stat. The Attorney General has investigated the matters alleged in this Complaint and determined that this enforcement action serves the public interest. § 501.207(2), Fla. Stat.

21. Attorney General Uthmeier is also authorized to bring this action seeking injunctive relief, civil penalties, attorney's fees, and investigative costs for violations of the Florida RICO Act. § 895.05(9), Fla. Stat.

22. Defendant World Professional Association for Transgender Health, Inc., is an Illinois 501(c)(3) corporation headquartered at 1061 East Main Street, Suite 300, East Dundee, IL 60118. Prior to 2007, WPATH was known as the Harry Benjamin International Gender Dysphoria Association.

23. Defendant The Endocrine Society is a Delaware 501(c)(3) corporation headquartered at 2055 L Street NW, No. 600, Washington, DC 20036.

24. Defendant American Academy of Pediatrics is an Illinois 501(c)(3) corporation headquartered at 345 Park Boulevard, Itasca, IL 60143.

7

## JURISDICTION AND VENUE

25.     This Court has jurisdiction because the amount in controversy exceeds $50,000. §§ 26.012(2)(a), 34.01(1)(c)3., Fla. Stat.

26.     Venue lies in this Court because Defendants are foreign corporations doing business in this State and the cause of action accrued in St. Lucie County. §§ 47.051, 542.30, Fla. Stat. Venue also lies in this Court because acts taken by Defendants in furtherance of the conduct prohibited by the Florida Antitrust Act occurred in St. Lucie County. § 542.30, Fla. Stat.

27.     Defendants' Guidelines have affected trade and commerce in Florida.

## RELEVANT MARKET

28.     The relevant market is the treatment of children and adolescents experiencing gender dysphoria in the United States ("the Relevant Market").

29.     There are two competing products offered within the Relevant Market: (1) a sex intervention model of care that treats pediatric gender dysphoria through "social transitioning," puberty blockers, cross-sex hormones, and surgeries; and (2) a Counseling-Based Model of Care that treats pediatric gender dysphoria through family therapy and individual counseling.

30.     Defendants have thousands of members across the country and wield considerable power in the Relevant Market.

## FACTUAL ALLEGATIONS

**I. DEFENDANTS PUBLISH "CLINICAL GUIDELINES" TO PROMOTE SEX INTERVENTION AND DISPARAGE THE COUNSELING-BASED MODEL OF CARE.**

### A. WPATH Is Created for the Purpose of Legitimizing Fringe Sex Interventions.

31. While WPATH holds itself out as an "interdisciplinary professional and educational organization" with the "mission" of "promot[ing] evidence based care . . . in transgender health,"[16] it has never been a disinterested scientific enterprise. In fact, WPATH was created for the purpose of legitimizing fringe sex interventions.

32. The first "sex reassignment surgery" was overseen by German sexologist Magnus Hirschfeld in 1906.[17] Hirschfeld, a eugenicist who advocated for the sterilization of the "feebleminded,"[18] wrote about his experiments in 1910's *Die Transvestiten*, which coined the term "transvestite."[19] In 1919, Hirschfeld opened the Institute for Sexual Science in Berlin, which specialized in "sexual transitions."[20]

33. Hirschfeld's mentees at the Institute for Sexual Science became pioneers in the field of sex intervention. For example, Erwin Gohrbandt performed the first penectomy-vaginoplasty in 1931 under Hirschfield's supervision.[21]

---

[16] *About WPATH*, World Professional Association for Transgender Health, https://wpath.org/about/mission-and-vision/.

[17] *See* Finn Ballard, *The House That Hirschfeld Built*, Gay & Lesbian Review (Mar.–Apr. 2025), https://glreview.org/article/the-house-that-hirschfeld-built-2/.

[18] Laurie Marhoefer, RACISM AND THE MAKING OF GAY RIGHTS 129–46 (2022); Michael Cook, *A dark corner of transgender history*, BioEdge (May 29, 2023), https://bioedge.org/gender/transgender/a-dark-corner-of-transgender-history/.

[19] *Transvestism*, Britannica (online ed.), https://www.britannica.com/topic/transvestism.

[20] Megan Lim, et al., *A pioneering gender-affirming health institute opened in 1919 in Berlin*, NPR (Mar. 1, 2023), https://www.npr.org/2023/03/01/1160457191/a-pioneering-gender-affirming-health-institute-opened-in-1919-in-berlin.

[21] Andrew J. Zilavy et al., *The History of Gender-Affirming Vaginoplasty Technique*, 165 Urology 366, 368 (2022), https://www.goldjournal.net/action/showPdf?pii=S0090-

34.     Another of Hirschfield's proteges, Harry Benjamin, moved to New York City after studying at the Institute for Sexual Science.[22] Benjamin's career languished in America for many years. After peddling a serum extracted from turtles as a cure for tuberculosis, Benjamin began promoting "tying off the ducts carrying sperm from the testes" and x-raying ovaries to stimulate "sexual rejuvenation."[23] Medical journals disproved Benjamin's techniques as "medical follies," and physicians in the American Medical Association counted Benjamin among the "quacks, near-quacks, and faddists."[24]

35.     Benjamin's fortunes improved in 1948, when he began seeing patients for "transsexualism." His new practice's first patient was a male child who insisted he was a girl.[25] The child was referred to Benjamin by Alfred Kinsey,[26] a sexologist who used "fraudulent, criminally gathered research"[27] to normalize deviant sexual

---

[22] Vernon Rosario, *The Birth of Transgender Science*, Gay & Lesbian Review (Sept. 2024), https://glreview.org/article/the-birth-of-transgender-science/ (reviewing Alison Li, WONDROUS TRANSFORMATIONS: MAVERICK PHYSICIAN, THE SCIENCE OF HORMONES, AND THE BIRTH OF THE TRANSGENDER REVOLUTION (2023)).

4295%2822%2900297-7. Gohrbandt would later participate in the hypothermia experiments at the Dachau concentration camp, which involved submerging prisoners in icy water to the point of unconsciousness and attempting to revive them through various means, including immersion in boiling water. Christian Pross, *Nazi Doctors, German Medicine, and Historical Truth*, in George J. Annas & Michael A. Grodi, THE NAZI DOCTORS AND THE NUREMBURG CODE 36 (1995); Robert L. Berger, *Nazi Science — The Dachau Hypothermia Experiments*, 322 New England J. Med. 1436 (May 17, 1990), https://www.nejm.org/doi/pdf/10.1056/NEJM199005173222006. The experiments killed between 80 and 90 prisoners. Berger at 1437.

[23] *Id.*

[24] *Id.*

[25] Walt Heyer *"Sex Change" Surgery: What Bruce Jenner, Diane Sawyer, and You Should Know*, Public Discourse (Apr. 27, 2015), https://www.thepublicdiscourse.com/2015/04/14905/.

[26] *Id.*

[27] Tom Strode, *Kinsey's flawed, deviant research transformed laws, Reisman says*, Baptist Press (Feb. 4, 1998), https://www.baptistpress.com/resource-library/news/kinseys-flawed-deviant-research-transformed-laws-reisman-says/; *see also* Judith A. Reisman et al., KINSEY,

behavior, including rape and pedophilia.[28] Benjamin administered estrogen and arranged for the child and his mother to travel to Germany for surgery.[29] Soon, European doctors began referring "transexual" patients to Benjamin as well.[30]

36. In 1954, Benjamin oversaw the vaginoplasty of George William "Christine" Jorgensen.[31] Jorgensen had served in the Army during World War II, and his transformation became national news. Benjamin capitalized on the press, publishing *The Transsexual Phenomenon*.[32] The book laid out Benjamin's view that "[s]ince . . . the mind of the transsexual cannot be adjusted to the body, it is logical and justifiable to attempt the opposite, to adjust the body to the mind."[33] Interventions recommended by the book included hormone therapy and surgery, including castration, penectomy, and vaginoplasty.[34]

37. In 1963, Benjamin began performing sex interventions on Rita "Reed" Erickson, a female heiress who wanted to live as a man.[35] In 1969, Erickson's foundation bankrolled Benjamin's "International Symposium on Gender Identity."[36]

---

SEX AND FRAUD: THE INDOCTRINATION OF A PEOPLE Hardcover (1990).

[28] *See* Robert H. Knight, *How Alfred C. Kinsey's Sex Studies Have Harmed Women and Children*, Concerned Women for America, https://concernedwomen.org/images/content/kinsey-women_11_03.pdf.

[29] Heyer, *supra*.

[30] Joanne Meyerowitz, HOW SEX CHANGED: A HISTORY OF TRANSSEXUALITY IN THE UNITED STATES 143 (2002).

[31] Rosario, *supra*.

[32] *Id.*

[33] Harry Benjamin, THE TRANSSEXUAL PHENOMENON 53 (1966).

[34] *See id.*

[35] Matt Walsh, *The Secret History of WPATH, the Perverse Cult That Pushed Gender Madness into the Mainstream*, Daily Wire (Mar. 6, 2024), https://www.dailywire.com/news/the-secret-history-of-wpath-the-perverse-cult-that-pushed-gender-madness-into-the-mainstream.

[36] *International Symposia*, World Professional Association for Transgender Health, https://wpath.org/about/history/international-symposia/.

11

Ten years later, the foundation created WPATH to fund Benjamin's efforts to promote sex interventions.[37] The organization was initially called the Harry Benjamin International Gender Dysphoria Association; it changed its name to the World Professional Association for Transgender Health in 2007.

38.     WPATH's first order of business was the development of "clinical guidelines" that could be used to legitimize the sex interventions being performed by Benjamin and his collaborators. WPATH published its first "Standards of Care for the Health of Transexual People" ("Standards of Care" or "SOC") in 1979, the same year it was incorporated. Revisions were published in 1980, 1981, and 1990.[38]

**B. WPATH Begins the Enterprise of Promoting Sex Interventions for Children and Adolescents by Publishing the SOC-5 (1998).**

39.     The fifth version of the WPATH Standards of Care, published in 1998, was the first to address the treatment of adolescents. It recommended that, "[i]n selected cases," adolescents may be administered "hormonal therapy" in two phases.[39] Hormones administered in the first phase "delay the somatic changes of puberty."[40] The second phase is the administration of "cross-sex hormones"[41] that alter the patient's voice, hair growth, and body fat distribution.

---

[37] *Id.*

[38] *History and Purpose*, World Professional Association for Transgender Health, https://wpath.org/publications/soc8/soc8-history/.

[39] Stephen B. Levine, et al., *Harry Benjamin International Gender Dysphoria Association's The Standards of Care for Gender Identity Disorders, Fifth Version*, 2 Int. J. Transgenderism 2 (Apr. - June 1998) ("WPATH SOC-5").

[40] *Id.*

[41] *Id.*

40.     The SOC-5 claimed that, while cross-sex hormones "produce irreversible changes," puberty-blockers merely "gain time to further explore the gender and other developmental issues in psychotherapy."[42]

41.     The SOC-5 stated that "[s]econd phase hormones, those which induce opposite sex characteristics[,] should not be given prior to age 16 years."[43]

## C.  WPATH Publishes the SOC-6 (2001).

42.     The SOC-5 were just the beginning of WPATH's campaign to shift the range of medically and politically acceptable pediatric sex interventions by publishing gradually more permissive guidelines. The next iteration of WPATH's Standards of Care was released in 2001.[44] The SOC-6 raised the possibility of gender dysphoric adolescents "attend[ing] school using a name and clothing opposite to his or her sex of assignment,"[45] now referred to as "social transitioning."

43.     Whereas the SOC-5 provided no guidance about the age at which puberty blockers should be commence, the SOC-6 advised that "[a]dolescents may be eligible for puberty suppressing hormones as soon as pubertal changes have begun," which may be as early as "9 years of age."[46] The SOC-6 justified this recommendation by asserting that puberty suppressing hormones effectively "avert negative social and emotional consequences of gender dysphoria."[47] On the other hand, "[r]efusing timely

---

[42] *Id.*

[43] *Id.*

[44] Walter Meyer III, et al., *Harry Benjamin International Gender Dysphoria Association's The Standards of Care for Gender Identity Disorders, Sixth Version*, 5 Int. J. Transgenderism 1 (Jan. – Mar. 2001) ("WPATH SOC-6").

[45] *Id.* at 12–13.

[46] *Id.*

[47] *Id.*

medical interventions for adolescents might prolong gender dysphoria and contribute to an appearance that could provoke abuse and stigmatization."[48]

44.    As for cross-sex hormones, the SOC-6 abandoned the age minimum specified by the SOC-5 (16 years old), instead recommending that "treatment decisions should be made among the adolescent, the family, and the treatment team."[49]

45.    There was no credible evidence for these recommendations.

### D.    Endocrine Society Joins the Enterprise by Publishing the 2009 ES Guideline.

46.    Endocrine Society is a membership organization that bills itself as "a global community of physicians and scientists dedicated to accelerating scientific breakthroughs and improving patient health and well being."[50] To this end, Endocrine Society "[p]ublish[es] and promot[es] cutting-edge endocrine science through [its] peer-reviewed journals and other publications," and "[c]reat[es] resources and educational materials to help clinicians and researchers accelerate the pace of scientific discovery and translate the latest science into quality clinical care."[51]

47.    Endocrine Society has over 18,000 members. It is "the world's largest organization dedicated to hormone research and clinical endocrinology."

48.    In 2009, Endocrine Society joined with WPATH for the common purpose of promoting pediatric sex interventions by publishing its "Gender Dysphoria/Gender

---

[48] *Id.*
[49] *Id.*
[50] *Who We Are*, Endocrine Society, https://www.endocrine.org/about-us.
[51] *Id.*

14

Incongruence Guideline" ("the 2009 ES Guideline"). The 2009 ES Guideline was co-sponsored by WPATH. It adopted nearly all the SOC-6's recommendations and cited the SOC-6 as the evidence for those recommendations.[52] Like WPATH's Standard of Care, the 2009 ES Guideline claimed that puberty blockers are "fully reversible"[53] and justified them on the assertion that "[m]anagement of gender dysphoria usually improves" after "[p]ubertal suppression."[54]

### E. WPATH Publishes the SOC-7 (2011).

49.     WPATH added a new link to the guidelines daisy chain in 2011 by publishing the Standards of Care Version 7.

50.     Unlike previous guidelines, the SOC-7 presented "social transitioning" as an option for *pre-pubertal* children allegedly experiencing gender dysphoria.[55]

51.     And while the SOC-7 stuck to the guidance in the SOC-6 and 2009 ES Guideline that "[g]enital surgery should not be carried out until . . . patients reach the legal age of majority,"[56] they stated that "[c]hest surgery in FtM [female to male] patients [i.e., mastectomy] could be carried out earlier, preferably after ample time of living in the desired gender role and after one year of testosterone treatment."[57]

---

[52] Wylie C Hembree et al., *Endocrine treatment of transsexual persons: an Endocrine Society clinical practice guideline*, 94 J. Clinical Endocrinology & Metabolism 3132, 3135 (Sept. 2009), https://academic.oup.com/jcem/article/94/9/3132/2596324 ("2009 ES Guideline").

[53] *Id.*

[54] *Id.* at 3140.

[55] Eli Coleman et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7*, 13 Int. J. Transgenderism 165, 176 (Aug. 27, 2012), https://onlineacademiccommunity.uvic.ca/ahdevor/wp-content/uploads/sites/2247/2020/04/Standards-of-Care-for-the-Health-of-Transsexual-Transgender-and-Gender-Nonconforming-People-Version-7.pdf ("WPATH SOC-7").

