**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **AMERICAN ACADEMY OF PEDIATRICS,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 26 C 2401** |
| **JAMES UTHMEIER, ATTORNEY GENERAL OF THE STATE OF FLORIDA,** in his official capacity, | ) ) ) ) ) | |
| **Defendant.** | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

The American Academy of Pediatrics (AAP) has sued James Uthmeier, the Florida Attorney General, alleging that he initiated a state court lawsuit against AAP to suppress its speech, in violation of the First Amendment. AAP has moved for a preliminary injunction to halt the state lawsuit. Uthmeier has moved to dismiss based on lack of personal jurisdiction, improper venue, *Younger* abstention, and failure to state a claim. For the reasons below, the Court denies Uthmeier's motion to dismiss and grants AAP's motion for a preliminary injunction.

**Background**

AAP is a non-partisan, non-profit organization composed of approximately 67,000 pediatricians, making it the largest professional association of pediatricians in the United States. AAP is incorporated and headquartered in Illinois.

According to AAP's website, the organization is committed to "the optimal

physical, mental, and social health and well-being for all infants, children, adolescents, and young adults." *About the AAP*, Am. Acad. of Pediatrics (last accessed Apr. 7, 2026), https://www.aap.org/en/about-the-aap.  Since its inception in 1930, AAP has contributed to pediatric medicine in a variety of ways.  For example, AAP conducts research; provides educational resources; hosts events for medical professionals; and publishes *Pediatrics*, a peer-reviewed scientific journal.  AAP also participates in public discourse on pediatric medicine by filing amicus briefs, submitting comments in response to agency rulemaking, and issuing clinical guidance and policy statements.

## A.      The 2018 policy statement

In 2018, AAP published a policy statement titled:  "Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents."  Compl., Ex. 1 (AAP Policy Statement) at 1.  Because the policy statement plays a central role in the lawsuit filed by Uthmeier, the Court describes it in some detail.

According to its abstract, the policy statement "review[s] relevant concepts and challenges and provide[s] suggestions for pediatric providers that are focused on promoting the health and positive development of youth that identify as TGD [transgender and gender diverse] while eliminating discrimination and stigma."  *Id.*  The first page states that "Dr[.] Rafferty conceptualized the statement, drafted the initial manuscript, reviewed and revised the manuscript, approved the final manuscript as submitted, and agrees to be accountable for all aspects of the work."  *Id.*  The policy statement also contains a disclaimer:  "The guidance in this statement does not indicate an exclusive course of treatment or serve as a standard of medical care.  Variations, taking into account individual circumstances, may be appropriate."  *Id.*

2

The policy statement starts its substantive discussion by describing health risks for transgender people.  It states that those who identify as transgender have "high rates of depression, anxiety, eating disorders, self-harm, and suicide."  *Id.* at 3.  Citing studies from the American Psychological Association and the American Psychiatric Association, it explains that those risks are "believed to be multifactorial, stemming from an internal conflict between one's appearance and identity, limited availability of mental health services, low access to health care providers with expertise in caring for youth who identify as TGD, discrimination, stigma, and social rejection."  *Id.*

The policy statement compares two general methods of addressing those health risks.  It states that "'conversion' or 'reparative' treatment models are used to prevent children and adolescents from identifying as transgender or to dissuade them from exhibiting gender-diverse expressions."  *Id.* at 4.  Citing external sources and AAP's previous publications, the policy statement disapproves of such treatment models:

> The Substance Abuse and Mental Health Services Administration has concluded that any therapeutic intervention with the goal of changing a youth's gender expression or identity is inappropriate.  Reparative approaches have been proven to be not only unsuccessful but also deleterious and are considered outside the mainstream of traditional medical practice.  The AAP described reparative approaches as "unfair and deceptive."  At the time of this writing, conversion therapy was banned by executive regulation in New York and by legislative statutes in 9 other states as well as the District of Columbia.

*Id.*  In contrast, the policy statement describes a "gender-affirmative care model" as one in which "pediatric providers offer developmentally appropriate care that is oriented toward understanding and appreciating the youth's gender experience."  *Id.*  According to the policy statement, "[t]here is a limited but growing body of

evidence that suggests that using an integrated affirmative model results in young people having fewer mental health concerns whether they ultimately identify as transgender." *Id.*

The policy statement then provides information on specific forms of gender-affirming care, starting with pubertal suppression:

> Gonadotrophin-releasing hormones have been used to delay puberty since the 1980s for central precocious puberty. These reversible treatments can also be used in adolescents who experience gender dysphoria to prevent development of secondary sex characteristics and provide time up until 16 years of age for the individual and the family to explore gender identity . . . and further define appropriate treatment goals.

*Id.* at 5. According to the policy statement, "[i]f pubertal suppression treatment is suspended, then endogenous puberty will resume." *Id.* The policy statement cautions, however, that pubertal suppression may come with risks. It asserts that "[d]elaying puberty beyond one's peers can . . . lead to lower self-esteem and increased risk taking." *Id.* It further notes that "[s]ome experts believe that genital underdevelopment may limit some potential reconstructive options." *Id.* It also identifies that some research suggests that pubertal suppression may have long-term effects on bone metabolism and fertility, but it observes that the research "is currently limited and provides varied results." *Id.*

In addition to pubertal suppression, the policy statement provides information on "various [other] interventions [that] may be considered to better align . . . gender expression with . . . underlying identity." *Id.* According to the policy statement, "[m]ost protocols for gender-affirming interventions incorporate World Professional Association of Transgender Health and Endocrine Society recommendations and include ≥1 of the following elements (Table 2)": "1. Social Affirmation"; "2. Legal

4

Affirmation"; "3. Medical Affirmation"; and "4. Surgical Affirmation." *Id.* at 6–7. Its discussions of social, medical, and surgical affirmation are relevant here.

The policy statement describes social affirmation as "a reversible intervention in which children and adolescents express partially or completely in their asserted gender identity by adapting hairstyle, clothing, pronouns, name, etc." *Id.* at 6. It defines medical affirmation as "the process of using cross-sex hormones to allow adolescents who have initiated puberty to develop secondary sex characteristics of the opposite biological sex." *Id.* According to the policy statement, "[s]ome changes are partially reversible if hormones are stopped, but others become irreversible once they are fully developed (Table 2)." *Id.* at 6–7. As for surgical affirmation, the policy statement states that "[s]urgical approaches may be used to feminize or masculinize features, such as hair distribution, chest, or genitalia, and may include removal of internal organs, such as ovaries or the uterus (affecting fertility)." *Id.* at 7. It cautions that "[t]hese changes are irreversible" and that "current protocols typically reserve surgical interventions for adults." *Id.* But, it notes, surgical interventions "are occasionally pursued during adolescence on a case-by-case basis." *Id.* In those instances, the decision considers "the necessity and benefit to the adolescent's overall health and often includ[es] multidisciplinary input from medical, mental health, and surgical providers as well as from the adolescent and family." *Id.*

Table 2 in the policy statement summarizes this discussion and is titled: "The Process of Gender Affirmation May Include ≥1 of the Following Components." *Id.* at 6, Table 2. It lists five categories of gender-affirming care—social affirmation, puberty blockers, cross-sex hormone therapy, gender-affirming surgeries, and legal

affirmation—and "[g]eneral [a]ge [r]ange" and "[r]eversibility" information. *Id.* A footnote explains that "the provided age range and reversibility is based on the little data that are currently available." *Id.*

The table provides the following general age ranges:

- Social and legal affirmation:  "Any"

- Puberty blockers:  "During puberty (Tanner stage 2–5)"

- Cross-sex hormone therapy:  "Early adolescence onward"

- Gender-affirming surgeries:  "Typically adults (adolescents on case-by-case basis)."

*Id.* A footnote appended to the age range for gender-affirming surgeries provides more detail:  "Eligibility criteria for gender-affirmative surgical interventions among adolescents are not clearly defined between established protocols and practice. When applicable, eligibility criteria is usually determined on a case-by-case basis with the adolescent and the family along with input from medical, mental health, and surgical providers." *Id.*

The table provides the following information about reversibility:

- Social affirmation, puberty blockers, and legal affirmation:  "Reversible"

- Hormone therapy:  "Partially reversible (skin texture, muscle mass, and fat deposition); irreversible once developed (testosterone:  Adam's apple protrusion, voice changes, and male pattern baldness; estrogen:  breast development); unknown reversibility (effect on fertility)

- Gender-affirming surgeries:  "Not reversible."

*Id.* A footnote appended to the reversibility of puberty blockers warns that "[t]he effect

6

of sustained puberty suppression on fertility is unknown." *Id.*

The policy statement next discusses barriers to care for transgender people. One issue it identifies is insurance companies' reluctance to cover services related to gender identity:

> Although the Office for Civil Rights of the US Department of Health and Human Services explicitly stated in 2012 that the nondiscrimination provision in the Patient Protection and Affordable Care Act includes people who identify as gender diverse, insurance claims for gender affirmation, particularly among youth who identify as TGD, are frequently denied.

*Id.* at 7. According to the policy statement, the lack of insurance coverage for gender-affirming care "can reinforce a socioeconomic divide." *Id.* It also cites a study "report[ing] that most young patients [in the study] who identified as transgender and were deemed appropriate candidates for recommended gender care were unable to obtain it because of . . . denials . . . based on the premise that gender dysphoria was a mental disorder." *Id.* The policy statement warns that these kinds of denials not only "contribute[] to stigma, prolonged gender dysphoria, and poor mental health outcomes, but . . . may also lead patients to seek nonmedically supervised treatments that are potentially dangerous." *Id.* It goes on to discuss several other issues, including the intersection of racism, transphobia, and sexism; the effects of familial acceptance or rejection of a youth's gender identity; increased visibility of youth who identify as transgender; the importance of safe communities for those youth; and proposed adjustments to medical school curriculums.

The policy statement concludes with nine "recommendations" from AAP. *Id.* at 10. Four are particularly relevant to this case:

> 1. that youth who identify as TGD have access to comprehensive, gender-affirming, and developmentally appropriate health care that is provided in a

7

safe and inclusive clinical space;

. . .

4. that insurance plans offer coverage for health care that is specific to the needs of youth who identify as TGD, including coverage for medical, psychological, and, when indicated, surgical gender-affirming interventions;

. . .

7. that pediatricians have a role in advocating for policies and laws that protect youth who identify as TGD from discrimination and violence; [and]

9. that the medical field and federal government prioritize research that is dedicated to improving the quality of evidence-based care for youth who identify as TGD.

*Id.*

In August 2023, AAP reaffirmed the policy statement.  Since its original publication, the policy statement has been freely accessible online at no cost.

**B.      The state lawsuit**

On December 9, 2025, Uthmeier filed a lawsuit in Florida state court against AAP and two other organizations that had published support for gender-affirming care: the World Professional Association for Transgender Health (WPATH) and the Endocrine Society.