[56] *Id.*

[57] *Id.*

15

52.     As evidence for their recommendations, the SOC-7 cited the 2009 ES Guideline—the same guidelines that had been sponsored by WPATH and relied upon earlier versions of the WPATH Standards of Care. The SOC-7 warned that "[r]efusing timely medical interventions for adolescents might prolong gender dysphoria."[58]

### F. Endocrine Society Publishes the 2017 ES Guideline.

53.     Endocrine Society leapfrogged WPATH in November 2017 with a new Gender Dysphoria/Gender Incongruence Guideline ("the 2017 ES Guideline").[59] According to Endocrine Society, the ES Guideline "provides the standard of care,"[60] "sets the standard of care,"[61] and "[e]stablishes a framework for the appropriate treatment of . . . individuals" experiencing gender dysphoria.[62]

54.     WPATH co-sponsored the revision.[63] And just as the 2009 ES Guideline marched in lockstep with WPATH's SOC-6, the 2017 ES Guideline marched in lockstep with WPATH's SOC-7, including eliminating the age minimum for breast

---

[58] *Id.*

[59] Wylie C Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869 (Nov. 2017), https://academic.oup.com/jcem/article/102/11/3869/4157558 ("2017 ES Guideline").

[60] *Transgender Health: An Endocrine Society Position Statement*, Endocrine Society (Dec. 16, 2020), https://www.endocrine.org/advocacy/position-statements/transgender-health; Letter from Endocrine Society to Rachel Levine (Apr. 5, 2021), https://www.endocrine.org/-/media/endocrine/files/advocacy/society-letters/2021/april-2021/levine-letter.pdf.

[61] *Endocrine Society urges policymakers to follow science on transgender health*, Endocrine Society (Oct. 28, 2019), https://www.endocrine.org/news-and-advocacy/news-room/2019/transgender-custody-statement; @EndoMedia, X (Oct 29, 2019 12:49 PM), https://x.com/EndoMedia/status/1189222801531555840.

[62] *Gender Dysphoria/Gender Incongruence Guideline Resources*, Endocrine Society (Oct. 25, 2024), https://www.endocrine.org/clinical-practice-guidelines/gender-dysphoria-gender-incongruence.

[63] 2017 ES Guideline at 3869.

16

surgeries.[64]

55. The authors of the 2017 ES Guideline included practitioners of "gender-affirming" care who had horizontal or vertical business relations in Relevant Market.

**G. AAP Joins the Enterprise by Issuing its Policy Statement (2018).**

56. The American Academy of Pediatrics (AAP) is a membership organization that represents its mission as "attain[ing] optimal physical, mental, and social health and well-being for all infants, children, adolescents and young adults."[65]

57. AAP has over 65,000 members. It is the largest professional association of pediatricians in the United States.

58. To "help guide practitioners in the care of children," AAP publishes "policy statements" on topics that impact the health and wellbeing of infants, children, adolescents and young adults.[66] AAP claims that these policy statements "are written by medical experts," "reflect the latest evidence in the field," and "are evidence driven, nonpartisan and rigorously reviewed."[67] AAP emphasizes that its policy statements "are an integral part of the Academy's identity."[68]

59. In or around 2017, AAP joined WPATH and Endocrine Society's circular, anticompetitive enterprise. In October 2018, AAP published a policy statement entitled "Ensuring Comprehensive Care and Support for Transgender and Gender-

---

[64] *Id.* at 3872.

[65] *Mission and Strategic Plan*, American Academy of Pediatrics, https://www.aap.org/en/about-the-aap/strategic-plan/.

[66] *Policy Statement Development Process*, American Academy of Pediatrics, https://www.aap.org/en/policy/policy-statement-development-process/.

[67] *Id.*

[68] *Id.*

Diverse Children and Adolescents" ("the AAP Policy Statement").[69]

60. The AAP Policy Statement adopted most of the recommendations of the SOC-7 and the 2017 ES Guideline and cited those guidelines as evidence for its recommendations.[70] But unlike the SOC-7 and the 2017 ES Guideline, the AAP Policy Statement recommended surgeries on "genitalia," including "removal of internal organs, such as ovaries or the uterus," on a case-by-case basis.[71] AAP further urged insurers to "offer coverage for health care that is specific to the needs of youth who identify as TGD, including coverage for . . . surgical gender-affirming interventions."[72]

61. The AAP Policy Statement also crystallized the Defendants' diligent work to eliminate the only competitive threat to pediatric sex intervention: the Counseling-Based Model of Care. According to the AAP Policy Statement, "any therapeutic intervention with the goal of changing a youth's gender expression or identity is inappropriate." The AAP Policy Statement disparagingly labeled such care as "'conversion' or 'reparative' treatment" and falsely claimed that it "ha[s] been proven to be not only unsuccessful but also deleterious and [is] considered outside the mainstream of traditional medical practice." The AAP Policy Statement further defamed the Counseling-Based Model of Care as "unfair and deceptive."[73]

---

[69] Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics 1 (Oct. 2018), https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for?autologincheck=redirected ("AAP Policy Statement").
[70] *Id.* at 12–13.
[71] *Id.* at 7.
[72] *Id.* at 10.
[73] *Id.* at 4.

62. In lockstep with AAP, Endocrine Society also began to publicly disparage the Counseling-Based Model of Care. For instance, an Endocrine Society "position statement" represented that "[m]any transgender individuals have been subjected to conversion therapy, or efforts to change a transgender person's gender identity using psychological interventions; this is known to be associated with adverse mental health outcomes, including suicidality."[74]

## H. States Respond by Banning Sex Interventions on Minors.

63. The AAP Policy Statement—along with the other coordinated efforts by WPATH and Endocrine Society—effectively shifted the Relevant Market. The rate of pediatric sex intervention—including genital surgeries—exploded from 2019 to 2021,[75] garnering the concern of the voting public and regulators charged with protecting them and their children.

64. In 2021, Arkansas became the first State to ban sex interventions on minors.[76] Alabama and Arizona followed in the spring of 2022.[77]

65. In April 2022, Florida's Department of Health issued guidance on treating gender dysphoria for children and adolescents ("FDOH Guidance").[78] The FDOH Guidance noted that "[s]ystematic reviews on hormonal treatment for young

---

[74] *Position Statement on Transgender Health*, Endocrine Society (Dec. 16, 2020), https://www.endocrine.org/advocacy/position-statements/transgender-health#8.
[75] *See* Ghorayshi, *supra*; Levin, *supra*.
[76] *See* Lindsey Dawson & Jennifer Kates, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions*, KFF (last accessed Dec. 9, 2025), https://www.kff.org/lgbtq/gender-affirming-care-policy-tracker/.
[77] *Id.*
[78] *Treatment of Gender Dysphoria for Children and Adolescents*, Florida Department of Health (Apr, 20, 2022), https://www.floridahealth.gov/newsroom/2022/04/20220420-gender-dysphoria-guidance.pr.html.

people show a trend of low-quality evidence, small sample sizes, and medium to high risk of bias."[79] It concluded that "[b]ased on the currently available evidence, encouraging mastectomy, ovariectomy, uterine extirpation, penile disablement, tracheal shave, the prescription of hormones which are out of line with the genetic make-up of the child, or puberty blockers, are all clinical practices which run an unacceptably high risk of doing harm."[80]

66. Regarding puberty blockers and cross-sex hormones, the Florida Department of Health found that hormonal treatments carry "the potential for long-term, irreversible effects" and that "evidence regarding their psychosocial and cognitive impact is generally lacking."[81] The Department therefore warned that "[a]nyone under 18 should not be prescribed puberty blockers or hormone therapy."[82]

67. The FDOH Guidance further cautioned that "[g]ender reassignment surgery should not be a treatment option for children or adolescents."[83]

68. Based on the FDOH Guidance, Florida's Agency for Health Care Administration (AHCA) directed the Florida Medicaid program to evaluate whether the gender-affirming care model is consistent with generally accepted professional medical standards.[84]

---

[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Agency for Health Care Administration Releases Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria*, Florida Agency for Health Care Administration (June 2, 2022), https://ahca.myflorida.com/content/download/7115/file/6-2-22_AHCA_GAPMS_Press_Release_FINAL.pdf?version=1.

69.     In June 2022, "[f]ollowing a robust review of available medical evidence and the assessment of five medical experts, including health care researchers who studied the quality of the evidence relied upon for 'gender affirming' care," AHCA issued a final report determining that "sex reassignment surgery, cross-sex hormones, and puberty blockers are not consistent with generally accepted professional medical standards and are experimental and investigational with the potential for harmful long term affects."[85]

70.     AHCA's report included the following findings:[86]

a) "Scientific studies supporting hormone replacement therapy, puberty blockers, and sex reassignment surgery for treating gender dysphoria are weak to very weak."

b) "The evidence showing benefits from hormone replacement therapies for gender dysphoria is very weak."

c) "Scientific studies do not show that the use of puberty blockers improves mental health."

d) "There is a lack of long term, follow-up studies after sex reassignment surgery."

e) "There are no randomized control trials on the effectiveness of 'gender affirming' care."

71.     Thus, AHCA promulgated rules excluding puberty blockers, cross-sex hormones, and surgeries from the Medicaid program's coverage treatments for pediatric gender dysphoria.[87]

72.     In response to these efforts to protect children, Defendants doubled down on their misleading, anticompetitive scheme.

---

[85] *Let Kids Be Kids*, Florida Agency for Health Care Administration https://ahca.myflorida.com/let-kids-be-kids.
[86] *Id.*
[87] Fla. Admin. Code R. 59G-1.050(7).

73. According to WPATH: "The Florida Boards, rather than following the science and consensus-based guidelines established and recently updated by WPATH, have chosen politics over science to deny families and their children vital medical care. Lack of access to gender affirming care adds to a patient's psychosocial stress and is associated with increased suicidality. The proposed ban will result in pain and potential harm for the very constituents it claims to protect. We denounce the proposed draft rule as cruel, counter to medical evidence and discriminatory."[88] WPATH further stated that the Florida Department of Health's "so-called guidance" was "aimed at stopping medically necessary health care for transgender youth" and "misrepresent[ed] the science on how to care for them."[89]

74. Endocrine Society released a statement that "object[ed] to the Florida Department of Health's bulletin on gender-affirming care for transgender and gender-diverse youth" and "call[ed] on the Florida Department of Health to rescind its bulletin and allow physicians to provide evidence-based care."[90] Endocrine Society alleged that the FDOH Guidance was contrary to "evidence-based care that is supported by major international medical groups—including Endocrine Society, American Medical Association, the American Psychological Association, and the

---

[88] *Statement of Opposition to Florida Draft Rule Banning Gender Affirming Care for Adolescents*, WPATH (Nov. 11, 2022), https://wpath.org/wp-content/uploads/2024/11/WPATHUSPATH-Statement-re-Florida-Ban-Nov-11-2022.pdf.

[89] *WPATH/USPATH Denounce Florida Department of Health for Harmful Guidelines Targeting Trans Youth*, WPATH (Apr. 21, 2022), https://wpath.org/wp-content/uploads/2024/11/WPATHUSPATH-Statement-re-Florida-Apr-21-2022.pdf.

[90] *Endocrine Society opposes Florida Department of Health policy on gender dysphoria treatment for children and adolescents*, Endocrine Society (Apr. 20, 2022), https://endocrinenews.endocrine.org/endocrine-society-opposes-florida-department-of-health-policy-on-gender-dysphoria-treatment-for-children-and-adolescents/.

American Academy of Pediatrics—and Clinical Practice Guidelines."[91]

75.     Endocrine Society further argued that the FDOH Guidance "reflects widespread misinformation about gender-affirming care. . . . When an individual's gender identity is not respected and the individual cannot access medical care, it can result in higher psychological problem scores and can raise the person's risk of committing suicide or other acts of self-harm."[92]

76.     Endocrine Society also reasserted the reversibility of puberty blockers: "The Florida Department of Health's message to eliminate access to puberty-delaying medication for transgender and gender-diverse teenagers contradicts accepted medical practice. Only reversible treatments to delay puberty are recommended for younger adolescents, according to our Clinical Practice Guideline and joint policy perspective issued with the Pediatric Endocrine Society. Puberty-delaying medication is a safe, reversible and conservative approach that gives teenagers and their families more time to explore their options."[93]

77.     The Endocrine Society statement then represented that "[t]here is broad consensus within the medical community about the importance of gender-affirming care. Other major international medical and scientific organizations such as WPATH . . . and the American Academy of Pediatrics are in alignment with the Society on the importance of gender-affirming care."[94]

78.     The president of AAP's Florida chapter called it "disheartening that

---

[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] *Id.*

23

Florida's health agency continues to issue child-health guidance that conflicts with broad scientific consensus and without the consultation of pediatric physicians."[95] "Appropriate gender-affirming care," she said, "is safe and effective for treating patients experiencing gender dysphoria."[96] Moreover, "[r]esearch shows that access to evidence-based gender affirming care among adolescents significantly improves their mental health."[97]

79. AAP posted an online "rapid-response rebuttal report" "to challenge [the Florida Department of Health's] disinformation about [gender affirming care]" and submitted public comments opposing the AHCA rule.[98]

80. Defendants and their clinical guidelines were also instrumental in litigation brought by gender dysphoric minors and their parents that challenged the AHCA rule in federal court. Their complaint included the following statements:

a) "The World Professional Association for Transgender Health ('WPATH') and the Endocrine Society have published widely accepted guidelines for treating gender dysphoria."[99]

b) "WPATH is an international and multidisciplinary association whose mission is to promote evidence-based health care protocols for transgender people. WPATH publishes the Standards of Care based on the best available science

---

[95] *FCAAP Rejects New Florida Department of Health Guidelines on Gender-affirming Care for Youth*, Florida Chapter of the American Academy of Pediatrics (Apr. 21, 2022), https://www.fcaap.org/posts/news/press-releases/florida-chapter-of-the-american-academy-of-pediatrics-rejects-new-florida-department-of-health-guidelines-on-gender-affirming-care-for-youth/.

[96] *Id.*

[97] *Id.*

[98] Meredithe McNamara et al., *Combating Scientific Disinformation on Gender-Affirming Care*, 152 Pediatrics 1, 1 (Sept. 2023), https://publications.aap.org/pediatrics/article/152/3/e2022060943/193719/Combating-Scientific-Disinformation-on-Gender.

[99] First Amended Complaint, *Dekker v. Weida*, No. 4:22-cv-00325-RH-MAF, 2023 WL 3723972 ¶ 37 (N.D. Fla. May 18. 2023).

and expert professional consensus."[100]

c) "The WPATH Standards of Care and Endocrine Society Guidelines are widely accepted as best practices guidelines for the treatment of adolescents and adults diagnosed with gender dysphoria and have been recognized as authoritative by the leading medical organizations. The WPATH Standards of Care and Endocrine Society Guidelines recognize that puberty delaying medication, hormone therapy, and surgery to align a person's primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring) with their gender identity are medically necessary services for many people with gender dysphoria."[101]

d) "Under the WPATH Standards of Care, medical interventions may become medically necessary and appropriate after transgender youth reach puberty."[102]

e) "Puberty delaying treatment is reversible."[103]

f) "Gender-affirming medical care . . . has been shown to positively impact the short and long-term health outcomes for transgender people of all ages."[104]

g) "When transgender people are provided with access to appropriate and individualized gender-affirming care in connection with treatment of gender dysphoria, its symptoms can be alleviated and even prevented. As such, the . . . Endocrine Society, . . . , American Academy of Pediatrics, and other major medical organizations have recognized that gender-affirming care is medically necessary, safe, and effective treatment for gender dysphoria, and that access to such treatment improves the health and well-being of transgender people."[105]

h) "The medical procedures for the treatment of gender dysphoria are not 'cosmetic' or 'elective' or for the mere convenience of the patient, but instead are medically necessary for the treatment of the diagnosed medical condition. They are not experimental or investigational, because decades of both clinical experience and medical research show that they are essential to achieving well-being for transgender patients with gender dysphoria."[106]

---

[100] *Id.* ¶ 38.
[101] *Id.* ¶ 39.
[102] *Id.* ¶ 47.
[103] *Id.* ¶ 49.
[104] *Id.* ¶ 52.
[105] *Id.* ¶ 56.
[106] *Id.* ¶ 57.