The original state complaint contained two counts.  The first alleged that the defendants (including AAP) violated the Florida Deceptive and Unfair Trade Practices Act's prohibition on "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Compl., Ex. 2 (State Compl.) ¶ 199 (quoting Fla. Stat. § 501.204(1)). Specifically, it alleged that they made "immoral, unethical, oppressive, and unscrupulous" representations likely to mislead consumers about the safety, reversibility, and effectiveness of "sex intervention[] drugs."  *Id.* ¶ 208.  According to the state complaint, they did so to "advertis[e], solicit[], provid[e], offer[], and distribut[e] memberships," "goods (such as published journals)," and "services (such

8

as training seminars [and member-only services])."  *Id.* ¶ 209.

The second count alleged that the defendants violated Florida's RICO (Racketeer Influenced and Corrupt Organizations) Act, which makes it unlawful "for any person employed by, or associated with, any enterprise to conduct or participate . . . in such enterprise through a pattern of racketeering activity."  *Id.* ¶ 213 (quoting Fla. Stat. § 895.03(3)).  The complaint alleged that the three defendants engaged in "racketeering activity" by "commit[ting]" a "crime that is chargeable . . . under [c]hapter 817"—specifically, "mak[ing] or disseminat[ing]" a "misleading advertisement."  *Id.* ¶¶ 216–17 (quoting Fla. Stat. § 895.02(8)(a), then *id.* § 817.41(1)).  As relevant here, a "misleading advertisement" is defined as any public statement which is "known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading," and which is "made or disseminated with the intent or purpose . . . of selling . . . property [or] services."  *Id.* ¶ 217 (quoting Fla. Stat. § 817.40(5)).

The state court complaint alleged that this enterprise began with WPATH's Standards of Care (SOC) 5 publication in 1998.  According to the complaint, WPATH stated that "puberty-blockers . . . 'gain time to further explore the gender and other developmental issues in psychotherapy'" and did not "specif[y]" an "age minimum" for puberty blockers.  *Id.* ¶¶ 32–33 (quoting Stephen B. Levine, et al., *Harry Benjamin International Gender Dysphoria Association's The Standards of Care for Gender Identity Disorders*, 2 Int'l J. Transgenderism 2 (5th ed. 1998)).  Uthmeier's complaint alleged that "WPATH had no credible evidence for these recommendations."  *Id.* ¶ 34.

Uthmeier's complaint went on to allege that subsequent publications continued

9

to "slowly shift the range of medically- and politically-acceptable pediatric sex interventions." *Id.* ¶ 35. For example, it alleged that the SOC-6 "raised the possibility of gender dysphoric adolescents 'attend[ing] school using a name and clothing opposite to his or her sex of assignment.'" *Id.* (quoting Walter Meyer III, et al., *Harry Benjamin International Gender Dysphoria Association's The Standards of Care for Gender Identity Disorders*, 5 Int'l J. Transgenderism (6th ed. 2001)). According to the complaint, the SOC-6 also suggested that "'[a]dolescents may be eligible for puberty suppressing hormones as soon as pubertal changes have begun,' which may be as early as '9 years of age,'" to "'avert negative social and emotional consequences of gender dysphoria.'" *Id.* ¶ 36 (quoting Meyer, *supra*). The complaint alleged that WPATH "cited no credible evidence for these recommendations and there was none." *Id.* ¶ 38.

According to Uthmeier's state court complaint, the Endocrine Society joined this enterprise in 2009 by publishing a guideline (ES Guideline) that "adopted nearly all the SOC-6's recommendations and cited the SOC-6 as the evidence for its recommendations." *Id.* ¶ 40. The complaint alleged that this guideline claimed that puberty blockers were "fully reversible." *Id.*

Skipping forward to AAP's involvement, Uthmeier's complaint alleged that AAP joined the enterprise by publishing its 2018 policy statement. By then, WPATH had published the SOC-7, and the Endocrine Society had published the 2019 ES Guidelines. According to Uthmeier's complaint, AAP's policy statement adopted those guidelines' recommendations and cited them as evidence. Moreover, the complaint alleged, AAP went further by "recommend[ing] surgeries on 'genitalia,' including

'removal of internal organs, such as ovaries or the uterus'" and "urg[ing] insurers to 'offer coverage for health care that is specific to the needs of youth who identify as [transgender], including coverage for . . . surgical gender-affirming interventions.'" *Id.* ¶ 50 (quoting AAP Policy Statement at 7, 10).

Uthmeier's complaint also devoted significant space to the three defendants' challenges to a rule proposed by the Florida Agency for Health Care Administration (AHCA) that would exclude puberty blockers, cross-sex hormones, and surgical interventions from Medicaid coverage. The complaint alleged that the defendants issued statements criticizing the proposed rule as "cho[osing] politics over science" and "contrary to 'evidence-based care.'" *Id.* ¶¶ 61–62. Regarding AAP in particular, the complaint quoted a statement from the president of AAP's Florida chapter in opposition to the rule:

> The president of AAP's Florida chapter called it "disheartening that Florida's health agency continues to issue child-health guidance that conflicts with broad scientific consensus and without the consultation of pediatric physicians." "Appropriate gender-affirming care," she said, "is safe and effective for treating patients experiencing gender dysphoria." Moreover, "[r]esearch shows that access to evidence-based gender affirming care among adolescents significantly improves their mental health."

*Id.* ¶ 66 (quoting *FCAAP Rejects New Florida Department of Health Guidelines on Gender-affirming Care for Youth*, Fla. Chapter of the Am. Academy of Pediatrics (Apr. 21, 2022), https://www.fcaap.org/posts/news/press-releases/florida-chapter-of-the-american-academy-of-pediatrics-rejects-new-florida-department-of-health-guidelines-on-gender-affirming-care-for-youth/). It also alleged that AAP "posted an online 'rapid-response rebuttal report' 'to challenge . . . disinformation about [gender affirming care]' and submitted public comments opposing the AHCA rule." *Id.* ¶ 67.

11

According to Uthmeier's complaint, the three defendants and their guidelines were "instrumental in litigation brought by gender dysphoric minors and their parents that challenged the AHCA rule in federal court."  *Id.* ¶ 68.  It alleged that they submitted amicus briefs challenging the scientific basis for the AHCA rule, successfully obtained orders quashing subpoenas seeking documents and corporate depositions, and obtained an injunction against the rule in federal district court.  Uthmeier's amended state court complaint adds that this was an oft-repeated "formula" of "co-signing amicus briefs that cite each other's guidelines."  Def.'s Mot. to Dismiss, Ex. 1 (Am. State Compl.) ¶ 84.

According to the original state court complaint, WPATH's publication of the SOC-8 in 2022 "completed [the state defendants'] preordained evolution from puberty blockers and cross-sex hormones starting no earlier than 16 (SOC-5) all the way to genital surgery without age limit (SOC-8)."  State Compl. ¶ 93.  The complaint took aim specifically at AAP's claimed role in the editorial process leading up to SOC-8's publication.  It alleged that the draft SOC-8 provided "[r]elaxed . . . age minimums:  14 for cross-sex hormones" and for some surgical interventions.  *Id.* ¶ 152.  According to the complaint, that raised concerns:

> Levine [a Biden administration official] "was very concerned" that "having ages (mainly for surgery) will affect access to health care for trans youth." The WPATH members reported back to their colleagues:  "[Levine] and the Biden administration worried that having ages in the document will make matters worse.  She asked us to remove them."

*Id.* ¶ 153.  The state court complaint alleged that WPATH responded by "downgrading the age recommendation to a suggestion," but that this "did not pacify Levine."  *Id.* ¶ 155.  According to Uthmeier's complaint, the breaking point was when "AAP joined

12

Levine in threatening to oppose SOC-8 if WPATH did not remove the age minimums."
*See id.* ¶ 156.  At that point, the complaint alleged, "WPATH caved and 'agreed to remove the ages.'  Thus, despite the Delphi 'consensus' [a scientific review process], the SOC-8 do not contain age minimums for any transitioning hormonal or surgical intervention outside of phalloplasty.  The SOC-8 deem all other surgeries 'medically necessary gender-affirming medical treatment[s] in adolescents.'"  *Id.* ¶¶ 157–58.

According to the state court complaint, none of the defendants' actions were scientifically supported.  It alleged that recent "disinterested systematic reviews—the gold standard in evidence-based medicine—have determined that there is no credible evidence that puberty blockers are 'fully reversible' or that sex interventions lead to positive mental health outcomes for children or adolescents."  *Id.*, Part II, § A; Am. State Compl. ¶ 113.  Thus, according to Uthmeier's complaint, the three defendants "continue to falsely advertise that:  (1) there is credible evidence demonstrating that sex interventions mitigate gender dysphoria and suicidality, (2) puberty blockers are fully reversible, and (3) their guidelines are 'evidence-based.'"  State Compl. ¶ 222.

In his complaint, Uthmeier sought several forms of relief.  First, he sought declaratory judgments that the three defendants' representations constituted an unfair trade practice and a pattern of racketeering activity, as well as an injunction against such representations.  Second, he sought statutory penalties of $1 million against each defendant and an additional $10,000 for each instance of the allegedly false representations.  Third, Uthmeier asked the state court to grant "any additional relief it finds necessary," including, as relevant here:  "[i]mposing reasonable restrictions upon Defendants' future activities" and "[o]rdering the dissolution or reorganization of

13

Defendants' enterprise." *Id.*, Prayer for Relief ¶ G.

The day that he filed the state complaint, Uthmeier announced the enforcement action on social media: "In 2023, @GovRonDeSantis signed legislation to ban so-called 'gender-affirming care' for kids. Now it's time for accountability! Today, my office sued @wpath, @AmerAcadPeds, and @TheEndoSociety for mutilating kids and misleading families." Pl.'s Mot. for Prelim. Inj., Charles Aff., Ex. 14.

## C.    Federal litigation

On March 4, 2026, AAP filed this federal lawsuit, alleging that Uthmeier initiated the state court lawsuit to retaliate against AAP's advocacy for gender-affirming care and to suppress disfavored viewpoints, in violation of the First Amendment. AAP alleged in its complaint that Uthmeier had not effectuated service or communicated with AAP in the almost three months since he filed the state court lawsuit. AAP moved in this case for a preliminary injunction, and this Court set a briefing schedule on the motion.

Uthmeier responded with a motion to dismiss the present case based on lack of personal jurisdiction, improper venue, *Younger* abstention, and failure to state a claim. The same day, he filed an amended complaint in state court, which added a state antitrust claim. In that claim, Uthmeier alleges that the three defendants restrained trade or commerce in the relevant market—"the treatment of children and adolescents experiencing gender dysphoria in the United States"—by agreeing to "employ[] biased standards-setting procedures designed to promote their members' 'gender-affirming' model of care and to disparage the Counseling-Based Model of Care offered by their members' competitors." Am. State Compl. ¶ 28, Prayer for Relief ¶ A. The amended

14

state court complaint seeks a $1 million penalty for each alleged antitrust violation, on top of the previously requested statutory penalties.

That prompted AAP to move in the present case for entry of a temporary restraining order, a motion the Court entered and continued to April 7, 2026, the date scheduled for oral argument on the preliminary injunction motion.