25

81.     Defendants submitted amicus briefs in support of the plaintiffs, arguing that the AHCA rule "did not rest on scientific knowledge and should be enjoined pending litigation."[107]

82.     Realizing that the plaintiffs would rely on their positions on treatments for gender dysphoria, AHCA sought documents and corporate depositions from WPATH, Endocrine Society, and AAP.[108] "In particular, the State wanted to know why the organizations support puberty blockers and cross-sex hormones as treatments for gender dysphoria, and how the organizations reached this position."[109] Defendants resisted and successfully quashed the subpoenas in United States Court of Appeals for the District of Columbia. "The State was thus prevented from . . . test[ing] the credibility and reliability of these organizations' public positions on the treatment of gender dysphoria."[110]

83.     The district court enjoined AHCA's rule, concluding that, "based on current medical knowledge," AHCA unreasonably determined that puberty blockers and cross-sex hormones to treat gender dysphoria are experimental.[111] The district court relied on the WPATH and Endocrine Society guidelines, calling them "the widely accepted standard of care."[112]

84.     Defendants have replicated this formula many times over, co-signing

---

[107] McNamara, *supra*, at 4.
[108] Defendants-Appellants' Initial Brief, *Dekker v. Weida*, No. 23-12155, 2023 WL 6849939, at *17 (11th Cir. Oct. 6, 2023).
[109] *Id.* at *17.
[110] *Id.*
[111] *Dekker*, 679 F. Supp. 3d at 1283.
[112] *Id.* at 1299.

amicus briefs that cite each other's guidelines.

85. In 2023, the Florida Legislature codified the Department of Health's recommendations by enacting SB 254.[113] That legislation generally prohibits "sex-reassignment prescriptions and procedures . . . for patients younger than 18 years of age."[114]

86. By the end of 2023, 19 States prohibited or restricted physicians from performing sex interventions on minors.[115]

**I.     WPATH Publishes the SOC-8 (2022).**

87. WPATH published the eighth version of the Standards of Care ("SOC-8") to provide gender-activist lawyers a "tool" for challenging States' pediatric sex intervention bans.

88. The SOC-8 were published in WPATH's journal, the "International Journal of Transgender Health," on September 15, 2022.[116] They identify "increasing scientific evidence" as WPATH's sole motivation for commissioning a new Standards of Care.[117]

89. In the SOC-8, WPATH asserts that it "is an international, multidisciplinary, professional association whose mission is to promote evidence-based care [and] research . . . in transgender health."[118] As such, publication of the

---

[113] Ch. 2023-90 Fla. Laws (codified at § 456.52(1), Fla. Stat.).

[114] *Id.*

[115] Dawson & Kates, *supra.*

[116] Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int. J. Transgender Health 1 (Sept. 15, 2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ("WPATH SOC-8").

[117] *Id.*

[118] *Id.* at S3.

Standards of Care is "[o]ne of the main functions of WPATH."[119]

90.    In the SOC-8's introduction, WPATH goes to great lengths to assure readers that the SOC-8 are an objective assessment of existing scientific evidence. WPATH claims the SOC-8 are "informed by a systematic review of evidence and an assessment of the benefits and harms of alternative care options."[120] WPATH elsewhere claims that the SOC-8 are "based on the best available science and expert professional consensus in transgender health,"[121] with recommendation statements "developed based on data derived from independent systematic literature."[122] WPATH's topline conclusion is that the SOC-8 establish "standards for promoting optimal health care and guidance for the treatment of people experiencing gender incongruence"[123] that provide "safe and effective pathways" for such patients.[124]

### i.    WPATH's Claims about the Methodology of the SOC-8

91.    Regarding methodology, WPATH boasts that the SOC-8 are "based upon a more rigorous and methodological evidence-based approach than previous versions. This evidence is not only based on the published literature (direct as well as background evidence) but also on consensus-based expert opinion."[125]

92.    The development of the SOC-8 allegedly consisted of 19 steps:[126]

i.    Establishing Guideline Steering Committee including Chair, and Co-Chairs (July 19, 2017)

---

[119] *Id.* at S5.
[120] *Id.* at S247.
[121] *Id.* at S3.
[122] *Id.*
[123] *Id.*
[124] *Id.*
[125] *Id.* at S8, S247.
[126] *Id.* at S247.

28

ii.    Determining chapters (scope of guidelines)

iii.    Selecting Chapter Members based upon expertise (March 2018)

iv.    Selecting the Evidence Review Team: Johns Hopkins University (May 2018)

v.    Refining topics in the SOC-8 and review questions for systematic reviews

vi.    Conducting systematic reviews (March 2019)

vii.    Drafting the recommendation statements

viii.    Voting on the recommendation statements using a Delphi process (September 2019–February 2022)

ix.    Grading of the recommendations statements

x.    Writing the text supporting the statements

xi.    Independently validating the references used in the supportive text

xii.    Finalizing a draft SOC-8 (December 1, 2021)

xiii.    Feedback on the statements by International Advisory Committee

xiv.    Feedback on the entire draft of the SOC-8 during a public comment period (November 2021–January 2022)

xv.    Revision of Final Draft based on comments (January 2022–May 2022)

xvi.    Approval of final Draft by Chair and Co-Chairs (June 10, 2022)

xvii.    Approval by the WPATH Board of Directors

xviii.    Publication of the SOC-8

xix.    Dissemination and translation of the SOC-8

93.    In forming the Guideline Steering and Chapter Committees under steps 1 and 3, WPATH claims that the SOC-8 used "recommendations on clinical practice guideline development from the National Academies of Medicine and The World Health Organization that addressed transparency, the conflict-of-interest policy, committee composition and group process."[127] Revision committees allegedly "consisted of subject matter experts, health care professionals, researchers and

---

[127] *Id.*

29

stakeholders with diverse perspectives and geographic representation."[128]

94.     WPATH further represents that "[c]onflict [sic] of interests were reviewed as part of the selection process for committee members and at the end of the process before publication. No conflicts of interest were deemed significant or consequential."[129]

95.     Steps 4 and 6 were handled by an "independent team" of researchers at Johns Hopkins University led by Dr. Karen A. Robinson.[130] The systematic reviews undertaken by Johns Hopkins allegedly "informed" WPATH's recommendations.[131]

96.     As for step 8, WPATH represents that "[c]onsensus of the final recommendations was attained using a Delphi process that included all members of the Standards of Care Revision committee and required that recommendation statements were approved by 75% of members."[132] WPATH discloses that step 15, revision of the final draft based on public comments, required the reconvening of Delphi in January 2022 to modify two statements and compose three additional statements.[133]

97.     For step 9, WPATH says that SOC-8 "chapter members graded each statement using a process adapted from the Grading of Recommendations, Assessment, Development and Evaluations (GRADE) framework. This a transparent framework for developing and presenting summaries of evidence and provides a

---

[128] *Id.*
[129] *Id.* at S177.
[130] *Id.* at S247.
[131] *Id.*
[132] *Id.*
[133] *Id.* at S251.

systematic approach for making clinical practice recommendations."[134] Statements were allegedly classified as "strong recommendations" ("we recommend") where "the evidence is of high quality" and "there are few downsides of therapy/intervention/strategies."[135] On the other hand, the SOC-8 offer "weak recommendations" ("we suggest") where "there are weaknesses in the evidence base" or "there is a need to balance the potential upsides and downsides of interventions/therapy/strategies."[136]

**ii.    WPATH's Claims about the Findings of the SOC-8**

98.    WPATH claims that the methodology described above yielded the following recommendations and conclusions:

99.    "There is strong evidence demonstrating the benefits in quality of life and well-being of gender-affirming treatments, including endocrine and surgical procedures," which "effectively affirm an individual's gender identity and reduce gender incongruence and dysphoria."[137]

100.    "Social transition can be extremely beneficial to many [transgender] people," as "[s]ocial transition and gender identity disclosure can improve the mental health of a TGD person seeking gender-affirming interventions."[138] With respect to children, the benefits of social transition "include facilitating gender congruence while reducing gender dysphoria and enhancing psychosocial adjustment and well-

---

[134] *Id.* at S250.
[135] *Id.*
[136] *Id.*
[137] *Id.* at S18.
[138] *Id.* at S39.

31

being."[139] The SOC-8 note that "[t]hese findings differ markedly from the mental health challenges consistently noted in prior research with gender diverse children and adolescents and suggest the impact of social transition may be positive."[140]

101. Puberty blockers are recommended when "[t]he adolescent has reached Tanner stage 2," i.e., "[t]he onset of puberty."[141]

102. "[T]he data consistently demonstrate improved or stable psychological functioning, body image, and treatment satisfaction" for transgender adolescents who are administered puberty blockers.[142] "[T]his emerging evidence base indicates a general improvement in the lives of transgender adolescents" who receive puberty blockers.[143] "Taken as a whole, the data show early medical intervention—as part of broader combined assessment and treatment approaches focused on gender dysphoria and general well-being—can be effective and helpful for many transgender adolescents seeking these treatments."[144] Administration of the pubertal hormone suppressor GnRHa (colloquially known as "puberty blockers") to adolescents is "fully reversible" and provides "an extended time for adolescents to explore their gender identity by means of an early social transition."[145]

103. The administration of cross-sex hormones "has been shown to improve quality of life and to decrease depression and anxiety.[146]

---

[139] *Id.* at S77.
[140] *Id.*
[141] *Id.* at S64.
[142] *Id.* at S46.
[143] *Id.* at S47.
[144] *Id.* at S47.
[145] *Id.* at S112.
[146] *Id.* at S174.

104.   Regarding sex intervention surgeries:

a) "Top surgery" in biological females (mastectomy) leads to "a consistent and direct increase in health-related quality of life, a significant decrease in gender dysphoria, [and] a consistent increase in satisfaction with body and appearance."[147]

b) "Breast augmentation" surgery in biological males leads to "a consistent and direct improvement in patient satisfaction, including general satisfaction, body image satisfaction, and body image" and a "positive trend toward improvement in both depression and anxiety scores."[148]

c) Vaginoplasty in biological males leads to a high level of patient satisfaction and a "low incidence of regret."[149]

d) Metoidioplasty and phalloplasty in biological females lead to "high overall levels of postoperative satisfaction."[150]

e) Studies "have reported improved psychosocial functioning and decreased gender dysphoria in adolescents who have undergone vaginoplasty," suggesting "there may be a benefit for some adolescents to having [surgical] procedures performed before the age of 18."[151]

105.   "Access to gender-affirming medical treatment is associated with a substantial reduction in the risk of suicide attempt."[152]

106.   Because they are "effective at reducing gender incongruence and gender dysphoria," "gender-affirming interventions" are "medically necessary."[153]

These include but are not limited to hysterectomy +/- bilateral salpingo-oophorectomy; bilateral mastectomy, chest reconstruction or feminizing mammoplasty, nipple resizing or placement of breast prostheses; genital reconstruction, for example, phalloplasty and metoidioplasty, scrotoplasty, and penile and testicular prostheses, penectomy, orchiectomy, vaginoplasty, and vulvoplasty; hair removal from the face, body, and genital areas for gender affirmation or as part of a

---

[147] *Id.* at S128.
[148] *Id.*
[149] *Id.* at S129.
[150] *Id.*
[151] *Id.* at S66.
[152] *Id.* at S174.
[153] *Id.* at S18.

preoperative preparation process; gender-affirming facial surgery and body contouring; voice therapy and/or surgery; as well as puberty blocking medication and gender-affirming hormones[.][154]

107. Consistent with Defendants' earlier conduct, the SOC-8 also disparage the Counseling-Based Model of Care. They recommend that health care professionals "[r]eject approaches that have the goal or effect of conversion and avoid providing any direct or indirect support for such approaches or services." According to the SOC-8, "[g]ender identity change efforts (gender reparative or gender conversion programs aimed at making the person cisgender) are widespread, cause harm to TGD people, and . . . are considered unethical." In fact, "[t]hese efforts may be viewed as a form of violence." Moreover, "[a]ctivities and approaches . . . aimed at trying to change a person's gender identity and expression to become more congruent with the sex assigned at birth have been attempted, but these approaches have not resulted in changes in gender identity" and "are associated with increases in mental illness and poorer psychological functioning." The SOC-8 boldly conclude that the Counseling-Based Model of Care is associated with "increased levels of depression, substance abuse, suicidal thoughts, and suicide attempts, as well as lower educational attainment and less weekly income" and call for the "ending [of] gender identity 'change' efforts."[155]

108. With the SOC-8, Defendants' Guidelines completed their preordained, coordinated evolution from recommending puberty blockers and cross-sex hormones starting no earlier than age 16 (SOC-5) to recommending genital surgery without an

---

[154] *Id.*
[155] *Id.* at S15, S17, S20, S53, S176.

34

age minimum (SOC-8).

II.  **DEFENDANTS' REPRESENTATIONS TO CONSUMERS REGARDING THE REVERSIBILITY OF PUBERTY BLOCKERS, THE EFFICACY OF SEX INTERVENTIONS, AND THE METHODOLOGY OF THE SOC-8 ARE UNFAIR AND DECEPTIVE.**

   A.  **Systematic Reviews Reveal that There Is No Credible Evidence that Pediatric Sex Interventions Improve Mental Health or that Puberty Blockers Are Fully Reversible.**

109.  In determining whether medical evidence is reliable, clinicians are guided by the principles of evidence-based medicine. *See* Gordon Guyatt et al., *Users' Guides to the Medical Literature: Essentials of Evidence-Based Clinical Practice* 10 (3d ed. 2015), https://perma.cc/H46Z-NKEC. Evidence-based medicine employs a hierarchy of evidence, with "systematic reviews" at the top and "expert opinion" at the bottom.

110.  A systematic review involves the "identification, selection, appraisal, and summary of primary studies that address a focused clinical question using methods to reduce the likelihood of bias." *Id.* at 484. After formulating the relevant question to be researched, reviewers identify selection criteria for relevant studies. *See id.* at 274–75. Reviewers then "conduct a comprehensive search of the literature in all relevant medical databases, which typically yields a large number of potentially relevant titles and abstracts." *Id.* "They then apply the selection criteria to the titles and abstracts, arriving at a smaller number of articles that they retrieve." *Id.* at 275.

111.  "Having completed the culling process, the reviewers assess the risk of bias of the individual studies and abstract data from each study," *id.*, bias being a "deviation from the underlying truth because of a feature of the design or conduct of

a research study." *Id.* at 422. If the data comes from studies with a high risk of bias, then the data is less reliable. And "[e]ven if the results of different studies are consistent, determining their risk of bias is still important" because "[c]onsistent results are less compelling if they come from studies with a high risk of bias." *Id.* at 283.

112. While Defendants have been collectively publishing guidelines for decades, there were no published systematic reviews on pediatric gender dysphoria until relatively recently. Once national health agencies began conducting systematic reviews in the early 2020s, however, Defendants' Guidelines were quickly exposed as methodologically bankrupt.

113. Disinterested systematic reviews—the gold standard in evidence-based medicine—have determined that there is no credible evidence that puberty blockers are "fully reversible" or that sex interventions lead to positive mental health outcomes for children or adolescents. Thus, guidelines containing these representations cannot be accurately characterized as "evidence-based."