## Discussion

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Before considering the merits, a court must consider "threshold grounds for denying audience to a case on the merits." *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007). A court may not issue a preliminary injunction if it lacks jurisdiction or should refrain from exercising its jurisdiction. *See United States v. Students Challenging Regul. Agency Procs.* (*SCRAP*), 412 U.S. 669, 690 (1973); *cf. Munaf v. Geren*, 553 U.S. 674, 690 (2008) (stating that jurisdictional problems make success on the merits "more *unlikely* due to potential impediments to even reaching the merits").

Here, Uthmeier raises three threshold grounds for dismissal before addressing the merits: (1) lack of personal jurisdiction, (2) improper venue, and (3) *Younger* abstention. The Court addresses each in turn.

## A.     Personal jurisdiction

Federal courts ordinarily follow state law in determining the bounds of personal

jurisdiction. *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 11 (2025) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)). There is no dispute that the Court's personal jurisdiction in this case depends on Illinois' long-arm statute, which authorizes the exercise of personal jurisdiction to the extent permissible under the federal Constitution. *See Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hou. Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010).

Under the Due Process Clause of the Fourteenth Amendment, a court has personal jurisdiction over a defendant only if he has "'contacts' with the forum State" such that "'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)). That analysis breaks down into two kinds of personal jurisdiction: general jurisdiction and specific jurisdiction. *Id.* A court "may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Id.* (quoting *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011)). AAP does not contend that the Court has general jurisdiction over Uthmeier, so the focus turns to specific jurisdiction.

A court has specific jurisdiction over claims that arise out of or relate to the defendant's contacts with the forum state. *See id.* at 359, 362. "The inquiry . . . focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (cleaned up). A court may exercise personal jurisdiction only if the defendant has "minimum contacts" with the forum

16

state. *Fuld*, 606 U.S. at 12 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)). Importantly, the defendant's "suit-related conduct must create a substantial connection with the forum State," not just "with persons who reside there." *Walden*, 571 U.S. at 284–85. That said, "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff." *Id.* at 286. At bottom, the defendant's "conduct and connection with the forum State" must be sufficient for him to "reasonably anticipate being haled into court there." *See World-Wide Volkswagen*, 444 U.S. at 297; *see Walden*, 571 U.S. at 286.

In this case, AAP points to three actions by Uthmeier that it contends give rise to personal jurisdiction. First, AAP argues that Uthmeier has "expressly targeted AAP in Illinois" via the state lawsuit and a "coordinated public campaign" "targeting AAP by name," knowing "where the brunt of the injury would fall." Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 5–6. Second, AAP points out that Uthmeier entered Illinois to serve AAP with summons in the state court case. Third, AAP contends that the relief sought in the state enforcement action reaches across state lines, with desired nationwide effect. The Court agrees that these contacts suffice for personal jurisdiction over Uthmeier, but it is worth analyzing them one at a time.

### 1. Targeting

AAP relies heavily on the fact that Uthmeier targeted AAP, knowing that it is headquartered in Illinois and that the harm would be felt there. It analogizes the situation to *Calder v. Jones*, 465 U.S. 783 (1984), where the Supreme Court held that California courts had personal jurisdiction over a defamation claim brought by an actress who lived and worked in California against Florida defendants for an article

17

written and edited in Florida and published nationwide. *See id.* at 785.

It is not clear that this analogy alone suffices for personal jurisdiction. In *Walden*, the Supreme Court rejected the suggestion that a defendant creates sufficient contacts with a forum whenever he intentionally targets a resident of the forum knowing that the harm will be felt there. *See Walden*, 571 U.S. at 289 & n.8. That approach, the Court warned, "impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.* at 289. In doing so, the Court stated that *Calder* did not turn on the Florida defendants' knowledge that their libelous story concerned a California resident. Rather, it turned on the defendants' contacts with California itself: they relied on California sources; the article concerned the plaintiff's activities in California; and, most importantly, the article was widely circulated in California. *Id.* at 287.

According to *Walden*, that last point was the "crux of *Calder*" because the reputational harm required for libel depended on California citizens reading the article. *Id.* at 287–88. In that sense, "defendants' intentional tort actually occurred in California." *Id.* at 288. Thus, the Court observed, the "'effects' caused by the defendants' article—*i.e.*, the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to *California*, not just to a plaintiff who lived there." *Id.* "That connection, combined with the various facts that gave the article a California focus, sufficed to authorize the California court's exercise of jurisdiction." *Id.*

Turning to the present case, Uthmeier undoubtedly has expressly targeted AAP in the state court lawsuit and his public commentary. But he has not relied on Illinois

18

sources, nor has he mentioned Illinois. And although he targets AAP's publications that might originate from Illinois, that is not the kind of meaningful reference to California activities that was present in *Calder*. Illinois is not the "focal point" of his commentary. *See id.* at 287 (quoting *Calder*, 465 U.S. at 789).

That leaves the "crux" of *Calder*—whether Uthmeier's conduct connects him to Illinois by virtue of its intended effect on Illinois residents. Here is where the Court sees some meaningful contacts. As AAP points out, Uthmeier has engaged in sustained public commentary identifying AAP by name. That information, of course, is broadcast nationwide and not uniquely to Illinois. But that is beside the point—in *Calder*, what mattered was the fact that the article was circulated widely to California readers, regardless of whether it was published nationwide.

Additionally, *Walden* instructs that the nature of the harm alleged is relevant in assessing the strength of the defendant's connection to the forum state. *Id.* at 287–88. Here, the effect on the Illinois audience is a key part of the First Amendment harm that AAP alleges. Besides the general harm to its reputation among Illinois residents, AAP has submitted an uncontroverted affidavit attesting that it has faced security issues at its events and that its members have been harassed. Though it does not specify the location of these incidents, it is implausible that these issues are happening everywhere but the state in which AAP is headquartered.

That said, it is possible that these contacts alone might not suffice for personal jurisdiction. *Walden* stated that the effect on California readers "*combined with the various facts that gave the article a California focus*" sufficed for personal jurisdiction in *Calder*. *Id.* at 288 (emphasis added). It is questionable whether there is an

analogous focus on Illinois here.  The Court also recognizes possible concerns about finding personal jurisdiction over a state attorney general based solely on his pronouncements regarding a lawsuit filed in his home state.  And although the Seventh Circuit has declined to adopt a different test for "virtual contacts"—contacts by virtue of online activity—it seems to be the case that even under general personal jurisdiction principles, online comments may not meaningfully target a forum state or connect a defendant to that state to the same degree that in-state publications do. *See Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802–03 (7th Cir. 2014).

### 2.     In-state service

Turning to Uthmeier's other contacts, AAP also points out that Uthmeier entered Illinois in connection with service of summons upon AAP.  Uthmeier responds that this contact with Illinois is incidental to out-of-state litigation and does not suffice for personal jurisdiction under Seventh Circuit precedent.  *See Wallace v. Herron*, 778 F.2d 391 (7th Cir. 1985); *John Crane, Inc. v. Shein L. Ctr., Ltd.*, 891 F.3d 692 (7th Cir. 2018).

In *Wallace*, an Indiana plaintiff sued California attorneys in Indiana for malicious prosecution based on a lawsuit that the defendants filed in California on behalf of their clients.  *Wallace*, 778 F.2d at 392.  The Seventh Circuit held that the Indiana district court lacked personal jurisdiction, rejecting the plaintiff's argument that the defendants had minimum contacts with Indiana because they "served interrogatories, requested the production of documents, and caused the plaintiff to respond to five complaints in Indiana where the plaintiff resides."  *Id.* at 392, 394.  It distinguished *Calder* and

20

emphasized that "the defendants filed these motions on behalf of their clients in a California court pursuant to a California lawsuit, and it would be unreasonable to require the defendants to appear in Indiana to defend this suit on the basis of such attenuated contacts." *Id.* at 394.

Those contacts aside, the Seventh Circuit observed that only one of the attorneys "had any actual contact with Indiana, having come to Indiana on one occasion to take depositions." *Id.* But the plaintiff's claim did not arise out of that contact, so it did not suffice for specific jurisdiction. *Id.*

*John Crane* presented a similar situation. In that case, several lawyers filed suits on behalf of their clients in Pennsylvania, California, and Texas against John Crane, an Illinois manufacturing company. *John Crane*, 891 F.3d at 694. None of the lawyers were Illinois residents, but John Crane sued them in Illinois, alleging that the lawsuits they filed were part of a conspiracy to defraud the company. *Id.* at 694–95. John Crane argued that the defendants established contacts by "send[ing] fraudulent litigation materials" to the company in Illinois. *Id.* at 695. The defendants responded that "their activities were directed at the states in which the litigation was carried out—Texas, California, and Pennsylvania. They had contact with Illinois in that [John Crane] is an Illinois resident, but had no other contact with the state." *Id.*

The Seventh Circuit, applying *Wallace*, agreed with the defendants. *Id.* at 695–96. Quoting the district judge's decision below, it reasoned that "directing pleadings, discovery, and other litigation communications to an Illinois citizen facing suit in some other state—even in furtherance of a tortious scheme—is simply not the same as targeting that citizen *in Illinois*." *Id.* at 696 (internal quotations omitted). It also

21

rejected John Crane's attempt to distinguish *Wallace* on the ground that the litigation was alleged to be part of a broader scheme. *Id.* The Seventh Circuit succinctly summarized the problem:

> Out-of-state litigation against an Illinois resident is not sufficient to establish personal jurisdiction in Illinois over a lawyer involved in the out-of-state litigation. . . . All contacts the defendants had with [John Crane] in Illinois were incidental to the litigation proceeding else-where. It would be unfair to require the defendants to appear in Illinois because of these limited contacts.

*Id.*

In the Court's view, these cases establish that contacts incidental to out-of-state litigation are not sufficient on their own to establish personal jurisdiction. But the Court does not read them to say that these contacts are entirely irrelevant. Both cases are careful to say that out-of-state litigation is not *sufficient* for personal jurisdiction. And in *Wallace*, the Seventh Circuit expressly considered physical entry into the state for a deposition as a contact. *Wallace*, 778 F.2d at 394. *Compare id.*, *with John Crane Inc. v. Shein L. Ctr., Ltd.*, No. 16 C 5913, 2017 WL 1105490, at *6 (N.D. Ill. Mar. 23, 2017) (noting that the complaint and discovery responses were not even served in Illinois).

The Court also notes that in both *Wallace* and *John Crane*, the plaintiff's theory of harm did not meaningfully impact Illinois. In *Wallace*, the alleged harm was simply economic harm to the plaintiff. *See* Petition at *6, *Wallace v. Herron*, 778 F.2d 391 (7th Cir. 1985) (No. 85-1086). The fact that the plaintiff felt the harm in Indiana, where he resided, was not enough, as *Walden* later made clear. *John Crane* involved fraud, but the district court observed that any fraud would have occurred in Pennsylvania, not Illinois. *John Crane*, 2017 WL 1105490, at *5. And the plaintiff's argument that one of the defendants "could foresee that its (allegedly) fraudulent communications would

22

injure [the plaintiff] in Illinois" was not dispositive under *Walden*. *Id.* at *8. By contrast, other courts of appeals have upheld the assertion of personal jurisdiction over attorneys general who seek to alter conduct beyond their home states via enforcement actions that allegedly seek to suppress First Amendment-protected conduct. *See, e.g.*, *Def. Distributed v. Grewal*, 971 F.3d 485, 492–93 (5th Cir. 2020); *Media Matters for Am. v. Paxton*, 138 F.4th 563, 587 (D.C. Cir. 2025).