### i. The Finnish Review

114. In Finland, public health services are "monitored, defined, and assessed as a whole by the Council for Choices in Health Care (COHERE)."[156] Due to a spike in the number of patients, including minors, referred to the Helsinki University Hospital and the Tampere University Hospital for assessment and treatment of gender dysphoria, COHERE "decided to prepare recommendations for medical treatments of gender dysphoria."[157] Based on "the available research evidence, . . . a literature review of medical treatments, an extensive ethical analysis, and feedback following meetings with patients and the advocacy groups who represent them," COHERE published a report entitled "Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors" in 2020 ("the Finnish Review").[158]

115. The Finnish Review found no correlation between puberty blockers and diminishment in gender dysphoria or improvement in body image.[159] On the other hand, "[p]otential risks of GnRH therapy include disruption in bone mineralization and the as yet unknown effects on the central nervous system," and "[t]he effect of pubertal suppression . . . on fertility is not yet known."[160]

116. The Finnish Review also evaluated "the effect of initiating cross-sex hormone therapy on functioning, progression of developmental tasks of adolescence,

---

[156] *What is COHERE Finland?*, Council for Choices in Health Care in Finland (PALKO / COHERE Finland), https://palveluvalikoima.fi/en/cohere-finland.
[157] Finnish Review at 4.
[158] *Id.*
[159] *Id.* at 6, 8.
[160] *Id.* at 6.

and psychiatric symptoms."[161] It found that "during cross-sex hormone therapy, problems in these areas did not decrease."[162]

117. Surgical treatments, the Finnish Review stated, "are not part of the treatment methods for dysphoria caused by gender-related conflicts in minors."[163]

118. Ultimately, the Finnish Review concluded that "[i]n light of available evidence, gender reassignment of minors is an experimental practice."[164]

119. Instead, the Finnish Review advised that "[t]he first-line intervention for gender variance during childhood and adolescent years is psychosocial support."[165] It noted that, "[i]n adolescents, psychiatric disorders and developmental difficulties may predispose a young person to the onset of gender dysphoria. These young people should receive treatment for their mental and behavioral health issues, and their mental health must be stable prior to the determination of their gender identity."[166]

## ii. The Swedish Review

120. In April 2023, researchers published a two-year systematic review commissioned by the Swedish National Board of Health and Welfare ("the Swedish Review").[167]

121. The Swedish Review concluded that "the efficacy and safety, benefits

---

[161] *Id.*

[162] *Id.*

[163] *Id.* at 10.

[164] *Id.* at 8.

[165] *Id.*

[166] *Id.*

[167] *Care of children and adolescents with gender dysphoria*, Socialstyrelsen (Dec. 2022), https://www.socialstyrelsen.se/contentassets/444af6c0a5fb429c9b56fd51b931a816/2023-1-8330.pdf.

and risks of [gender-affirming] treatments are not proven," and that "the risks of puberty blockers and gender-affirming treatment are likely to outweigh the expected benefits of these treatments."[168] It noted multiple "factors have shifted the balance between benefit and risk in a negative direction."[169] First, alluding to the concept of social contagion, the Swedish Review described a "lack of clarity about the causes, . . . particularly in the 13 to 17 age group and especially among people whose registered sex at birth is female."[170] The second factor was "[t]he documented prevalence among young adults of medical detransition, which is the process by which a person discontinues gender-affirming medical treatment for any reason or seeks to reverse the medical effects of completed gender-affirming treatment."[171] And third, "[t]he experience-based knowledge of participating experts is less uniform than it was in 2015."[172]

122. As with the Finnish Review, the systematic review underlying the Swedish Review found no evidence for the assertion that puberty blockers are "fully reversible." Instead, it concluded that "long-term effects of hormone therapy on psychosocial and somatic health are unknown, except that GnRHa treatment seems to delay bone maturation and gain in bone mineral density."[173]

123. Sweden's National Board of Health and Welfare therefore recommends

---

[168] *Id.* at 3.

[169] *Id.*

[170] *Id.*

[171] *Id.* at 4.

[172] *Id.*

[173] Jonas F. Ludvigsson et al., *A systematic review of hormone treatment for children withgender dysphoria and recommendations for research*, 112 Acta Paediatrica 2280 (Nov. 2023), https://onlinelibrary.wiley.com/doi/epdf/10.1111/apa.16791.

that treatment of pediatric gender dysphoria should focus on "psychosocial support" and that healthcare professionals "[s]ystematically search for signs of autism spectrum disorder (ASD) and ADHD/ADD."[174]

### iii.    The Cass Review

124.    In 2020, Great Britian's National Health Service (NHS), noticing a striking increase in pediatric gender dysphoria diagnoses, called for an independent systematic review of gender identity services for children and young people.[175]

125.    "Given the increasingly evident polarisation among clinical professionals," NHS asked Dr. Hillary Cass—and well-respected pediatrician and senior clinician "with no prior involvement or fixed views in this area"—to oversee the review.[176]

126.    To guide the review, NHS commissioned a "research programme" from the University of York using an open procurement process.[177] The University of York ultimately produced qualitative and quantitative studies of epidemiology and outcomes for children and young people facing gender dysphoria, an international survey of available gender services, and eight systematic reviews.[178] The systematic reviews evaluated patient characteristics, social transition, psychosocial interventions, "puberty suppression," "masculinising and feminising hormone interventions," and care pathways.[179] A final systematic review evaluated the quality

---

[174] Socialstyrelsen, *supra*, at 5.
[175] Cass Review at 25.
[176] *Id.* at 75.
[177] *Id.* at 20.
[178] *Id.* at 53.
[179] *Id.*

of existing guidelines on pediatric gender dysphoria.[180]

127. In April 2024, NHS published a final report synthesizing the findings of Dr. Cass and the University of York ("the Cass Review"). The report is widely regarded as one of "the most comprehensive, evidence-based reviews of a medical service from the long history of such independent investigations" in the United Kingdom.[181]

128. In the forward, Dr. Cass delivers her topline conclusion: "This is an area of remarkably weak evidence, and yet results of studies are exaggerated or misrepresented by people on all sides of the debate to support their viewpoint. The reality is that we have no good evidence on the long-term outcomes of interventions to manage gender-related distress."[182]

129. Beginning with "social transitioning," Dr. Cass reported that systematic reviews "showed no clear evidence that social transition in childhood has any positive or negative mental health outcomes, and relatively weak evidence for any effect in adolescence," except "those who had socially transitioned at an earlier age and/or prior to being seen in clinic were more likely to proceed to a medical pathway."[183]

130. Similarly, the Cass Review "found no evidence that puberty blockers improve body image or dysphoria."[184]

131. The Cass Review also rejected the notion that there is any credible

---

[180] *Id.*

[181] C. Ronny Cheung et al., *Gender medicine and the Cass Review*, 110 Arch. Dis. Child. 1, 2 (2024).

[182] *Id.* at 13.

[183] *Id.* at 31.

[184] *Id.* at 179.

evidence for the claim that puberty blockers are "fully reversible." To the contrary, there is "no evidence that puberty blockers buy time to think," and "[b]locking the release of these sex hormones could have a range of unintended and as yet unidentified consequences."[185]

132. For instance, because puberty blockers "inhibit" normal pubertal "experimentation," there is "no way of knowing whether the normal trajectory of the sexual and gender identity may be permanently altered."[186] The Cass Review also recognized that "[m]ultiple studies" have shown that puberty blockers compromise bone density.[187] Worse yet, "brain maturation may be temporarily or permanently disrupted by the use of puberty blockers, which could have a significant impact on the young person's ability to make complex risk-laden decisions, as well as having possible longer-term neuropsychological consequences."[188]

133. Similarly, Dr. Cass stated that "[n]o conclusions can be drawn about the effect [of cross-sex hormone interventions] on gender dysphoria, body satisfaction, psychosocial health, cognitive development, or fertility."[189] The Cass Review also noted an "increasing" percentage of people treated with hormones who subsequently detransition.[190]

134. Dr. Cass further concluded that "[i]t has been suggested that hormone treatment reduces the elevated risk of death by suicide in this population, but the

---

[185] *Id.* at 32, 178.
[186] *Id.* at 178.
[187] *Id.* at 132.
[188] *Id.* at 178.
[189] *Id.* at 33.
[190] *Id.*

42

evidence found did not support this conclusion. . . . [T]he evidence does not adequately support the claim that gender-affirming treatment reduces suicide risk."[191]

135.     Based on the Cass Review, NHS recommends that pediatric gender dysphoria be treated with counseling-based, psychosocial interventions rather than sex interventions.

136.     To explain the divergence between her recommendations and those of Defendants' Guidelines, Dr. Cass presented the results of the University of York's appraisal of existing guidelines. The University of York "identified 23 guidelines published between 1998 and 2022 that contained recommendations about children and young people with gender dysphoria," but only five—including the 2017 ES Guideline and WPATH's SOC-8—"described using a systematic approach to searching for and/or selecting evidence."[192]

137.     But using the Appraisal of Guidelines for Research & Evaluation (AGREE) II instrument—"the most commonly applied and comprehensively validated appraisal tool"[193]—the University of York found that the 2017 ES Guideline and SOC-8 used unacceptably poor methodologies. The University of York found that the 2017 ES Guideline rated just 42 out of 100 in terms of "developmental rigour" and "lack[ed] a robust and transparent approach to [its] development."[194] The Cass Review therefore warned healthcare providers not to use the 2017 ES Guideline.[195]

---

[191] *Id.* at 187.
[192] *Id.* at 130.
[193] *Id.* at 128.
[194] York Guideline Quality at s71.
[195] Cass Review at 130.

138. For WPATH, Dr. Cass relayed that the organization "has been highly influential in directing international practice, although its guidelines were found by the University of York appraisal process to lack developmental rigour,"[196] scoring just 35 out of 100.[197] Dr. Cass warned that the SOC-8 "overstate[] the strength of the evidence in making the[ir] recommendations"[198] and should not be relied on by physicians.[199]

139. The University of York concluded that Defendants' Guidelines did "not follow[] the international standards for guideline development"[200] and "describe insufficient evidence about the risks and benefits of medical treatment in adolescents, particularly in relation to long-term outcomes. Despite this, [they] then went on to cite this same evidence to recommend medical treatments."[201]

140. The University of York also reported that early Endocrine Society and WPATH guidelines were "linked through cosponsorship"[202] and relied on little more than repeated self-references. Other organizations' guidelines then used the "recommend[ed] medical treatments [from the 2009 ES Guideline and WPATH SOCs 5-7] as their basis for making the same recommendations."[203] The 2017 ES Guideline and WPATH SOC-8 completed the trick by citing those third-party guidelines as

---

[196] *Id.* at 28.
[197] York Guideline Quality at s69.
[198] Cass Review at 132.
[199] *Id.* at 130.
[200] *Id.* at 27, 130.
[201] York Guideline Quality at s68–69.
[202] *Id.* at s65.
[203] Cass Review at 130.

evidence for their recommendations.[204]

141.    As the University of York researchers explained:

Early versions of two international guidelines, the Endocrine Society 2009 and World Professional Association for Transgender Healthcare (WPATH) 7 guidelines influenced nearly all the other guidelines. These two guidelines are also closely interlinked, with WPATH adopting Endocrine Society recommendations, and acting as a co-sponsor and providing input to drafts of the Endocrine Society guideline. WPATH 8 cited many of the other national and regional guidelines to support some of its recommendations, despite these guidelines having been considerably influenced by WPATH 7. The links between the various guidelines are demonstrated in the graphics in the guideline appraisal paper. The circularity of this approach may explain why there has been an apparent consensus on key areas of practice despite the evidence being poor.[205]

142.    The following graph,[206] referenced in the previous paragraph, shows how early versions of the WPATH Standards of Care and the 2009 ES Guideline "dominated the development of other guidelines,"[207] which were then cited as the evidentiary basis for the 2017 ES Guideline, 2018 AAP Policy Statement, and SOC-8 in an endlessly iterative, circular, and collusive house of cards:

---

[204] York Guideline Quality at s70.
[205] Cass Review at 130.
[206] York Guideline Quality at s70.
[207] *Id.* at s71.

45



143.    Ultimately, the University of York determined that the Finnish Review and Swedish Review were "the only guidelines that have been informed by an ethical review conducted as part of the guideline development" and thus the only guidelines that "could be recommended for use in practice."[208]

### iv.    The Department of Health and Human Services Review

144.    In November 2025, HHS published "a peer-reviewed study of the medical dangers posed to children from attempts to change their biological sex."[209]

145.    The HHS Review observed that "U.S. medical associations played a key

---

[208] Cass Review at 130.
[209] *HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures*, U.S. Dep't of Health & Human Services (Nov. 19, 2025), https://www.hhs.gov/press-room/hhs-releases-peer-reviewed-report-discrediting-pediatric-sex-rejecting-procedures.html

role in creating a perception that there is professional consensus in support of pediatric medical transition. This apparent consensus, however, is driven primarily by a small number of specialized committees, influenced by WPATH. It is not clear that the official views of these associations are shared by the wider medical community, or even by most of their members. There is evidence that some medical and mental health associations have suppressed dissent and stifled debate about this issue among their members."

146. Like the Cass Review, the HHS Review recognizes "extensive problems in the SOC-8 development process" and concludes that the SOC-8 is neither "credible" nor "evidence-based."[210] Rather, based on revelations discussed below, the HHS Review states that WPATH "steer[ed] findings to align with predetermined agendas rather than allowing an independent, evidence-driven process."[211] The HHS Review also states that the SOC-8's "substantial methodological shortcomings and conflicts of interest . . . result[ed] in recommendations not reliably supported by rigorous evidence."[212]

147. Ultimately, the HHS Review concludes that "the beneficial effects [of the sex intervention model of care] reported in the literature are likely to differ substantially from the true effects of the interventions." [213] Among "the risks of pediatric medical transition" identified by the HHS Review are: "infertility/sterility, sexual dysfunction, impaired bone density accrual, adverse cognitive impacts,

---

[210] HHS Review at 147, 166.
[211] *Id.* at 172.
[212] *Id.* at 15616.
[213] *Id.* at 156.

cardiovascular disease and metabolic disorders, psychiatric disorders, surgical complications, and regret."[214]

148. With respect to "gender affirming" surgeries, the HHS Review concludes that "the best available evidence indicates that . . . surgery [in adolescents] ha[s] not been shown to improve mental health outcomes" and that the "ubiquitous claim that . . . regret rates [of children who have undergone transition procedures] are vanishingly low is unsupported by the evidence."[215]

149. This conclusion is supported by a study published in the *Journal of Sexual Health* in February 2025, which evaluated 107,583 gender-dysphoric patients and found that those who underwent transgender surgery "demonstrated a significantly higher risk for depression, anxiety, suicidal ideation, and substance use disorders than those without surgery."[216]

150. The HHS Review therefore endorses the Counseling-Based Model of Care. The HHS Review found it "unfortunate" that "efforts to research the influence of cultural and social factors, trauma, or co-occurring mental health conditions on GD have been denigrated as 'harmful'" and "mischaracterize[ed] . . . as 'conversion therapy.'" Pressure from Defendants and other proponents of so-called gender-affirming care, HHS concluded, "may cause clinicians to overlook the significant possibility that in some patients, GD has arisen from trauma, 'primary' mental health

---

[214] *Id.*

[215] HHS Review at 132.

[216] Joshua E. Lewis et al., *Examining gender-specific mental health risks after gender-affirming surgery: a national database study*, 22 J. Sex Med. 645 (Apr. 2025), https://pubmed.ncbi.nlm.nih.gov/39996623/.

concerns, or neurodevelopmental conditions."

151. The HHS Review makes clear that "[s]ystematic reviews of evidence have found no evidence of adverse effects of psychotherapy in this context" and concludes that "[g]iven that this population often presents with complex psychosocial histories and multiple mental health concerns, psychotherapy takes a holistic approach—addressing the full range of issues rather than focusing exclusively on GD . . . . Psychotherapy for adolescents with GD is a well-suited intervention, as it is intended to help patients develop self-understanding, engage with emotional vulnerability, and build practical strategies for managing distress . . . . It generally promotes improved mental health and psychosocial functioning and carries little risk."[217]

**B. Internal Leaks and Litigation Discovery Reveal WPATH's Misrepresentations about the Methodology of the SOC-8.**

152. In March 2024, Environmental Progress, a nonprofit think tank, received hundreds of documents and communications from an anonymous source.[218] The files included "screenshots of posts from WPATH's internal messaging forum dating from 2021 to 2024 and a video of an internal panel discussion."[219]

153. At the same time, the State of Alabama was obtaining information about the development of the SOC-8 through discovery in the case of *Boe v. Marshall*, case number 2:22-CV-0184-LCB (M.D. Ala.), which was brought in federal court by

---

[217] *Id.* at 16, 260–69.
[218] Mia Hughes, *The WPATH Files*, Environmental Progress (Mar. 4, 2024), https://environmentalprogress.org/big-news/wpath-files.
[219] *Id.*

parents of "transgender children" and a pair of physicians to challenge the State's ban on sex interventions for minors.[220] The plaintiffs' central argument was that intervention was medically necessary, and they relied on the SOC-8 to demonstrate that necessity.