### 3. Out-of-state relief

That brings the Court to AAP's last argument—that Uthmeier seeks to reach across state lines to halt AAP's conduct in Illinois and nationwide. In the Court's view, this cinches the case for personal jurisdiction. Uthmeier's state court complaint makes it clear that he seeks injunctive relief precluding AAP from publishing its views on gender-affirming care and from collaborating with WPATH and the Endocrine Society. These requests, unlike other requests for relief, are not limited to AAP's activities in Florida. *Compare, e.g.*, Am. State Compl., Prayer for Relief ¶ G (seeking to "enjoin Defendants from continuing to publish false, deceptive, or misleading advertisements"), *with id.* ¶ H (seeking the "suspension or revocation of all licenses, permits, or prior approvals granted to Defendants by any agency of the State"). In case there were any ambiguity in the original state complaint, the amended state complaint adds an antitrust claim based on the same challenged conduct and defines the relevant geographic market as the entire United States.

This case resembles *Defense Distributed*, where the Fifth Circuit concluded that Texas courts had personal jurisdiction over New Jersey's attorney general, Gurbir Grewal. *See Def. Distributed*, 971 F.3d at 488. In that case, Defense Distributed filed

23

suit in Texas against Grewal, alleging that Grewal took several selective enforcement actions against Defense Distributed to prevent it from publishing information on how to 3D print firearms. *Id.* at 488–89. The only contact with Texas, however, was a cease-and-desist letter "ostensibly" sent to enforce New Jersey law. *Id.* at 491.

Nonetheless, the Fifth Circuit determined that the exercise of personal jurisdiction was appropriate, primarily because "Grewal's assertion of legal authority" reached beyond New Jersey. *Id.* at 492. It noted that Grewal did "not cabin his request by commanding the plaintiffs to stop publishing materials to New Jersey residents" or requiring Defense Distributed to acquire a license before doing business in the state. *Id.* at 493. Rather, he sought "to bar Defense Distributed from publishing its materials anywhere." *Id.* In the Fifth Circuit's view, he had "projected himself across state lines and asserted a pseudo-national executive authority." *Id.* Viewed in that light, his deliberate mailing of the cease-and-desist letter, and the chilling effect that it allegedly caused, sufficed to establish minimum contacts with Texas. *Id.* at 495–96.

So too here. The enforcement action that AAP challenges seeks to affect AAP's conduct nationwide, including in Illinois. That may have downstream effects on other Illinois residents. Additionally, the alleged chilling effect from the initiation of the enforcement action, in combination with Uthmeier's public commentary, affects Illinois residents (and a nationwide audience), not just AAP. *See Media Matters*, 138 F.4th at 578. Given this context, Uthmeier could reasonably anticipate being haled into court in Illinois for his conduct.

By the same token, the exercise of personal jurisdiction does not offend

24

traditional notions of fair play and substantial justice.  That inquiry considers factors such as the burden on the defendant, the forum state's interest in the dispute, the plaintiff's interest in convenient and effective relief, and federalism interests in efficient resolution of controversies and the states' shared interests in furthering substantive social policies.  *Felland v. Clifton*, 682 F.3d 665, 677 (7th Cir. 2012).  Here, litigating in Illinois may be burdensome to Uthmeier, but it is a more convenient forum for AAP. Moreover, Illinois has a strong interest in protecting its residents from an allegedly retaliatory action—especially one seeking severe penalties and sweeping injunctive relief—and the protection of First Amendment liberties is a shared interest of both Illinois and Florida.  Given the existence of pre-existing state court litigation in Florida, litigating the federal claims in Florida too may be more efficient, but that begs the question of whether the state court litigation should continue.

On balance, the Court concludes that it has personal jurisdiction over Uthmeier in this case.

## B.     Venue

Venue in this case depends on the general venue state, 28 U.S.C. § 1391.  As relevant here, subsection (b)(2) states that "[a] civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  *Id.* § 1391(b)(2).  Uthmeier argues that the state court lawsuit is the event giving rise to AAP's claims, and that action "was taken in Florida, by a Florida resident."  Def.'s Mot. to Dismiss at 22.  In his view, the fact that the state lawsuit has allegedly caused AAP injury in Illinois is irrelevant.  Thus, he contends, venue is improper.

25

The Court disagrees.  For the proposition that the location of injury is irrelevant, Uthmeier cites district court cases reasoning that a forum is not a proper venue solely because economic harm is felt there.  Fair enough—where a plaintiff happens to be when it suffers economic loss is an uncomfortable fit for the statute's focus on "events."  And permitting venue on that basis would mean that a plaintiff effectively could always sue in its home district, an option that Congress removed from the general venue statute in 1990.  14D Wright & Miller's Federal Practice and Procedure § 3806 (4th ed. Apr. 2026).

But that does not mean that the location where *any* kind of harm is felt is irrelevant.  To the contrary, in tort cases, "courts tend to focus on where the allegedly tortious actions took place *and where the harms were felt*."  *Id.* (emphasis added) (citing cases).  The Second and Ninth Circuits have adopted the view that "the locus of the injury" can be a relevant factor in tort suits.  *See Myers v. Bennett L. Off.*, 238 F.3d 1068, 1076 (9th Cir. 2001) (citing *Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 867–68 (2d Cir. 1992)).  Though the Seventh Circuit does not seem to have addressed the issue, the Court concludes that the Second and Ninth Circuit's position comports with the statutory text and good sense.  The effects of fraud, for example, are "a substantial part of the events . . . giving rise to" a fraud claim, even if they take place in a different location from where the fraudulent statement was formed.

Courts have applied similar logic to claims alleging constitutional injuries, including First Amendment claims.  *See, e.g.*, *Cabellero v. Taylor*, No. 12 C 8645, 2013 WL 2898254, at *2 (N.D. Ill. June 13, 2013).  Moreover, recent district court decisions have found venue appropriate in the district where a chilling effect is felt in

26

First Amendment retaliation cases analogous to this one. *See, e.g.*, *Twitter, Inc. v. Paxton*, No. 21 C 1644, 2021 WL 1893140, at *2 (N.D. Cal. May 11, 2021); *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 27 (D.D.C. 2024). The Court agrees with those decisions. The chilling of speech is a "substantial part of the . . . events giving rise to" a First Amendment retaliation claim. To be sure, Uthmeier's conduct in Florida is significant with respect to the motive issues at the heart of this case. But those issues also turn on how his claims about AAP's conduct actually match up with AAP's conduct, including what AAP knew and its internal decisionmaking process. Much of that occurred in Illinois, and it would be an artificially narrow reading of the venue statute not to consider that practical reality.

The Court thus concludes that venue is proper in this district.

## C.      *Younger* abstention

Federal courts have a "virtually unflagging obligation" to adjudicate claims within their jurisdiction. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *see New Orleans Pub. Serv., Inc. v. Council of New Orleans* (*NOPSI*), 491 U.S. 350, 359 (1989). The *Younger* abstention doctrine is one of a handful of limited exceptions to this general rule. *Younger v. Harris*, 401 U.S. 37 (1971); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996).

Under *Younger*, federal courts should abstain from interfering with certain ongoing state proceedings absent "extraordinary circumstances." *See Younger*, 401 U.S. at 45; *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982). This policy is rooted in principles of comity and federalism, which "reinforce[]" the "basic doctrine . . . that courts of equity should not act . . . when the

27

moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger*, 401 U.S. at 43–44. The result is that "even irreparable injury is insufficient" to warrant federal intervention "unless it is both great and immediate." *Id.* at 46 (internal quotations omitted). The "cost, anxiety, and inconvenience of having to defend against a single criminal prosecution" made in good faith does not suffice. *Id.* at 46–47. Nor does the risk that the prosecution will chill the exercise of First Amendment rights, without more. *Id.* at 51–52. Rather, a defendant ordinarily "should first set up and rely upon his defense in the state courts . . . unless it plainly appears that this course would not afford adequate protection." *Id.* at 45.

But *Younger* itself contemplated that some situations would nonetheless justify federal intervention. As relevant here, the Court recognized that a federal court may enjoin a state proceeding that is brought in bad faith or to harass. *Id.* at 53–54.

In *Younger*, the Court applied these principles to deny injunctive relief to a plaintiff who claimed that he was being prosecuted under a criminal statute that violated the First Amendment on its face. *Id.* at 38–41. Since then, the Court has held that *Younger* is implicated by exactly three categories of ongoing state proceedings: state criminal proceedings, quasi-criminal civil enforcement proceedings, and civil proceedings intimately tied to "state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013).

The underlying state court lawsuit in this case fits into the second category because it is at least arguably "akin to a criminal prosecution" in the three "important respects" described in *Sprint*. *Id.* at 79 (internal quotations omitted). First, the state

28

lawsuit was "initiated to sanction the federal plaintiff." *Id.* Second, a state actor is "a party to the state proceeding and . . . initiate[d] the action." *Id.* Third, a formal complaint was filed. *Id.* at 80. Because AAP seeks to enjoin an ongoing state proceeding covered by *Younger*, the Court must abstain unless an exception applies.

AAP suggests that this case does not implicate *Younger* for two reasons, but its arguments amount to an assertion that Uthmeier's lawsuit was filed in bad faith. First, AAP asserts that *Younger* does not apply when the underlying enforcement action is retaliatory. AAP points out that "[d]efending against the [enforcement action] is not an adequate remedy" because the prosecution of a retaliatory enforcement action violates AAP's First Amendment rights regardless of whether it is ultimately successful. Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 15. Moreover, AAP says, *Younger*'s comity rationale does not apply because "a state has 'no legitimate interest in pursuing a bad faith prosecution.'" *Id.* at 16 (quoting *Collins v. Kendall County*, 807 F.2d 95, 98 n.5 (7th Cir. 1986)). AAP's points are well taken, but they essentially restate the bad faith exception to *Younger*.

Second, AAP contends that *Younger* does not apply because Uthmeier's lawsuit does not advance the consumer-protection interest underlying the state's consumer-fraud and antitrust laws. The theory of his lawsuit is that AAP has engaged in illegal conduct to drive consumers toward gender-affirming care, creating a profitable market for puberty blockers, hormone treatments, and surgical interventions. Florida, however, has already banned those forms of gender-affirming care. And according to AAP, "Florida has no interest in protecting Florida consumers from a service they cannot obtain, and it has no legitimate state interest in regulating a

29

market that does not exist in Florida." *Id.*

This argument may provide support for AAP's assertion of bad faith, but it does not take this case entirely out of *Younger*'s scope. As the Supreme Court has explained:

> [W]hen we inquire into the substantiality of the State's interest in its proceedings we do not look narrowly to its interest in the *outcome* of the particular case—which could arguably be offset by a substantial federal interest in the opposite outcome. Rather, what we look to is the importance of the generic proceedings to the State.