154. Alabama sought discovery from WPATH regarding, among other things, the evidence it used to develop its guidelines and standards of care. But WPATH, "the organization allegedly responsible for creating the benchmark for gender dysphoria treatment[,] was not so keen on turning over the evidence it used to develop that standard."[221]

155. In fact, WPATH "resisted the Defendants' subpoena at every turn."[222] At first, it moved to quash the subpoena arguing that the information was not relevant to the case—an argument the court found "preposterous."[223] WPATH then sought an interlocutory appeal and mandamus from the Court of Appeals for the Eleventh Circuit, which were denied.[224]

156. In the end, much of the material obtained by Alabama, including depositions of WPATH leadership, became public information. These documents reveal that WPATH's representations about the development and rigor of the SOC-8 range from highly misleading to brazenly false.

---

[220] Memorandum Opinion and Order, *Boe v. Marshall*, No. 2:22-CV-0184-LCB, 2025 WL 1638374, at *1 (M.D. Ala. June 9, 2025).
[221] *Id.*
[222] *Id.*
[223] *Id.* at 2
[224] *Id.*

### i. The SOC-8 were motivated by WPATH's pecuniary and ideological agendas rather than "increasing scientific evidence."

157.    Revisions of previous versions of the Standards of Care have been so nakedly activist that even former WPATH members have warned that the organization's recommendations are "dominated by politics and ideology, rather than by scientific process."[225]

158.    The SOC-8 were no exception. By 2020, States were beginning to recognize sex interventions on minors as a problem. The first ban was enacted in 2021, and many other States followed in short order.[226]

159.    Advocacy groups quickly challenged the legislation, but they were hamstrung by the fact that many of the banned sex interventions were not recommended for minors, even by the WPATH and Endocrine Society guidelines.

160.    Thus, like previous versions of the Standards of Care, the SOC-8 were commissioned as a means to WPATH's pecuniary and ideological ends. Communications exposed by internal leaks and litigation discovery reveal that WPATH members, many of whom were retained as experts by the advocacy groups challenging the legislation, "advocate[d] for language changes [in the SOC] to strengthen [their] position in court."[227]

161.    Others agreed. For example, one member expressed the need for a new

---

[225] Azeen Ghorayshi & Austin Mitchell, *The Protocol: Episode 4*, New York Times (June 2, 2025), https://www.nytimes.com/2025/06/02/podcasts/trans-gender-care-protocol.html.
[226] Dawson & Kates, *supra.*
[227] Brief of Alabama as Amicus Curiae Supporting State Respondents, *U.S. v. Skrmetti*, No. 23-477, 2024 WL 4525181, at *11 (Oct. 15, 2024) (summarizing documents discovered in *Boe v. Marshall*) ("Brief of Alabama").

51

Standards of Care that would "have serious effect in the law and policy settings that have affected us so much recently; even if the wording isn't quite correct for people who have the background you and I have."[228] Another member agreed that "we need[] a tool for our attorneys to use in defending access to care."[229] Yet another said that a new Standards of Care was needed to "help in the fight against the conservative anti trans agenda."[230]

162. To further this purpose, WPATH retained gender-activist "social justice lawyers" to conduct a "legal review" of the SOC-8 in order to support the position that sex interventions are medically necessary rather than merely experimental or cosmetic.[231] "The WPATH Executive Committee discussed various options for the review—'ideas; ACLU, TLDEF, Lambda Legal'—before apparently settling on the senior director of transgender and queer rights at GLAD . . . to conduct the review."[232]

163. WPATH's leaders acknowledged that attorney involvement in the development of clinical guidelines is highly unusual. In a message to another WPATH author, then-WPATH president Dr. Walter Bouman observed that he did not "recall the Endocrine Guidelines going through legal reviews before publication, or indeed the current SOC[-7]."[233]

164. At the top of the wish list for the activist lawyers conducting the SOC-8 legal review—and the WPATH members whom they retained as experts—was

---

[228] *Id.*
[229] *Id.* at *13.
[230] *Id.* at *18.
[231] *Id.* at *12.
[232] *Id.* at *13.
[233] *Id.*

52

authority for the proposition that sex interventions are medically necessary. As one member explained: "Medical necessity is at the center of dozens of lawsuits in the US right now," "one or more of which could go to the Supreme Court[] on whether trans care is medically necessary vs. experimental or cosmetic. I cannot overstate the importance of SOC 8 getting this right at this important time."[234]

165.    Establishing the medical necessity of sex intervention was critical for another reason: insurance. Because experimental medicine is usually not covered by health insurance, one of the main goals of WPATH's SOC-8 was to secure insurance coverage for sex interventions.[235] As a SOC-8 revision committee member expressed in one internal communication: "I really think the main argument [for establishing the medical necessity of adolescent interventions] is access/insurance."[236]

## ii.    SOC-8 revision committee members were not screened for conflicts under industry standards.

166.    With the objective of establishing the medical necessity of experimental sex interventions firmly in mind, WPATH created an authorship structure for its Guideline Steering Committee that would guarantee its predetermined conclusions. Rather than screening potential members for conflicts of interests, the committee was comprised of members who had direct financial and/or non-financial conflicts of interest.

167.    Under step 1—the creation of the Guideline Steering Committee— WPATH selected Dr. Eli Coleman, a sexologist at the University of Minnesota, to

---

[234] *Id.* at *13.
[235] *See* WPATH SOC-8 at S16.
[236] Brief of Alabama at *18.

chair the Guideline Steering Committee.[237] Asa Radix and Jon Arcelus were selected as Co-Chairs.[238] Two WPATH presidents also oversaw development of the guideline, Dr. Bouman and Dr. Marci Bowers. Dr. Bowers is a male surgeon who has undergone sex interventions and performed thousands of vaginoplasties.[239]

168.    These selections did not comply with the recommendations on clinical practice guideline development that WPATH claimed to follow. The World Health Organization recommends selecting a guideline chair who is free of significant conflicts and neutral between differing perspectives.[240] The National Academies of Medicine likewise recommend that "unconflicted methodologists" lead recommendation development.[241]

169.    Dr. Coleman "had unmanaged financial and/or non-financial [conflicts of interest] that were plausibly 'significant or consequential.'"[242] First, Coleman had coauthored academic publications in support of expanded access to medical transition, including the SOC-7.[243] Additionally, Coleman had benefited personally and professionally from large donations by the Tawani Foundation to the University of Minnesota's Institute for Sexual and Gender Health, which Coleman "spent many years of [his] professional life building up, [and] which was . . . renamed" in his honor. The Tawani Foundation, a gender-affirming care advocacy organization chaired by

---

[237] *Id.* at *10.
[238] WPATH SOC-8 at S248.
[239] Brief of Alabama at *10–11.
[240] *Id.* at *25–26.
[241] HHS Review at 167.
[242] *Id.*
[243] *Id.* at 167–68.

54

transgender billionaire Jennifer Pritzker, also funded the SOC-7 and the SOC-8. The HHS has concluded that, "[u]sing [World Health Organization] criteria, [Dr. Coleman's] professional activities and academic profile, which were closely aligned with advancing medical transition, likely constitute both intellectual and financial [conflicts of interest]."[244]

170. Chapter members were equally conflicted. The National Academies of Medicine and World Health Organization recognize that arm's-length experts are best equipped to create clinical guidelines. Thus, both instruct that "[m]embers with [conflicts of interest] should represent *not more than a minority* of the [guideline development group]."[245]

171. But WPATH membership and a demonstrated support for the expansion of gender transition were prerequisites for *all* members of the SOC-8 revision committee—a "composition bias" that the Department of Health and Human Services would later identify as "panel stacking."[246] As Dr. Bowers explained, it was "important" for each author "to be an advocate for [transitioning] treatments before the guidelines were created."[247] He likewise called it "absolutely" important for someone to be an "advocate" of sex intervention to be considered for the committee.[248] Thus, "expertise due to accomplishments in trans health advocacy and a history of work in the community" was an express "criteri[on] for stakeholder membership in

---

[244] *Id.* at 168.
[245] Brief of Alabama at *26.
[246] HHS Review at 170.
[247] Brief of Alabama at *26.
[248] HHS Review at 216 n.30.

55

the SOC-8 Revision Committee."[249]

172. Chapter members demonstrated their advocacy faithfulness to the transgender cause in a variety of ways: For instance, WPATH members who had published articles advocating for broader acceptance of sex interventions weighed the credibility of those same articles as part of their duties as a SOC-8 revision committee member.[250]

173. At least two SOC-8 revision members—Dr. Bowers and Co-Chair Radix—identify as transgender. Other members were accepted because they had "a member of a family that includes a transgender child, sibling, partner, parent, etc."[251]

174. Four authors of the SOC-8—Stephen Rosenthal, Joshua Safer, Vin Tangpricha, and Guy T'Sjoen—co-authored the 2017 ES Guideline.

175. Others testified as paid expert witnesses in legal cases directly related to gender transition before and during the SOC-8 development process.[252] The National Academies of Medicine explicitly identifies this as a conflict of interest.

176. Several chapter members were practitioners of "gender-affirming" care and derived much of their income from performing the sex interventions that the SOC-8 purported to evaluate disinterestedly.

177. All these activities constitute conflicts of interest under the National Academies of Medicine's definition: "[a] divergence between an individual's private

---

[249] *Establishing the SOC8 Revision Committee and the Chairs and Lead Evidence Team*, WPATH, https://wpath.org/publications/soc8/revision-committee/.
[250] Brief of Alabama at *26.
[251] *Establishing the SOC8 Revision Committee and the Chairs and Lead Evidence Team*, WPATH, https://wpath.org/publications/soc8/revision-committee/.
[252] Brief of Alabama at *11; HHS Review at 169.

interests and his or her professional obligations such that an independent observer might reasonably question whether the individual's professional actions or decisions are motivated by personal gain, such as financial, academic advancement, clinical revenue streams, or community standing."[253] Yet not one author was excluded from SOC-8 due to a conflict, and no conflicts were disclosed to readers.[254]

178.    Privately, WPATH knew the SOC-8 were riddled with conflicts. Dr. Coleman admitted at his deposition that "most participants in the SOC-8 process had financial and/or nonfinancial conflicts of interest."[255] Another author agreed that "[e]veryone involved in the SOC process" had at least a non-financial interest in creating a more permissive Standards of Care.[256] Dr. Robinson likewise "expect[ed] many, if not most, SOC-8 members to have competing interests."[257] She even informed WPATH that "[d]isclosure, and any necessary management of potential conflicts, should take place *prior* to the selection of guideline members."[258] "Unfortunately," she said, "this was not done here."[259] Indeed, the SOC-8 committee did not submit conflict of interest disclosure statements until at least six months *after* members had already been selected.[260]

---

[253] *Id.* at *26–27.
[254] *Id.* at *27.
[255] *Id.*
[256] *Id.*
[257] *Id.*
[258] *Id.* at *28.
[259] *Id.*
[260] HHS Review at 168.

### iii. The SOC-8 include recommendations decided outside the Delphi consensus-building process.

179. The SOC-8 were shaped not only by activist attorneys, but also activists within the Biden administration and the AAP.

180. Admiral Richard "Rachel" Levine, the former Assistant Secretary for Health at HHS, met regularly with WPATH leaders, "eager to learn when SOC 8 might be published."[261] According to one WPATH member who met with Levine, "[t]he failure of WPATH to be ready with SOC 8 [was] proving to be a barrier to optimal policy progress" for the Biden Administration.[262] Another member reported: "I am meeting with Rachel Levine and her team," "as the US Department of Health is very keen to bring the trans health agenda forward."[263]

181. Levine's role was not merely advisory. A few months before SOC-8 was to be published in September 2022 (and long after the public comment period had closed that January), WPATH sent Levine an "Embargoed Copy - For Your Eyes Only" draft of SOC-8 that had been "completed" and sent to the publisher for proofreading and typesetting.[264] The draft included a departure from Standards of Care 7, which, except for so-called "top surgeries," restricted transitioning surgeries to patients who had reached the "[a]ge of majority in a given country."[265] The draft SOC-8 relaxed the age minimums: 14 for cross-sex hormones, for "chest masculinization" (i.e., mastectomy), for "breast augmentation, facial surgery

---

[261] Brief of Alabama at *15.
[262] *Id.*
[263] *Id.* at *16.
[264] *Id.*
[265] *Id.*

(including rhinoplasty, tracheal shave, and genioplasty)," for "metoidioplasty, orchiectomy, vaginoplasty, hysterectomy and fronto-orbital remodeling," and for "phalloplasty."[266]

182.    After reviewing the draft, Levine's office contacted WPATH at the beginning of July with a political concern: that the listing of "specific minimum ages for treatment," "under 18, will result in devastating legislation for trans care."[267] Admiral Levine's chief of staff suggested that WPATH hide the recommendations by removing the age minimums from SOC-8.[268] WPATH leaders met with Levine and HHS officials to discuss the age recommendations. According to a WPATH participant, Levine "was very concerned" that "having ages (mainly for surgery) will affect access to health care for trans youth."[269] The WPATH members reported back to their colleagues: "[Levine] and the Biden administration worried that having ages in the document will make matters worse. She asked us to remove them."[270]

183.    The authors of the adolescent chapter wrestled with how to respond to the request:

a) "[T]he fear is that ages will spark political attacks on access. I don't know how I feel about allowing US politics to dictate international professional clinical guidelines that went through Delphi."[271]

b) "I'm also curious how the group feels about us making changes based on current US politics . . . . I agree about listening to Levine."[272]

---

[266] *Id.* at *16–17.
[267] *Id.* at *17.
[268] *Id.*
[269] *Id.* at *18.
[270] *Id.* at *18 n.67.
[271] *Id.* at *18.
[272] *Id.* at *18.

c) "I think it's safe to say that we all agree and feel frustrated (at minimum) that these political issues are even a thing and are impacting our own discussions and strategies."[273]

184. WPATH initially told Levine that it "could not remove [the age minimums] from the document" because the recommendations had already been approved by the Delphi consensus process.[274] Indeed, Dr. Coleman said that consensus was "[t]he only evidence we had" for the recommendations.[275] But, WPATH continued, "we heard your comments regarding the minimal age criteria" and, "[c]onsequently, we have made changes to the SOC8" by downgrading the age "recommendation" to a "suggestion."[276] But this did not pacify Levine, who immediately requested more meetings with WPATH.[277]

185. Just days before the SOC-8 were to be published, AAP joined Levine in threatening to oppose SOC-8 if WPATH did not remove the age minimums.[278]

186. In a letter dated September 8, 2022, AAP President Dr. Moira A. Szilagyi thanked Dr. Bouman for providing AAP "an opportunity to review" the SOC-8 before their release. That review, completed by "AAP experts from the Section on LGBT Health and Wellness and the Section on Endocrinology," concluded that "there are some portions of the final version that raise concerns."

187. For instance, AAP was concerned that the SOC-8's discussion of "social contagion, rapid onset gender dysphoria, and desistence/persistence" would "give[]

---

[273] *Id.* at *18–19.
[274] *Id.* at *19.
[275] *Id.*
[276] *Id.*
[277] *Id.*
[278] *Id.*

60

validity" to "anti-transgender arguments."

188. Dr. Szilagyi also attached an edited copy of the SOC-8 that highlighted typos and formatting errors, noted inconsistencies in terminology and contradictory statements, suggested the inclusion and exclusion of various medical reports, and discussed whether conclusions made by the SOC-8 were "in line with the AAP policy statement."

189. AAP's editorial comments privately conceded, among other things, that "reviewing the 3 studies to justify vaginoplasty at 17, none of the individuals referenced in the study were under 18," and that "[f]acial surgery for minors is going to be a big deal, tracheal shaves are very high risk," even though those interventions were recommended without age minimum by the 2018 AAP Policy Statement.

190. But of chief concern for AAP was the SOC-8's inclusion of age minimums for surgeries. Dr. Szilagyi asserted that WPATH "lack[ed] the evidence to justify the recommended surgery ages" and "request[ed] the opportunity for [AAP's] subject matter experts to meet with [WPATH] to discuss these important matters upon receipt of this communication."