*NOPSI*, 491 U.S. at 365. Here, that means asking whether Florida has a substantial, legitimate interest in protecting its consumers from misleading advertising and anticompetitive conduct, which it clearly does. *Id.* Additionally, some of the challenged conduct took place before Florida's ban, so even taking a step down in generality to ask whether Florida has an interest in punishing purportedly misleading advertising and anticompetitive conduct regarding gender-affirming care specifically, *Younger* still applies. That leaves AAP to argue that its conduct is not a proper subject for prosecution, but that argument takes "too narrow an analytical focus" under *Younger*. *Id.* at 366.

### 1. Bad faith standard

Having established that this case implicates *Younger*'s policy against federal intervention, the Court next considers whether the bad faith exception applies. The bad faith exception requires "more than a mere allegation and more than a conclusory finding." *Collins*, 807 F.2d at 98 (internal quotation marks omitted). Rather, the Seventh Circuit has said that a plaintiff "must allege specific facts to support an inference of bad faith." *Id.* As AAP points out, *Younger* does not require a court to

30

abstain from enjoining a state prosecution that is brought to retaliate against or deter the exercise of constitutionally protected rights. *Id.* (citing *Wilson v. Thompson*, 593 F.2d 1375, 1383 (5th Cir. 1979)).

Shortly after *Younger*, in a decision favorably cited by the Seventh Circuit, the Fifth Circuit reasoned that when a plaintiff alleges that the state proceeding itself is retaliatory, the bad faith exception merges with the merits of the First Amendment retaliation claim. *See Wilson*, 593 F.2d at 1384–85, 1385 n.17. That is largely true here, but it is worth further unpacking.

"As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up). That formulation contains two elements: (1) the plaintiff's activity was protected by the First Amendment, and (2) that activity caused the retaliatory action. *See, e.g.*, *Whitfield v. Spiller*, 76 F.4th 698, 707–08 (7th Cir. 2023). There is a third that can be dealt with briefly: the retaliatory action must be "likely to deter a person of ordinary firmness from continuing to engage in protected activity." *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020) (cleaned up). The state lawsuit in this case, which threatens substantial monetary penalties, readily qualifies on this element. Uthmeier argues that AAP must show that it has actually self-censored, but his cited cases relate to the showing required for Article III standing to challenge an enforcement action that has not yet occurred. *See* Mot. to Dismiss at 26 (citing *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020)). Pre-enforcement standing is distinct from the substantive issue of whether the allegedly retaliatory action is sufficiently severe to deter a person of ordinary firmness,

which is assessed against an objective standard that does not hinge on AAP's personal experience. *Holleman*, 951 F.3d at 880. And to the extent that Uthmeier is challenging AAP's standing, his argument is unavailing because the state lawsuit against AAP is already underway.

That leaves the questions of whether AAP's conduct is protected and whether its protected conduct caused the state court lawsuit. Causation ordinarily takes the form of a three-step burden shifting framework, with the plaintiff bearing the ultimate burden to show but-for causation. *See, e.g.*, *Minocqua Brewing Co. v. Hess*, 160 F.4th 849, 855 (7th Cir. 2025) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).[1] But in this case, there is no dispute that AAP's support of gender-affirming care is the but-for cause of Uthmeier's decision to bring the state court lawsuit. Indeed, as AAP emphasizes, Uthmeier has been open that the goal of the lawsuit is to punish AAP for its speech.

The parties' dispute instead centers on whether AAP's advocacy was protected by the First Amendment. According to Uthmeier, AAP's advocacy constituted anticompetitive and deceptive commercial speech that a state may prevent without violating the First Amendment. *See Zauderer v. Off. of Disciplinary Counsel of Sup. Ct. of Ohio*, 471 U.S. 626, 638 (1985). AAP argues that its advocacy was neither misleading nor commercial speech.

---

[1] A plaintiff bears the initial burden of showing that its protected activity was a "motivating or substantial factor" in the defendant's decision to take the retaliatory action. *Minocqua*, 160 F.4th at 855. The burden then shifts to the defendant to show that he would have taken the action even absent the plaintiff's protected activity. *Id.* If the defendant does so, the burden shifts back to the plaintiff to show that the proffered justification is pretext for retaliation. *Id.*

Here is where the bad faith exception to *Younger* may require more than what is necessary to establish a First Amendment retaliation claim. The Seventh Circuit has recently addressed whether a retaliation claim is affected by a defendant's sincere but mistaken belief that a plaintiff's conduct is not protected by the First Amendment. *Whitfield*, 76 F.4th at 705. In *Whitfield*, the defendant argued that her "commitment to enforcing her mistaken view of [a law] provide[d] an independent reason for . . . punishment" that would defeat causation as a matter of law. *Id.* at 711, 713.

The Seventh Circuit held that genuine disputes of material fact precluded summary judgment in the defendant's favor, but not before expressing some skepticism about the defendant's good-faith defense. *See id.* at 713–14. According to the Seventh Circuit, "*Mt. Healthy* establishes that the question in First Amendment retaliation cases is about cause, not intent: did the officer impose the adverse action in response to the protected activity?" *Id.* at 711–12. Accordingly, "If it turns out that an officer imposed the adverse action in response to the protected conduct, then that is the end of the 'retaliatory motive' analysis. Whether the officer . . . sincerely misread the law is beside the point." *Id.* at 712.

On causation, the Seventh Circuit observed that "an officer's misunderstanding of the law is not a legal defense to a First Amendment claim." *Id.* at 713. Reasoning by analogy, it stated that "[j]ust as the officials in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), could not excuse their sign policy by explaining that they did not realize that it was content-based, so too a retaliating officer cannot cast their legal

33

misunderstanding as an excuse."[2] *Whitfield*, 76 F.4th at 713. Even assuming that "there is some room for a good-faith exception in First Amendment cases," the Seventh Circuit said, it would apply only when the mistaken interpretation was "objectively reasonable." *Id.* at 713–14.

In contrast, *Younger*'s bad faith exception seems to require AAP to show more than a mistake on Uthmeier's part, and perhaps more than an objectively unreasonable mistake. In *Cameron v. Johnson*, 390 U.S. 611 (1968), a decision that foreshadowed *Younger*, the Supreme Court rejected an argument that a federal court could enjoin a state prosecution based on a challenge to the sufficiency of the evidence supporting the charge. *Id.* at 621. The Court explained:

> This argument mistakenly supposes that 'special circumstances' justifying injunctive relief appear if it is not shown that the statute was in fact violated. But the question for the District Court was not the guilt or innocence of the persons charged; the question was whether the statute was enforced against them with no expectation of convictions but only to discourage exercise of protected rights. The mere possibility of erroneous application of the statute does not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings.

---

[2] *But see Reed*, 576 U.S. at 182 (Kagan, J., concurring) ("[One reason for content-based restrictions] is to ensure that the government has not regulated speech 'based on hostility—or favoritism—towards the underlying message expressed.' *R.A.V. v. St. Paul*, 505 U.S. 377, 386 (1992). . . . We apply strict scrutiny to facially content-based regulations of speech, in keeping with the rationales just described, when there is any 'realistic possibility that official suppression of ideas is afoot.'"); Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413 (1996) (positing that "the application of First Amendment law is best understood and most readily explained as a kind of motive-hunting" and discussing *R.A.V.* as an example). Even if motive-hunting underlies First Amendment doctrine, rejecting legal misunderstanding as a categorical defense may be justified given the ease with which it may be asserted and the evidentiary difficulty in proving that it is pretextual. *See* Kagan, *supra*, at 516 ("[I]n all but the most unusual case, the government could offer a permissible reason for its action . . . . Hence, the Court . . . has constructed and relied upon a set of rules and categories . . . that operates as a proxy for this direct inquiry.").

*Id.* (internal quotation marks omitted). And in a companion case to *Younger*, the Court used similar language to describe *Younger*'s bad faith exception as applying only when state officials undertake a prosecution "without hope of obtaining a valid conviction." *See Perez v. Ledesma*, 401 U.S. 82, 85 (1971). Several years later, the Court articulated a similar standard, but with more objective language: "'bad faith' in this context generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." *See Kugler v. Helfant*, 421 U.S. 117, 125 n.6 (1975) (citing *Perez*, 401 U.S. at 85).

The Court's descriptions of bad faith suggest that AAP cannot avoid *Younger* solely on the basis that its speech is protected, even if that would suffice to succeed on the merits of its retaliation claim. Rather, they suggest that the inquiry is whether Uthmeier initiated the enforcement action in subjective bad faith or without an objectively reasonable expectation of success. *See Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 199 (2d Cir. 2002). This deference helps ensure that *Younger*'s bad faith exception does not swallow the rule. *See Hicks v. Miranda*, 422 U.S. 332, 352 (1975) (cautioning that courts should not infer bad faith merely because they believe that the state proceeding violates the First Amendment).

The question then is whether a plaintiff must show subjective bad faith, no objectively reasonable expectation of success, or both to avoid *Younger* abstention. Several courts of appeals have said that a showing of subjective bad faith—including retaliatory motive—suffices, regardless of the chance of success. *See, e.g., Cullen v. Fliegner*, 18 F.3d 96, 103–04 (2d Cir. 1994) (reasoning that subjective bad faith undercuts the justification for federal deference); *Diamond*, 282 F.3d at 199–200

35

(same); *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir. 1981) (same); *Lewellen v. Raff*, 843 F.2d 1103, 1109–10, 1112 (8th Cir. 1988) (same); *Yelp Inc. v. Paxton*, 137 F.4th 944, 953 (9th Cir. 2025) (same). The Seventh Circuit has affirmatively cited reasoning along the same lines. *See Collins*, 807 F.2d at 98 & n.5.

It is less clear whether a court may decline to abstain under *Younger* when a state official subjectively believes that his enforcement is legitimate and may succeed, but his belief is objectively unreasonable. The Second Circuit has largely adhered to a subjective test. *See Diamond*, 282 F.3d at 199. But language from other courts of appeals cases frame the objective-reasonableness standard as distinct from illegitimate motive. *See, e.g.*, *Stockton v. Brown*, 152 F.4th 1124, 1139 (9th Cir. 2025); *see also Abbott v. Mette*, No. 21-1804, 2021 WL 5906146, at *3 (3d Cir. Dec. 14, 2021); *American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1058 (9th Cir. 1995).

In this Court's view, whatever difference exists between these standards is not material, at least in this case. If an objective lack of merit can suffice to establish an exception to *Younger*, the standard must be deferential to the state. *See Yelp*, 137 F.4th at 952. In *Younger*, for example, the Court suggested that federal intervention would be appropriate if the state action was brought pursuant to a "flagrantly and patently" unconstitutional statute. *Younger*, 401 U.S. at 53–54; *NOPSI*, 491 U.S. at 366. In the context of retaliation claims, courts of appeals have framed their inquiry in terms of whether the state action is "facially meritless," "frivolous," or brought without a "remote chance" of obtaining a conviction. *See, e.g.*, *Yelp*, 137 F.4th at 953 ("facially meritless"); *Phelps v. Hamilton*, 122 F.3d 885, 889 (10th Cir. 1997) ("frivolous");

36

*Netflix, Inc. v. Babin*, 88 F.4th 1080, 1095 (5th Cir. 2023) (no "remote chance"). The fact that a state proceeding flunks even those highly deferential standards may support an inference of subjective bad faith. *See, e.g.*, *Yelp*, 137 F.4th at 953; *Netflix*, 88 F.4th at 1095. At that point, the subjective and objective standards arguably seem to merge. For simplicity's sake, the Court will analyze whether the state lawsuit has an objectively reasonable expectation of success as a proxy for subjective bad faith.