191. The letter concluded by reiterating that "[t]he AAP and WPATH share a common goal in ensuring that gender-affirming care is accessible . . . and that transgender and gender-diverse youth can lead healthy, fulfilling lives as their true selves."

192. Internally, WPATH responded by criticizing the "AAP guidelines" as

having "a very weak methodology, written by few friends who think the same."[279] Dr. Bouman "struggle[d] to find any sound evidence-based argument(s)" in AAP's comments and was "surprised that a 'reputable' association as the AAP is so thin on scientific evidence."[280]

193. Dr. Arcelus complained that "[a]s far as I can tell they are asking for us to remove anything that it does not fit into their narrative . . . . The AAP comments asked us to remove age as it does not fit to their AAP [Policy]." His view was that "we should not remove 'ages'" that were "approved via Delphi and approved by the WPATH board," as doing so would "make a joke of our methodology and will see us as weak."

194. Dr. Coleman would later report that AAP was "not only" saying that "they would not endorse the SOC, they indicated that they would *actively publicly oppose it*." AAP, he emphasized, was "a MAJOR organization" that was "very connected to the other major medical organizations" and had "much more resources for advocacy and communications." "Clearly, if AAP were to publicly oppose the SOC8, it would be a major challenge for WPATH, SOC8, and trans youth access to care in the U.S."

195. In the end, because of these threats by AAP, "WPATH leadership" "agreed to remove the ages."[281] Dr. Coleman organized a "top-level confidential" "taskforce" to quickly revise the SOC-8 as necessary "to obtain [AAP's] endorsement."

---

[279] *Id.*
[280] *Id.* at *20.
[281] *Id.*

WPATH sent the new version of the SOC-8 to AAP State Government Affairs Analyst Jeff Hudson, informing him that "[w]e have just finished our meeting and we have agreed to remove the ages and to add the sentence we agreed. I hope that by doing this AAP will be able to endorse the SOC8 or at least to support it."

196. With the age minimums removed, AAP responded that it was "satisfied with the proposed" revision, "w[ould] not oppose the SOC 8," and was "ready to make a statement in support of WPATH." Dr. Coleman sent an email thanking task members for "the tremendous effort [they] made to reach a deal with the AAP."

197. This "deal" between WPATH and AAP means that, despite the Delphi "consensus," the SOC-8 do not contain age minimums for any transitioning hormonal or surgical intervention outside of phalloplasty.[282] The SOC-8 deem all other surgeries "medically necessary gender-affirming medical treatment[s] in adolescents."[283]

198. In his deposition, Dr. Coleman made clear that WPATH removed the age minimums "without being presented any new science of which the committee was previously unaware."[284] In fact, despite assuring that "formal consensus for *all* statements was obtained using the Delphi process," WPATH treated its decision as "highly, highly confidential."[285] When asked by the press about the removal of the age minimums, WPATH forewent saying what was "true" in favor of saying "what [it]

---

[282] *Id.*
[283] *Id.*
[284] *Id.* at *21.
[285] *Id.*

need[ed] to say."[286]

### iv. WPATH was not "informed" by the Johns Hopkins University systematic reviews; it suppressed them.

199. Some SOC-8 authors cautioned against conducting systematic evidence reviews, lest they "reveal[] little or no evidence and put[] us in an untenable position in terms of affecting policy or winning lawsuits."[287] Despite this warning, WPATH commissioned six systemic reviews from Dr. Robinson's evidence review team at Johns Hopkins University.[288]

200. The choice of Johns Hopkins was strategic. That institution has a long history of cooperation with gender transition activists. In fact, Johns Hopkins Hospital opened North America's first gender clinic with seed funding from Rita Erickson's foundation—the same organization that seed funded WPATH.[289]

201. The fear of some SOC-8 authors over systematic reviews proved prescient. In August 2020, Dr. Robinson wrote to the Agency for Healthcare Research and Quality at HHS about their research into "multiple types of interventions (surgical, hormone, voice therapy . . .)." Her conclusion: "[W]e found little to no evidence about children and adolescents."[290]

202. Dr. Robinson further informed HHS that she was "having issues with

---

[286] *Id.* at *22.
[287] *Id.* at *2.
[288] *Research into trans medicine has been manipulated*, The Economist (June 27, 2024), https://www.economist.com/united-states/2024/06/27/research-into-trans-medicine-has-been-manipulated.
[289] Walsh, *supra*.
[290] Brief of Alabama at *32.

this sponsor" "trying to restrict our ability to publish."[291] WPATH had rejected Robinson's request to publish two manuscripts because her team failed to seek "final approval" of the articles from a SOC-8 Steering Committee member.[292] WPATH also mandated that authors "use the Data for the benefit of advancing transgender health in a positive manner" as defined by WPATH and "involved at least one member of the transgender community in the design, drafting of the article, and the final approval of the article."[293]

203. In fact, in December 2017, an executive director at WPATH told Dr. Robinson that her team "[could] not publish their findings independently."[294] In case there was any confusion, the executive director later reiterated that "the [WPATH] board wants it to be clear that the data cannot be used without WPATH approval."[295]

204. Dr. Robinson pushed back: "Hopkins is an academic institution, and I as a faculty member therein, will not sign something that limits academic freedom in this manner," nor "language that goes against current standards in systematic reviews and in guideline development."[296]

---

[291] *Id.*at *33.
[292] *Id.*
[293] *Id.*
[294] *Research into trans medicine has been manipulated*, The Economist (June 27, 2024), https://www.economist.com/united-states/2024/06/27/research-into-trans-medicine-has-been-manipulated.
[295] *Id.*
[296] *Research into trans medicine has been manipulated*, The Economist (June 27, 2024), https://www.economist.com/united-states/2024/06/27/research-into-trans-medicine-has-been-manipulated.

205. WPATH eventually allowed the Johns Hopkins team to publish two of its manuscripts.[297] It is still unclear what happened to the other four.[298]

## v. WPATH deviated from GRADE methodology when the results did not support its predetermined conclusions.

206. WPATH publicly claims to have used a process "adapted from the Grading of Recommendations, Assessment, Development and Evaluations (GRADE) framework" for "developing and presenting summaries of evidence"—a "systematic approach for making clinical practice recommendations."[299] According to the SOC-8's purported methodology, the Johns Hopkins team conducted systematic evidence reviews, "assign[ing] evidence grades using the GRADE methodology," and "present[ing] evidence tables and other results of the systematic review" to the SOC-8 authors.[300]

207. Chapter authors were then to grade the recommendation statements based on the evidence. The SOC-8 represent that "strong recommendations"—"we recommend"—were only for situations where "the evidence is high quality," "a high degree of certainty [that] effects will be achieved," "few downsides," and "a high degree of acceptance among providers."[301] On the other hand, "[w]eak recommendations"—"we suggest"—were for when "there are weaknesses in the

---

[297] Brief of Alabama at *34.
[298] The suppression of the Johns Hopkins studies recalls an episode years earlier where WPATH censured a member who publicly discussed concerns about "sloppy" care resulting from gender dysphoric youth being "[r]ushed through the medicalization" of transitioning treatments. *Id.* at *40.
[299] Brief of Alabama at *28.
[300] *Id.*
[301] *Id.* at *29.

evidence base," "a degree of doubt about the size of the effect that can be expected," and "varying degrees of acceptance among providers."[302]

208.    Yet Dr. Coleman has since revealed that the SOC-8 "did not use GRADE explicitly."[303] Dr. Karasic likewise admitted that, rather than relying on systematic reviews, some drafters simply "used authors . . . [they] were familiar with."[304] WPATH also decided not to differentiate "between statements based on [literature reviews] and the rest," and ordered the removal of all notations disclosing the quality of evidence for each recommendation.[305]

## C.    The Endocrine Society and AAP Guidelines Used Similarly Biased Methodologies.

209.    A growing body of evidence shows that the standards-setting processes behind the 2017 ES Statement and the 2018 AAP Policy Statement were equally rigged in favor of the conclusion that drugs and surgeries are the only evidence-backed treatment protocol for pediatric gender dysphoria.

210.    The 2017 ES Guideline and the 2018 AAP Policy Statement were not drafted by disinterested practitioners like Dr. Cass.

211.    While Endocrine Society claims to have "resolved or managed all identified conflicts of interest," the authors of the 2017 ES Statement were each longtime advocates for—and most were providers of—pediatric sex interventions.

212.    The lead author of the 2017 ES Statement was Dr. Wylie C. Hembree,

---

[302] *Id.*
[303] *Id.*
[304] *Id.* at *30.
[305] *Id.*

67

an endocrinologist whose practice at New York Presbyterian Hospital and Columbia University Medical Center profited from pediatric sex interventions.

213. Along with serving as the lead author for the 2009 ES Statement, Hembree had co-authored many articles advocating for pediatric sex intervention prior to 2017. For example, a 2016 article entitled *Barriers to Health Care for Transgender Individuals* identified the lack of insurance coverage for gender-affirming care as a "barrier to health care" that needed to be eliminated.[306] The article was co-authored by Eli Coleman, Asa Radix, and Joshua Safer—the Chair, Co-Chair, and co-author of WPATH's SOC-8.[307]

214. Another article, *Priorities for Transgender Medical and Health Care Research* (2016), was co-authored by Dr. Hembree (lead author of the 2009 ES Guideline and the 2017 ES Guideline), Dr. Jamie Feldman (co-author of the SOC-8), Dr. George R. Brown (co-author of the SOC-8) Dr. Walter J. Meyer (co-author of the 2017 ES Guideline), Dr. Heino Meyer-Bahlburg (co-author of the SOC-8), Dr. Vin Tangpricha (co-author of the 2017 ES Guideline and the SOC-8), Dr. Guy T'Sjoen (co-author of the 2017 ES Guideline and the SOC-8), and Dr. Joshua Safer (co-author of the 2017 ES Guideline and the SOC-8). The article was funded by the Tawani Foundation, Endocrine Society, WPATH, and the Program in Human Sexuality at the University of Minnesota Medical School led by Dr. Coleman (the lead author of

---

[306] Joshua Safer et al., *Barriers to Health Care for Transgender Individuals*, 23 Curr Opin Endocrinol Diabetes Obes. 23 (2016), https://pmc.ncbi.nlm.nih.gov/articles/PMC4802845/pdf/nihms767277.pdf.
[307] *Id.*

the SOC-8).[308] The SOC-8 cite this article as authority.

215. Despite his personal stake in, and substantial advocacy of, pediatric sex intervention, Dr. Hembree did not declare any conflict of interest.

216. Other co-authors were longtime sex interventionists as well. For instance, co-authors Peggy T. Cohen-Kettenis and Louis Gooren were the first clinicians to experiment with puberty blockers as a treatment for pediatric gender dysphoria.[309] As co-authors of the 2017 ES Statement, Cohen-Kettenis and Gooren cited their own articles as evidence for pediatric sex intervention and omitted that medical journals have concluded that their work "is methodologically flawed and should have never been used in medical settings."[310]

217. In fact, the 2017 ES Guideline evaluated, and cited as authority, the "scholarship" of each of its 10 authors.

218. The 2018 AAP Policy Statement was as or more methodologically biased as the 2017 ES Guideline.

219. AAP boasts a robust draft and review process for its policy statements. First, an "intent" to write a policy is submitted to the AAP Board of Directors. If approved, the drafting process begins. This involves "an evidence review, collaborative writing among the group of expert authors and submission to multiple

---

[308] Jamie Feldman et al., *Priorities for Transgender Medical and Health Care Research*, 23 Curr. Opin. Endocrinol. Diabetes Obes. 180 (Apr. 2016), https://pubmed.ncbi.nlm.nih.gov/26825469/.

[309] *See* Cass Review at 68.

[310] E. Abbruzzese et al., *The Myth of "Reliable Research" in Pediatric Gender Medicine: A critical evaluation of the Dutch Studies—and research that has followed*, J. Sex & Marital Therapy (Jan. 2, 2023), https://www.tandfonline.com/doi/full/10.1080/0092623X.2022.2150346.

groups of peers for review" and can "take up to two years." "After a policy completes peer review, it is reviewed internally by senior leadership at AAP and voted upon by the AAP Board of Directors. If approved, it is published in Pediatrics, the official peer-reviewed journal of the AAP."[311]

220. The 2018 AAP Policy Statement, however, begins with the following disclaimer: "Dr. [Jason] Rafferty conceptualized the statement, drafted the initial manuscript, reviewed and revised the manuscript, approved the final manuscript as submitted, and agrees to be accountable for all aspects of the work," indicating that the 2018 AAP Policy Statement was not developed with the ordinary procedural safeguards or distribution of editorial control.

221. The concentration of authority in a single author would be curious enough, but even stranger is that, at the time he was chosen to unilaterally draft and review the AAP's policy statement on pediatric gender dysphoria, Dr. Rafferty was *still completing his medical residency*—i.e., he was not yet licensed to independently practice medicine.

222. Worse still, Dr. Rafferty's nascent practice consisted largely of prescribing of puberty blockers and cross-sex hormones. This is detailed by two lawsuits brought by women who were prescribed sex interventions by Dr. Rafferty in their youth, experienced negative health effects and regret, and have subsequently detransitioned.

---

[311] *Policy Statement Development Process*, AAP, https://www.aap.org/en/policy/policy-statement-development-process/?srsltid=AfmBOooLAtwfD1M0udxlJlz4fCZaO3U8VeQySLpY8ky-YbxtelWD8B9r.

223. The first lawsuit alleges that in February 2017, Dr. Rafferty prescribed cross-sex hormones to a 14-year-old girl "after a single visit for less than an hour." When the girl's mother voiced concern, Dr. Rafferty informed her that "the only treatment for her [daughter's] gender dysphoria and related mental health issues was cross-sex hormonal treatment." The hormones only worsened the girl's psychological distress. Following a suicide attempt, the girl stopped taking cross-sex hormones, "gradually grew out of her gender dysphoria[,] and began to become more comfortable with her female body, altered as it was from taking testosterone." She now realizes "that her mental health issues and discomfort in her body were likely the result of her traumatic childhood and other mental health comorbidities—a realization any competent physician would have also realized or at least explored."

224. The second lawsuit alleges that Dr. Rafferty prescribed testosterone to a female patient who had recently escaped from a cult and was reporting "up to nine independent identities inhabiting her mind." The hormones "ma[de] her already severe psychological disorders even worse." Fortunately, the patient began counseling, "uncover[ed] the underlying psychological roots for [her] manifestations," and stopped taking testosterone. Her dissociative identity disorder desisted. But as a result of the "gender-affirming care," she now experiences "ongoing estrogen deficiencies, painful premenstrual dysphoric disorder, suspected osteoporosis, development of painful skin nodules from testosterone injection sites, an onset of severe histamine sensitivity resulting in chronic severe allergies, suspected infertility, reduced sex drive, chronic hot flashes, genital pain and discomfort, [and]

71

chronic joint pain."

225. Despite all this, the 2018 AAP Policy Statement states that Dr. Rafferty "indicated he has no potential conflicts of interest to disclose" and "indicated he has no financial relationships relevant to this article to disclose."

226. Co-authors of the 2018 AAP Policy Statement also had a financial interest in developing medical standards that would yield credibility to "gender-affirming care." Dr. Ilana Sherer is one example. Her California-based pediatrics practice specializes in prescribing sex interventions for minors. As she explained during a panel in 2018, this often requires partnering with Diane Ehrensaft—a psychiatrist who co-authored WPATH's SOC-8. Dr. Sherer explained that she sees "lots and lots of kids" who "don't have dysphoria, that really don't have mental health issues, and so to say to them 'you have to go get a letter from a mental health provider' feels challenging to me. And so what we've started to do in our clinics is have someone like Diane [Ehrensaft] . . . go in and do brief assessment, and give their rub—I know you [addressing Ehrensaft] said you don't rubber-stamp, but basically in my mind that's what it feels like, and so then we can move on and say 'OK, now we can talk about what you're actually here for'"—that is, puberty blockers or cross-sex hormones.