To summarize, the Court considers whether AAP can show not only that the state lawsuit is legally flawed, but also that Uthmeier initiated it with an improper motive or "without a reasonable expectation of obtaining a valid conviction" such that it "connote[s] bad faith." *See Yelp*, 137 F.4th at 953. Under the circumstances of this case, such a showing will also suffice to establish a likelihood of success on the merits of AAP's First Amendment retaliation claim, as discussed in more detail below.

### 2. Evidence of bad faith

AAP points to three indicia of bad faith: the state complaint itself, public statements by Uthmeier and other state officials, and the way that Uthmeier has litigated the state lawsuit. The Court addresses each in turn.

#### i. The state complaint

AAP argues that the state court complaint is meritless on its face. Uthmeier responds that the Court cannot conduct a first-instance analysis of the merits of the state lawsuit. Instead, according to Uthmeier, *Younger*'s bad faith exception applies only when state officials initiate multiple unsuccessful prosecutions.

The Court disagrees with Uthmeier's proposed bright-line rules. Starting with Uthmeier's proposed multiple-prosecution rule, the Fifth Circuit considered and

37

rejected the same argument in *Wilson*. *Wilson*, 593 F.2d at 1377. It observed that "[n]early every Supreme Court case addressing the bad faith exception has described it in terms which indicate that it is not limited to situations of repeated or multiple prosecutions." *Id.* at 1381. In *Younger*, for example, the Court denied equitable relief because the plaintiff did not suggest that the prosecution was "brought in bad faith *or* [was] only one of a series of repeated prosecutions to which he will be subjected." *Younger*, 401 U.S. at 49 (emphasis added). The Fifth Circuit thus held that "a state prosecution undertaken in retaliation for or to deter the exercise of constitutionally protected rights may be enjoined regardless of whether the criminal defendant is threatened with repeated or multiple prosecutions." *Wilson*, 593 F.2d at 1377.

*Wilson* is not binding on this Court, but its reasoning is persuasive. And although the Seventh Circuit has not expressly decided the issue, *see Arkebauer v. Kiley*, 985 F.2d 1351, 1358 (7th Cir. 1993), it has cited *Wilson* favorably. *See Collins*, 807 F.2d at 98 n.5. Uthmeier's proposed multiple-prosecution rule would mean that federal courts would have to permit state officials one bad-faith prosecution against a person or entity, regardless of how clear it is that the prosecution's sole purpose is to deter the exercise of constitutional rights. That would distort the equity and comity rationales underlying *Younger*.

As for whether the Court can consider the merits of the state lawsuit for purposes of determining whether the bad faith exception to *Younger* applies, the above discussion establishes that *Younger* abstention may be inappropriate when a state official has brought a state proceeding without a reasonable expectation of success. Whether that is an objective standard or merely evidence of subjective bad

faith, it contemplates that the merits of a state prosecution or, as in this case, a state court civil suit, are a relevant consideration.

The Supreme Court's First Amendment retaliation cases are also instructive.  In *Hartman v. Moore*, 547 U.S. 250 (2006), the Court recognized that one aspect of the merits of a prosecution—specifically, the presence or absence of probable cause—is "highly valuable circumstantial evidence" that can reinforce or undercut other evidence of a retaliatory motive.  *Id.* at 261.  Though *Hartman* emphasized the importance of probable cause specifically when the prosecutor-defendant is not the government actor alleged to have a retaliatory motive—a situation not presented here—the Court in *Nieves v. Bartlett*, 587 U.S. 391 (2019), clarified that the same principle applies when "it is difficult to determine whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct."  *Id.* at 402.  This case presents that same kind of causation issue:  it is clear that Uthmeier targeted AAP's speech but more debatable whether the state court lawsuit reflects a good faith attempt to enforce state law, as opposed to a lawsuit driven by an improper motive or undertaken with no reasonable expectation of success.  Considering the merits of the enforcement action provides "weighty evidence" to distinguish between the two.  *Id.*; *see Smith v. Hightower*, 693 F.2d 359, 369 (5th Cir. 1982); *Phelps v. Hamilton*, 59 F.3d 1058, 1067 n.18 (10th Cir. 1995).

Even assessing the state court complaint through a highly deferential lens, a significant weakness appears on its face.  All of the state claims require AAP's support of gender-affirming care to be somehow commercial in nature.  But AAP is a non-profit, and it does not sell any forms of gender-affirming care.  The state court

complaint instead alleges that AAP engaged in the allegedly anticompetitive and deceptive speech to (1) sell memberships and services, such as patient referral services and training seminars, and (2) enable its members to sell gender-affirming care.

The problem with the first suggestion is that AAP's 2018 policy statement does not mention, let alone promote, AAP's membership or services. The state court complaint's explanation is more attenuated: "[s]ex intervention providers' desire to fund efforts to create guidelines that generate demand for sex interventions, and to appear in directories of sex intervention providers, causes them to purchase AAP memberships, thereby fueling AAP's enterprise." Am. State Compl. ¶ 264. The theory thus seems to be that AAP thought to intentionally publish misleading information to legitimize gender-affirming care specifically—evidently because it was a particularly profitable industry to promote, for whatever reason—with the hope that the medical providers benefited by such legitimacy would pay AAP back in the form of memberships.

This quid-pro-quo theory can be fairly characterized as highly speculative at best. It is possible, as the state complaint suggests, that the provision of gender-affirming care is now a profitable business. But it is unclear how AAP or the other state court defendants would have predicted that would turn out to be the case when they published their support for gender-affirming care. Nor is it clear why they would choose to back gender-affirming care specifically—a form of care that only a relatively tiny proportion of the population would pay for—if their true motivation was to make money. Add the fact that AAP's supposed economic scheme was to prop up this

40

industry not to directly participate in it, but to profit indirectly by enticing practitioners to pay for AAP memberships, and the theory starts to strain credulity.[3]  And, unsurprisingly, there are no facts suggesting that AAP had such an unlikely plan.

The state court complaint's second theory—that AAP backed gender-affirming care to enable its members who provide such care—is perhaps more economically plausible from a theoretical standpoint, but it similarly lacks factual support.  The only allegations of any financial motive in the state complaint concern the authors of AAP's policy statement.  The state complaint alleges that the authors of AAP's policy statement provide gender-affirming care themselves and therefore "had a financial interest in developing medical standards that would yield credibility to 'gender-affirming care.'"  Am. State Compl. ¶ 226.  But even assuming that is true, it does not explain why AAP's *leadership* agreed to publish the policy statement and continues to adhere to it.  From the state court complaint, it is clear that Uthmeier's claim is against AAP itself, as an organization, on the theory that it sought to profit from publishing the policy statement.  There are no allegations to support that theory.

Taking a step back and viewing the AAP's policy statement as a whole, it is difficult to see how it reflects a commercial interest.  It looks and reads like an informational document, not an advertisement.  Some portions do seem to approve of and promote gender-affirming care, but they do so in a way that resembles standard scientific and medical advocacy, not a money-making scheme.  Indeed, the

---

[3] According to AAP's website, its membership dues range from $25 / year for medical students to $675 / year for board-certified surgical specialists.  *AAP Membership Categories*, Am. Acad. of Pediatrics (last visited Apr. 4, 2026), https://www.aap.org/en/membership-application/join-aap/aap-membership-categories/#in-training.

statement's explanations are often accompanied by open disclosure of potential health risks that a financially motivated actor would likely omit. Several parts of the policy statement are also a poor fit for the alleged financial motivation. For example, the policy statement emphasizes the importance of social and legal affirmation; identifies unique issues for "youth of color who identify as transgender"; and spends over a page discussing the importance of safe schools and communities. None of those topics have any discernible relationship to the purported financial schemes alleged in the state court complaint.

Likewise, it is hard to see how most of the policy statement's express recommendations would help sell gender-affirming care. Consider, for example, the statement's recommendation "that family-based therapy and support be available to recognize and respond to the emotional and mental health needs of parents, caregivers, and siblings of youth who identify as TGD." AAP Policy Statement at 10. That is advocacy, but it is not easily explained by financial motivations. Similarly, AAP's recommendation "that pediatricians have a role in advocating for policies and laws that protect youth who identify as TGD from discrimination and violence" has little to do with making money, but it fits naturally with AAP's position that its policy statement reflects an honest belief in promoting acceptance of transgender youth. *See id.*

In short, Uthmeier's theory of how AAP's policy statement is commercial in nature—a necessary part of all three state claims—is as weak as they come. That is enough to establish that Uthmeier has no objectively reasonable expectation of success. It also suggests that AAP's speech is noncommercial speech entitled to a

greater level of First Amendment protection. *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 515–16 (7th Cir. 2014). And even if this weakness in the merits alone is insufficient to satisfy the bad faith exception, *see Yelp*, 137 F.4th at 952, it further informs the Court's assessment of AAP's other evidence of bad faith.

On that note, it is concerning how the state court complaints have presented certain factual contentions. One particularly concerning example was a table in the original complaint, purporting to summarize the state defendants' recommended "age limit[s]" for various forms of gender-affirming care. The state court lawsuit represents that AAP's policy statement recommends the following age limits:

- "Social Transition": "No min."

- "Puberty Blockers": "Tanner 2 (9 yrs)"

- "Cross-Sex Hormones": "No min."

- "Breast Surgery": "No min."

- "Genital Surgery": "No min."

State Compl. ¶ 93. That is false. As an initial matter, AAP's policy statement does not recommend age limits; it describes the "[g]eneral [a]ge [r]ange[s]" for forms of gender-affirming care under "[m]ost protocols for gender-affirming interventions." AAP Policy Statement at 6.

But even if one assumes that AAP's descriptions of general age ranges fairly can be construed as recommendations regarding age limits, the state court complaint distorts what AAP's policy statement actually says. AAP's policy statement states that the general age range for cross-sex hormone therapy is "[e]arly adolescence onward." *Id.* That is not the same as, or anywhere close to, "no minimum." Even without

43

considering context, the policy statement clearly indicates a minimum—early adolescence. Similarly, the AAP policy statement provides the following general age range for gender-affirming surgeries: "Typically adults (adolescents on case-by-case basis)." *Id.* at 6. The assertion in Uthmeier's state court complaint that AAP recommends no minimum for breast and genital surgery is an egregious misrepresentation.

The amended state court complaint omits this table, but it still contains several other problematic representations. Several allegations assert that AAP threatened to oppose WPATH's SOC-8 unless WPATH removed its recommended age minimums. Am. State Compl. ¶¶ 179–98. The clear import of the allegations is that AAP did so because it thought those age minimums were too restrictive.