227. AAP knew or should have known that Dr. Sherer was biased in favor of pediatric sex intervention based on her preexisting "scholarship." One article from 2015 called on pediatricians to "affirm" their patients' sense of gender beginning at the age of "0 to 4."[312] The article was co-authored by Ehrensaft (co-author of WPATH's

---

[312] Ilana Sherer et al., *Affirming gender: Caring for gender-atypical children and adolescents*, (Jan. 1, 2015), https://www.contemporarypediatrics.com/view/affirming-gender-caring-

SOC-8) and Dr. Stephen M. Rosenthal (co-author of the 2017 ES Guideline and WPATH's SOC-8).

228. Members of the medical community quickly noticed that the 2018 AAP Policy Statement did not appear to go through the ordinary development process. In December 2019, Dr. James M. Cantor published a double-peer reviewed article in the *Journal of Sex and Marital Therapy* for the purpose of "fact-checking [the] AAP Policy."[313]

229. Dr. Cantor explained that he decided to perform a fact-check because "[a]s I read the works on which [AAP] based their policy[], I was pretty surprised—rather alarmed, actually: These documents simply did not say what AAP claimed they did. In fact, the references that AAP cited as the basis of their policy instead outright contradicted that policy." After analyzing the policy statement footnote-by-footnote, Dr. Cantor's article concludes that "AAP gave readers exactly the reverse of what was contained in its own sources . . . . In its policy statement, AAP told neither the truth nor the whole truth, committing sins both of commission and of omission, asserting claims easily falsified by anyone caring to do any fact checking at all." Moreover, "AAP's statement is a systematic exclusion and misrepresentation of entire literatures. Not only did AAP fail to provide compelling evidence, it failed to provide the evidence at all . . . . Any assertion that [AAP's] policy is based on evidence is

gender-atypical-children-and-adolescents.
[313] James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, J. Sex & Marital Therapy (Dec. 14, 2019) https://www.ohchr.org/sites/default/files/Documents/Issues/SexualOrientation/IESOGI/Other/Rebekah_Murphy_20191214_JamesCantor-fact-checking_AAP-Policy.pdf.

73

demonstrably false."[314]

230. The glaring flaws in the 2018 AAP Policy Statement's methodology and conclusions led many of AAP's members to seek its withdrawal. In 2021, a resolution was submitted to AAP's annual leadership forum "to inform the academy's . . . members about the growing international skepticism of pediatric gender transition." "Even though the resolution was in the top five of interest based on votes by members cast online, the AAP's leadership voted it down." The following year, AAP leaders approved a resolution that supported sex intervention. "When members submitted another resolution to conduct a review of the evidence, the AAP enforced for the first time a rule that shut down member comments, effectively burying it."[315]

231. Many AAP members now feel that "something has gone wrong with how we help kids with distress over their bodies" but "fear the personal and professional repercussions of voicing their concerns."[316]

D. **Defendants Actively Colluded and Conspired for the Common Purpose of Deceiving the Public about the Safety, Reversibility, and Efficacy of Pediatric Sex Interventions.**

232. Defendants' Guidelines are the result of yearslong coordination and collaboration between WPATH, Endocrine Society, and AAP. Examples of this collaboration include:

- WPATH sponsored the 2009 and 2017 ES Guidelines.

- The authorship of the WPATH Standards of Care and the Endocrine Society

---

[314] *Id.*

[315] Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, Wall Street Journal (Aug. 17, 2022).

[316] Leor Sapir, *Is the AAP Placing Its Own Members at Risk?*, City Journal (Oct. 31, 2023), https://www.city-journal.org/article/is-the-aap-placing-its-own-members-at-risk.

Guidelines overlaps significantly, with four individuals co-authoring both the 2017 ES Guideline and WPATH's SOC-8 (2022). Several individuals who served as co-authors for one Defendant are members of another Defendant.[317]

- WPATH and the Endocrine Society jointly funded research that was co-authored by the lead authors of the 2017 ES Guideline and WPATH's SOC-8. The research was then cited as supporting authority by Defendants' Guidelines.

- WPATH sought AAP's approval of the SOC-8 before publishing. When AAP objected to the age minimums for breast and genital surgeries, WPATH secretly abandoned the Delphi consensus process to strike a "deal" with AAP.

- Defendants cited one another's guidelines as authority for their own recommendations over the course of many years, creating the illusion of a substantial body of evidence supporting pediatric sex intervention.

- After States took action to protect children from sex interventions, Defendants co-signed amici briefs across the country touting one another's guidelines as the standard of care.

- Defendants' purpose in all this was to deceive the public about the safety, reversibility, and efficacy of pediatric sex interventions, thereby generating demand for the drugs and surgeries offered by their dues-paying members.

233. WPATH, Endocrine Society, and AAP are all composed of members who have horizontal or vertical business relations in the Relevant Market. The members of these medical associations have a common economic incentive to establish drugs and surgeries as the only recommended treatment for children suffering from pediatric gender dysphoria. The standards set by these organizations therefore have a serious potential for anticompetitive harm.

234. And together, Defendants wield considerable power in the Relevant Market. Their guidelines have been recognized as the most influential of their kind.

235. Defendants attempted to use their substantial force to deceive

---

[317] For example, Dr. Lynn Hunt co-authored the 2018 AAP Policy Statement and is a member of WPATH. At least four co-authors of the 2017 ES Guideline are WPATH members.

75

consumers and destroy the Counseling-Based Model of Care, a treatment protocol offered by their members' competitors, and exclude those competitors from the Relevant Market. Defendants' conduct adversely affected competition without producing any counterbalancing pro-competitive effects.

236. Because drugs and surgeries are far more profitable for the medical industry than counseling, Defendants had a pecuniary interest to ostracize the Counseling-Based Model of Care.

237. To ensure this outcome, Defendants employed panel stacking and failed to manage authors' obvious conflicts of interests.

### III. DEFENDANTS CONTINUE TO MAKE FALSE REPRESENTATIONS ABOUT THE REVERSIBILITY AND EFFICACY OF SEX INTERVENTIONS AND THE LEGITIMACY OF THEIR GUIDELINES TO SELL MEMBERSHIPS.

#### A. WPATH

238. WPATH continues to market the SOC-8 as a "rigorous review of all evidence and ideas"[318] that was "developed using an evidence-based approach"[319] and "explain[s] in detail the science—and evidence—based benefits of gender affirming care for TGD people."[320] The SOC-8 are prominently displayed on WPATH's website and freely downloadable therefrom.[321]

239. WPATH continues to make these debunked claims because they are crucial to its ability to sell memberships and generate business for its members.

---

[318] *History and Purpose*, WPATH, https://wpath.org/publications/soc8/soc8-history/.
[319] *Id.*
[320] *Statement of Opposition to Legislation Banning Access to Gender-Affirming Health Care in the US* (Mar. 8, 2023), https://wpath.org/wp-content/uploads/2024/11/USPATH_WPATH-Statement-re_-GAHC-march-8-2023.pdf.
[321] *Standards of Care Version 8*, WPATH, https://wpath.org/publications/soc8/.

Because the SOC-8 continue to deceive the public and generate demand for pediatric sex interventions, sex intervention providers continue to purchase WPATH memberships.

240. Sex interventionists also buy WPATH memberships because the SOC-8 disparage their competitors' Counseling-Based Model of Care. This benefits not only physicians who prescribe and perform sex interventions, but also mental health professionals who provide "gender-affirming" therapy.

241. WPATH's members include many mental health professionals who provide "gender-affirming" therapy, including one whose practice is located in St. Lucie County.

242. Many Florida-based mental health professionals reject "gender-affirming" therapy and treat gender dysphoria through the Counseling-Based Model of Care.

243. The SOC-8 help WPATH generate income in other ways as well. For example, another benefit listed on the "Membership" page of WPATH's website is the "[o]pportunit[y] to join WPATH task forces and committees," the most important being the Standards of Care revision committee.[322]

244. Another benefit is "[i]nclusion in the online WPATH 'Find a Provider' search tool," which connects individuals seeking sex interventions to WPATH members who perform them.[323] The Standards of Care and the search tool are crucial

---

[322] *Membership Information*, WPATH, https://wpath.org/membership/membership-information/.
[323] *Id.*

to WPATH's business model. WPATH publishes the Standards of Care to generate demand for sex interventions by duping minors and their parents (as well as insurers and courts) into believing that pediatric sex interventions are safe, reversible, and effective at alleviating gender dysphoria. Indeed, the SOC-8 state that "[w]hile this is primarily a document for health care professionals, individuals, their families, and social institutions may also use the SOC-8 to understand how it can assist with promoting optimal health for members of this diverse population."

245. WPATH then maintains a search tool directing prospective sex intervention customers to sex intervention providers. Sex intervention providers' desire to fund efforts to create guidelines that generate demand for sex interventions, and to appear in directories of sex intervention providers, causes them to purchase WPATH memberships, thereby fueling WPATH's enterprise.

246. WPATH's "Find a Provider" tool prompts users to input their city.[324] The tool then returns a list of providers based in that city. In this respect, the WPATH website is not a passive webpage; it engages with users throughout Florida, and in St. Lucie County, to solicit information and, based on that information, direct prospective patients to a provider.

---

[324] *Provider Directory Search*, WPATH, https://app.wpath.org/provider/search.

78

247.    The "Find a Provider" tool lists 61 providers in the State of Florida.[325] The practice of at least one WPATH member is based in St. Lucie County.[326]

248.    The "About WPATH" page of WPATH's website contains a link to the "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8" (SOC-8). In a paragraph repeating the claim that WPATH offers evidence-based standards of care, WPATH states: "We are funded primarily through the support of our membership, and through donations and grants sponsored by non-commercial sources."[327] The website's navigation bar, which appears at the top of each page, includes a "Donate" tab.

249.    The "Donate" page repeats that "[t]he World Professional Association for Transgender Health (WPATH) is dedicated to promoting evidence based care . . . in transgender health" and tells potential donors that contributions support WPATH's "research" and "standards."[328]

250.    The unfair and deceptive claims about the developmental rigor of the Standards of Care also create an erroneous belief that WPATH is a legitimate source

[325]    *Provider    Directory    Search*,    WPATH, https://app.wpath.org/member/search/results?cb_member_search_form_global%5Baddress%5D%5Bcountry%5D=US&cb_member_search_form_global%5Baddress%5D%5Bstate%5D=FL&cb_member_search_form_global%5BfirstName%5D=&cb_member_search_form_global%5BlastName%5D=&cb_member_search_form_global%5Bphone%5D=&cb_member_search_form_global%5Bspecialty%5D=.

[326]    *Provider    Directory    Search*,    WPATH, https://app.wpath.org/provider/search?provider_directory_search_form%5Baddress%5D%5Bcountry%5D=US&provider_directory_search_form%5Baddress%5D%5Bstate%5D=FL&provider_directory_search_form%5Baddress%5D%5Bcity%5D=port+saint+lucie&provider_directory_search_form%5BfirstName%5D=&provider_directory_search_form%5BlastName%5D=&provider_directory_search_form%5Bspecialty%5D=.

[327] *About WPATH*, WPATH, https://wpath.org/about/mission-and-vision/.

[328] *Donate*, WPATH, https://wpath.org/donate-home/.

of evidence-based research, facilitating WPATH's efforts to sell trainings and conference tickets.

251. WPATH has transmitted, and continues to transmit, the Standards of Care to consumers, providers, and insurers across the State of Florida and specifically in St. Lucie County.

## B. Endocrine Society

252. Endocrine Society continues to advertise the 2017 ES Guideline as evidence-based clinical guidelines.

253. Endocrine Society continues to make this debunked claim because the 2017 ES Guideline facilitates the sale of memberships. Because the 2017 ES Guideline continues to deceive the public and generate demand for pediatric sex interventions, sex intervention providers continue to purchase Endocrine Society memberships.

254. Sex interventionists also buy Endocrine Society memberships because the 2017 Endocrine Society Guideline disparages their competitors' Counseling-Based Model of Care. This benefits not only physicians who prescribe and perform sex interventions, but also mental health professionals who provide "gender-affirming" therapy.

255. The 2017 ES Guideline is prominently displayed on Endocrine Society's webpage and freely downloadable therefrom.

256. Like WPATH, Endocrine Society advertises its "'Find an

80

Endocrinologist' Physician Referral Directory" as a leading benefit of membership.[329] Endocrine Society publishes the ES Guideline to generate demand for sex interventions by duping minors and their parents (as well as insurers and courts) into believing that pediatric sex interventions are safe, reversible, and effective at alleviating gender dysphoria. Endocrine Society then maintains a search tool directing prospective sex intervention customers to sex intervention providers. Sex intervention providers' desire to fund efforts to create guidelines that generate demand for sex interventions, and to appear in directories of sex intervention providers, causes them to purchase Endocrine Society memberships, thereby fueling Endocrine Society's enterprise.

257. Endocrine Society's "Find an Endocrinologist" tool prompts users to input their ZIP code and a radius.[330] The tool then returns a list of providers within the specified range of that city. In this respect, the Endocrine Society website is not a passive webpage; it engages with users throughout Florida, and in St. Lucie County, to solicit information and, based on that information, direct prospective patients to a provider.

258. The "Find an Endocrinologist" tool lists 169 providers in the State of Florida.[331] The practice of at least one Endocrine Society member is based in St. Lucie

---

[329] *Membership*, Endocrine Society, https://www.endocrine.org/membership.

[330] *Find an Endocrinologist*, Endocrine Society, https://www.endocrine.org/patient-engagement/find-an-endocrinologist-directory.

[331] *Find an Endocrinologist*, Endocrine Society, https://www.endocrine.org/patient-engagement/find-an-endocrinologist-directory/find-an-endocrinologist-results?page=1&state=FL.

County.[332]

259. Endocrine Society also advertises the opportunity to serve on its committees (including the task force that drafts the ES Guideline) as a benefit of membership.[333]

260. Endocrine Society has transmitted, and continues to transmit, the ES Guideline to consumers, providers, and insurers across the State of Florida and specifically in St. Lucie County.

## C. AAP

261. After striking a "deal" with WPATH on removing age minimums for gender surgeries in SOC-8, the AAP Board of Directors voted to reaffirm its 2018 Policy Statement on gender-affirming care on August 4, 2023. And even now, AAP continues to advertise its 2018 Policy Statement as an evidence-based evaluation of the reversibility and efficacy of pediatric sex interventions.

262. AAP continues to make this debunked claim because the 2018 AAP Policy Statement facilitates the sale of memberships. Because the 2018 AAP Policy Statement continues to deceive the public and generate demand for pediatric sex interventions, sex intervention providers continue to purchase AAP memberships.

263. Sex interventionists also buy AAP memberships because the 2018 AAP Policy Statement disparages their competitors' Counseling-Based Model of Care. This benefits not only physicians who prescribe and perform sex interventions, but also mental health professionals who provide "gender-affirming" therapy.

---

[332] *Id.*

[333] *Membership*, Endocrine Society, https://www.endocrine.org/membership.

264. Like WPATH and Endocrine Society, AAP advertises its membership directory as a leading benefit of membership.[334] AAP publishes the Policy Statement to generate demand for sex interventions by duping minors and their parents (as well as insurers and courts) into believing that pediatric sex interventions are safe, reversible, and effective at alleviating gender dysphoria. AAP then maintains a search tool directing prospective sex intervention customers to sex intervention providers. Sex intervention providers' desire to fund efforts to create guidelines that generate demand for sex interventions, and to appear in directories of sex intervention providers, causes them to purchase AAP memberships, thereby fueling AAP's enterprise.

265. AAP's "Find a Pediatrician" tool prompts users to input their city or ZIP code.[335] The tool then returns a list of providers based in that city or ZIP code. In this respect, the AAP website is not a passive webpage; it engages with users throughout Florida, and in St. Lucie County, to solicit information and, based on that information, direct prospective patients to a provider.