That is misleading. WPATH's draft SOC-8 proposed relaxed age minimums: "15 years and above for chest masculinization unless there are significant, compelling reasons to take an individualized approach"; "16 years and above for breast augmentation, facial surgery (including . . . tracheal shave . . .) as part of gender-affirming treatment unless there are significant, compelling reasons to take an individualized approach." Def.'s Summ. J. Ex. 187 (SOC-8 Commc'ns) at 25, *Boe v. Marshall*, No. 2:22 C 184, dkt. 700-16 (M.D. Ala. Oct. 9, 2024); *see* Am. State Compl. ¶ 181. AAP responded with a letter stating in relevant part: "SOC 8 recommendations for gender-affirming surgery do not align with AAP policy. *The AAP does not recommend surgery for minors* except on an individualized, case-by-case basis with parental involvement and consent. Additionally, AAP experts agree SOC 8 lacks the evidence to justify the recommended surgery ages." *See* Compl. ¶ 102 (emphasis

44

added) (citing SOC-8 Commc'ns at 13–14). AAP's letter and its comments prompted WPATH members to express concerns about reverting to the age of majority, as SOC-7 recommended. *See* SOC-8 Commc'ns at 107 ("We certainly can not revert to age of majority for all surgeries as this would be grossly unethical for all the obvious reasons."); *see also id.* at 100 ("If we don't have any suggested ages, some clinicians will still use SOC7 (age of majority) and others will be able to refer people at any age (for genital at 15 or 16). . . . In addition, having the age of, chest for sample [sic], as age of majority, is in my view unethical."). In context, it is clear that AAP opposed the relaxed age minimums because it did not want them to be construed as broad approval of surgery for minors.

With that context, some of the state court complaint's allegations take on a completely different light. One allegation, for example, states that

> AAP's editorial comments privately conceded, among other things, that "reviewing the 3 studies to justify vaginoplasty at 17, none of the individuals referenced in the study were under 18," and that "[f]acial surgery for minors is going to be a big deal, tracheal shaves are very high risk," even though those interventions were recommended without age minimum by the 2018 AAP Policy Statement.

Am. State Compl. ¶ 189. As framed by the state complaint, this allegation suggests that AAP knew that current scientific evidence did not justify lowering age minimums below eighteen but nonetheless provided no minimum in its policy statement and urged WPATH to do the same. As the discussion above indicates, that is not accurate. AAP's policy statement generally contemplates surgery for adults only, with exceptions on a case-by-case basis, and that is the same position it urged WPATH to take.

Here is the main comment in question, with emphasis on the portion omitted by

45

the state complaint: "*Sterilizing procedures prior to the age of consent when the person can make the decision for themselves is going to be VERY controversial.* Additionally, when reviewing the 3 studies to justify vaginoplasty at 17, none of the individuals referenced in the study were under 18 . . . ." SOC-8 Commc'ns at 57. The state court complaint also fails to mention a comment on the same page expressing concern with WPATH setting age minimums subject to case-by-case exceptions: "'unless there are significant, compelling reasons to take an individualized approach . . .' is very concerning. The recommendations, as written, appear to be an opt out model rather than an individualized approach." *Id.* Another comment similarly states that "[s]urgery should be presented as the exception rather than the rule." *Id.* They all point to the same reading: AAP opposed the age minimums because it did not want to broadly approve of surgeries for minors.

These comments also harken back to the earlier discussion regarding the merits: as far as the Court can tell, AAP's many comments to WPATH are all medical and scientific in nature. *See id.* at 13–81. A select few briefly allude to considerations about how SOC-8 would be perceived by the public. *See id.* at 36 ("I'm worried that the way this statement is phrased will also draw some criticism and inflammatory comments."); *id.* at 57 ("Surgery should be presented as the exception rather than the rule. This is going to heavily influence the current climate in the US and feeds directly in the anti-transgender arguments."). None suggest financial motivations.

Notably, the state court complaint omits citations for the quotes related to AAP's correspondence with WPATH concerning SOC-8, despite providing citations throughout other portions of the complaint. Several other inflammatory allegations

46

purport to quote other sources but provide no citations. *See, e.g.*, Am. State Compl. ¶¶ 223–26.

The clear misrepresentations in Uthmeier's state court complaint raise suspicions about more subtle discrepancies. For example, as a core part of its theory for how AAP's policy statement is false or deceptive, the state complaint alleges that "[d]isinterested systematic reviews—the gold standard in evidence-based medicine— have determined that there is no credible evidence that puberty blockers are 'fully reversible' or that sex interventions lead to positive mental health outcomes for children or adolescents." Am. State Compl. ¶ 113. But AAP does not represent that puberty blockers *are* fully reversible. In its policy statement, AAP describes puberty blockers as "reversible," but each time, that adjective is qualified by a warning that there are potential long-term health effects that require further research.

That nuance matters. The state court complaint suggests that calling puberty blockers "reversible" is false or deceptive because it omits concerns about long-term effects contained in "gold standard" systematic reviews, but AAP largely identifies those same concerns in its policy statement. AAP's policy statement warns that puberty blockers may cause "stress[]," "lower self-esteem," and "increased risk taking"; "limit some potential reconstructive options"; and have "long-term" effects on "bone metabolism and fertility." AAP Policy Statement at 5.

Compare that to the reviews cited by the state court complaint, referred to as

the Finnish Review,[4] the Swedish Review,[5] and the Cass Review.[6]  Similar to AAP's warnings, the Finnish Review cautions that puberty blockers may:  have "unknown effects on the central nervous system," likely referring to later-referenced effects on "young people's judg[]ment and decision-making"; create a need for "alternative sources of tissue grafts for a potential future vaginoplasty," a type of reconstructive surgery; and cause "disruption in bone mineralization" and "not yet known" effects on fertility.  Finnish Review at 5, 7.[7]

The Swedish Review concludes that "the safety, benefits[,] and risks of [pubertal suppression] are not proven," but it does not seem to identify any risks not disclosed by AAP.  Swedish Review at 3.  Rather, it cites a systematic review study reporting similar concerns about the effects of puberty blockers on bone development. *Id.* at 3 n.2; Jonas F. Ludvigsson et al., *A Systematic Review of Hormone Treatment*

---

[4] Am. State Compl. ¶¶ 6 n.8, 114–19 (citing *Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors*, Council for Choices in Health Care in Finland (PALKO / COHERE Finland) (2020), https://segm.org/sites/default/files/Finnish_Guidelines_2020_Minors_Unofficial%20Tra nslat ion.pdf).

[5] *Id.* ¶¶ 120–23, 120 n.167 (citing *Care of Children and Adolescents with Gender Dysphoria*, Socialstyrelsen (Dec. 2022), https://www.socialstyrelsen.se/contentassets/444af6c0a5fb429c9b56fd51b931a816/2 023-1-8330.pdf).

[6] *Id.* ¶¶ 4 n.6, 124–43 (citing Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People:  Final Report* (Apr. 2020), https://webarchive.nationalarchives.gov.uk/ukgwa/20250310144409mp_/https://cass.i ndependent-review.uk/wp-content/uploads/2024/04/CassReview_Final.pdf).

[7] The Finnish Review does suggest that "hormonal interventions that alter sex characteristics" can be "irreversible."  Finnish Review at 9.  That corresponds to what the AAP policy statement refers to as "[c]ross-sex hormone therapy," not to be confused with puberty blockers.  *See id.*; AAP Policy Statement at 6; *see also* SOC-8 Commc'ns at 45.  AAP's policy statement states that cross-sex hormone therapy is "partially reversible" regarding certain symptoms, is "irreversible once developed" regarding others, and has "unknown reversibility" regarding fertility.  AAP Policy Statement at 6.

*for Children with Gender Dysphoria and Recommendations for Research*, 112 Acta Paediatrica 2279, 2290 (2023).

The concerns in the Cass Review, which the state court complaint touts as "one of the most comprehensive, evidence-based reviews of a medical service . . . in the United Kingdom," Am. State Compl. ¶ 127, largely overlap with the concerns identified in AAP's policy statement and the Finnish Review:  (a) effects on "the trajectory of development of sexuality and gender identity"; (b) impacts on "the young person's ability to make complex risk-laden decisions" and other "possible longer-term neurological consequences"; (c) limitations on "subsequent genital surgery"; and (d) "[o]ther physical health impacts," including compromised bone density and lag in height gain.  Cass Review at 178–79.

To be sure, AAP's policy statement and these reviews differ in tone.  Whereas AAP's policy statement seems to approve of puberty suppression and gender-affirming care at a general level, the other reviews are more skeptical.  Some of this difference in tone seems to derive from different views on how to characterize the existing evidence, which everyone seems to agree is uncertain.  The Court acknowledges that tone or characterization can make a statement misleading, but it is also mindful of the fact that good-faith medical and scientific disagreement is protected by the First Amendment.  *See Chiles v. Salazar*, 146 S. Ct. 1010, 1022–23, 1029 (2026).

With that in mind, the problem is not that Uthmeier's theory of fraud depends on nuance.  The problem is that the state court complaint glosses over that nuance by omitting the fact that AAP's policy statement did identify potential long-term effects,

49

then relying on those same concerns in the other studies to say that they "exposed" AAP's policy statement as "methodologically bankrupt."  *See* Am. State Compl. ¶¶ 112–143.  And when one looks at AAP's policy statement and the other studies directly, rather than as the state complaint presents them, it is hard to see how AAP's statement goes beyond good-faith medical disagreement and into the realm of false and deceptive conduct.  That is another objective weakness in the state complaint, and the misrepresentations used to disguise it suggest subjective bad faith as well.

One arguably could view these misrepresentations as a simple oversight or perhaps an attempt to avoid overcomplicating the state court complaint—albeit a misguided one, as they draw a materially misleading picture of AAP's position.  Or it could be an attempt to inflate the merits of the enforcement action.  Attorneys, of course, sometimes take liberties in characterizing the facts to benefit their case, even without an improper motive.  But, in the Court's view, the misrepresentations here extend beyond the norm of vigorous representation.  The specific facts that are misrepresented, and how they are misrepresented, are a matter of further concern.  Beyond skewing the facts to undermine the scientific basis for AAP's support of gender-affirming care, the state complaint goes out of its way to include provocative misrepresentations that make AAP's conduct look as radical and extreme as possible.  That tends to support AAP's contention that the state enforcement action is motivated by animus against those perceived as favorable to gender-affirming care.

In sum, a review of the state court complaint leaves the Court with two takeaways.  First, the state court complaint presents a distorted and at times outright dishonest depiction of AAP's conduct.  Second, without the benefit of those

distortions, the state court complaint's theories of how AAP's policy statement is either commercial speech or fraudulent are highly unlikely. By the same token, AAP's speech is likely protected by the First Amendment, and AAP is therefore likely to succeed on the merits of its First Amendment claim. Additionally, because the state claims against AAP require that AAP's speech be commercial *and* false or misleading, it is doubly unlikely that there is any objectively reasonable expectation of success on those claims. That is important context for the rest of AAP's evidence of bad faith.