266. AAP's "Find a Pediatrician" tool lists 480 providers in the State of Florida.[336] The practice of at least one AAP member is based in St. Lucie County.[337]

267. AAP also advertises the opportunity to serve on its committees as a benefit of membership.

---

[334] *Fellow Members*, AAP, https://www.aap.org/en/membership-application/Fellows/.
[335] *Find a Pediatrician*, AAP, https://www.healthychildren.org/English/tips-tools/find-pediatrician/Pages/Pediatrician-Referral-Service.aspx
[336] *Id.*
[337] *Id.*

268. AAP has transmitted, and continues to transmit, the AAP Policy Statements to consumers, providers, and insurers across the State of Florida and specifically in St. Lucie County.

**D. Defendants' Guidelines Remain Highly Influential.**

269. Though discredited, the 2017 ES Guideline, the 2018 AAP Policy Statement, and the SOC-8 continue to have a persuasive and coercive effect in the Relevant Market, including due to their widespread adoption by insurance providers, hospital systems, clinics, and governments.

270. For example, in his expert report in *Boe v. Marshall*, Dr. Dan Karasic, an author of the WPATH guidelines, stated that the WPATH Standards of Care had been adopted "by many insurance companies, and health systems, as well as by Maximus, which administers independent medical reviews for insurance appeals in many states as well as federal appeals." Karasic Report ¶ 25, Doc. 592-40 at 27 in *Boe v. Marshall*, No. 2:22-cv-184 (M.D. Ala.).

271. In addition, numerous state insurance programs incorporate the WPATH standards.

272. Moreover, Defendants' Guidelines have been enforced as a constitutional standard and a federal statutory standard. *See, e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) (holding that denial of treatment under the WPATH standards was cruel or unusual punishment under the Eighth Amendment); *Cavallo v. Cerba Research USA, Inc. Health and Welfare Plan*, 2025 WL 1112695 (C.D. Cal. Mar. 14, 2025) (holding that denial of surgery that met WPATH criteria was denial of benefits under ERISA because surgery was "medically necessary"); *Dekker v.*

*Weida*, 679 F. Supp. 3d 1271, 1284 (N.D. Fla. 2023) (identifying the 2017 ES Guideline and SOC-8 as the "well-established standards of care for treatment of gender dysphoria").

273. Gender activists continue to rely on Defendants' Guidelines in their efforts to enjoin laws banning pediatric sex intervention, including Florida's.

274. Defendants' Guidelines have affected and continue to affect the price and output of pediatric sex interventions and counseling-based treatments.

275. Defendants' Guidelines were intended to and continue to exclude counseling-based care providers from the Relevant Market and affect the price and supply of goods in the Relevant Market.

## COUNT I
## FLORIDA ANTITRUST ACT
### (WPATH, Endocrine Society, and AAP)

276. The Attorney General realleges and incorporates, as though fully set forth, paragraphs 1 to 275 of this complaint.

277. Section 542.18, Florida Statutes, provides that "[e]very contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful."

278. This prohibition exists "to foster effective competition" and is to be "liberally construed to accomplish its beneficial purpose." § 542.16, Fla. Stat.

279. Corporations that violate Section 542.18 are subject to civil penalties. § 542.21(1), Fla. Stat. Violations may also be remedied by "injunctive or other equitable relief in the circuit courts of this state." § 542.23, Fla. Stat.

280. Defendants' Guidelines are the result of panel stacking, failure to

manage conflicts of interest, and other procedural biases designed to promote the sex interventions offered by Defendants' members and to ignore evidence supporting the Counseling-Based Model of Care offered by their members' competitors.

281. In creating the 2017 ES Guideline and continuing to affirm it, Endocrine Society contracted, combined, and conspired in restraint of trade or commerce in the Relevant Market.

282. In creating the 2018 AAP Policy Statement and continuing to affirm it, AAP contracted, combined, and conspired in restraint of trade or commerce in the Relevant Market.

283. In creating the SOC-8 and continuing to affirm them, WPATH contracted, combined, and conspired in restraint of trade or commerce in the Relevant Market.

284. The conduct of the three Defendant organizations is intertwined. Defendants were actively involved in the creation of one another's guidelines and consistently cross-referenced one another's guidelines over time to create the illusion of a body of evidence supporting pediatric sex interventions. In doing so, Defendants contracted, combined, and conspired in restraint of trade or commerce in the Relevant Market.

**COUNT II**

**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

**(WPATH, Endocrine Society, and AAP)**

285. The Attorney General realleges and incorporates, as though fully set forth, paragraphs 1 to 275 of this complaint.

286. Section 501.204(1), Florida Statutes, prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

287. "Trade or commerce" is "broadly defined in the statute" as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated" and includes "the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity." *Id.* at 716 n.7 (quoting § 501.203(8), Fla. Stat.).

288. FDUTPA is to be "construed liberally to promote the policy of "protect[ing] the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.; *see also Diamond Aircraft Indus., Inc. v. Horowitch*, 107 So. 3d 362, 367 (Fla. 2013) (observing that "[t]he Legislature has specifically articulated that the provisions of FDUTPA are to be construed liberally").

289. Accordingly, "courts have adopted broad definitions of the term "unfair trade practice." *BJ's Wholesale Club, Inc. v. Bugliaro*, 319 So. 3d 711, 716–17 (Fla. 3d DCA 2021). "An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

290. A "representation or omission" that is "likely to deceive a consumer

acting reasonably in the same circumstances" constitutes an unfair trade practice. *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000).

291. Because FDUTPA "is designed to protect not only the rights of litigants, but also the rights of the consuming public at large," *Beacon*, 842 So. 2d, 777, "a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *State, Off. of Atty. Gen., Dep't of Legal Affs. v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. 1st DCA 2004); *see also Davis*, 776 So. 2d at 974 ("[T]he question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances.").

292. "[A]n advertisement is considered deceptive if it has the capacity to convey misleading impressions to consumers even though nonmisleading interpretations may be possible." *Dep't of Legal Affs. v. Father & Son Moving & Storage, Inc.*, 643 So. 2d 22, 26 (Fla. 4th DCA 1994) (citing *Chrysler Corp. v. F.T.C.*, 561 F.2d 357 (D.C. Cir. 1977)).

293. "[A]ny person, firm, corporation, association, or entity, or any agent or employee of the foregoing, who is willfully using, or has willfully used, a method, act, or practice declared unlawful under s. 501.204 . . . is liable for a civil penalty of not more than $10,000 for each such violation." § 501.2075, Fla. Stat. Additional penalties apply if the practice is directed at a senior citizen, a person who has a disability, a servicemember, or a servicemember's spouse or dependent child. *Id.*; § 501.2077(2–3), Fla. Stat. A violation is "willful" if the defendant "knew or should have known that

88

[its] conduct was unfair or deceptive." § 501.2075, Fla. Stat.

294. Defendants have made deceptive and misleading representations and omissions about the safety, reversibility, and efficacy of sex interventions in Florida and St. Lucie County in particular through many mediums, including their websites, publications, and public statements, and through their members. Defendants continue to deceptively and misleadingly advertise that: (1) there is credible evidence that sex interventions mitigate gender dysphoria and suicidality, (2) puberty blockers are fully reversible, and (3) their guidelines are "evidence-based" and methodologically sound. WPATH has made many deceptive and misleading statements regarding the methodology of the SOC-8.

295. These representations are immoral, unethical, oppressive, and unscrupulous. They are also likely to mislead a consumer acting reasonably in the circumstances to believe that sex interventions drugs are safer, more reversible, or more effective than they truly are, to their detriment. Thus, Defendants' claims constitute a deceptive and unfair trade practice.

296. Defendants made these deceptive and misleading representations to facilitate the conduct of their "trade or commerce." The representations were intended to and did aid the Defendants in advertising, soliciting, providing, offering, and distributing memberships and the services that accompany membership, such as patient referrals, publishing opportunities and discounts, designations, voting and officeholding privileges, regulatory and legislative advocacy, and access to member-only content. The representations also were intended to and did aid the Defendants

89

in advertising, soliciting, providing, offering, and distributing goods (such as published journals) and services (such as training seminars). Furthermore, the representations were intended to and did aid Defendants' members in advertising, soliciting, providing, offering, and distributing goods (such as puberty blockers and cross-sex hormones) and services (such as "social transition" therapy and sex intervention surgeries).

297. Each transmission of the deceptive and misleading representations, including each transmission of a physical or digital copy of the Defendants' Guidelines, constitutes a distinct violation of FDUTPA. *See 3B TV, Inc. v. State, Off. of Att'y. Gen.*, 794 So. 2d 744, 751 (Fla. 1st DCA 2001) (citing *State v. Ell–Gee, Inc.*, 255 So.2d 542, 545–46 (Fla. 3d DCA 1971) ("The fact that the same words were used and the same . . . conduct was indulged in does not convert the separate activities into a continuous transaction or continuing activity.")).

298. Defendants made these representations and omissions willfully. Defendants have significant expertise in the development of clinical guidelines and knew from the beginning that their guidelines regarding pediatric gender dysphoria were unsupported by credible evidence and did not meet industry standards. In any event, critical analyses such as those issued by Florida's Department of Health and AHCA and systematic reviews published by national health agencies put Defendants on notice that their claims regarding the methodological rigor of their guidelines and the safety, reversibility, and efficacy of sex interventions were baseless. Thus, Defendants knew or should have known that their conduct was unfair and deceptive.

## COUNT III

## FLORIDA RICO ACT

## (WPATH, Endocrine Society, and AAP)

299.    The Attorney General realleges and incorporates, as though fully set forth, paragraphs 1 to 275 of this complaint.

300.    Section 895.03(3–4), Florida Statutes, makes it unlawful "for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity," or to "conspire or endeavor" to do so.[338]

301.    An "enterprise" is "any individual, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity . . . ; and it includes illicit as well as licit enterprises . . . ."

302.    "Pattern of racketeering activity" is defined as "engaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided . . . that the last of such incidents occurred within 5 years after a prior incident of racketeering conduct."

---

[338] It is also unlawful "for any person who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise," "for any person, through a pattern of racketeering activity . . . , to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property," or for any person to "conspire or endeavor" to do the foregoing. § 895.03(1–2, 4), Fla. Stat.

303.    As relevant here, "racketeering activity" means "to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit . . . [a]ny crime that is chargeable by petition, indictment, or information under . . . [c]hapter 817, relating to fraudulent practices, false pretenses, fraud generally, credit card crimes, and patient brokering." § 895.02(8)(a)36., Fla. Stat.

304.    Under chapter 817, it is "unlawful for any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement." § 817.41(1), Fla. Stat. "Misleading advertising" is defined as "any statements made, or disseminated, in oral, written, electronic, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services." § 817.40(5), Fla. Stat.

305.    Violations of Section 817.41 are punishable as first-degree misdemeanors, § 817.45(1), Fla. Stat., and therefore constitute "racketeering activity." § 895.02(8)(a)36., Fla. Stat.

306.    Natural persons who violate Section 895.03 are subject to a civil penalty of up to $100,000; artificial persons are subject to a civil penalty of up to $1 million. § 895.05(9)(a), Fla. Stat.

92

307. The circuit court is further authorized to enjoin violations of Section 895.03 by (a) ordering divestment; (b) imposing reasonable restrictions upon future activities or investments; (c) ordering dissolution or reorganization; (d) ordering suspension or revocation of state licenses and permits; and (e) ordering forfeiture of charters and certificates to conduct business. § 895.05(1), Fla. Stat.

308. "Any person prevailing in a civil action for violation of [Section 817.41] shall be awarded costs, including reasonable attorney's fees, and may be awarded punitive damages in addition to actual damages proven. This provision is in addition to any other remedies prescribed by law." § 817.41(6), Fla. Stat.

309. Defendants' claims regarding the methodical rigor of their clinical guidelines and the safety, reversibility, and efficacy of sex interventions are false and misleading. Defendants continue to falsely advertise that: (1) there is credible evidence that sex interventions mitigate gender dysphoria and suicidality, (2) puberty blockers are fully reversible, and (3) their guidelines are "evidence-based." WPATH has made many more false statements regarding the methodology of the SOC-8.

310. Defendants have caused, made, and disseminated these claims before the general public of Florida and portions thereof with the intent of legitimizing and promoting the sex interventions offered by their members. These statements were made in Florida, including in St. Lucie County, through, among other things, Defendants' websites, publications, and public statements, and through their members. Defendants knew, or through the exercise of reasonable care or

93

investigation would have ascertained, that these statements were untrue or misleading. These statements therefore constitute "misleading advertisements" under Section 817.40(5).

311. Because these advertisements are punishable as first-degree misdemeanors, § 817.45(1), Fla. Stat., they also constitute "racketeering activity" under Section 895.02(8)(a)36.

312. Defendants have disseminated multiple misleading advertisements with the same or similar intent (to promote sex interventions as the only evidence-based treatment for pediatric gender dysphoria), results (the purchase of pediatric sex interventions), accomplices (co-Defendants and their members), victims (minors experiencing gender dysphoria and those paying for their care, such as parents, employers, and insurers), and methods of commission (through publications and representations on their websites). The advertisements are interrelated and not isolated incidents. The misleading advertisements are frequent and ongoing; Defendants transmit physical and digital copies of their clinical guidelines each day. Thus, the most recent misleading advertisement occurred well within five years of a prior misleading advertisement.

313. Defendants have therefore conducted and participated, and conspired to conduct and participate, in an enterprise through a pattern of racketeering activity in violation of Section 895.03(3–4), Florida Statutes.

94

## PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

Plaintiff respectfully requests this Court:

A.    Declare that Defendants contracted, combined, and conspired in restraint of trade or commerce in the Relevant Market by employing biased standards-setting procedures designed to promote their members' "gender-affirming" model of care and to disparage the Counseling-Based Model of Care offered by their members' competitors.

B.    Pursuant to Section 542.21(1), impose a civil penalty of $1 million for each violation of the Florida Antitrust Act.

C.    Declare that Defendants' representations, which mislead reasonable consumers about the safety, reversibility, and efficacy of pediatric sex interventions, constitute an unfair trade practice under FDUTPA.

D.    Pursuant to Section 501.2075, impose the statutory penalty of $10,000 for each instance in which Defendants transmitted deceptive or misleading claims about the safety, reversibility, or efficacy of sex interventions or misrepresented the rigor of their guidelines' methodology.

E.    Declare that Defendants' repeated false advertisements regarding the reversibility and efficacy of pediatric sex interventions constitute a pattern of racketeering activity.

F.    Pursuant to Section 895.05(9)(a), impose a civil penalty of $1 million on each Defendant for each violation.

G.  Pursuant to Sections 542.23 and 895.05(1), enjoin Defendants from continuing to publish false, deceptive, or misleading advertisements regarding the safety, reversibility, or efficacy of pediatric sex interventions.

H.  Pursuant to Section 895.05(1), issue any additional injunctive relief it finds necessary, including:

- Ordering Defendants to divest their interests in the enterprise;

- Imposing reasonable restrictions upon Defendants' future activities;

- Ordering the dissolution or reorganization of Defendants' enterprise;

- Ordering the suspension or revocation of all licenses, permits, or prior approvals granted to Defendants by any agency of the State; and

- Ordering the forfeiture of Defendants' charters and the revocation of certificates authorizing Defendants to conduct business within Florida.

I.  Award attorney's fees and investigative costs.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all issues so triable.

Date: March 16, 2026

JAMES UTHMEIER
*Attorney General*

RYAN D. NEWMAN
*Chief Deputy Attorney General*

JASON HILBORN
*Deputy Attorney General*
*for Civil Enforcement*

Respectfully submitted,

*/s/ Samuel F. Elliott*

Tracy Moye (FLB 782361)
*Chief Assistant Attorney General*
Victoria Butler (FLB 861250)
*Director of Consumer Protection Litigation*
Samuel F. Elliott (FLB 1039898)
*Deputy Solicitor General*
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 410-2672
tracy.moye@myfloridalegal.com
victoria.butler@myfloridalegal.com
samuel.elliott@myfloridalegal.com

*Counsel for Plaintiff Office of the*
*Attorney General*