### ii. Public statements

Turning to evidence of Uthmeier's subjective motivations, AAP points to statements from several Florida government officials—including Uthmeier—that it contends openly display a content-based bias against speech supporting gender-affirming care. Uthmeier argues that other state officials' statements should not be imputed to him, but his own statements suffice to support AAP's point. For example, he posted on social media: "Florida led the nation in protecting women's sports, women's spaces, and kids from harmful transgender treatments while empowering parents. Rest assured—I will aggressively fight this radical ideology anytime it threatens women, kids, and our Florida way of life." Pl.'s Mot. for Prelim. Inj., Charles Aff., Ex. 4. That personal view was reflected in his enforcement decisions. In a public comment on an enforcement action against Target's pro-LGBTQ+ practices, Uthmeier stated: "On a personal level, I'm a dad of three young kids, no company should be celebrating and marketing the sexualization of our children. This is a fight worth having, and we will fight to hold Target financially accountable for these wrongful practices . . . ." *Id.*, Ex. 16. His public announcement of the enforcement action

51

against AAP delivered the same message in cruder fashion: "Today, my office sued @wpath, @AmerAcadPeds, and @TheEndoSociety for mutilating kids and misleading families." *Id.*, Ex. 14.

These statements support an inference that Uthmeier not only had personal convictions against gender-affirming care, but also that those convictions affected his enforcement decisions and his decision specifically to initiate the state lawsuit at issue here. On the other hand, his statement that AAP was "misleading families" is arguably at least facially consistent with a good-faith enforcement of Florida's consumer fraud laws.

The Court views this evidence, in its totality, as supporting AAP's assertion of bad faith, especially in light of the objective weakness of the state complaint. Uthmeier's statements, in context, go beyond "the commonplace stridency of prosecutorial press releases." *See Yelp*, 137 F.4th at 956. There is also a clear through-line between these statements and the mischaracterizations in the state court complaint. And although state attorneys general are entitled to have enforcement priorities, the weakness of the state complaint suggests that Uthmeier is retaliating against AAP without a reasonable expectation of success, rather than merely picking between viable enforcement opportunities.

### iii. Litigation conduct

Finally, AAP contends that the way that Uthmeier has litigated the enforcement action further suggests bad faith. Specifically, AAP points to the fact that Uthmeier waited three months to effectuate service and only acted after AAP filed this lawsuit, at which point Uthmeier filed an amended complaint adding the antitrust claim and

seeking additional penalties. AAP also alleges that Uthmeier did not correspond with it at all during this time. It argues that Uthmeier's conduct is "consistent with political performance designed to intimidate and chill protected speech, not an enforcement action designed to investigate or remedy any real harm." Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. at 3. Uthmeier responds that his conduct has complied with Florida civil procedure rules, which provide 120 days for the state plaintiff to serve an initial pleading and permit an amendment as a matter of course.

Both parties have a point. Uthmeier's litigation conduct is consistent with a purpose of prolonging the hardship on AAP from being the subject of a controversial state enforcement action. And his addition of the antitrust claim shortly after AAP asserted its First Amendment rights in this Court may have been an attempt to further discourage AAP by upping the ante. But his conduct is also consistent with standard litigation practice of taking advantage of the time and amendment opportunities provided under applicable rules of civil procedure. And nothing required him to engage in any communication with AAP in the interim.

Two factors tilt this ambiguity slightly in AAP's favor. First, on the record before the Court it is not apparent that anything changed, aside from the filing of the present lawsuit, to prompt Uthmeier to add the antitrust claim. Uthmeier's conduct may be permitted by the state civil procedure rules, but that does not shed any light on the basis for his actions. Second, the objective weakness of the state lawsuit, the mischaracterizations in the state complaint, and Uthmeier's statements provide context that causes the Court to view his litigation conduct with skepticism.

In that respect, this case resembles *Netflix*, where the Fifth Circuit affirmed a

53

district court's finding of bad faith. *See Netflix*, 88 F.4th at 1085. There, Netflix filed a federal suit against Lucas Babin, a Texas district attorney, seeking to enjoin a state criminal prosecution charging Netflix with "advertising and promoting child pornography based on its streaming of *Cuties*, a controversial film starring preteen girls who participate in a dance competition." *Id.* Babin relied heavily on prosecutorial discretion and the presumption of regularity—as Uthmeier does here. *See id.* at 1093. The Fifth Circuit took those arguments seriously, but it ultimately determined that the case looked like a "mosaic" of bad faith, "[h]owever persuasive . . . Babin's arguments [were] individually." *Id.* at 1096. Several factors that led to that conclusion are also present in this case.

First, "[a]fter Babin initially charged Netflix and issued a press release about the unprecedented prosecution, the case sat idle for a year. . . . Then, shortly after Netflix [asserted its First Amendment rights], there was a burst of prosecutorial alacrity," and Babin filed four new indictments. *Id.* at 1092. Likewise, here, Uthmeier initiated an unprecedented enforcement action against AAP, accompanied by provocative, public statements. Then he waited. When AAP asserted its First Amendment rights, he filed an amended complaint adding an antitrust claim seeking substantial additional penalties. Of course, the delay in *Netflix* was much longer than the delay here. But in *Netflix*, there was also a reason for the unusually long delay: the COVID-19 pandemic. *Id.* Uthmeier has provided no explanation for his actions here, aside from the fact that he is permitted to do so by the state rules of civil procedure.

Second, in *Netflix*, Babin secured grand jury indictments by "show[ing] only curated clips and images of the most provocative scenes" from *Cuties*. *Id.* at 1093.

54

The Fifth Circuit acknowledged that he had no duty to show exculpatory evidence to the grand jury. But "considering all the other allegations against him, Babin's refusal to show the grand jury the entire film" gave the court "reason to question the evenhandedness of his prosecutorial tactics." *Id.* Similarly, in this case, the state complaints have contained glaring misrepresentations that draw an oversimplified and inflammatory picture of AAP's conduct. Considering AAP's allegations and the evidence as a whole, Uthmeier's litigation tactics suggest bad faith as well.

Third, one of Babin's indictments concerned a scene involving an actress who was, in fact, over the age of eighteen at the time *Cuties* was filmed. *Id.* at 1093–94. As a result, Babin had no chance of securing a conviction on that indictment. Additionally, Netflix had offered to provide proof of the actress' age, but Babin refused to consider it. *Id.* at 1094. And when pressed at an evidentiary hearing, his only explanation was, in the Fifth Circuit's words, "terse and unilluminating: 'Visual inspection of the image.'" *Id.* This factor is the most distinguishable in this case. Although the Court is skeptical of Uthmeier's state lawsuit, it is not verifiably meritless in quite the same way as a child-pornography charge involving images of an actress above the age of majority. And though Uthmeier's lack of communication with AAP is disconcerting, it is not the same thing as a refusal to see proof that the claims are bound to fail.

In the final analysis, the Court concludes that the objective weakness of the state complaint and the more direct evidence of Uthmeier's subjective motives put together a "mosaic" of "specific facts" that "support an inference of bad faith." *See Collins*, 807 F.2d at 98. Each individual item of AAP's evidence might arguably be too

55

ambiguous to infer bad faith when viewed in isolation.  But as in *Netflix*, the Court "cannot help but step back and conclude that the whole picture does not resemble what [it] would otherwise presume to be a good-faith prosecution."  *Netflix*, 88 F.4th at 1096.  When viewed together, the evidence—the weaknesses and misrepresentations on the face of the state complaint; Uthmeier's inflammatory public commentary; and his delay in prosecuting the case, followed by the addition of an antitrust claim seeking significant additional penalties (and seemingly without merit) when AAP asserted its First Amendment rights—all points in the same direction and is indicative that the state lawsuit is one undertaken in bad faith and without a reasonable expectation of success.  The Court therefore concludes that the bad faith exception to *Younger* applies and denies Uthmeier's motion to dismiss.

### D.      Preliminary injunction

Having addressed each of Uthmeier's threshold grounds for dismissal, the Court turns to AAP's motion for a preliminary injunction.  As mentioned at the outset, a "plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  These equitable factors largely follow the same analysis as the discussion thus far.

AAP has shown a likelihood of success on the merits of its retaliation claim.[8] As discussed, to establish a First Amendment retaliation claim, a plaintiff must show that (1) it engaged in protected First Amendment activity; (2) that activity caused the

---

[8] As a result, the Court need not address AAP's viewpoint discrimination claim.

allegedly retaliatory action; and (3) the retaliatory action was severe enough to likely deter First Amendment activity in the future. *See FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 585 (7th Cir. 2021). In his briefing before this Court, Uthmeier offers no reasons beyond the theories in the state court complaint to argue that AAP's speech is not protected by the First Amendment. The above analysis shows that those theories are deeply flawed, so AAP's speech is likely protected, satisfying the first element. Regarding the second element, there is little dispute that AAP's speech was the but-for cause of the state court lawsuit, and even if AAP must further establish a subjective retaliatory motive, it has sufficiently done so through its showing of bad faith. Finally, being subjected to a state court lawsuit, especially one that seeks significant penalties, satisfies the third element's objective test. *See id.*

AAP has also established that it is likely to suffer irreparable harm absent an injunction. Irreparable harm is presumed in First Amendment cases. *Int'l Ass'n of Fire Fighters, Local 365 v. City of East Chicago*, 56 F.4th 437, 450–51 (7th Cir. 2022). Additionally, AAP has submitted an affidavit from its Chief Executive Officer attesting that the state court lawsuit will negatively impact AAP's collaborative efforts, chill scientific discourse within the pediatric-health community, undermine security and attendance at AAP's events, and burden AAP employees with threats to their safety.

Uthmeier advances two contentions in response, neither of which are availing. First, he argues that AAP will not suffer irreparable harm because it has an adequate remedy at law—raising a First Amendment defense in state court. Not so. As the Fifth Circuit has observed, the "federal 'right not to be subjected to a bad faith prosecution . . . cannot be vindicated by undergoing the prosecution.'" *Wilson*, 593

57

F.2d at 1382; *see Netflix*, 88 F.4th at 1096–1100.  Second, Uthmeier contends that the state court lawsuit does not cause irreparable harm because AAP has continued its advocacy instead of self-censoring.  But the fact that AAP has continued its advocacy does not mean that it is not being deterred.  As the Seventh Circuit has said, "[a] loss is a loss:  [a plaintiff] need not show total deprivation to meet the irreparable harm element for a preliminary injunction."  *Int'l Ass'n of Fire Fighters*, 56 F.4th at 451.

The last two preliminary injunction factors require little discussion.  The balance of equities and the public interest both weigh in favor of granting an injunction protecting First Amendment freedoms.  *See ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012).  Given the Court's determination that AAP's speech is likely protected, both factors support enjoining the state court lawsuit.

### Conclusion

For the reasons stated above, the Court denies Uthmeier's motion to dismiss [dkt. 21] and grants AAP's motion for a preliminary injunction [dkt. 4].  It appears that AAP previously submitted a draft temporary restraining order, but it has not yet (as far as the Court can tell) submitted a draft preliminary injunction.  AAP is directed to submit a draft preliminary injunction to the undersigned judge's proposed order email address, in Word format, by June 4, 2026.  The Court sets the case for a telephonic status hearing on June 8, 2026 at 8:40 a.m., using call-in number 650-479-3207, access code 2305-915-8729.

Date:  June 2, 2026

MATTHEW F. KENNELLY
United States District Judge

58